**IN THE UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

CORNELIUS BENNETT, ET AL.
                                        *
              Plaintiffs                *
VS.                                     *
                                        *        NO.  3:04CV00291 SWW
NUCOR CORPORATION, ET AL.               *
                                        *
              Defendants                *

## ORDER

Six plaintiffs bring this employment discrimination case, a putative class action, against

Nucor Corporation, Nucor-Yamato Steel Company, and Nucor Steel-Arkansas ("Nucor"),

pursuant to Title VII of the 1964 Civil Rights Act, as amended by the Civil Rights Act of 1991,

and 42 U.S.C. § 1981.  Plaintiffs are current and former employees of  Nucor's plant in

Blytheville, Arkansas.  They claim that Nucor discriminated against them because they are black

by way of discriminatory selection, training, and discipline practices and a racially hostile work

environment.   Before the Court is Plaintiffs' motion for class certification (docket entry #72),

Nucor's response (docket entry #78), and Plaintiffs' reply (docket entry #89).  Also before the

Court is Nucor's motion to exclude Plaintiffs' proposed expert testimony (docket entry #93),

Plaintiffs' response (docket entry #107), and Nucor's reply (docket entry #113).  After careful

consideration, and for the reasons that follow, Plaintiffs' motion for class certification will be

denied, and Nucor's motion to exclude expert testimony will be denied, without prejudice.

### I.  Background

#### A.  Nucor's Blytheville Plant

Nucor produces steel beams and other steel structures from scrap.  At Nucor's Blytheville

plant, production activities are divided among five departments: the melt shop, the roll mill department, quality assurance, maintenance, and shipping.  In the melt shop, scrap metal is melted and cast into semi-finished products, which proceed to the roll mill department.[1]  In the roll mill department, semi-finished products are heated and rolled into finished products.  The quality control department exists to ensure the integrity of Nucor's products by performing tests throughout the production process and resolving customer concerns; the maintenance department is charged with keeping the plant's mechanical and electrical equipment in working order, and employees in the shipping department maintain the finished steel product and load it for shipment by rail, truck, and barge.

Most job openings in the plant's production departments are posted plant-wide, and employees from all departments are eligible to bid on open jobs.  However, vacancies for supervisor positions are not posted but are announced during department meetings by department managers.

Nucor maintains the following written policies for hiring, promotions, and transfers:

• Nucor promotes from within when possible, rather than fill jobs from outside sources.

• Department managers making hiring, promotion, and transfer decisions give considerable weight to the opinions and recommendations of the supervisor to whom the successful applicant will report.

• Each employee has the opportunity to participate in a yearly performance evaluation with their supervisor.

• Management will select the most qualified applicant for the position based on, but not limited to:  skills possessed for the job, opening, education, experience, attitude, dependability, growth potential, judgment, relations with others, ability to direct others,

---

[1]A portion of semi-finished products are sold as is.  *See* docket entry #78, Ex. 3 (McQuillis Aff.).

stability, and length of service.

- Promotions must be approved in writing by the supervisor to whom the employee currently reports and the supervisor "at the next higher level."

- If two or more employees are equally qualified for a position, the applicant with the most seniority is preferred.

- If a position cannot be filled from within the organization for lack of qualified applicants, the company will search the labor market for suitable candidates.

- There is no waiting period to bid for a position from one department to another.

- Vacant supervisory positions will not be posted.

- Every vacancy will be posted a minimum of five days on plant bulletin boards, and interested individuals may apply by completing a bid sheet at the personnel office. After the posting period, the department manager and supervisors will select the most qualified individuals and interview them personally. Applicants who receive interviews but are not selected will be informed by the department manager of the reasons for the selection. Applicants who do not receive interviews "are encouraged to ask the department manager for his reasons for not doing so."

- Vacancies created by an individual's move will be posted and filled from within. Any outside hiring will be done at the lowest level position possible. The only exceptions will be special talents or crafts not readily available from within the Company.

*See* docket entry #71, Ex. 1.

Nucor's written policy for cross training states: "All on-the-job cross training must be approved in advance by all department managers [and] supervisors involved." Docket entry #71, Ex. 24. According to the written policy, employees must submit a cross training application to his or her department manager. The policy for cross training further states:

Consideration will be given to individuals who have a positive work record, including but not limited to the following items: current job performance, work experience, prior training, and attendance and safety record. Consideration will also be given to your potential to acquire this position.

*Id.* The cross training policy provides that an employee who receives approval for cross training

must schedule the training on his or her own time whenever possible, and all supervisors and managers involved must approve cross training schedules. *Id.* Nucor's policy for compensated training states that an employee's department manager must approve all compensated training in advance, and all compensated training should be scheduled during the employee's own time whenever possible. *Id.*

Each production department at the Blytheville plant has unique job categories that require various levels of skill and training. *See* docket entry #78, Exs. 1-3, 23-24. For example, the maintenance department employs 156 workers in 13 diverse job categories ranging from electricians, mechanics, lubricators, and engineers to custodial workers. *See* docket entry #78, Ex. #3, ¶9 (Ramsdell Aff.). Although some maintenance positions, such as custodial positions, require general training that can be obtained on the job; electricians, mechanics, and lubricators must pass special tests and have specialized training to ensure they meet required levels of technical knowledge and proficiency. *Id.*, ¶10. In contrast to the highly specialized division of labor in the maintenance department, the shipping department needs versatile workers that can perform multiple jobs. *See* docket entry #78, Ex. 1, ¶19.

Although Nucor maintains written policies governing hiring decisions, production department managers develop their own departmental hiring procedures. For example, the manager of the maintenance department has developed departmental procedures for applicant testing and interviews, *id.*, ¶¶ 12-15; the shipping department has a two-tiered interview structure between the department manager and supervisors; and the melt shop has several positions that require specific training and examinations. *See* docket entry #78, Ex. #1, ¶14; Ex. #25, at 185. Policies and practices regarding attendance, safety, and discipline also vary across

production departments.   *See* docket entry #78, Exs. 1-3, 23-24.

### B.  Plaintiffs' Individual Claims

Each Named Plaintiff has worked exclusively in the roll mill department and charges that

Nucor has discriminated against him in the areas of promotions, training, and discipline.  In

separate declarations, each Plaintiff claims that the roll mill department is segregated by race in

that almost all black employees work in the roll shop and finishing areas of the department; and

almost all white employees work in the rolling mill or mechanic crew areas.  *See* docket entry

#71, Exs. 2-7.  Plaintiffs claim that the roll shop and finishing jobs performed by black

employees are "dirtier" and require more physical labor than the rolling mill and mechanic crew

jobs performed by white employees.  A summary of Plaintiffs' allegations concerning

promotions, training, and discipline follows.

*Plaintiff Cornelius Bennett*

Plaintiff Bennett, a current Nucor employee, began working for Nucor in 1993 and has

never applied for a promotion.  *See* docket entry #71, Ex. 7(Bennett Aff.)   He claims that he

"could see that it was a waste of . . . time to try to bid on jobs that had always been passed down

from one white employee to another."  *Id*., ¶7.   Bennett states that his chances of promotion

were hurt by the "way the Company applies factors like work-area experience, informal training

on crews, time-in-job or length of service, formal training, and discipline."  *Id*., ¶10.

Bennett claims that race affects "how [employees] are treated and viewed for discipline,

promotions, and training" and that "[d]iscipline, attendance, and safety . . . are factors that are

not equally applied and that have been used as an excuse to deny promotions to [black] persons."

*Id*.  According to Bennett, black employees "are watched closer and disciplined quicker and

5

more often than white employees . . . in similar circumstances." *Id*. Bennett states that he has received harsher discipline that white employees on several occasions. For example, in 2003, he was disciplined for sleeping on the job, and he received harsher discipline than white employees guilty of the same conduct. *Id*.

*Plaintiff Rodney Washington*

Plaintiff Washington worked at the Blytheville plant from 1993 until his discharge in 2003. Washington testifies that he bid on several jobs during his employment at Nucor, but each time his bid was rejected in favor of a white applicant. Docket entry #71, Ex. 2, ¶¶ 5-6. He states that he was especially interested in being promoted to a supervisory position, but he had no means to learn about openings for supervisors. *Id*., ¶ 11. Washington states that "large areas" of the Blytheville plant are segregated by race and that "it is well known that there were certain areas . . . where a black person would not be allowed to work . . . referred to as the 'white house.'" *Id.*, ¶22.

Washington states that black employees at the Blytheville plant receive unfavorable treatment compared to similarly-situated white employees in the areas of discipline, training, and promotions. He states, "Discipline, attendance, and safety . . . are factors that are not equally applied and . . . have been used as an excuse to deny promotions to me and other persons of my race." *Id*., ¶ 10. Washington recounts the following instances where Nucor denied his bids for promotions to non-supervisory positions:

- In May 2001, Washington bid on an opening for a mill operator in the roll mill department. Washington states that before the job was posted, white supervisors and managers selected a white employee, Jeffrey Stobaugh, to fill the opening.

- In July 2002, Washington bid on an opening for a lubricator job in the maintenance department. Qualifications for this position include passing a written test. Washington

states that, out of all the bidders for the job, he earned the highest test score. Washington states that despite his score, a white employee received the job after Washington's supervisor placed false information about his attendance in his personnel file. Washington claims that he has received harsher discipline regarding his attendance and safety issues than white employees and that Nucor used his disciplinary record as an excuse to deny him promotions.

• In February 2003, Washington bid on an leadman position in the roll mill department. Washington claims he was qualified for the job, but Nucor selected Robert Despain, a white employee. Washington claims that Despain uttered racial epithets on a daily basis and used the company's computer system to send racially offensive email messages to other employees throughout the plant.

• In March 2003, Washington bid for a rotary straightener operator job in the finishing area of the roll mill department. A white supervisor, Glen Ellis, awarded the job to Jim Gilmer, a white employee. Washington claims that Ellis provided Gilmer on-the-job cross training that helped him qualify for the job. Washington claims that he was denied similar cross training because he is black.

*Plaintiff Larry McBride*

Plaintiff McBride has worked for Nucor since 1999, and he currently works in the finishing area of the roll mill department. McBride states that he has applied for several jobs at the Blytheville plant, including jobs in the shipping and melting department and other areas of the roll mill. Docket entry #71, Ex. 3, ¶ 5. McBride states that each time he has placed a job bid, the job was awarded to a white applicant. *Id*. McBride believes that his supervisors discipline him "every so often" to ensure that negative entries in his personnel file will provide an excuse to deny his bids for promotion. *Id*., ¶8(e). He claims that his chances of promotion were hurt because of the way Nucor "applies factors like work area experience, informal training on crew, time-in job or length of service, formal training and discipline." Docket entry #71, Ex. 3, at 5.

McBride describes the following instances in which he was denied promotions:

• In March 2000, McBride applied for a cold saw operator position. He alleges that he

7

met all the posted qualifications for the job, but a white employee was selected.  McBride states that the hiring supervisor told him that his bid was unsuccessful because his plant service was less than one year.  McBride states that Nucor promotes white employees regardless of their length of service.

- McBride submitted four bids for openings in the shipping department.  He states that in response to one of these bids, a white manager told him an interview would be a waste of time because he already knew who he would select for the job.  Each time McBride interviewed for a job in the shipping department, the interview was very short and the interviewer did not "really consider" his experience, background, training, or education.

- McBride submitted bids for two shipper/loader vacancies that Nucor filled with white applicants, who did not work for Nucor.

- McBride bid on two jobs in the roll shop work area of the roll mill department–a roll guide builder position and a roll mill mechanic position–which Nucor awarded to white applicants.  McBride states that he was never interviewed for the guide builder position.

- McBride states that he has submitted numerous bids for entry level jobs that he believed would provide him better working conditions and more opportunities than his current job.  He states that, contrary to Nucor's policy, he received no credit for his status as a current employee and white applicants who did not work at Nucor were selected for the jobs.

- From 2001 to 2002, McBride placed seven bids for open jobs in the shipping department.  Nucor rejected each bid in favor of a white bidder.

- After McBride determined that his race limited his opportunities to obtain jobs outside the finishing area of the roll mill department, he submitted five separate bids for jobs that became available in the finishing area.  McBride alleges that he met the posted job qualifications for each of these finishing area jobs, but Nucor awarded the jobs to white applicants.

McBride states that Nucor provides white employees informal training and formal cross training, and black employees cannot "fairly compete" for cross training.  *Id.*, ¶18.  He states that many of his requests for cross training have been denied.  McBride was granted training for an inspection bed operator position but received only one day of training and was told that further training would have to occur on his own time.  *Id.*  McBride states that he has observed white employees receive cross training during their regular shifts.  *Id.*

8

*Plaintiff Sylvester Rogers*

Rogers, a current Nucor employee, began working at the Blytheville plant in 1999 in the finishing area of the roll mill department, where he has remained throughout his employment with Nucor. Docket entry #71, Ex. 4. Rogers states that from 2000 to 2003, he applied for at least eighteen jobs in various departments, including the roll mill, shipping, and melt shop. *Id.*, ¶4. Rogers claims that each time he bid on a job, he was rejected in favor of a white applicant. Rogers claims that his bids for promotion have been rejected in favor of new hires, in contravention of Nucor's policy preferring current employees to fill vacancies. *Id.*, ¶6.

Rogers charges that his chances of promotion were hurt "by the way the Company applies factors like work area experience, informal training on crews, time-in-job or length of service, formal training, and discipline." *Id.*, ¶7. He states that "such factors are applied more harshly, and less leniently, to [black employees] . . . and were often used as excuses to bypass [him] in favor of a white employee." *Id.* For example, Rogers states that Nucor has denied his requests for cross training, but provides on-the-job cross training to white employees. *Id.* Further, he states that when he has received cross training, "it didn't matter." *Id.*

*Plaintiff Ozzie Green*

Green began working for Nucor in 1992 and states that he "was never able to work anywhere but the finishing area of the roll mill department." Docket entry #71, Ex. 5, ¶4. Green states that he applied, unsuccessfully, for several open positions. Green recounts two instances where his bids were rejected in favor of less qualified white applicants. *Id.*, ¶¶ 9, 10. Green states that his chances of promotion were hurt by the "way the company applies factors like work experience, informal training on crews, time-in-job or length of service, formal training, and

9

discipline." *Id.*, ¶9.  Green claims that he would have bid on leadman jobs in the roll mill

department but such jobs are awarded to "preselected white employees."  *Id*., ¶ 14.

### Plaintiff Clifton Lee

Lee, a current Nucor employee, began working in the roll mill department in 1991.

Docket entry #71, Ex. 6.  Lee states that he has applied for promotions, but each time Nucor

rejected him in favor of white applicants.  Lee states, "My chances of promotion were hurt by the

way the Company applies factors like work experience, informal  training on crews, time-in-job

or length of service, formal training and discipline."  *Id.*, ¶ 9.  For example, Lee states that in

2003, he bid on a rotary straightener operator job in the roll mill department, but Nucor awarded

the job to a white employee who had received cross training.  *Id*., ¶6.  Lee had requested cross

training, but his supervisors denied his requests.  *Id.*  Lee states that he has been disciplined

more harshly than similarly-situated white employees and that "discipline, attendance, and safety

allegations . . . are factors that are not equally applied and . . . used as an excuse to deny

promotions to [black] employees."  *Id*., ¶15.

### Plaintiffs' Hostile Environment Claims

Each Plaintiff claims that Nucor subjected him to a racially-hostile work environment.

Plaintiffs claim they have been subjected to racial slurs, degrading jokes and comments, and

racially offensive graffiti on bathroom walls.  Additionally, Plaintiffs state that white employees

have displayed the confederate flag in the work place, and, at one time, Nucor sold bandanas and

"do-rags" in the company store that featured the confederate flag along with Nucor's logo.

Clifton Lee states that white employees burned a cross in the roll mill department and covered

their heads with white hoods, *see* docket entry #71, Ex. 6, ¶¶ 13-14, and Ozzie Green states that

he once observed a chicken with a hangman's noose hanging in another black employee's

workstation.  *See* docket entry #71, Ex. 5, ¶15.

C.  Class Claims

In support of their request for class certification, Plaintiffs claim that Nucor engages in a

practices, which they refer to collectively as a selection process or selection criteria, that prevent

black employees throughout the Blytheville plant from advancing their careers and receiving

promotions.   According to Plaintiffs, the challenged selection process begins at the point-of-hire

when black employees are assigned to racially-segregated work crews and given "harder, dirtier,

and lower paying jobs requiring greater physical labor and less sophisticated equipment."

Docket entry #73, at 11.  Plaintiffs contend that black employees are "kept away from the

experience and informal training needed to break into the traditionally white jobs on the rolling

mill and mechanic crews."  *Id*. at 12.    Plaintiffs note that Nucor's expert, Dr. Finis Welch,

acknowledges that some Nucor employees receive informal training opportunities by virtue of

their "proximity" to other jobs.  In his expert report, Dr. Welch explains:

> The informal process follows from the fact that most positions involve working in
> small crews with other employees in different jobs.  In most of these situations the
> less experienced employees are routinely expected to perform the tasks associated
> with other jobs for short periods of time.  Through this process the less experienced
> employees build skills to handle more advanced positions.

Docket entry #93, Ex. 3, at 10.

Plaintiffs claim that Nucor's placement of black employees in areas that lack "proximity"

to work that would allow them to receive informal training, allows "white crews to groom new

crew members to inherit job openings through the informal experience/training challenged in this

case."  Docket entry #73, at 12.   In addition to the "proximity" factor, Plaintiffs claim that

11

Nucor prevents black employees from advancing their careers by way of intentionally

discriminatory practices in the areas of discipline and formal training, which ensure that black

employees will not qualify for promotions.

Plaintiffs assert that their hostile environment claims are suitable for class certification

because Nucor sold racially hostile merchandise for display in the work place and subjected

black employees to racial slurs and graffiti.  *See* docket entry #73, at 39.

*Statistical Evidence*

Plaintiffs present expert reports by Dr. Edwin L. Bradley, a professional statistician.[2]

Bradley compared the racial composition of the Blytheville plant's workforce with the racial

composition of  "employment selections" to determine whether Nucor's selection process had

an adverse impact on black applicants, or was otherwise related to race, during the period from

December 1, 1999 through the present.  *See* docket entry #71, Ex. 12A, at 2.

Bradley states that his analyses lead him to the following conclusions:

- During the period from December 1999 through September 2005, Nucor underutilized  black employees in supervisory positions, indicating the process for selecting supervisors was related to race and had an adverse impact against African-Americans.

- Nucor's  process for filling vacant [non-supervisory] positions in the production departments from December 1999 through October 2005 was related to race and has had an adverse impact against African-Americans applying for those positions.

---

[2]Plaintiffs also submit reports by Dr. John G. Veres, who has a Ph.D. in Industrial and Organizational Psychology.  Docket entry #71, Exs. 15, 16.  Dr. Veres reviewed materials documenting Nucor's hiring and promotion selection procedures, and he concluded that the procedures "do not meet applicable professional or regulatory standards for establishing the job-relatedness or validity of employee selection procedures."  Docket entry #71, Ex. 15, at 2.  The Court finds Dr. Veres' opinions unrelated to issues governing the question presently before the Court: whether the criteria for class certification are met in this case.

*Id*. at 3.

Promotions to Supervisory Positions.  With respect to Nucor's utilization of black employees in supervisory positions, Bradley determined that from December 1, 1999 though September 11, 2005, 66 employees worked as supervisors in the Blytheville plant.  *Id*. at 12. This number includes supervisors who were promoted to supervisor before December 1, 1999. Bradley conducted "a comparison of the utilization of supervisors to the applicable workforce" and concluded that 16.85% of supervisors "would have been expected to be African-American under a race neutral process."  *Id*.  Bradley found that only 3.03% of supervisors were black, resulting in a statistically significant adverse impact ratio of 15.4% at -3.12 standard deviations. *Id*.

In conducting his analysis, Bradley defined the "applicable workforce" as employees holding positions  categorized as craft workers or operatives.  *Id*.  These job categories were created by the Equal Employment Opportunity Commission ("EEOC") for use in employer information reports.  According to EEOC definitions, "craft workers" include manual workers with a relatively high skill level having a thorough and comprehensive knowledge of the processes involved in their work, who exercise considerable independent judgment and usually receive an extensive period of training.  *See* EEOC Job Classification Guide, available at http://www.eeoc.gov/eeo1survey/jobclassification.html. Operatives, in contrast, are workers who operate machine or processing equipment or perform other factory-type duties of intermediate skill level which can be mastered in a few weeks and require only limited training.  *Id*.

Nucor's expert, Dr. Welch, asserts that Bradley's supervisor utilization analysis is flawed for two reasons.  *See* docket entry #97, Ex. 3.  First, Welch notes that Bradley's supervisor

population included individuals hired as supervisors before the beginning of the class period,

December 1999; thus he failed to confine his inquiry to decisions made during the class period.

*Id*. at 12.

Second, Bradley failed to consider whether the population of craft workers and

operatives, which Bradley deemed the applicable workforce, includes employees qualified for

promotion to supervisor positions.[3]  Welch states that Bradley's "applicable workforce" includes

shipper loaders and grade 3 crane operators, positions from which promotion to supervisor is

extremely unlikely.  Welch states that Nucor promoted only 12 employees to supervisory

positions during the class period, and in each case, the employee was promoted from a grade 6

through 9 position. Welch conducted his own analysis and found no statistical evidence of

adverse impact.  *Id*. at 13.

In his rebuttal report, Bradley states that he conducted an second analysis focusing solely

on the 12 promotions that occurred during the class period, which revealed an adverse impact

ratio of 44.9%.  However, Bradley acknowledges that under the EEOC's Uniform Guidelines on

Employee Selection Procedures ("Uniform Guidelines") his revised analysis is based on a

sample size that is too small to be statistically significant.  Bradley states that under these

circumstances, his initial analysis, which considers supervisors promoted outside the class

period, is appropriate.  *See* docket entry #97, at 24.   Additionally, Bradley contends that it would

be inappropriate to confine the "applicable workforce" to employees holding grade 6 though 9

positions because "the practice of favoring higher pay grades is a racially tainted factor . . . . "

---

[3]*See Watson v. Fort Worth Bank & Trust*, 108 S. Ct. 2777, 2790 (1988)(stating that "statistics based on an applicant pool containing individuals lacking minimal qualifications for the job would be of little probative value").

*Id.* at 25.

Promotions to Non-Supervisory Craft and Operative Positions.  Bradley analyzed Nucor's selections for non-supervisory craft and operative positions made from December 3, 1999 to October 31, 2005.  Bradley conducted his analysis according to the following four-step process set forth in the Uniform Guidelines:  (1) calculate the rate of selection for each group (divide the number of persons selected from a group by the number of applicants from that group); (2) observe which group has the highest selection rate; (3) calculate the impact ratios by comparing the selection rate for each group with that of the highest group (divide the selection rate for a group by the selection rate for the highest group); and (4) observe whether the selection rate for any group is substantially less than the selection rate for the highest group.  Under the Uniform Guidelines, adverse impact is inferred if members of a protected group are selected at a rate less than 80% of the rate at which the group with the highest rate is selected. *See Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 995 n.3 (1988)(citing 29 C.F.R. § 1607.4(D)).[4]

Bradley conducted his analysis on a plant-wide basis, without taking into account hiring procedures or job qualifications that are unique to particular production departments.  Bradley's initial report, states: "Because Nucor-Yamato has determined that employees from every department may bid plant-wide without regard to the department or job held, it is appropriate to determine whether hiring and promotions are race neutral on a similar plant-wide basis after controlling for individual job postings and selections."  Docket entry #71, Ex 12, at 10.  Bradley states that "controlling for individual job postings and selections" means that "for each awarded

_____

[4]The Supreme Court has observed that this Guideline provides nothing more than a rule of thumb for the courts. *See Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 995 n.3 (1988).

posting, the racial distribution of selected candidates was compared to the racial distribution of the available bidding pool." *Id*.

Bradley states that after he computed results for each job posting, the "results were summed for all jobs filled . . . . That is, the results [were] aggregated to the 'bottom line' in order to evaluate the total statistical process . . . ." *Id.* at 12-13.

Bradley identified 343 craft and operative positions awarded to existing Nucor employees between December 3, 1999 and October 21, 2005, with 16.03% going to black employees. Bradley states that, based on the racial composition of the applicant pools, 21.09% of the awards would be expected to go to black employees. Bradley reports that the adverse impact ratio was 71.5%, less than 80%. Based on the foregoing analysis, Bradley concludes that "the promotion selection process used by [Nucor] to fill vacant craft and operative positions between December 3, 1999 and October 31, 2005 has been related to race and has had an adverse impact against African-Americans." Docket entry #71, Ex. 12, at 14.

Welch maintains that Bradley's analysis is flawed for many reasons, including Bradley's failure to perform a separate analysis for each department and account for explanatory factors such as applicants' training and disciplinary histories and the "proximity" factor–that is, whether the work area or department for the position sought is different from the applicant's current work area or department. Welch conducted analyses that took such factors into consideration, and his results showed no statistically significant differences in selection rates between black and white applicants.[5] *See* docket entry #78, Ex. 4, at 11-12.

_____

[5]In their brief in support of class certification, Plaintiffs claim that Dr. Welch found that Nucor's selection criteria disfavors black employees and has a racially disparate impact. *See* docket entry #71, at 3. Neither Dr. Welch's reports nor his deposition testimony support

In his rebuttal report, Dr. Bradley asserts that the factors considered by Welch are "significantly related to race and have had adverse impact against African-American applicants at Nucor." Docket entry #71, Ex. 13, at 3. Bradley contends that the factors considered by Dr. Welch are "themselves a source of disparity" and should not be considered in isolation. *Id.*

*Anecdotal Evidence*

Plaintiffs present the declaration of Danny Lee, who works as a maintenance lubricator in the Blytheville plant maintenance department. Docket entry #71, Ex. 8. Lee, who is black, states that he has observed that black employees at the plant have "a harder time than white employees when it comes to getting training." *Id.*, ¶2. Lee states that his department manager told him he would lose his production bonus for attending a training session during the work day, but his manager did not punish a white employee who also attended the same training session.

Lee states that the electronic shop of the maintenance department is "nearly" segregated, and to the best of his knowledge, there are only two black employees out of fifty in the electronic shop. Lee states that, based on his observations of Nucor's treatment of other black employees, he has been discouraged from seeking promotions. Lee states that he believes Nucor created artificial barriers to keep another black employee, Michael Hooks, out of the electric shop.

---

Plaintiffs' rendition of Dr. Welch's findings. Dr. Welch isolated variables that affect Nucor's hiring decisions such as applicants' training and discipline records, and he found that such facially-neutral selection criteria explain any bottom-line racial disparity in Nucor's overall selection process. Although Dr. Welch found that the variables he considered tend to favor white applicants, he did not conclude that the observed race differentials stem from race discrimination. *See* docket entry #71, Ex. 18, 260-278. In fact, during Dr. Welch's deposition, Plaintiffs' counsel inquired whether he found "any adverse impact" related to the selection procedures or hiring decisions at Nucor, and Dr. Welch answered, "No." Docket entry #71, Ex. 18, at 271.

Plaintiffs also present the declaration of Jesse Kimbrough, a former Nucor employee. Docket entry #71, Ex. 9.  Kimbrough, like Plaintiffs, worked in exclusively in the roll mill department.  Kimbrough states that in 2000, he bid on a mill operator job.  He states that he was qualified for the position, but Nucor awarded the job to a white employee.  Kimbrough states that he believes he was more qualified for the job than the successful applicant, and his race was a factor in the decision to deny his application.  Kimbrough states that he became discouraged and made no additional bids for promotions.

## II.  Discussion

### A.  Nucor's Motion to Exclude Expert Testimony

Nucor moves to strike Plaintiffs' expert testimony pursuant to *Daubert v. Merrill Dow Pharmaceuticals, Inc*, 509 U.S. 579 (1993).  At this stage of the case, Plaintiffs submit expert testimony in support of their motion for class certification, not for the purpose of proving the merits of their claims.  Accordingly, the Court finds that the testimony should be judged on the basis of whether it supports class certification–not whether it meets the standards for admission at trial.  *See Daubert*, 509 U.S. at 582 ("In this case we are called upon to determine the standard for admitting expert scientific evidence testimony in a federal trial.").   Whether Plaintiffs' expert testimony is admissible can be raised later in the proceedings.

### B.  Plaintiff's Motion for Class Certification

Plaintiffs seek to certify a class of  more than 100 black individuals "who were employed, or who applied or were discouraged from applying for employment at [Nucor's] manufacturing plant in Blytheville, Arkansas at any time since December 9, 1999, or, in the alternative, for such separate classes or subclasses of such persons as may be appropriate under

18

the Federal Rules of Civil Procedure."  Docket entry #72, at .  Although Plaintiffs' definition of the putative class does not make it clear, the Court understands that the class  includes individuals who claim that Nucor discriminated against them through selection, training, and discipline practices and subjection to a racially hostile working environment.[6]

Federal Rule of Civil Procedure 23(a) lists four criteria for the maintenance of a class: (1) that the class be so numerous that joinder of all members is impracticable; (2) that common questions of law and fact exist among potential class members; (3) that claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) that representative parties will fairly and adequately protect the interests of the class.

In addition to the numerosity, commonality, typicality, and adequacy of representation requirements, a proposed class must fall in to one of three categories provided in Rule 23(b).[7] Plaintiffs shoulder the burden to show that each of the foregoing requirements for class certification are met in this case.

**<u>Hiring Subclass</u>**

---

[6]In their motion for class certification, Plaintiffs state: "The Third Amended Complaint pleads individual and class claims of disparate impact and disparate treatment in defendants' selection, training and discipline procedures, as well as a racially hostile work environment." Docket entry #72, ¶ 3(a).

[7]Plaintiffs seek class certification under Rule 23(b)(2), which provides that a class action is maintainable if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Because Plaintiffs seek compensatory and punitive damages in addition to injunctive and declaratory relief, in the alternative, Plaintiffs seek "hybrid certification of the equitable claims and relief under Rule 23(b)(2) and certification of the claim and remedies at law under [Rule 23(b)(3)]." Docket entry #72, ¶ 1.

Plaintiffs' proposed class includes individuals who applied for jobs at the Blytheville plant but were rejected and individuals who were discouraged from applying for employment. Docket entry #72, at 1. The Court finds that Plaintiffs have failed to show that essential Rule 23(a) requirements are met with respect to this group, hereinafter referred to as the "hiring subclass."

In *General Telephone Co. v. Falcon*, 102 S. Ct. 2364 (1982), a Mexican-American employee, who claimed his employer denied him a promotion based on his national origin, sought to represent a class of current, former, and future Mexican-American employees and "all those Mexican-Americans who have applied or would have applied for employment had the defendant not practiced racial discrimination in its employment practices." *Falcon*, 102 S. Ct. at 2367. The district court certified the proposed class in accordance with Fifth Circuit precedent that permitted an employee complaining of one employment practice to represent another complaining of a different practice, so long as the named plaintiff and class members alleged unlawful discrimination. *See Falcon,* 102 S. Ct. at 2368 (citation omitted). But the Supreme Court held that it was error to presume that the named plaintiff's claim was typical of the claims of other employees and applicants "without any specific presentation identifying the questions of law or fact that were common to the claims of respondent and of the members of the class he sought to represent. " *Falcon,* 102 S. Ct. at 2370-71.

In *Falcon's* footnote 15, the Court provided examples of conditions that might satisfy the typicality and commonality requirements and form the basis of a class action. First, the Court stated that the if an employer used "biased testing procedures to evaluate both applicants for employment and incumbent employees a class action on behalf of every applicant or employee

20

who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a)." *Falcon*, 102 S. Ct. at 2371 n.15.   Second, the Court stated that "significant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees **if** the discrimination manifested itself in the same general fashion, such as through entirely subjective decision making processes." *Id.* (emphasis added).

Plaintiffs assert that Nucor makes hiring and promotion decisions according to a single, written policy and that hiring and promotion candidates are subject to the same basic selection process and selection criteria. *See* docket entry #73, at 36.  However, unlike a biased testing procedure or a manifestation of a general policy of discrimination mentioned in footnote 15, Nucor's written policy for hiring, promotions, and transfers sets forth race-neutral policies and procedures such as hiring from within when possible, considering the opinions of supervisors, making selections on the basis of seniority when two or more candidates are equally qualified, and selecting the most qualified candidates based on criteria that includes skills, education, and experience. *See* docket entry #73, Ex. 1.

That Nucor uses similar procedures and considers some of the same general factors in making hiring and promotion decisions provides no basis for concluding that Plaintiffs' claims and the claims of rejected and discouraged applicants turn on the same substantive questions of law and fact.  Plaintiffs claim that Nucor denied them promotions by segregating them from white employees, denying them training opportunities provided to white employees, and disciplining them more harshly than white employees.  They also allege that Nucor subjected them to a hostile working environment.  These discriminatory employment practices harm

21

individuals who have actually worked at Nucor, not rejected or discouraged applicants for hire.

Plaintiffs contend that their claims and hiring class claims must be tried together because "absent hiring relief, the racially patterned crews will be difficult, if not impossible, to dismantle or prevent in the future." *See* docket entry #73, at 36; docket entry #89, at 39. The Court disagrees. Title VII grants a trial court broad discretion to order equitable relief as required under the circumstances of a particular case, including relief from deprivations caused by a segregated work force. *See Franks v. Bowman Transp. Co., Inc*., 96 S. Ct. 1251, 1256 (1976)(noting that federal courts have broad discretion to fashion the most complete relief possible and order any equitable relief as the court deems appropriate because Title VII is intended to make the victims of discrimination whole).

The Court concludes that Plaintiffs have failed to demonstrate that their claims and the claims of the putative hiring class share common questions of law and fact such that trying the claims together would be economical and efficient and the interests of the hiring class would be fairly and adequately protected. *See Falcon*, 102 S. Ct. at 2370 n.13(explaining that the commonality and typicality requirements merge with the adequacy-of-representation requirement).

## Current and Former Employees-Selection, Training, and Discipline Procedures

The Court will now consider whether the requirements for class certification are met with respect to the proposed class of current and former employees claiming that Nucor has discriminated against them through selection, training, and discipline procedures.

*Numerosity*

Under Rule 23, a class action is warranted only if the class is "so numerous that joinder

22

of all members is impracticable." Fed. R. Civ. P. 23(a)(1).   Although the party moving for

certification need not show the exact number of potential class members, "the party does bear the

burden of showing impracticability [of joinder], and mere speculation as to the number of parties

involved is not sufficient to satisfy Rule 23(a)(1)."   Charles Alan Wright, Arthur Miller & Mary

Kay Kane, Federal Practice and Procedure § 1762 (3d. ed. 2005).

Plaintiffs assert Dr. Bradley has shown that the proposed class includes more than 100

current and former black employees.[8]   In his expert report, Bradley states  that he has identified

156 black employees who worked at Nucor between December 1, 1999 and September 11, 2005

who were "potentially affected" by Nucor's selection process.  *See* docket entry #72, Ex. 12A, at

18.   However, Bradley fails to explain his criteria, other than race, for categorizing an employee

as "potentially affected" by Nucor's selection process.  Bradley provides no information as to

how many black employees applied for and were denied promotions to jobs for which they were

qualified.   Accordingly, the Court is unable to determine the size of the putative class, and

Plaintiffs have failed to meet their burden to establish numerosity.

*Commonality and Typicality*

The commonality and typicality requirements for class certification tend to merge and

serve as "guideposts for determining whether under the particular circumstances maintenance of

a class is economical and whether the named plaintiff's claims and the claims of the class are so

interrelated that the interests of the class members will be fairly and adequately protected in their

absence." *Falcon*, 102 S. Ct. at 2371 n.13.  Although the commonality and typicality

---

[8]Plaintiffs identify no evidence, other than Dr. Bradley's report, in support of their claim
that the numerosity requirement is satisfied.

23

requirements work together to assure judicial economy and adequate representation, they remain separate inquiries because commonality focuses on class claims, while typicality examines the relationship between the representative parties' claims and the class claims.

The commonality requirement does not require that every question of law or fact be common to every member of the class and may be satisfied, for example, "'where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated.'" *Paxton v. Union Nat. Bank,* 688 F.2d 552, 561 (8th Cir. 1982)(quoting *American Finance Sys., Inc. v. Harlow*, 65 F.R.D. 94, 107 (D. Md. 1974)). And the typicality requirement is satisfied with "a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." *Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269, 1275 (8th Cir. 1990)(citations omitted).

Disparate Impact. Plaintiffs plan to prosecute class claims regarding selection, discipline, and training under theories of disparate impact and disparate treatment. They assert that the "type of subjective combinations of selection criteria" challenged in this case present common questions of fact and law concerning disparate impact. *See* docket entry #73, at 30.

Plaintiffs' ground their individual claims on allegations that Nucor denied them promotions or opportunities for career advancement by segregating them from white employees, thus denying them informal training opportunities, and subjecting them to disparate treatment in the areas of training and discipline. The charge that Nucor denied Plaintiffs opportunities for career advancement though conspicuous, intentionally discriminatory means is incompatible with the disparate impact model of discrimination, which investigates evenly-applied "employment practices that are facially neutral in their treatment of different groups but that in

24

fact fall more harshly on one group than another and cannot be justified by business necessity." *Hazen Paper Co. v. Biggins,* 113 S. Ct. 1701, 1705 (1993)(citing *Teamsters v. United States,* 97 S. Ct. 1843, 1855, n. 15 (1977)).

Although Plaintiffs' grievances boil down to claims of intentional discrimination, they attempt to show the existence of class claims with statistical evidence which they maintain demonstrates disparate impact. Even if Plaintiffs could somehow bridge the gap between their individual claims and class claims with evidence of disparate impact, for the reasons that follow, Plaintiffs' statistical evidence fails to establish a common question of law or fact, under either a disparate impact or disparate treatment theory.

Congress has expressly mandated that Title VII shall not be interpreted to require any employer  to grant preferential treatment or numerical quotas.  *See* 42 U.S.C. § 2000e-2(j).  For this reason, a plaintiff's burden to establish a prima facie case of disparate impact goes beyond showing a bottom-line statistical disparity or racial imbalance in the employer's workforce. *Watson v. Fort Worth Bank and Trust,* 108 S. Ct. 2777, 2788 n.2 (1998)("This congressional mandate requires in our view that a decision to extend the reach of disparate impact theory be accompanied by safeguards against the result that Congress clearly said it did not intend.").

First, a plaintiff must identify the specific employment practice that is challenged.[9] "Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is . . . responsible for isolating and identifying the

---

[9]A plaintiff must show that "each particular challenged employment practice" causes a disparate impact, "except that if the complaining party can demonstrate to the court that the elements of [the employer's] decision making process are not capable of separation for analysis, the decision making process may be analyzed as one employment practice."  42 U.S.C. § 2000e-2(k)(1)(B)(I).

specific employment practices that are allegedly responsible for any observed statistical disparities." *Watson v. Fort Worth Bank and Trust,* 108 S. Ct. 2777, 2788-89(1998)(citation omitted). Second, causation must be proved–"that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Id.* at 2789.

Rather than identify a specific employment practice for disparate impact analysis, Plaintiffs attribute the bottom-line racial imbalances documented by Dr. Bradley to unidentified "subjective combinations of selection criteria." Additionally, Plaintiffs maintain that the factors considered by Dr. Welch, such discipline and training, which indisputably affect hiring decisions at Nucor, do not qualify as legitimate causal factors because they are "racially tainted" and have a disparate impact on black applicants. In an attempt to substantiate this argument, Dr. Bradley examined Dr. Welch's data regarding discipline and training and concluded that black applicants were disciplined more than white applicants and received less training than white applicants. *See* docket entry #97, at 11-12. However, Dr. Bradley failed to eliminate common non-discriminatory reasons for the disparity in rates of disciplinary action and training between white and black applicants, thus his analysis fails to show that discipline and training factors are racially tainted based on disparate impact.

Disparate Treatment. Classwide disparate treatment is shown with evidence that the defendant engaged in a pattern or practice of unlawful discrimination in various company policies, such that "'discrimination was the company's standard operating procedure–the regular rather then the unusual practice.'" *Hervey v. City of Little Rock*, 787 F.2d 1223, 1228 (8th Cir.

1986)(quoting *Craik v. Minnesota State University Board,* 731 F.2d 465, 470 (8th Cir.1984)).

"Classwide disparate treatment is usually proved by using statistics, but '[t]o be legally sufficient

these statistics must show a disparity of treatment, eliminate the most common

nondiscriminatory explanations of the disparity, and thus permit the inference that, absent other

explanation, the disparity more likely than not resulted from illegal discrimination.'" *Hervey*,

787 F.2d at 1228 -1229(quoting *Segar v. Smith,* 738 F.2d 1249, 1274 (D.C. Cir.1984)(citing

*International Brotherhood of Teamsters v. United States,* 97 S. Ct. 1843, 1866(1977)).

　　　　Plaintiffs contend that they have shown a pattern or practice of discrimination and

common questions of law and fact through anecdotal and statistical evidence of racially

correlated work crews and a subjective selection process. *See* docket entry #73, at 32.  The

Court disagrees.  Plaintiffs allege that work crews are segregated in the roll mill department in a

manner that prevents black employees from receiving informal training and that relegates black

employees to the least desirable jobs.  But they present no evidence, statistical or otherwise,

showing that the same circumstances exist in other production departments.  Furthermore, the

record contains no statistical or anecdotal evidence comparing Nucor's selection, discipline, and

training decisions among similarly-situated, protected and unprotected employees in the various

production departments.

　　　　Finally, although Plaintiffs characterize the Blytheville plant as a single assembly line,

with homogenous production departments managed in lock step with a uniform selection

process,  Defendants have presented overwhelming evidence showing otherwise.  Decentralized

decision making and the diversity of employment practices, job classifications, and functions

among the production departments,  standing alone, precludes a finding that the commonality

27

and typicality requirements are met in this case.

*Adequacy of Representation*

Given the Court's findings regarding numerosity, commonality, and typicality, Plaintiffs cannot possibly qualify as adequate representatives of a plant-wide class of current and former employees who claim that Nucor has discriminated against then through selection, training, and discipline procedures.  *See Yapp v. Union Pacific Railroad Co.,* 229 F.R.D. 608, 623 (E.D. Mo. 2005)("[W]hether the named plaintiffs would adequately protect the nonexistent other putative plaintiffs is a *non sequitur*.  Furthermore, without commonality or typicality, these plaintiffs cannot adequately represent others with different issues of law and fact among them.").

## Current and Former Employees-Hostile Environment

An employer creates an actionable hostile work environment if "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21 (1993).  To be actionable, an allegedly hostile work environment must be both objectively and subjectively offensive--one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283 (1998).

In support of their motion for class certification with respect to hostile environment claims, Plaintiffs have presented evidence that Nucor sold caps or "do-rags" in the company store that featured the confederate flag and Nucor's logo.   They also allege that they have been subject to repeated racial slurs, nooses and similar items hung in the roll mill department, and

28

racially offensive graffiti on bathroom walls.   Based on this evidence, Plaintiffs seek

certification of a class consisting of all black, current and former employees, plant-wide.  The

Court cannot assume that black employees, throughout the Blytheville plant, were subject to the

same offenses as Plaintiff and, like Plaintiffs, found them personally offensive.   Accordingly,

the Court finds that Plaintiffs have failed to show that the numerosity, commonality, and

typicality requirements are met with respect to their hostile environment claims.

### III.  Conclusion

For the reasons stated, Plaintiffs' motion for class certification (docket entry #72) is

DENIED, and Defendants' motion to exclude Plaintiffs' proposed expert testimony (docket entry

#93) is DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED THIS 25TH DAY OF AUGUST, 2006.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE