IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

CORNELIUS BENNETT, et al.,          )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )          CIVIL ACTION NO:
                                    )          3:04 CV 00291 SWW
                                    )          JURY DEMAND
                                    )
NUCOR CORPORATION, et al.,          )
                                    )
        Defendant.                  )

**PLAINTIFFS' BRIEF IN OPPOSITION TO SUMMARY JUDGMENT**

**VOLUME ONE OF TWO**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

CORNELIUS BENNETT, et al.,                    )
                                              )
          Plaintiff,                          )
                                              )
v.                                            )          CIVIL ACTION NO:
                                              )          3:04 CV 00291 SWW
                                              )          JURY DEMAND
                                              )
NUCOR CORPORATION, et al.,                    )
                                              )
          Defendant.                          )

## PLAINTIFFS' BRIEF IN OPPOSITION TO SUMMARY JUDGMENT

Robert L. Wiggins, Jr., ABS-1754-G-63R
Ann K. Wiggins, ABS-7006-I-61A
Benjamin J. De Gweck, ABS-8943-B-46-D
Susan Donahue ASB-4525-A-48-D
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building, 301 19th Street North
Birmingham, Alabama 35203
205/314-0500
205-254-1500 (Facsimile)

Philip E. Kaplan, AR Bar No. 68026
Kaplan, Brewer, Maxey & Haralson, P.A.
415 Main Street
Little Rock, Arkansas 72201
(501) 372-0400
(501) 376-3612 (facsimile)

## TABLE OF CONTENTS

**Page No.**

I.    PLAINTIFFS HAVE ESTABLISHED A *PRIMA FACIE* PRESUMPTION
      OF RACIAL DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   DEFENDANTS FAILED TO CARRY THEIR BURDEN OF ARTICULATION . . . . . . 5

III.  THE NAMED PLAINTIFFS HAVE ESTABLISHED INDIVIDUAL CLAIMS ON
      A SPECIFIC JOB-BY-JOB BASIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.    Larry McBride . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            1.    Reheat Furnace Stocker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            2.    Roll Mill Guide Builder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            3.    Shipper/Loader . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            4.    McBride's Other Six Pre-2003 Job Bids . . . . . . . . . . . . . . . . . . . . . 19

            5.    Cold Saw Operator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

            6.    Supervisory Jobs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

            7.    Roll Mill Mechanic And Piler Operator Bids In 2003-2005 . . . . . . . . . 26

      B.    Rodney Washington . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      C.    Clifton Lee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

      D.    Clifton Lee's And Cornelius Bennett's Demotion From NYSII To
            NYSI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

      E.    Ozzie Green . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

## TABLE OF CONTENTS

**Page No.**

F.  Sylvester Rogers .................................................. 59

    1.  Shipper/Loader And Strandtender In February 2000 ................ 59

    2.  Roll Guide Builder And Inspection Bed Tagger Job Postings
        September 6, 2000 ........................................... 63

    3.  Mill Area Jobs In 2001 ...................................... 66

    4.  Rogers' Seven Job Bids In 2002-2003 .......................... 69

    5.  Rogers Does Not Challenge Two Additional Inspector Jobs Given To
        Two Black Employees ......................................... 70

G.  Cornelius Bennett ................................................ 70

H.  Claims Based on Futility of Bidding .............................. 77

IV.  RODNEY WASHINGTON'S DISCHARGE CLAIM ......................... 80

V.  THE QUESTION OF PRETEXT INVOLVES GENUINE ISSUES OF MATERIAL
    FACT ............................................................ 88

VI.  RACIALLY HOSTILE WORK ENVIRONMENT ........................... 91

A.  Evidence Of A Racially Hostile Work Environment ................. 91

B.  Nucor Knew Or Should Have Known Of The Racially Hostile Environment
    Because It Was Conspicuous And Was Reported To Management Many
    Times ........................................................... 106

C.  Nucor Has Not Taken Prompt Remedial Action Or Established A Written
    Policy Or Training Against Racial Harassment .................... 118

VII..  PATTERN-OR-PRACTICE EVIDENCE OF PRETEXT ..................... 123

VIII.  DISPARATE IMPACT ............................................. 132

## TABLE OF CONTENTS

**Page No.**

IX.    PLAINTIFFS MAY RELY ON THE EARLIEST EEOC CHARGE FILED
      AND NEED NOT FILE REPETITIVE CHARGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

X.     NUCOR HAS FAILED TO SATISFY ITS INITIAL PROCEDURAL BURDEN
      REGARDING PLAINTIFFS' RETALIATION CLAIMS . . . . . . . . . . . . . . . . . . . . . . 141

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

CORNELIUS BENNETT, et al.,           )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )          CIVIL ACTION NO:
                                      )          3:04 CV 00291 SWW
                                      )          JURY DEMAND
                                      )
NUCOR CORPORATION, et al.,            )
                                      )
          Defendant.                  )

**PLAINTIFFS' BRIEF IN OPPOSITION TO SUMMARY JUDGMENT**

I.   **PLAINTIFFS HAVE ESTABLISHED A *PRIMA FACIE* PRESUMPTION OF RACIAL DISCRIMINATION**

Plaintiffs have established a *prima facie* case under *McDonnell Douglas v. Green*, 411 U.S. 792

(1973) by showing in their Declarations that: (1) they are African-Americans; (2) they applied in writing

for posted job opportunities; (3) they were qualified based on Nucor's posted qualifications; and (4)

someone else was selected. *See* Pl. Exhs. 2-7, 40-46; *see Texas Dept. of Community Affairs v.*

*Burdine*, 450 U.S. 248, 252 (1981). Nucor argues that plaintiffs' proof of their qualifications is

"conclusory", but each plaintiff has submitted very detailed Declarations stating exactly how they satisfied

each knowledge, skill and ability that Nucor listed on the Job Posting of the jobs they sought. *See* Pl.

Exhs. 2-7, 40-46. Nucor's argument about "conclusory" qualifications is inconsistent with *Legrand v.*

*Trustees of Univ. Of Arkansas at Pine Bluff*, 821 F.2d 478 481 & n. 4 (8th Cir. 1987), and similar

cases which have held that plaintiffs are only required to show their objective qualifications for the jobs at

issue, leaving it to the defendants' phase of the case to articulate any subjective qualifications they did not

satisfy:

> The district court also found that the plaintiffs were not qualified for the job because they were "unreliable", an assessment that turned largely on subjective evidence produced by the defendant. Even if we assume that this finding is valid, it should not affect the district court's evaluation at the prima facie stage of whether the plaintiffs have established that they are qualified for the job. For purposes of establishing a prima facie case, the plaintiffs need only show their objective qualifications for the job.
>
> * * *
>
> A determination of an employee's reliability necessarily involves subjectivity. One UAPB employee evaluation form lists traits such as "dependability", "cooperation", and "responsibility." A supervisor fills in the appropriate level of performance, from zero (lowest) to four (highest). Another UAPB form includes as performance criteria "integrity," "dependability," and "attitude." In the aggregate, these traits may help to measure one's reliability, but the subjective judgments that come into play are undeniable. Evidence of an employer's subjective intent and pretext, if any, is raised at the second and third stages of proof in a Title VII case; evidence of one's objective qualifications is all that is required at the prima facie stage.

*Id.* at 481 & n.4; *accord, Kobrin v. Univ. of Minnesota*, 34 F.3d 698 (8th Cir. 1994); *Walker v. Mortham*, 158 F.3d 1177, 1183-1184 (11th Cir. 1998); *Lynn v. Regents of the Univ. of Cal.*, 656 F.2d 1337, 1344-45 (9th Cir.1981), *cert. denied*, 459 U.S. 823 (1982); *Schmittou v. Wal-Mart Stores, Inc.*, 2003 WL 22075763 (D. Minn. 2003); *Axtell v. Northwest Airlines, Inc.*, 1999 WL 33912056 (D. Minn. 1999).

Plaintiffs' Declarations obviously satisfy this standard. Nucor has not identified any knowledge, skill or ability that the plaintiffs lacked for the jobs they sought. Nor has it submitted any evidence from a decisionmaker who gives an opinion that the plaintiffs were unqualified for the jobs they sought. Even if such evidence had been submitted, however, the plaintiffs' detailed description of their qualifications on a job-by-job basis creates a genuine issue of material fact that precludes summary judgment regarding their *prima facie* case.

Nucor's argument that three of the plaintiffs — Washington, Green and Rogers — had too much discipline to be considered qualified is the type of subjective determination which the Eighth Circuit has held irrelevant at the *prima facie* stage of the case in *Legrand* and *Kobrin, supra*.[1]

That contention is disputed because: (1) no decisionmaker has testified that their discipline was considered or was any worse than the Caucasian applicants selected; (2) plaintiffs had no discipline in the relevant twelve months before many of their bids and so disciplines could not have possibly been relevant or credible as a reason for not promoting them[2], and (3) the evidence also shows that many white employees were promoted to the same or similar positions despite substantial disciplinary and counseling records, including discipline and counseling in the one year prior to their promotion. Given such evidence, the type and degree of discipline that might cause an employee not to be considered "qualified" is obviously highly subjective and too much disputed to be considered for purposes of summary judgment or at the

---

[1] Nucor's summary judgment brief does not mention discipline as a possible reason for not promoting the other three plaintiffs — Lee, McBride and Bennett — in the sections discussing their claims. It argues instead that Bennett never applied, Lee withdrew his bids, and McBride was less qualified that Mark Warren for one of the jobs he bid on, the Cold Saw Operator Job Posting of February 28, 2000. *See Def. Br.* at 32-38, 42-46.

[2] Larry McBride was denied ten promotion bids in the 1999-2003 time period when his disciplinary record was spotless. *See* Pl. Exh.3 & 41. The other five plaintiffs also have claims that arose before any relevant discipline occurred. *Bradley Sup. Report* at App. A (Dkt. #88). Rodney Washington was not disciplined in the three years prior to 6 of the 7 promotions he was denied (Pl. Exh. 40); Ozzie Green was not disciplined in the three years preceding 3 of the 4 promotions that he challenges in this case (Pl. Exh. 43); Clifton Lee and Cornelius Bennett were not disciplined in the two years before their first discipline during the liability period (Pl. Exh. 44); and Sylvester Rogers was not disciplined in the year preceding three of his promotion bids in 2003 (Pl. Exh. 42). Thus, each of the named plaintiffs have significant claims that occurred before any discipline could possibly be relevant, or credible as the reason for not being promoted. The evidence shows that many white employees were promoted to the same or similar positions despite substantial disciplinary and counseling records, including discipline and counseling in the one year prior to their promotion. Pl. Exhs. 2-7, 40-46.

*prima facie* stage of the case. *Legrand,*821 F.2d at 481 & n.4.[3]

Plaintiffs are not required to show they were better qualified in order to establish a *prima facie* presumption of discrimination. The Eighth Circuit has held that "whether [plaintiff] was more qualified . . . is not relevant to her *prima facie* case." *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 702 (8th Cir. 1994). The Supreme Court has held in a similar vein that it was "error for the District Court to instruct the jury that petitioner could carry her burden of persuasion only by showing that she was in fact better qualified than the white applicant who got the job." *Patterson v. McLean Credit Union*, 491 U.S. 164, 188 (1989); *Walker v. Mortham*, 158 F.3d 1177, 1192 (11th Cir. 1998) ("Thus, under *Patterson*, we may *never* require a plaintiff to establish that she is more qualified than the successful promotee, let alone impose that requirement at the prima facie stage. We believe that *Patterson* also prohibits us from requiring a plaintiff to prove equal qualifications at the prima facie stage."). Plaintiffs are usually unable to prove they are better qualified until after the decisionmaker has articulated which qualifications were considered. *Walker v. Mortham* at 158 F.3d at 1193:

> Only the employer knows whether it truly considered relative qualifications when determining whether to promote the plaintiff, and only the employer can establish what qualifications it actually used to make its promotion decisions. Further, if the employer utilized subjective qualifications in making the challenged decision, there is no way for the plaintiff employee to determine how he "ranked" according to those subjective qualifications in the decisionmaker's mind. It is therefore appropriate to place the burden of articulating those qualifications--if relevant--on the employer, not the employee.

---

[3] As shown in the remainder of this brief, the plaintiffs have directly challenged their discipline, and its subsequent use as a pretext for denying promotions, as racially discriminatory, and in many cases retaliatory for opposing such racial discrimination. Black employees have been disciplined at rates significantly greater than would be expected in the absence of racial discrimination and that disparity has been shown to be statistically significant. There is also substantial comparative and other evidence of disparate treatment in discipline and counseling African-Americans.

In light of our own precedent and the decisions by the Supreme Court in *Burdine* and *Patterson*, we hold that district court in this case erred in imposing as part of the prima facie case a requirement that each plaintiff establish that the successful applicant for his or her coveted position was less than or equally qualified to hold the position. Although a plaintiff may be forced to address relative qualifications if the defendant presents them to rebut the plaintiff's presumption of discrimination, the plaintiff need not introduce evidence regarding relative qualifications before then; she need only prove that she herself was qualified to perform the coveted job.

*Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998).

## II.   DEFENDANTS FAILED TO CARRY THEIR BURDEN OF ARTICULATION

"Establishing a prima facie case creates a presumption that the employer unlawfully discriminated against the plaintiff." *Kobrin v. Univ. of Minnesota*, 34 F.3d 698, 702 (8th Cir. 1994); *Patterson v. McLean Credit Union*, 491 U.S. 164, 187 (1989) ("Once the plaintiff establishes a prima facie case, an inference of discrimination arises."); *Burdine,* 450 U.S. at 253-254 ("The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection. [T]he prima facie case 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'").[4]

The Eighth Circuit describes the defendants' burden to dispel such *prima facie* presumption or

---

[4] *Kennedy v. Swift Transp., Inc.*, 347 F.3d 1041, 1045 (8th Cir. 2003) ("Establishing a prima facie case creates a presumption the employer has discriminated unlawfully against the plaintiff."); *Winbush v. State of Iowa, by Glenwood State Hospital*, 66 F.3d 1471, 1482 n.18 (8th Cir. 1995) ("The fact that the plaintiffs fulfilled a prima facie case of racial discrimination means that the district court *could* find intentional discrimination in violation of Title VII.") [citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, ----, (1993)]; *Bogren v. State of Minnesota*, 236 F.3d 399, 404 (8th Cir. 2001) ("A prima facie showing creates a legal presumption of unlawful discrimination and shifts the burden to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination.") [citing *O'Sullivan v. Minnesota*, 191 F.3d 965, 969 (8th Cir.1999)].

inference as follows:

> Establishment of a prima facie case creates a "legally mandatory, rebuttable presumption" of discrimination. *Burdine, supra* 450 U.S. at 254 n. 7. The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employees' rejection. "[I]f the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case."

*Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251, 257 n.10 (8th Cir.1985) (quoting *Burdine,* 450 U.S. at 254); *see also Kobrin*, 34 F.3d at 702 ("Once the plaintiff establishes a prima facie case, the defendant then has the burden of production to articulate a legitimate, nondiscriminatory reason for its employment decision.").

Nucor can carry such burden of articulation only through admissible evidence from the decisionmaker, not mere argument of counsel. "An articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248. 255, n.9 (1981) (". . . defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection."); *Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000) ("the employer is in the best position to put forth the actual reason for its decision."); *Stegar v. General Elec. Co.*, 318 F.3d 1066 (11th Cir. 2003); *Walker v. Mortham*, 158 F.3d 1177, 1182 n. 8 (11th Cir. 1998) ("The defendant cannot testify in abstract terms as to what might have motivated the decision-maker; it must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision. Likewise, a court may not assume, based on its own perusal of the record, that the decision-maker in a particular case was motivated by a legitimate reason when the defendant has offered none."); *Conley v. Pitney Bowes*, 176 F.3d 1044, 1049 (8th Cir. 1999) (In similar ERISA context, "a court must focus on

the evidence available to the plan administrators at the time of their decision and may not admit new evidence or consider *post hoc* rationales." ).[5]

Nucor has failed to come forward with decisionmakers who articulate a reason for selecting the white applicants over the plaintiffs for any of the jobs they sought except for three of the job bids by two plaintiffs— Rodney Washington's bid for Lubricator given to Mike Smith and Clifton Lee's bids for Rotary Straightener Operator and Cold Saw Operator. For the latter two job bids, Nucor has submitted affidavits from Keith Shelton and Glen Ellis articulating one reason— that Clifton Lee voluntarily withdrew his bid. Def. Exhs. 83 & 84. Lee denies that, however. Pl. Exh. 44 at ¶¶ 7 & 10. The resulting credibility choice

---

[5] *See also Price Waterhouse v. Hopkins,* 490 U.S. 228, 252 (1989) ("An employer may not ... prevail by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision"); *McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, ----, (1995) (explaining that because an employee's misconduct was not discovered until after her discharge, the "employer could not have been motivated by knowledge it did not have and it [could not] claim that the employee was fired for the nondiscriminatory reason"); *Wixted v. DHL Airways, Inc.,* 1998 WL 164922 (N.D. Ill. 1998) ("This explanation is insufficient since it is proffered after the fact. To prevail as a matter of law, DHL must articulate a non-discriminatory reason that *actually* motivated its rejection of plaintiff; it cannot bring an alternative explanation." *See Hill v. Seaborad Coast Line R.R.,* 767 F.2d 771, 774 (11th Cir. 1985) ("[F]ailure to promote a plaintiff because the person actually promoted was more qualified is a nondiscriminatory reason, but the articulation of that reason must include the fact that the decision-maker knew that the promoted individual's qualifications were superior at the time the decision was made."). The Supreme Court explained in *Price Waterhouse* that "proving 'that the same decision would have been justified ... is not the same as proving that the same decision would have been made.'" *Price Waterhouse,* 109 S.Ct. at 1791 (quoting *Givhan v. Western Line Consolidated School Dist.,* 439 U.S. 410, 416 (1979)). *See also Perkins v. Brigham & Women's Hosp.,* 78 F.3d 747, 751 (1st Cir. 1996) ("It is true that an employer's proffered justification must be based on information that it knew and relied upon at the time it decided to take the adverse employment action. That is to say, an employer cannot avoid liability in a discrimination case by exploiting a weakness in an employee's credentials or performance that was not known to the employer at the time of the adverse employment action (and that, therefore, could not have figured in the decisional calculus."); *Sabree v. United Brotherhood of Carpenters & Joiners Local No. 33,* 921 F.2d 396, 403 -404(1st Cir. 1990); *McCulley v. Allstates Technical Services,* 2005 WL 1475314 *7 (S.D. Ala. 2005) ("Mere contentions not backed by evidence are manifestly insufficient."); *Moncus v. Johanns,* 2006 WL 163309 *12-*13 (M.D. Ala. 2006); *USOC of Greater Iowa, Inc. v. City of Bellevue, Nebraska,* 279 F. Supp. 2d 1080, 1087 (D. Neb. 2003) ("Post-hoc rationales cannot serve as substantial evidence.").

between Nucor's officials and Clifton Lee makes granting summary judgment improper. The only other job

bid for which Nucor has submitted by a decisionmaker's testimony is the deposition extracts from Rick

Ramsdell's deposition stating that Mike Smith was better qualified for the Lubricator job sought by Rodney

Washington. Washington, however, has submitted substantial evidence to the contrary. Pl. Exh. 40 at ¶¶ 15

& 16. The Court's earlier Order regarding class certification summarized part of Washington's evidence

on the Lubricator job as follows:

> In July 2002, Washington bid on an opening for a lubricator job in the
> maintenance department. Qualifications for this position include passing
> a written test. Washington states that, out of all the bidders for the job, he
> earned the highest test score. Washington states that despite his score, a
> white employee received the job after Washington's supervisor placed
> false information about his attendance in his personnel file. Washington
> claims that he has received harsher discipline regarding his attendance and
> safety issues than white employees and that Nucor used his disciplinary
> record as an excuse to deny him promotions.

The deposition extracts Nucor submits from the decisionmaker for this job, Rick Ramsdell does not

articulate discipline as a factor in choosing Smith over Washington for the Lubricator Job Posting.

Except for these three job bids by Washington and Lee, Nucor has failed to present any other

evidence from a decisionmaker stating a reason for plaintiffs' non-selection for the jobs they sought and

were qualified to fill. Nucor also relies only on the argument of counsel based on raw personnel records

that suggest what the decisionmaker's reasons *might have been*: "The introduction of 'personnel records

which *may* have indicated that the employer based its decisions on one or more of the possible valid

grounds' will not suffice to meet the defendant's rebuttal burden. The evidence must include facts which

show what the decision-maker knew at the time when the decision was made." *Stegar v. General Elec.

Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003); *see also Walker v. Mortham*, 158 F.3d 1177, 1182 (11th

Cir. 1998) (" Likewise, a court may not assume, based on its own perusal of the record, that the

decision-maker in a particular case was motivated by a legitimate reason when the defendant has offered none."); *Winbush v. State of Iowa, by Glenwood State Hospital,* 66 F.3d 1471, 1482 (8th Cir. 1995)("The defendants had an opportunity to prove that the caucasians who were promoted were highly qualified, but did not do so.").[6]  Because Nucor has failed to come forward with *evidence*, rather than mere argument, of the decisionmaker's articulated reasons for preferring a white applicant for any of the other job bids addressed by the plaintiffs' Declarations, the presumption of discrimination from their *prima facie* case remains standing, making summary judgment inappropriate. *Burdine,* 450 U.S. at 254 ("[I]f the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case."); *Easley,* 758 F.2d at 257 n.10;  *Walker,* 158 F.3d at 1184.

Nucor has also failed to satisfy its initial procedural obligation as the movant for summary judgment. The movant has "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)); *see also Bald Mountain Park, LTD v. Oliver,* 863 F.2d 1560, 1563 (11th Cir. 1989) ("Under Rule 56(c) of the Federal Rules of Civil Procedure, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it

---

[6] *See also IMPACT v. Firestone,* 893 F.2d 1189, 1193-94 (11th Cir. 1990);  *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 775 (11th Cir.1982) (rejecting on appeal the legitimate nondiscriminatory reasons "assigned by the court" because they were "not [reasons] articulated by [the decision-makers] when they were questioned"); *Eastland v. Tennessee Valley Authority,* 704 F.2d 613, 626 (11th Cir.1983) (holding that the district court erred in finding that relative qualifications were a sufficient legitimate, nondiscriminatory reason when there was no evidence that the decision-maker knew of the applicants' relative qualifications when he made the adverse employment decision."); *Moncus v. Johanns,* No. Civ.A 2:03CV416-W, 2006 WL 163309 (M.D. Al. 2006).

believes demonstrates the absence of a genuine issue of material fact.").[7]

The Eighth Circuit has "emphasize[d] the oft repeated phrase that summary judgment should seldom be granted in discrimination cases." *Bassett*, 211 F.3cd at 1099 [citing *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1264 (8th Cir.1997)].[8]

The court must review the entire record, "drawing all reasonable inferences in favor of the nonmoving party, but making no credibility determinations or weighing any evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135 (2000). Although the record as a whole must be reviewed, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.*; *see also Perez v. Texas Dept. of Criminal Justice Institutional Division*, 395 F.3d 206, 215 (5th Cir. 2004). The Eighth Circuit has explained that:

> In passing on a motion for summary judgment, it is not the court's role to decide the merits. The court must, as has often been stated, simply determine whether there exists a genuine dispute of material fact. In an employment discrimination case, if evidence of the employer's proffered reason for its action is undisputed, the movant is entitled to a grant of summary judgment. On the other hand, if the proffered reason is shown by conflicting evidence to be untrue, then the nonmoving party is entitled

---

[7] *Poehl v. Randolph*, No. 4:05CV00400 ERW, 2006 WL 1236838 *5 (E.D. Mo. 2006) ("The initial burden of proof in a motion for summary judgment is placed on the moving party, Defendant Randolph, to establish the non-existence of any genuine issue of fact that is material to a judgment in his favor as to the issue of whether he was acting under color of state law."); *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir.1988); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000).

[8] *See also Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir.1999); *Lynn v. Deaconess Med. Ctr.-West Campus*, 160 F.3d 484, 486 (8th Cir.1998); *Helfter v. United Parcel Serv., Inc.*, 115 F.3d 613, 615 (8th Cir.1997); *Bialas v. Greyhound Lines, Inc.*, 59 F.3d 759, 762 (8th Cir.1995); *Oldham v. West*, 47 F.3d 985, 988 (8th Cir.1995); *Weissman v. Congregation Shaare Emeth*, 38 F.3d 1038, 1045 (8th Cir.1994); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994); *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M-Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987).

> to all favorable inferences that the false reason given masks the real reason
> of intentional discrimination.

*Bassett v. City of Minneapolis*, 211 F.3d 1097, 1107 (8th Cir. 2000) (citations omitted). The standard

for summary judgment also requires that the Court give plaintiffs "the benefit of all reasonable inferences"

after "viewing the facts in the light most favorable to the non-moving party." *Kennedy v. Swift Transp.,*

*Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003) ("In ruling on a motion for summary judgment a court must not

weigh evidence or make credibility determinations."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when she

or] he is ruling on a motion for summary judgment ....").

The next section goes through the evidence establishing each plaintiffs' qualifications and *prima*

*facie* case in a specific, non-conclusory manner for various promotions they sought, then shows that Nucor

has failed to submit any evidence of the decisionmakers' reason for selecting white applicants for such jobs,

and ultimately demonstrates that the reasons argued by Nucor's attorneys without any such

decisionmakers' testimony are a pretext for racial discrimination when the evidence is viewed in the light

most favorable to the plaintiffs' opposition to summary judgment and with the benefit of all inferences that

a reasonable jury might draw from the evidence as a whole.

## III.    THE NAMED PLAINTIFFS HAVE ESTABLISHED INDIVIDUAL CLAIMS ON A SPECIFIC JOB-BY-JOB BASIS

### A.    Larry McBride

#### 1.    Reheat Furnace Stocker

Larry McBride's Declaration states his qualifications for Reheat Furnace Stocker in exacting detail,

showing that he satisfied each knowledge, skill and ability Nucor listed on the Job Posting of July 31, 2001

that he applied for and was denied. Pl. Exh. 41 at ¶¶6-7. He also states, and Nucor's records confirm, that he had no discipline prior to that time, but that the person selected, James Hymas, had "at least five prior disciplinary warnings for poor performance, safety and rules violations, including a disciplinary suspension for cursing and striking a black employee." Pl. Exh. 41 at ¶6; Pl. Exh. 3 at ¶6; Pl. Exh. 86.

McBride's evidence goes beyond what is required for a *prima facie* case regarding his Reheat Furnace Operator bid. Nucor has not submitted testimony from anyone who says he was unqualified for any such jobs. In fact, Nucor's summary judgment brief never mentions McBride's Reheat Furnace Operator bid. Nor does it provide any reason why a repeatedly disciplined white employee like Hymas would be promoted over McBride who had a spotless record at the time. Pl. Exh. at 41 at ¶6; Pl. Exh. 86. Nucor has not identified any knowledge, skill or ability that Mr. McBride lacked for Reheat Furnace Stocker, or that James Hymas better satisfied.

Nucor's failure to respond to McBride's *prima facie* case precludes summary judgment. "Establishing a prima facie case creates a presumption that the employer unlawfully discriminated against the plaintiff." *Kobrin v. Univ. of Minnesota*, 34 F.3d 698, 702 (8th Cir. 1994). Because Nucor has not articulated any reason for selecting Hymas over McBride for Reheat Furnace Stocker in August 2001, plaintiffs' *prima facie* presumption of racial discrimination stands unanswered and precludes summary judgment without anything further. *See e.g., Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251. 256 (8th Cir. 1985) ("With respect to Patricia Murphy, the trial court concluded that Anheuser-Busch had failed to articulate any legitimate nondiscriminatory reason for not hiring her, and she was therefore entitled to judgment on her disparate treatment claim under *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1084, 67 L.Ed.2d 207 (1981).").

Even if Nucor had submitted evidence of the decisionmaker's reason for choosing Hymas over

McBride, the plaintiffs have submitted substantial evidence of pretext by showing that the jobs in the mill

area of the plant, like Reheat Furnace Stocker, were racially segregated. Pl. Exh. 41 at ¶¶4-5, 8-10; Pl.

Exh. 3 at ¶¶4, 18; Pl. Exh. 163.  The Court noted some of such evidence in its prior Order regarding class

certification:

> In separate declarations, each Plaintiff claims that the roll mill department
> is segregated by race in that almost all black employees work in the roll
> shop and finishing areas of the department; and almost all white employees
> work in the rolling mill or mechanic crew areas. *See* docket entry #71,
> Exs. 2-7.  Plaintiffs claim that the roll shop and finishing jobs performed
> by black employees are "dirtier" and require more physical labor than the
> rolling mill and mechanic crew jobs performed by white employees. A
> summary of Plaintiffs' allegations concerning promotions, training and
> discipline follows.
>
> * * *
>
> According to Plaintiffs, the challenged selection process begins at the
> point-of-hire when black employees are assigned to racially-segregated
> work crews and given "harder, dirtier, and lower paying jobs requiring
> greater physical labor and less sophisticated equipment." Docket entry
> #73, at 11. Plaintiffs contend that black employees are "kept away from
> the experience and informal training needed to break into the traditionally
> white jobs on the rolling mill and mechanic crews." *Id.* at 12. Plaintiffs
> note that Nucor's expert, Dr. Finis Welch, acknowledges that some
> Nucor employees receive informal training opportunities by virtue of their
> "proximity" to other jobs.
>
> * * *
>
> Plaintiffs claim that Nucor's placement of black employees in
> areas that lack "proximity" to work that would allow them to receive
> informal training, allows "white crews to groom new crew members to
> inherit job openings through the informal experience/training challenged in
> this case." Docket entry #73 at 12. In addition to the "proximity" factor,
> Plaintiffs claim that Nucor prevents black employees from advancing their
> careers by way of intentionally discriminatory practices in the areas of
> discipline and formal training, which ensure that black employees will not
> qualify for promotions.

*Order* at 5, 11 (Dkt. #123).

The Court also noted that such segregated patterns of job assignments and promotions can be

effectively enjoined and dismantled without any need of certifying a hiring class in this case.

>Plaintiffs contend that their claims and hiring class claims must be tried together because "absent hiring relief, the racially patterned crews will be difficult, if not impossible, to dismantle or prevent in the future." *See* docket entry #73, at 36; docket entry #89 at 39. The Court disagrees. Title VII grants a trial court broad discretion to order equitable relief as required under the circumstances of a particular case, including relief from deprivations caused by a segregated work force. *See Franks v. Bowman Transp. Co., Inc.*, 96 S. Ct. 1251, 1256 (1976) (noting that federal courts have broad discretion to fashion the most complete relief possible and order any equitable relief as the court deems appropriate because Title VII is intended to make the victims of discrimination whole).

*Order* at 22 (Dkt. #123).

Nucor has not submitted any evidence that disputes the racially segregated jobs, crews and training in the mill area of the plant. The mill areas have their own set of Supervisors, Leadmen and crews in two large, physically distinct sections of the Blytheville plant, one in the NYSI building built in 1988 and a second mill area in the NYSII building built in 1993. Pl. Exh. 41 at ¶¶4-10; Pl. Exh. 3 at ¶¶4 & 18. The NYSI mill area has five Supervisors and crews and the NYSII mill area has three Supervisors and crews. *Id*.[9] All of such Supervisors and Leadmen have always been white, and there was never any black non-supervisory employees in the mill area at NYSII from the time McBride was hired until the present. *Id.*. Until 2005, there was only one black employee in the mill area of NYSI, Reginald Stewart. *Id.*[10] By

---

[9] See Chart 1 at p.14 of Bradley Rebuttal Report using data file cenamt. created by Nucor's expert, Dr. Welch on January 28, 2006. Dkt. #67 at 14. Mill area jobs include Mill Operator, Reheat Heater, Sample Inspector, Utility Man, Reheat Stocker, Mill Crane Operator, Mill Inspector, Mill Mechanics, Hot Saw Operator, Extra Man, and Mill Leadman. Pl. Exh. 163; Pl. Exh. 41 at ¶¶4-10.

[10] The NYSII mill area has remained all white since this case was filed in 2003, and only one additional black employee has been added to the NYSI mill area when Harold Williams joined Crew 153A in 2004. Pl. Exh. 163; Pl. Exh. 41 at ¶¶4-10; Pl. Exh. 40 at ¶5. Assignments to the mill area occur through transfers, initial assignments, training and promotions. *Id.*

contrast, black employees made up 16.7% of Nucor's employees at the Blytheville plant. Pl. Exh. 162 (EEO-1 Report). You would normally expect, absent racial segregation, that black employees would be located in the mill areas roughly as much as they are in the other areas of the plant. There is nothing unique or difficult about the mill area jobs as compared to other parts of the plant. Nucor itself has classified *all* of the jobs in the mill area as "Semi-Skilled Operatives" in its annual EEO-1 Report, and that Report showed there were 459 such "Semi-Skilled Operatives" throughout the plant in 2003, of which 93 or 20.2% were black in all areas except the mill areas where they comprised zero percent of such employees at NYSII and only one (2.5%) of such employees at NYSI. Pl. Exhs. 62, 162, 163 & 12D

The Supreme Court and this Circuit have stressed the role that such segregated patterns play in establishing a triable issue of fact at the pretext stage of analysis. *Teamsters v. United States*, 431 U. S. 324, 343 n.23 (1977) ("[T]he company's inability to rebut the inference of discrimination came not from a misuse of statistics but from the 'inexorable zero'"); *Jensen v. Eveleth Taconite Co.*, 824 F. Supp. 847, 869 (D. Minn. 1993) ("[T]he Court is left with one piece of plaintiffs' proof: the 'inexorable zero'. No amount of wrangling can change the *numerical* evidence of disparity which zero represents."); *Donaghy v. City of Omaha*, 933 F.2d 1448, 1460 (8th Cir. 1991) (noting that in *Teamsters*, the "inference of discrimination came from the inexorable zero"); *Jensen v. Eveleth Taconite Co.*, 139 F.R.D. 657, 661 n. 8 (D. Minn. 1991) ("The Court observes that no 'fine tuning' of statistics can obscure the inference of discrimination raised by the 'inexorable zero.'").

The difference between 20.2% black Semi-Skilled Operatives in the non-mill areas and crews and zero percent in the NYSII mill area and 2.5% in the NYSI is obvious on its face.[11] The absence of black

---

[11]Such disparities between the representative of black Semi-Skilled Operatives in the mill areas and non-mill areas of the plant is more than 2.9 standard deviations from what would be expected in the

employees in the mill areas constitutes the "inexorable zero" which has always been found probative of racial discrimination regardless of whether the lack of black employees in the mill areas of the plant are compared to the number of black employees in the plant as a whole in 2003 (16.7%)[12], or in jobs in the same job category at Nucor (20.2%)[13] or surrounding general population from which Nucor draws its employees (29%)[14].  Pl. Exh. 12D, 162, 163. Larry McBride and the other plaintiffs describe their personal experience working around, but not in, the racially segregated mill areas of the plant as follows:

> 4.      * * * My first Declaration described how this mill area of the plant was racially segregated during my employment except for one token black employee, Reginald Stewart, who was put in the mill area at NYSI in the mid-1990's. There have never been any black employees in the mill area of the NYSII building. * * *
>
> 5.      The all white composition of the crews and supervisors in such a large physical section of the plant was obvious as you worked there everyday.  In my experience, the mill areas were too large physically, and had too many employees, to have become racially segregated by accident. The plant had plenty of black employees in other work areas and drew its employees from a geographical area in Arkansas that had a sizable African-American population experienced in similar industrial work.* * *
>
> 6.      * * * My own experience in applying for Reheat Furnace Stocker in the mill area reinforced the perception that such area and crews were reserved for white employees and not open to black employees like me
>
> 7.      * * * My prior experience, training and education before coming to work at Nucor qualified me for such job and satisfied Nucor's posted qualifications.  Black employees like me, however, were not able to get any training or experience on the Reheat Furnace Stocker job itself.  Not only were all of the employees in such jobs white at the time, but all of the more than thirty employees who were given training to become

---

absence of a significant correlation with race.

[12] Pl. Exh. 162 (EE0-1 Report 2003).

[13] Black employees constituted 20.2% of the employees Nucor classified as "Semi-Skilled Operatives" for purposes of its EEO-1 Reports in its 2003 workforce (93 of 459). Pl. Exh. 162 & 163.

[14] "It is such a comparison — between the racial composition of the qualified persons in the labor market and the persons holding at-issue-jobs — that generally forms the proper basis for the initial inquiry in a disparate impact case." *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650 (1989); *Hazelwood*, 433 U.S. at 308 n.13 (approving labor market population of "qualified public school teachers" as benchmark).

a Reheat Furnace Stocker were also white at the NYSII building, and all but one were white at the NYSI building (Reginald Stewart).

8.    It is usually well known who has been selected for a job before it is posted. Nucor preselects the person it plans to succeed the current employee in the job and begins grooming such person in ways that make it obvious that he will receive the job when it comes open. The favored employee is allowed to perform the job and given other training on his regular shift that is not open to other employees, and the person is almost always white if the job is one already or traditionally held by whites. * * * All the employees given training on mill area jobs were white from the time I was employed until well after this lawsuit was filed. This included more than 40 white employees who were trained as Sample Inspector, more than 40 white employees who were trained as Mill Operator, more than 30 white employees who were trained as a Reheat Furnace Stocker, more than 20 white employees who were trained as a Reheat Heater, more than 20 white employees who were trained as a Reheat Furnace Operator, more than 10 white employees who were trained as Utility Man, more than 5 white employees who were trained as Extra Man, and more than 30 white employees who were trained as Roll Mill Mechanic.

9.    I was interested in other jobs in the roll mill area and crews because they were better jobs with a greater future and paid more than jobs that were open to black employees in my area of the plant.

* * *

10.    Many of the white employees placed in mill crew jobs had extensive disciplinary records before they were promoted.

Pl. Exh. 41 at ¶¶4-10; *see also* Pl. Exhs. 40-46; Pl. Exh. 12D & 13; Pl. Exhs. 162-163..

McBride has also come forward with other evidence of pretext regarding Nucor's ongoing racial segregation of the mill area jobs like Reheat Furnace Stocker. That evidence includes: (1) numerous white employees being promoted into such jobs with extensive disciplinary records, including James Hymas who was selected over McBride; (2) a pattern of training only white employees for such mill area jobs; and (3) preselecting white employees for such jobs before they are ever posted for bid. McBride testifies that "[d]uring the four years prior to filing this case, every black employee who applied for one of these mill crews or jobs was rejected, including me, Rodney Washington, Jimmy Wells, Rickey Logan, Danny Wells, Wilson Done, Sylvester Rogers and others" and that "[a]ll the employees given training on mill area jobs were white from the time I was employed until well after this lawsuit was filed." Pl. Exh. 41 at ¶¶4 & 8; Pl.

Exh. 164. Plaintiffs other evidence of pretext and intent is set forth jointly with the other plaintiffs at pp. 88-90 of this brief.[15]

## 2.    Roll Mill Guide Builder

McBride also established his qualifications for Roll Mill Guide Builder in a very detailed manner similar to that already shown for Reheat Furnace Stocker. Pl. Exh.41 at ¶¶16-17; Pl. Exh. 3 at ¶8(d). Nucor does not identify any qualification that he lacked for such job, nor does it suggest any reason that a white employee, Gary Steward, was selected over him in April 2001. McBride had never been disciplined before that, but Gary Steward was promoted to such job with at least four prior disciplinary incidents for poor performance and safety, including one incident where he struck and injured another employee with a sledge hammer, and another incident where he was found to have engaged in "demeaning horseplay" and to lack "focus and commitment to his job." Pl. Exh. 41 at ¶17; Pl. Exh. 99. Steward also had to be disciplined or counseled three additional times in the first six months after he was promoted to Roll Mill Guide Builder, for a total of seven disciplines. *Id.* McBride's record was spotless during this same time period. *Id.* Other white employees promoted to Roll Mill Guide Builder with repeated prior disciplinary incidents. Pl. Exh. 41 at ¶17; Pl. Exhs. 100-103. Despite McBride's detailed qualifications and lack of any disciplinary record, Nucor did not even interview McBride. Pl. Exh. 41 at ¶16.

Nucor's silence about McBride's bid for this job leaves the *prima facie* inference or presumption of racial discrimination unanswered, precluding summary judgment for the same reason as the Reheat Furnace Stocker bid already discussed. *Burdine*, 450 U.S. at 254.

---

[15]McBride also shows in his Declaration that he would have applied for other specific jobs in the mill area if he had not been deterred by the on-going racial segregation of those crews of the plant by the way his applications for jobs in that area were treated. Pl. Exh. 41 at ¶¶8-9. His and other plaintiffs' *prima facie* case for jobs they were deterred from seeking are discussed at pages 11-80 of this brief.

### 3.    Shipper/Loader

McBride also detailed his qualifications for Shipper/Loader on the same item-by-item basis based

on the knowledges, skills and abilities that Nucor listed on the Job Posting of July 30, 2001 that he applied

for and was denied. Pl. Exh. 41 at ¶¶18-20; Pl. Exh. 3 at 8 (b-c).  He again had no disciplinary history

at the time he bid on this job, and Nucor has once again failed to identify any knowledge, skill or ability that

he didn't satisfy. *Id.* Nor has the Company submitted any affidavit or testimony from anyone who had the

opinion that McBride was unqualified. Yes, McBride was rejected without having had any prior discipline

while white employees were promoted to the same Shipper/Loader job classification, and even Shipping

Crew Leader, with repeated disciplinary infractions. Pl. Exh. 41 at ¶20; Pl. Exhs. 104-106.

It is undisputed that two white non-employees, Norman Jenkins and Delbert Hooker, were hired

into this job rather than promoting McBride. Pl. Exh. 3 at ¶8(d) and ¶9; Pl. Exh. 41 at ¶18.  The Court

noted this fact in its class certification Order, stating that "McBride submitted bids for two shipper/loader

vacancies that Nucor filled with white applicants, who did not work for Nucor." *Order* at 7-8 (Dkt. #123).

Nucor's written Policy in the Employee Handbook states the following: "It is company policy to promote

from within the corporate organization rather than fill jobs or positions from outside sources." *Policy* at

¶1 ((Pl. Exh. 172); Pl. Exh. 1 at ¶1).  It also states: "Any hiring from the outside will be done at the lowest

level position possible." *Id. Policy* at ¶12.  Because Nucor's summary judgment submission fails to suggest

any reason for hiring two white non-employees rather than promoting McBride, the *prima facie*

presumption of discrimination remains unanswered and summary judgment is inappropriate without anything

further. *Burdine*, 450 U.S. at 254.

### 4.    McBride's Other Six Pre-2003 Job Bids

The same pattern holds true for the following six additional jobs that Larry McBride bid on and was

denied in 2000-2002:

| JOB BID ON | DATE POSTED | PERSON SELECTED |
| --- | --- | --- |
| Forklift Operator | August 9, 2001 | Eddy Barger |
| | | Gary Keiter |
| Inspection Bed Operator | August 22, 2001 | Mark Warren |
| Inspection Bed Inspector (NYSII) | August 22, 2001 | Ronnie Cato |
| Inspection Bed Inspector (NYSII) | December 20, 2001 | Robin Dillon |
| Inventory Position | February 14, 2002 | Hughie Bond |
| | | Tim Alexander |
| Random Saw Operator/Crane Operator | February 15, 2002 | Bruce Brown |

Pl. Exh. 41 at ¶3 & ¶¶11, 21-32; Pl. Exh. 3 at ¶8(a-b), ¶¶9-15. The Court noted McBride's evidence

regarding these six jobs in its prior Order: *Order* at 7-8 (Dkt. #123). McBride has laboriously stated his

qualifications for each of these jobs in a detailed specification that addresses each element of Nucor's

posted qualifications. Pl. Exh. 41 at ¶11 & ¶¶21-32. That specification of his qualifications is obviously

not "conclusory" and fully satisfies the standards set forth in *Legrand* and *Kobrin* for establishing

qualifications and a *prima facie* case. *See* pp. 11-32 *supra*. Nucor does not argue that McBride had

a poor discipline safety or work record. He had no discipline whatsoever during the 1999-2002 period

when he was denied such jobs. Pl. Exh. 41 at ¶¶11 & ¶¶21-32. Many times white employees have been

promoted to these and similar jobs with extensive prior disciplinary records. Pl. Exh. 41 at ¶¶14, 36 & 40.

Nucor, however, has ignored these six job bids the same way as it has for the other jobs already

discussed. It identifies no qualifications that McBride lacked, submits no testimony from anyone willing to

state that he was unqualified, and is completely silent as to the reason that the white employees and non-

employees listed above were selected over McBride. The only thing that Nucor says about such jobs is

that he admits to being "interviewed for most if not all these positions" and that he was eventually promoted

to one of them. A mere interview, however, is not an answer when the white applicants were both

interviewed *and promoted*. McBride also disputes Nucor's contention that he was later promoted to one

of such jobs. The lone "promotion" that McBride has ever obtained was to the same bottom rung job and pay grade that he has always occupied. Pl. Exh. 41 at ¶42 (I was never promoted to any job different than my own Inspection Bed Inspector job. Nucor's statement that I was "promoted" one time must be referring to my transfer to the same Inspection Bed Inspector job classification from one building to another at the Blytheville plant.). That says nothing about why he wasn't promoted to the *better jobs* that he was seeking. Nucor's submission is completely silent as to any *decisionmaker's* articulated reason for any of such jobs. In this circumstance, the *prima facie* presumption of racial discrimination is left unanswered by Nucor. Plaintiffs are not required to go any further for purposes of summary judgment. *Burdine*, 450 U.S. at 254.

In addition, McBride has shown credibility issues that would occur if any decisionmaker were ever to articulate a belief that the white employees selected for these six jobs were better qualified. Tim Alexander stated on the Job Bid Sheet he submitted February 21, 2002, for the Inventory job that he had not cross-trained on such job and only had "some" familiarity with it. Pl. Exh. 47. He was first hired May 11, 2000, which was less than a year before he was promoted to the Inventory job. *Id.* Bruce Brown had four different disciplinary incidents before he was promoted to the Random Saw Operator job. Pl. Exh. 173.

### 5.   Cold Saw Operator

Unlike the foregoing nine job bids, Nucor does discuss McBride's bid for Cold Saw Operator in its brief. But it has submitted no evidence from a decisionmaker who states that he was either unqualified to be a Cold Saw Operator or that the white employee who was selected, Mark Warren, was better qualified. Nucor merely presents the argument of its attorneys without any decisionmaker's affidavit or testimony that Warren was better qualified. That is an insufficient response to plaintiffs' *prima facie* case.

*Burdine*, 450 U.S. at 255-256; *Stegar*, 318 F.3d at 1075-1076.

McBride has established his *prima facie* case by showing in a very detailed way that he was qualified for the Cold Saw Operator job based on Nucor's list of qualifications on the Job Posting of February 2000. Pl. Exh. 41 at ¶¶11-15; Pl. Exh. 3 at ¶8(a). He had never been disciplined or counseled at Nucor at the time, and he has shown, in any event, that white employees have been promoted to similar jobs with extensive disciplinary histories. Pl. Exh. 41 at ¶14; Pl. Exhs. 95-98.

Nucor does not identify any qualifications that McBride lacked for Cold Saw Operator, but merely argues that he was not *better qualified* than Mark Warren. As already shown, however, being better qualified is irrelevant to a *prima facie* case. *Kobrin*, 34 F.3d at 702; *see* pp.11-32 *supra*.

Nucor has failed to come forward with any evidence from a decisionmaker concerning what qualifications were relied on or how McBride fared in comparison to the white employees selected over him. The only thing presented are defense counsel's conclusions from rummaging through Mark Warren's raw personnel records. Those records, however, never state what the decisionmaker's reasons were or even that McBride was ever considered by the decisionmaker in comparison to Warren. The only reason for not promoting McBride that appears in the record is a false one that McBride was given by the decisionmaker, Durrell Warren — that Nucor requires that bidders be employed for more than a year. This Court has already noted the evidence showing that this was false and that white employees were promoted in their first year of employment. The Court stated::

> In March 2000, McBride applied for a cold saw operator position. He alleges that he met all the posted qualifications for the job, but a white employee was selected. McBride states that the hiring supervisor told him that his bid was unsuccessful because his plant service was less than one year. McBride states that Nucor promotes white employees regardless of their length of service.

*Order* at 7-8 (Dkt.#123).

Nucor's written policy in the Employee Handbook states that there is no such waiting period: "There is no waiting period to bid for a position from one department to another." *Policy* at ¶8. The Court itself has already noted that Nucor's written policy states that "[t]here is no waiting period for a position from one department to another." *Order* at 2-3 (Doc. 123) (quoting Nucor's "written policies for hiring, promotions, and transfers."). McBride testifies that white employees like Steve Berry and Tim Alexander were promoted in their first year at Nucor:

> * * * A white employee named Mark Warren was selected instead of me by Durrell Warren, a white supervisor. * * * Durrell Warren told me that I was not selected because my plant service and time-in-job was less than one year, but I have since learned that there is no such rule. Nucor's written hiring-promotion Policy in the Employee Handbook states: "There is no waiting period to bid for a position from one department to another." *Policy* at ¶8. A white employee, Steve Berry, was promoted twice in his first year of employment. Berry was hired on September 28, 2000, as an Inspector at pay grade 2, promoted to Cold Saw Recorder at pay grade 4 job in April 2001 and promoted to the Cold Saw Operator job at pay grade 5 on November 4, 2001 that I had been denied earlier in 2000. Hired a year after me, Steve Berry jumped from pay grade 2 to pay grade 4 in nine months while I remained at pay grade 3, and he then jumped to pay grade 5 in eleven months of being hired while I still remained at pay grade 3. Steve Berry was hired as a pay grade 2 and reached pay grade 5 in fourteen months after being hired. In addition to Steve Berry being promoted in his first year, Tim Alexander was promoted to the Inventory position in his first eight months at Nucor. Pl. Exh. 47.

Pl. Exh. 41 at ¶11; Pl. Exh. 3 at ¶8(a).

Even if a decisionmaker had provided the reasons that Nucor's attorneys think might have been involved — "direct experience in the area, cross-training on that specific job, and outstanding work history" — there is ample evidence to create a genuine issue of material fact about whether such reasons are credible or a pretext for racial discrimination. Not only was McBride given a completely different and false

23

reason for his non-selection, but he too had "direct experience in the area . . . an outstanding work history",

and "consistently participated in various safety and training courses." Pl. Exhs. 41 at ¶¶11-15. McBride

hadn't cross-trained as Cold Saw Operator because he had been denied that opportunity in comparison

to Warren. Pl. Exh. 41 at ¶13.

The Court's class certification Order states the following about McBride's cross-training claim:

> McBride states that Nucor provides white employees informal
> training and formal cross training, and black employees cannot "fairly
> compete" for cross training. *Id.*, ¶18. He states that many of his requests
> for cross training have been denied. McBride was granted training for an
> inspection bed operator position but received only one day of training and
> was told that further training would have to occur on his own time. *Id.*
> McBride states that he has observed white employees receive cross
> training during their regular shifts. *Id.*

*Order* at 7-8 (Dkt. #123).

On McBride's cross-training claim, Nucor concedes that he "alleges that Caucasian employees

are allowed to cross-train during regular shifts which receive bonus pay, while black employees must cross-

train during off days and do not receive bonus pay." *Def. Br.* at 45. It also concedes that for cross-training

on such "non-scheduled days" the employees "are paid their regular hourly rate" without a bonus while

cross-training on "regularly scheduled shifts" is allowed to occur with both "regular hourly rates" and

"bonus pay." *Id.* The only point of difference between the parties is whether white employees got the latter

regular shift bonus-paid cross-training while McBride got only the non-bonus cross-training that required

him to work on his off-days. *Id.* Nucor says McBride got both; and, therefore, there is no evidence of

disparate treatment. McBride's Declaration flatly contradicts that contention, creating a genuine issue of

material fact through the following testimony:

> 40.   **Training:**  I have not had the same or similar job or
> training opportunities that have been given to white employees and

applicants with whom I am familiar. Many of the work areas at Nucor are racially segregated or have only one or two black employees. White employees receive informal training and formal cross-training that African-Americans, like me, cannot fairly compete for. I was directly affected by this when I requested to be cross-trained for the Piler Operator job and Crane 10 in the repair bed and was denied this training. I also requested training on the OP5 as an Inspection Bed Operator but was given only one day of training before I was told I could no longer train on the position during my regular shift and would have to come to work on my own time to get that training. I observed white coworkers, however, being given cross-training during their regular shifts, such as George Reed, Frankie Hunt and Carlos Turner. In my experience at Nucor, this practice has had an adverse impact or effect on African-Americans' rate of bidding and promotion. It has had that effect on me in the way I have described in this Declaration and the earlier one I filed in February of this year.

Pl. Exh. 41 at ¶40.

Nucor argues that McBride admitted in his deposition that he had worked at a job other than his own on a regular shift, bonus-paid basis at least once, but that was to fill-in for an absent employee rather than cross-training, as he explains in his Declaration. Pl. Exhs. 3 & 41. Nucor also argues that McBride admits that he had seen white employees "cross-training outside of their regular scheduled shifts", but he also says that was not normal and that while white employees usually got the on-shift, bonus-paid type of cross-training, he could only obtain the off-shift, non-bonus type cross-training. *Id.* McBride has also shown that "The Cold Saw Operator job sits in a glass-enclosed compartment commonly known as 'the white-house' because only white employees have held that job." Pl. Exh. 41 at ¶11; Pl. Exh. 3 at ¶8(a).

### 6. Supervisory Jobs

McBride established a similar *prima facie* case regarding his application for Supervisor which has gone unanswered by Nucor. Pl. Exh. 41 at ¶¶37-38. His Declaration details his qualifications for supervisory jobs. He also states that he applied as soon as Nucor established a posting and application

process for such jobs, and that he would have applied earlier if there had been any application process provided by Nucor before 2005. *Id.* Nucor has not identified any qualifications for Supervisor that McBride lacked, nor provided any other response to the facts surrounding that claim set forth in his original Declaration filed last February. As with his other claims, Nucor is silent about the reason why white employees were selected for such jobs, leaving his *prima facie* presumption of racial discrimination, and later retaliation unanswered. Summary judgment is prohibited in this circumstances. *Walker v. Mortham*, 158 F.3d 1177, 1185 (11th Cir. 1998) ("If any plaintiff had established evidence at trial sufficient to raise a presumption of intentional discrimination, therefore, that presumption stood at the end of trial and the plaintiff was entitled to judgment in her favor if she convinced the trier of fact of the credibility of her prima facie case. "). Discipline has not been articulated by a decisionmaker as a reason for ignoring McBride. Such a reason would have been pretextual even if it had been articulated because white employees have been promoted to Supervisor and Leadman despite prior disciplinary histories[16]

### 7.    Roll Mill Mechanic And Piler Operator Bids In 2003-2005

McBride's bids for Roll Mill Mechanic and Piler Operator in 2003-2005 stand in the same posture.

---

[16]Howard Kelly was promoted to Supervisor in September 2002 with at least three prior disciplinary warnings for poor performance. I have also already listed several white employees promoted to Leadman with prior disciplinary records. Mikle Crawford was promoted to Leadman in the Roll Mill Department in November 2002 with at least five disciplinary incidents for misconduct, poor attendance, poor performance, rules violations and safety violations and he continued the same pattern with at least two additional disciplinary warnings for poor attitude, poor attendance and misconduct after he became Leadman. Johnnie Hawkins was promoted to Ladleman in 2003 with at least four prior disciplinary warnings for poor attendance and performance and rules violations. Paul Williamson was promoted to Repairman Helper in March 2002 and later to Leadman in 2005 with at least eight prior disciplinary incidents for poor performance, safety and rules violations. Glenn French was promoted to Leadman in the Roll Mill on August 6, 2001 despite the fact that he received a written warning two months earlier on June 12, 2001 which caused 250-260 tons of steel to be scrapped. The mistake was characterized as a "devastating time, tons of revenue loss."

He has demonstrated discrete qualifications for both such jobs based on the qualifications Nucor listed on

the three Job Postings he applied for and was denied in favor of white employees. Pl. Exh. 41 ¶¶33-35.

Once again, Nucor has not identified any qualifications he lacked and has failed to come forward with any

decisionmakers' affidavit or testimony concerning the reason the following three white employees were

selected over McBride:

| JOB BID ON | DATE POSTED | PERSON SELECTED |
|---|---|---|
| Piler Operator | October 7, 2003 | Allen Rice |
| Rolling Mill Mechanic | October 8, 2004 | Jerry Foley |
| Piler Operator (NYSII) | June 10, 2005 | Steve Brannen |

In fact, Nucor's summary judgment brief does not even mention these three jobs or any evidence

that states the reasons Foley, Rice or Brannen were selected instead of McBride.  Whatever the

decisionmaker might have said if asked, the reason for these three employees selection after McBride

certainly had nothing to do with their having a superior disciplinary or work record. McBride has shown,

and Nucor's records confirm, that such employees had extensive prior disciplinary records. Pl. Exh. 41

at ¶¶34 & 36; Pl. Exhs. 100, 182. Jerry Foley was promoted to Roll Guide Builder and then to Roll Mill

Mechanic with six or more disciplinary incidents for poor attendance, performance and safety. *Id.* Steve

Brannen was given a Piler Operator job with three prior disciplines for poor performance. *Id.* Other white

employees were also promoted to similar jobs despite having extensive disciplinary records. Pl. Exh. 41

at ¶36; Pl. Exhs. 107-113.[17]  By contrast, McBride had no discipline in the year prior to his bid for Piler

---

[17] Joseph Allen Wood was promoted to Roll Mill Mechanic with a disciplinary suspension in the prior twelve months for trying to strangle another employee, misconduct and rules violations. Pl. Exh. 107. Frederick Linder was promoted to Millwright in the Roll Mill in June 2002 with a disciplinary suspension in the prior fifteen months for poor performance and safety, and two previous disciplinary suspensions and one written warning for the same thing, for a total of three suspensions and other disciplinary incidents before his promotion. Pl. Exh. 108. Brian Stahl was promoted to Millwright in January 2001 with two disciplinary warnings in the prior twelve months, one for destruction/defacing of property and another for

Operator based on the June 10, 2005, Job Posting awarded to Brannen. He had only one discipline prior to his bid for the Piler Operator job given to Allen Rice. Pl. Exh. 41 at ¶34.

Such evidence raises a serious credibility issue as to whether discipline was really relied upon for anything other than a convenient excuse for not promoting black employees. As held by the Eighth Circuit in a similar context where the employer's stated reason for denying promotions didn't ring true:

> "[R]ejection of the defendant's proffered reasons ... will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and ... upon such rejection, 'no additional proof of discrimination is *required.*' " *Id.* (citation omitted).
>
> &ast; &ast; &ast;
>
> Thus, Kobrin may overcome summary judgment by producing evidence that, if believed, would allow "a reasonable jury to reject the defendant's proffered reasons for its actions." *Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1109 (8th Cir.1994).
>
> &ast; &ast; &ast;

---

poor attitude, conduct and safety. Pl. Exh. 109. Wencel Beggs had numerous disciplinary warnings, including two disciplinary suspensions, before he was made a Lubricator in August 2002. Pl. Exh. 110. Beggs also had been disciplined in the twelve months prior to his promotion to Lubricator in August 2002. *Id.* His two prior disciplinary suspension were for "blatant" insubordination and leaving his assigned work area without authorization. *Id.* Rudi Cagle was promoted to Roll Turner on October 26, 2003 with a disciplinary warning in the prior twelve months for poor performance and at least one other disciplinary warnings for other performance problems. Pl. Exh. 112. Bruce Luttrell was promoted to Roll Turner, which is a leadman job, in October 2003 with a prior disciplinary suspension for sleeping on the job and eight other disciplinary incidents for refusal to perform, misconduct and poor performance and safety. Pl. Exh. 113. Brett Richardson was promoted to Cooling Bed Inspector in June 2004 with a written disciplinary warning for poor performance in the prior twelve months and a disciplinary suspension for poor performance in the prior fourteen months. Pl. Exh. 95. The conduct which caused his suspension required the roll mill to be shut down for 36 hours and caused damage to the newly replaced refractory furnace. *Id.* James Brandenburg was promoted to Repair Bed Helper on September 5, 2002, despite having been suspended in the prior twelve months for poor performance and rules violations, and despite having a prior suspension and at least four disciplinary warnings for poor attitude, poor performance, misconduct and safety violations as well as numerous accidents. Pl. Exh. 96. Matthew Estes was promoted to Charge Crane Operator with one prior disciplinary suspension and numerous disciplinary warnings for poor performance, attitude problems, and safety and for inadequate paperwork and rules violations. Pl. Exh. 97. Robert Rayburn was moved from Repair Bed Helper to Cooling Bed Inspector in June 2000 after he had been disciplined for refusing to come to work while on call. Pl. Exh. 98.

There is evidence, however, that the Department was not concerned at all with the core areas when it was searching for a second professor. First, when comparing Kobrin's qualifications to Canning's in depositions, the University's witnesses focused on Canning's allegedly superior background in critical theory. Moreover, Sousa, the chair of the search committee, testified that the emphasis on the second position was on the critical theory area and that the search committee simply selected for interviews the semi-finalists from the search for the first position who were the strongest in critical theory. *See* II Jt.App. at 305-06. Thus, there is evidence that the Department in practice disregarded the core areas in its search for a second professor. *See Cotton v. City of Alameda,* 812 F.2d 1245, 1249 (9th Cir.1987) (explaining that the issue is whether one candidate is more qualified than another with respect to the criteria that the employer actually uses). If a jury found that the Department ignored the core areas in the selection process, it could find pretextual the University's current claim that Kobrin was less qualified than Canning because Jha had already filled the emergent literature position.

*Kobrin,* 34 F.3d at 703.

McBride and the other plaintiffs have also shown that the discipline they received in 2002-2004 was both retaliatory and racially discriminatory. Pl. Exh. 41 at ¶¶30-32; Pl. Exhs. 86-118, 173, 182.

31.     When I began to oppose the pattern of racial discrimination and harassment at Nucor in 2002-2003, my supervisors began to discipline me several times in the following months between July 19, 2003 and June 7, 2004. I had never been disciplined before then, but immediately following my participation with the other plaintiffs filing EEOC Charges I was given five Notice of Warnings for petty matters that other employees were not disciplined about. Prior to the first such discipline on July 18, 2003, I had never received any discipline. My conduct and performance after I began opposing Nucor's racial discrimination in 2002 was no different than it had been in the prior five years when I wasn't disciplined or counseled about such matters, but as soon as I began my opposition and participation with other employees in EEOC proceedings in 2002 I began to be singled out to be disciplined for things that had previously been permissible and that weren't any different than what other employees were allowed to do. I was disciplined for petty matters for which white employees and employees who had not participated in EEOC proceedings were not disciplined. I did nothing wrong, however, and followed the normal procedure that everyone else did in similar circumstances. I was also given a non-disciplinary "Notice

29

of Counseling Sessions" in November 2002 after I had begun acting in concert with other black employees to oppose Nucor's racial discrimination and to bring such matters to the attention of the Equal Employment Opportunity Commission. The other plaintiffs who were participating with me in opposing Nucor's racial discrimination in 2002 also began to be singled out for discipline and "counseling" in the same way. Ozzie Green had not been disciplined in more than five years before he began participating in the same EEOC proceedings, but between February 19, 2003 and January 23, 2004 he was given four Notice of Warnings for petty matters that would not normally result in discipline. Rodney Washington, who hadn't been disciplined in more than five years, was suddenly discharged in September 2003 a few months after he filed EEOC Charges. He was allegedly fired for hitting a window in his work cubicle, but white employees who had not filed EEOC Charges were only suspended when they physically attacked or struck other employees. The other plaintiffs who participated with me in the same EEOC Charges in 2002-2003 were also disciplined in the period immediately following such participation for things that normally did not result in discipline. Cornelius Bennett was disciplined for being five minutes late in March 2003; Clifton Lee was disciplined for asking a question in August 2002, for a minor safety issue in September 2002, and for talking to a cook in the cafeteria while off-duty in September 2003; and Sylvester Rogers, who had not had any discipline in the prior two years, was suddenly disciplined for making a joke about watermelon to several black co-workers in 2004.

     32.     My supervisors began to discipline me every so often to make sure there was always something in my file to use as an excuse for my not being promoted. I would be disciplined for petty matters that white employees were not disciplined for or whenever job openings were about to occur at a time when I had not been recently disciplined. Discipline, attendance, and safety allegations are factors that are not equally applied and that have been used as an excuse to deny promotions to me and other persons of my race. The attitudes I have experienced with white supervisors leads me to believe that my race and that of other black employees makes a difference in how we are treated and viewed for discipline, promotions and training. It has been my experience that persons of my race are watched closer and disciplined quicker and more often than white employees I have known in similar circumstances. This has caused me to be given discipline that I don't believe I would have been given if I were of a different race. In my experience at Nucor, this practice has had an adverse impact or effect on African-Americans' rate of bidding and promotion. It has had that effect on me in the way I have described in this Declaration and the earlier one I filed in February of this year.

*McBride Decl.* at ¶¶31-32.

McBride's and the other plaintiffs' evidence is similar to that the Eighth Circuit found sufficient in

*Bassett*, 211 F.3d at 1107-1108:

> If Bassett's evidence is taken as true, a jury could well find that she was targeted for a discharge from the beginning.
>
>       &ast; &ast; &ast;
>
>    The district court's opinion best sums up the theory of discrimination alleged by Bassett:
>
> > Bassett's basic contention is that she was specifically targeted for discipline by Roland and other city superiors, and that this targeting was motivated by her race. Bassett relies on evidence showing that she was sharply reprimanded for minor workplace rule infractions, denied personal requests granted to other specialists, and secretly taped by Roland when she talked with Roland on the phone. Bassett also contends that Roland "built a file" against her in order to justify any adverse employment decisions made by Roland and the city.
>
> Dist. Ct. Op. at 7. There is sufficient case law to support Bassett's theory. *See Kim v. Nash Finch Co.*, 123 F.3d 1046, 1066 (8th Cir.1997) (considering evidence that employer attempted to discredit employee by "papering" his personnel file); *Mays v. Williamson & Sons Janitorial Servs., Inc.*, 591 F.Supp. 1518, 1522 (E.D.Ark.1984) (supervisor placing allegations of misconduct in employee's personnel file without notice to employee is "highly suspect practice"), *aff'd*, 775 F.2d 258 (8th Cir.1985).
>
>    In considering Bassett's claim, the district court discounted the fact that a file was built on Bassett and not on others. The court then concluded that Bassett was a problematic employee and a disruptive force in the office environment. As our overall analysis has detailed, however, there is conflicting evidence as to whether Bassett was an unsatisfactory employee or whether Roland targeted her from the beginning of her employment. From nearly the first day of Bassett's employment, Roland built a personal file on Bassett-but did not initially maintain a similar file on the other three specialists until told to do so by City supervisors. The City's evidence of alleged misconduct relies heavily on Roland's personal notes which were written as much as six months after-the-fact and transcribed from an original calendar planner that Roland was unable to produce during discovery. These facts could weigh heavily in Bassett's favor as evidence of pretext for racial discrimination.

*Bassett*, 211 F.3d at 1107-1108.

### B.    Rodney Washington

The same type of evidence supports Rodney Washington's claims.  He provides a detailed

statement of his qualifications based on Nucor's posted qualifications for the following jobs that he bid on:

| JOB BID ON | DATE POSTED | PERSON SELECTED |
|---|---|---|
| Mill Operator | May 29, 2001 | Jeffrey Stobaugh |
| Lubricator | July 18, 2002 | Michael Smith |
| Leadman | February 3, 2003 | Robert Despain |
| Rotary Straightener | March 18, 2003 | Jim Gilmer |
| Lubricator | August 3, 2003 | Tim Rudick |
| Roll Turner | September 16, 2003 | Rudi Cagle |
| | | Bruce Luttrell |
| Leadman | September 12, 2003 | Mark Warren |
| | | Danny Roberts |

Pl. Exh. 40 at ¶¶3, 6, 9, 12, 14-24.

The Court's earlier Order has already noted the following about Washington's claims regarding

each of the foregoing job opportunities from his original Declaration filed last February:

> Plaintiff Washington worked at the Blytheville plant from 1993 until his discharge
> in 2003.  Washington testifies that he bid on several jobs during his employment at Nucor,
> but each time his bid was rejected in favor of a white applicant.  Docket entry #71, Ex. 2,
> ¶¶5-6.  He states that he was especially interested in being promoted to a supervisory
> position, but he had no means to learn about openings for supervisors.  *Id.,* ¶11.
> Washington states that "large areas" of the Blytheville plant are segregated by race and that
> "it is well known that there were certain areas . . . where a black person would not be
> allowed to work . . . referred to as the 'white house.'"  *Id.,* ¶22.
>     Washington states that black employees at the Blytheville plant receive unfavorable
> treatment compared to similarly-situated white employees in the areas of discipline,
> training, and promotions.  He states, "Discipline, attendance, and safety . . . are factors that
> are not equally applied and . . . have been used as an excuse to deny promotions to me
> and other persons of my race."  *Id.,* ¶10.  Washington recounts the following instances
> where Nucor denied his bids for promotions to non-supervisory positions:
>
> •    In May 2001, Washington bid on an opening for a mill operator in the roll mill
>      department.  Washington states that before the job was posted, white supervisors

and managers selected a white employee, Jeffrey Stobaugh, to fill the opening.

- In July 2002, Washington bid on an opening for a lubricator job in the maintenance department. Qualifications for this position include passing a written test. Washington states that, out of all the bidders for the job, he earned the highest test score. Washington states that despite his score, a white employee received the job after Washington's supervisor placed false information about his attendance in his personnel file. Washington claims that he has received harsher discipline regarding his attendance and safety issues than white employees and that Nucor used his disciplinary record as an excuse to deny him promotions.

- In February 2003, Washington bid on an leadman position in the roll mill department. Washington claims he was qualified for the job, but Nucor selected Robert Despain, a white employee. Washington claims that Despain uttered racial epithets on a daily basis and used his company's computer system to send racially offensive email messages to other employees throughout the plant.

- In March 2003, Washington bid for a rotary straightener operator job in the finishing area of the roll mill department. A white supervisor, Glen Ellis, awarded the job to Jim Gilmer, a white employee. Washington claims that Ellis provided Gilmer on-the-job cross training that helped him qualify for the job. Washington claims that he was denied similar cross training because he is black.

*Order* at pp. 6-7 (Doc. 123).

The foregoing testimony that the Court recites from Washington's initial Declaration establishes a

*prima facie* case for both the unposted supervisor vacancies and the five posted non-supervisory jobs

listed above in the Court's Order. Pl. Exh. 2 at ¶7(a-d), ¶¶8-9; Pl. Exh. 40 at ¶¶3-27. Washington's

supplemental Declaration filed in opposition to summary judgment also details his qualifications for both the

unposted supervisory jobs and the posted non-supervisory jobs that he bid on in even more detailed terms

than his original Declaration recited in the Court's Order. Pl. Exh.40 at ¶¶3-27.

Despite the clarity of the Court's description of the evidence supporting Washington's claims

regarding the promotions he sought, Nucor has not responded to any of them except the Lubricator job

awarded to Michael Smith. For the other seven jobs listed in the Court's prior Order and Washington's

Declaration, Nucor does not identify any qualification that Washington failed to satisfy. Nor does Nucor

provide any decisionmaker's affidavit or testimony as to why the white employees listed above were

selected over Washington. Even if Nucor had presented any such testimony, Washington's Declarations

clearly establish a genuine issue of material fact regarding his qualifications for such jobs sufficient to

establish a *prima facie* presumption of racial discrimination, and Nucor has left such presumption

unanswered by any decisionmaker who articulates a legitimate, non-discriminatory reason for selecting any

of such white employees rather than Washington. Pl. Exh.40 at ¶¶3-27. Nucor's summary judgment brief

and evidentiary submission simply ignore every promotion that Washington was denied except Lubricator,

and the evidence is disputed for that job.

Washington's qualifications demonstrated in his Declarations are not "conclusory", but are stated

in very discrete and concrete terms regarding each knowledge, skill, ability and other qualification that

Nucor listed on the job postings for such jobs. Pl. Exh.40 at ¶¶3-27. For the one job that had a written

test to establish comparative qualifications — Lubricator — Washington has also shown that he scored

the highest on Nucor's test for the Lubricator job, but was still not selected. Pl. Exh. 2 at ¶9; Pl. Exh. 40

at ¶¶15-18. The Court noted his testimony on this point in the earlier Order on class certification. *Order*

at 6-7 (Dkt. #123). Nucor has not identified any specific qualification he lacked for any of the supervisory

or non-supervisory jobs that he bid on and that are the basis of his claim. For example, Nucor's records

show that Jim Gilmer was promoted to Rotary Straightener without any prior cross-training on the job.

Such records show his "training completed" on May 9, 2003, for this job which was well after the March

10, 2003 Job Posting he and Washington bid on for such job.

Nucor's generalized assertion that Washington had "six workplace accidents and . . . seven

disciplinary incidents during his employment" is disputed. Pl. Exh. 40 at ¶¶7-9, 13, 18, 20, 22, 24.

Washington has shown that he didn't have "seven disciplinary" incidents at any point in time, much less during the year prior to the promotions he sought. *Id.* The evidence shows that only discipline in the prior year is considered for promotions and that Washington had no such discipline at the time of any of the jobs he sought. Pl. Exh. 40 at ¶7; Pl. Exh. 169. Nucor's expert, Dr. Welch, investigated defendants' practices and determined that: (1) the Company looks only at "whether the employee had a verbal or written warning or a suspension the previous year" before a given posting; and (2) that Nucor's application form itself asks only "whether the applicant . . . has had any written warnings in the past year." *Welch Rpt.* at 4 & 16 (Def. Exh. 4); *Bradley Supp. Report* at 15-18 (Dkt. #88; Dkt. #71 at Pl. Exh. 22 (copy of Nucor's promotion application form). Nucor's management has stated that discipline will be considered only if it occurred in the twelve months before an application or bid for promotion. Pl. Exh. 40 at ¶7. Nucor's standard application form for promotions, known as a "Job Bid fForm", asks only for written disciplines "in the past 12 months." Pl. Exh. 169. The questions on the Job Bid Form are: "In the past 12 months have you received any written disciplinary warnings. If yes, for what reasons." Pl. Exh. 169.

No decisionmaker has disputed that fact or supported the contention in Nucor's brief that Washington had seven disciplinary incidents. More importantly, Nucor has not shown any discipline to have been known or relied upon by the decisionmaker for such jobs. The case law already cited at page 5-11 prohibits mere attorney-based allegations to function as a response to a *prima facie* case or a basis for summary judgment. The only decisionmaker testimony submitted by Nucor — that of the Maintenance Department Manager, Rick Ramsdell, for the Lubricator job awarded to Michael Smith — does not mention Washington's discipline or indicate that it was either known, relied upon or different than Smith's disciplinary record. *See* Def. Exh. 104 at 197-202. Thus, discipline is obviously irrelevant to Washington's Lubricator claim. *Burdine*, 450 U.S. at 254.

The fact that the decisionmaker never mentions discipline is a good example of why the courts are prohibited from relying upon raw records or attorney-based speculation based on such records. Without any testimony from the decisionmaker's themselves as to what they knew or found important for the other seven jobs Washington sought, there is no basis in the current record to assume that the decisionmakers for these jobs knew about or relied upon any comparison of Washington's disciplinary record to that of the persons selected. Nucor's brief and evidence is simply silent on this issue. Nucor attempts here what was rejected as legally insufficient in a similar case: "Mere contentions not backed by evidence are manifestly insufficient." *McCulley v. Allstates Technical Services*, No. Civ.A. 04-0115-WS-B, 2005 WL 1475314 *7 (S.D. Ala. 2005); *see also* cases cited at pp. 5-11 *supra*.

The only testimony presented on the subject is that of the plaintiffs which shows that many of the white employees selected for the same jobs had extensive disciplinary records. For example, Washington and the other five plaintiffs identify white employees who were promoted with substantial disciplinary records to the same Mill Operator, Leadman, Lubricator, Roll Turner jobs that Washington bid on and was denied. Washington's Declaration states the following:

> I had no discipline in the nearly three years before my bid for Mill Operator in 2001.
>
>           * * *
>
> Many of the white employees promoted to mill area jobs had prior disciplinary records. For example, James Hymas was promoted to Reheat Stocker in the mill area even though he had been previously disciplined for starting a heated argument in which he physically pushed and cussed a black employee, Michael Brown, and was given a two-day suspension with loss of bonus. Hymas was promoted to Reheat Stocker on October 12, 2001 in the mill area crews with at least five prior disciplinary warnings, including a disciplinary suspension for cursing and pushing a fellow employee, for poor performance, safety and rules violations. Earl Draughn was promoted to temporary Utility Man on October 27, 2003, permanently to the position on November 17, 2003 in the roll mill area with at least two prior suspensions for misconduct and

36

poor performance, and at least seven other disciplinary incidents for poor performance, poor attendance, punctuality and safety. Roger Jefferson was promoted to Mill Operator in July 2001 in the mill area crews with a prior disciplinary suspension for rules violations and three prior disciplinary warnings for misconduct, poor attendance and poor performance. He was then promoted to Roll Mill Leadman in March 2003 in the mill area with this same disciplinary history. Tracy Kelly was promoted to Sample Inspector in July 2001 with a safety issue in the prior twelve months and then promoted to Roll Guide Builder in September 2003 with a written warning for poor performance and safety in the prior twelve months and at least five other disciplinary incidents for poor attitude, communication, performance and safety in the prior two years. Scott Lindsey became a Relief Operator in March 2002 with two disciplinary suspensions in the prior twelve months. Erick Rouse was promoted to Utility/Crane in the mill area in 2003 with at least two prior disciplinary warning for safety violation causing injury. Robert Sharp was promoted to Reheat Heater in the mill area in 2005 with at least two prior disciplinary suspensions for poor performance and at least four other disciplinary warnings for poor attitude, performance and safety. William Vassar was promoted to Sample Inspector in May 2004 with a disciplinary warning for poor attendance in the prior twelve months and a disciplinary warning for poor performance in the prior two years. Lester Mann was promoted to the Reheat Stocker job in the mill area of the plant on January 11, 2004 despite the fact that two months earlier on November 4, 2003 he had been written up for poor job performance that caused a loss of 380 tons of steel which had to be scrapped.

\* \* \*

I had not been disciplined for anything in the five years preceding my bids for Leadman. White employees, however, had extensive prior disciplinary records before they were promoted to Leadman positions. Mikle Crawford was promoted to Leadman in the Roll Mill Department in November 2002 with at least five disciplinary incidents for misconduct, poor attendance, poor performance, rules violations and safety violations and he continued the same pattern with at least two additional disciplinary warnings for poor attitude, poor attendance and misconduct after he became Leadman. Johnnie Hawkins was promoted to Ladleman in 2003 with at least four prior disciplinary warnings for poor attendance and performance and rules violations. Paul Williamson was promoted to Repairman Helper in March 2002 and later to Leadman in 2005 with at least eight prior disciplinary incidents for poor performance, safety and rules violations. Glenn French was promoted to Leadman in the Roll Mill on August 6, 2001 despite the fact that he received a written warning two months earlier on June 12, 2001 which caused 250-260 tons of steel to

37

be scrapped. The mistake was characterized as a "devastating time, tons of revenue loss." Howard Kelly was promoted to Supervisor in September 2002 with at least three prior disciplinary warnings for poor performance.

\* \* \*

I had not been disciplined in the four years preceding my Lubricator bids in 2002-2003. White employees, however, had extensive prior disciplinary records before they were promoted to Lubricator positions. For example, Wencel Beggs had numerous disciplinary warnings, including two disciplinary suspensions, before he was made a Lubricator in August 2002. Beggs also had been disciplined in the twelve months prior to his promotion to Lubricator in August 2002. His two prior disciplinary suspension were for "blatant" insubordination and leaving his assigned work area without authorization. I have already listed white employees who were promoted to similar jobs even though they had prior disciplinary records.

\* \* \*

I had not been disciplined for anything in the four years prior to the Rotary Straightener job being given to Gilmer in 2003. White employees were promoted to similar jobs, however, even though they had prior disciplinary records. For example, Brett Richardson was promoted to Cooling Bed Inspector in June 2004 with a written disciplinary warning for poor performance in the prior twelve months and a disciplinary suspension for poor performance in the prior fourteen months. The conduct which caused his suspension required the roll mill to be shut down for 36 hours and caused damage to the newly replaced refractory furnace. James Brandenburg was promoted to Repair Bed Helper on September 5, 2002 despite having been suspended in the prior twelve months for poor performance and rules violations, and despite having a prior suspension and at least four disciplinary warnings for poor attitude, poor performance, misconduct and safety violations as well as numerous accidents. Matthew Estes was promoted to Charge Crane Operator with one prior disciplinary suspension and numerous disciplinary warnings for poor performance, attitude problems, and safety and for inadequate paperwork and rules violations. Robert Rayburn was moved from Repair Bed Helper to Cooling Bed Inspector in June 2000 after he had been disciplined for refusing to come to work while on call.

\* \* \*

I had not been disciplined for anything in the three years prior to various white employees being promoted to Supervisor. White employees, however, had extensive prior disciplinary records before they were promoted to Supervisor and similar Leadman positions. For example, Howard Kelly was promoted to Supervisor in September 2002 with at

38

least three prior disciplinary warnings for poor performance.

\* \* \*

I had not been disciplined for anything during the five years prior to my bid for Roll Turner. The person selected for promotion to the Roll Turner job I bid on, Bruce Luttrell, had been given a disciplinary suspension for sleeping on the job and had eight other disciplinary incidents for refusal to perform, misconduct and poor performance and safety. Rudi Cagle was promoted to Roll Turner on October 26, 2003 with a disciplinary warning in the prior twelve months for poor performance and at least one other disciplinary warnings for other performance problems.

Pl. Exh. 40 at ¶¶7, 8, 13, 18, 20, 22, 24.

Although Washington never had "seven disciplinary incidents" at any point in time, most of what Nucor's attorneys are calling "discipline" was actually part of the company's *non-disciplinary* "Notice of Counseling Session" forms:

I had no discipline in the nearly three years before my bid for Mill Operator in 2001. Nucor's management has stated that discipline will be considered only if it occurred in the twelve months before an application or bid for promotion. Nucor's standard application form for promotions, known as a "Job Bid Form", asks only for written disciplines "in the past 12 months." The questions on the Job Bid Form are: "In the past 12 months have you received any written disciplinary warnings. If yes, for what reasons." A copy of such standard application form is attached. Even without that 12-month restriction, I had no "Notice of Warning" in the three years preceding my rejected efforts in 2001-2003 to obtain a job in the mill area of the plant. Discipline at Nucor is put on an official form known as a "Notice of Warning", and I had not been issued such a disciplinary notice since mid-1998. Nucor's "Notice of Warning" form has three standard forms of progressive discipline listed on it: "verbal warning", "written warning" and "suspension." Verbal warnings considered to be discipline are placed on this form rather than a separate standardized form called a "Notice of Counseling." "Notice of Counseling" forms are not to be considered to be "discipline." Such Notice of Counseling forms sometimes included positive commendations or congratulations that were obviously not disciplinary in nature.

Pl. Exh. 40 at ¶7.

Nucor's attorneys count "Notice of Counseling" forms as "discipline" even through Nucor's

officials have also testified that they are not disciplinary in nature, and the forms themselves often bear

congratulations and other positive commendations that are obviously not disciplinary in nature. *See e.g.* Pl.

Exh. 40. For example, one of Nucor's chief management witnesses, Glen Ellis, testified as follows:

> Q And let's look at the first document behind exhibit D, which
> is Bates number 31166D1. Is this a disciplinary form or an evaluation?
> A This is a counseling form.
> Q Were you disciplining Mr. McBride?
> A No, ma'am. This is -- this is a counseling form. This is not
> used for disciplinary action. We have a separate form for that.

*Ellis Depo.* at 47 (Pl. Exh. 183). Discipline is recorded on a form called "Notice of Warning", which is

a completely different form than the "Notice of Counseling" that Nucor's attorneys are trying to count as

"discipline." Ellis' testimony and the forms themselves show once again why lawyer-driven speculation

about what might have been considered by a decisionmaker is not a permissible means of responding to

a *prima facie* case in this area of the law.

Four of Washington's six "accidents" referenced by Nucor's attorneys occurred in 1993-1995 and

involved such minor things as bruising his back when his foot slipped in September 1993, bruising his heel

on a beam "pinch point" in June 1994, straining his back in lifting a hundred pound spacer in August 1994

and then restraining his back agin in May 1995. He had no other "accidents" for the next six years until

August 2001 when he got an "electrical shock" from a source that could never be determined. *Id.* His only

other "accident" was when a 350 pound spacer slipped and cut his finger in May 2002. *Id.* None of these

six occasions ever resulted in any disciplinary warning or "Notice of Counsel Session" being issued, and

no one came forward to testify that they played a role in any of the promotions that Washington was

denied.

There is also a genuine issue of material fact regarding the one vacancy for which Nucor has

submitted a decisionmaker's testimony — the 2002 Lubricator promotion given to Mike Smith that is

discussed in Rick Ramsdell's deposition. First, Ramsdell has not stated that discipline had anything to do

with his decision, and it is undisputed that Washington had not been disciplined in the five years before his

Lubricator bids.[18] Nucor's argument that Mike Smith had better "knowledge, background and experience"

than Washington is directly disputed by Washington's higher score in the test for that job. Pl. Exh. 40 at

¶15. This Court has already noted such evidence and the fact that "lubricators must pass several tests and

have specialized training to ensure they meet the required levels of technical knowledge and proficiency."

*Order* at 4, 6-7 (Doc. 123). In addition, one of Nucor's interviewers who was charged with determining

the comparative qualifications of Smith, Washington and other candidates, Danny Lee, states in his

Declaration that:

> 2.      During my career at Nucor I have participated in
> interviews of applicants for various vacancies in the Maintenance
> Department. I participated in the interview process to fill the position of
> Maintenance Lubricator that was posted in July of 2002. Among those
> present during the interviews, besides myself, were my supervisors and
> co-workers.
>
> 3.      With respect to the Maintenance Lubricator position in
> July of 2002, I participated in the interviews of, among others, Rodney
> Washington and Mike Smith. Rodney Washington performed outstanding
> during his interview, was very well prepared and answered every question
> asked of him correctly.   During the interview Mr. Washington
> demonstrated that he possessed the necessary knowledge, skills and
> ability to be successful in the Lubricator position. Based on his answers

---

[18] Even if Nucor had considered "Notice of Counseling" forms to be disciplinary *arguendo*, the plaintiff had no such "Notice of Counseling Session" in the twelve months preceding Smith's selection for the Lubricator job in July 2002. Washington's Declaration and Nucor's records show that discipline is considered only when it has occurred within 12 months of the promotion at issue. Even without that 12 month restriction, Washington had no "Notice of Warning" and only two "Notice of Counseling" in the five years preceding Smith's selection over Washington in late 2003. Pl. Exh. 40 at ¶18. Washington has also shown that non-African Americans have been promoted to Lubricator and similar jobs despite extensive disciplinary and accident records. Pl. Exh. 40 at ¶18.

during the interview, and my experience as a Lubricator, it was obvious
to me that Mr. Washington was very well qualified for the position.

5.      I also participated in Mike Smith's interview and he did
not perform as well as Rodney did in his interview.

6.      Mr. Washington was clearly the best candidate for the
Lubricator position that I interviewed. After interviews were completed
the interviewers caucused to discuss the candidates' performance and
relative qualifications. The consensus among the other interviewers that
I talked to was that Mr. Washington was the best qualified applicant. I
was very surprised to learn that Mike Smith was awarded the position
over Rodney Washington.

Pl. Exh. 46 at ¶¶2-6.

Such a credibility choice between the opposing testimony of Lee and Ramsdell precludes summary

judgment. The Supreme Court has recently reiterated that a movant's official's testimony cannot be relied

upon at the summary judgment or judgment-as-a-matter-of-law stage of a Title VII case because their

interest in the case creates an inherent credibility choice regarding their testimony. *Reeves v. Sanderson*

*Plumbing*, 530 U.S. 133, 147-148 (2000). The following additional evidence also establishes credibility

issues regarding Ramsdell's reason for selecting Smith:

- The only objective indicator of qualifications was the test for the Lubricator job
  which Washington scored higher than Smith. The remainder of the decision in
  Smith's favor was entirely subjective. Pl. Exh. 40 at ¶16.

- The test was taken directly from the duties and responsibilities of a Lubricator, and
  the knowledges, skills and abilities necessary to perform that job. If Smith had
  more experience, or training or qualifications than Washington, he would have
  scored higher on a test that was taken from the content of the job itself. Pl. Exh.
  46 at ¶¶6-9.

- Ramsdell's subjective opinion that Smith's experience and training made him better
  qualified was contradicted by the test results because such results were based on
  the content and qualifications of the Lubricator job. Pl. Exh. 46 at ¶¶6-9.

- Ramsdell's opinion is contradicted by the results of the actual interview panel who
  rated Washington as better qualified from Smith. *See* Declaration of Danny Lee,
  who was on the interview panel. Pl. Exh. 46 at ¶¶7-9..

42

- Nucor's officials recognized this contradiction in their reason for selecting Smith when they began trying to manipulate the test scores in three distinct ways in order to help Smith falsely appear to be better qualified than Washington: (1) Smith was allowed to restate the test after he had been advised of the correct answers to questions he missed the first time; (2) Smith was given credit for test questions that he had obviously answered incorrectly; and (3) Smith's test was graded by a different method than that applied to Washington.

- Despite these three forms of disparate treatment, Washington still scored higher than Smith. Pl. Exh. 40 at ¶16.

- The Maintenance Department jobs are filled almost exclusory by non-black employees.

- Washington's test score shows that he didn't need to cross train and was fully qualified despite not having had the opportunity to receive such cross-training. Pl. Exh. 46 at ¶¶6-9. He has also shown that such cross-training was not available to black employees who were not in the Maintenance Department. Id.

In addition, one of the interviewers, Danny Lee, has testified that Smith's test was graded more

leniently than Washington's:

> 7.      I have personally reviewed the Lubricator tests that were given to Rodney Washington and Mike Smith. Based on my experience and knowledge of the Lubricator position, I believe that Mr. Washington performed better on the written evaluation than Mr. Smith. In general, Mr. Washington's answers are more complete and thorough than Mr. Smith's. Also, in some instances, where Smith and Washington gave similar answers, Mr. Washington lost credit for his answer and Mike Smith did not. For example, in response to question 45 "What is glycol?" Mr. Smith answers "A waterbased synthetic fluid." He is given full credit for his response. Mr. Washington answered the same question with "A waterbased hydraulic fluid." Mr. Washington's answer was marked as being wrong, the test grader's notes appear to indicate that Mr. Washington's answer was wrong because it did not state that gylcol is "40% water-60% di-ethylene, ethylene, propylene." I can see no reason why Mr. Smith received credit for his answer and Mr. Washington did not.
>
> 8.      Additionally, it appears Mr. Smith was given credit for an incorrect answer. His answer to number 27 is not correct, yet it appears he received credit as if it was correct.   Also, Mr. Washington was docked one point for his answer to number 26, which states "What is

sludge in gearbox?" Mr. Washington's answer is "metal shavings, water, and dirt." He is deducted a point and the test grader's notes appear to indicate that Mr. Washington's answer was wrong because it did not state "Insoluble material formed as a result either of deteriorate reaction in an oil by contamination of an oil or both." However, Mr. Smith, whose answer to the exact same question was "Broke down lubrication, contamination" was given full credit.   Based on my knowledge of Lubrication I believe that Mr. Washington's answer was just as valid as Mr. Smith's and don't see why Mr. Washington was deducted points for his answer.  Additionally, I believe that Mr. Washington's answer to number 25, which was graded as incorrect, is correct because a oil ring in bearing is used to "lubricate the bearing". This is just as accurate an answer as Mr. Smith's answer that was not found to be incorrect which stated that it "distributes oil in bearing."

        9.     In my view, Mr. Washington should not have been deducted 3 for number 37 on the test. The grading indicates that Mr. Washington got "a" correct" yet missed "b" and "c." However, Washington's score for the question was a "-3." Mr. Washington should have received one-third credit for his answer to number 37, and likewise should have received 75% credit for his answer to number 38.

Pl. Exh. 46 at ¶¶7-9

As to discipline, Washington's supplemental Declaration and his personnel file show that he had

*no discipline* in the five years preceding Smith being selected for Lubricator in July 2003. Pl. Exh.40 at

¶3.[19]    Nucor's argument that Washington was rejected for Lubricator because "he stated his five-year

goal was to be self-employed and not working for Nucor-Yamato" is a disputed issue of fact that precludes

summary judgment.  Washington testifies that he never said this, that he made it clear in his interview that

---

[19]Discipline at Nucor is put on an official form known as a "Notice of Warning", and I had not been issued such a disciplinary notice since mid-1998. Nucor's "Notice of Warning" form has three standard forms of progressive discipline listed on it: "verbal warning", "written warning" and "suspension." Verbal warnings considered to be discipline are placed on this form rather than a separate standardized form called a "Notice of Counseling." "Notice of Counseling" forms are not to be considered to be "discipline." Such Notice of Counseling forms sometimes included positive commendations or congratulations that were obviously not disciplinary in nature.

if he obtained the job he was seeking he would remain with Nucor permanently and that he also made it

clear in writing when he answered Nucor's questionnaire regarding this job. It has now been nearly five

years since Washington's alleged comment in 2002, and he still has not made any effort to become "self-

employed." In addition, Jonathan Marshall was promoted even though he admitted on January 6, 2003

that he had been "involved with my two businesses that I started six years ago", which was before he was

promoted to Inspection Bed Tagger in September 2000. Pl. Exh.70 (1NYS-005169).

### C.    Clifton Lee

Clifton Lee has provided the same type of detailed testimony concerning his qualifications for the

promotions he sought based on Nucor's posted qualifications for such jobs. Pl. Exh. 44 at ¶¶5-15. A

white employee, Jim Gilmer, was selected for the Rotary Straightener Operator that Lee bid on, and

another white employee, Jeremy Davis, was selected for the Cold Saw Operator job that Lee sought. *Id.*

Nucor has not identified any qualifications that Lee lacked for either such job or argued that the

white employees selected were better qualified. It has limited its response instead to one contention—that

he "voluntarily withdrew both of those bids before the job selection decision was made", citing affidavits

from two Supervisors, Keith Shelton and Glenn Ellis. *Def. Br.* at 36-37 (citing Def. Exhs. 83 and 84). Mr.

Lee, however, has submitted his own Declaration stating under oath that he didn't withdraw his application.

He states:

> 10.    The only reason that I understand Nucor to have argued for not promoting
> me is that I withdrew my bid. That is untrue. I did not withdraw any bid. I had substantial
> doubts that I would ever be promoted because of my race and the racial discrimination and
> hostility I described in my earlier Declaration filed last February, but I went ahead and bid
> and went through the entire selection process without withdrawing my bid.

Pl. Exh. 44 at ¶¶ 7 & 10. Plaintiffs have also submitted the deposition of one of Nucor's officials in Mr.

Lee's Department, Don Burns, who testified that bid withdrawals or cancellations were supposed to be

in writing and signed by the employee himself.

> Q Is there a policy that when someone withdraws a bid, that it should be in writing or documented somehow?
> A There is now.
> Q How long has that been the case?
> A Since Mr. Dugan's come on.
> Q And how did you learn that?
> A He told us.

Pl. Exh. 184 (Burns Depo. at 179:4-11). Dugan has been at the Blytheville plant since August 2001, and

has been Burn's boss since that time. Pl. Exh. 185 (Dugan Depo. at 10:9-14). It is undisputed that no

such signed declaration exists for Lee's alleged withdrawal of his bid for Rotary Straightener Operator or

Cold Saw Operator. Pl. Exh. 44 at ¶¶7 & 10. Nucor has submitted an unsigned note regarding the Cold

Saw Operator job, but that note is not Lee's and is disputed by his Declaration. *Id.* As a disputed fact,

it is not a permissible basis for summary judgment. *Reeves v. Sanderson Plumbing*, 530 U.S. at 147-148.

Even if it is assumed *arguendo* that Lee withdrew his bid, his Declaration shows that Nucor had

made such bids untenable by preselecting and grooming white employees for such jobs before they were

posted. Pl. Exh. 44, ¶¶12-14. The Court has already noted the following evidence on that subject in its

earlier Order regarding class certification.

> Lee, a current Nucor employee, began working in the roll mill department in 1991. Docket entry #71, Ex. 6. Lee states that he has applied for promotions, but each time Nucor rejected him in favor of white applicants. Lee states, "My chances of promotion were hurt by the way the Company applies factors like work experience, informal training on crews, time-in-job or length of service, formal training and discipline." *Id.,* ¶9. For example, Lee states that in 2003, he bid on a rotary straightener operator job in the roll mill department, but Nucor awarded the job to a white employee who had received cross training. *Id.,* ¶6. Lee had requested cross training, but his supervisors denied his requests. *Id.* Lee states that he has been disciplined more harshly than similarly situated white employees and that "discipline, attendance, and safety allegations . . . are factors that are not equally applied and . . . used as an excuse to

deny promotions to [black] employees. *Id.*, ¶15.

*Order* at p. 10 (Doc. 123).

Lee also identified a number of supervisory and mill area jobs that he was qualified for but either couldn't bid because they weren't posted or subject to any application procedure (Pl. Exh. 44 at ¶25) or were in the racially segregated mill areas of the plant that he had observed black employees consistently being rejected for training or assignment to such area. Pl. Exh. 44 at ¶¶12-18. His evidence established a *prima facie* case under the principles of *Winbush v. State of Iowa, by Glenwood State Hospital*, 66 F.3d 1471 (8th Cir. 1995), which held that formal applications are not required where they would be futile or where there is no posting or application procedure that would allow the plaintiffs to express their interest before jobs are filled. Nucor has not responded to Lee's *prima facie* case based on *Winbush* for the jobs set forth in his Declaration last February, and in the Court's Order regarding class certification quoted above. Pl. Exh. 6 at ¶¶5-7; Pl. Exh. 44 at ¶¶ 12-18, 25. It has not identified any qualifications that Mr. Lee failed to satisfy for such jobs or come forward with a decisionmaker who states why he would not have been selected if he had applied. Summary judgment is inappropriate in this circumstance. *Burdine*, 450 U.S. at 254.

### D.   Clifton Lee's And Cornelius Bennett's Demotion From NYSII To NYSI

Clifton Lee and Cornelius Bennett have shown that their jobs at the new NYSII building were taken away from them and given to two white employees in 2003, and that they were then demoted to the older NYSI plant shortly after it became known to Nucor that they were participating in EEOC Charges and other opposition to race discrimination at the Blytheville plant. Pl. Exh. 44 at ¶¶18-21; Pl. Exh. 45 at ¶¶12-14; Pl. Exhs. 176, 180-181. Contrary to Nucor's representation, Lee and Bennett testified in their depositions that the jobs at NYSI paid less bonus hours and were otherwise less desirable than those at

47

the newer NYSII facility.  Pl. Exhs. 180-181; Pl. Exh. 44 at ¶20; Pl. Exh. 45 at ¶13.  Mr. Lee testified:

> Q   Your lawsuit claims that you lost $17,000 in pay.  How did you calculate that number?
>
> A   For the simple fact is that you work at NYS II -- it was like you get 48 hours, 60 hours, 72 hours and all those hours are bonus hours.  Every hour you work was bonus hours.  And at NYS I, you got I think like a month of 36 and a month of -- a month of 36 and a month of 48.  And if you work a 48 hour, you have a down day, you get roughly 44 bonus hours.  And it's the opposite.  If you work 36 hour, you get roughly, I think, 32 bonus hours.  Every hour we worked NYS II was bonus.  Every hour we worked NYS I was not bonus.  And you didn't have to worry about overtime because it was overtime over everybody.  At NYS II, you got to hustle to get your overtime before somebody else picked it up in front of you.
>
> Q   So how much money did you lose by being transferred from NYS II to NYS I?
>
> A   Just what it says on the paper, roughly  $17,000.
>
> * * *
>
> Q   Do you know that you made less money at NYS I than you made at NYS II?
>
> A   Yes, I do.
>
> Q   What did you look at to kind of establish that?
>
> A   I -- I just gave you the ratio.
>
> Q   So was -- was your, you know, bonus and base pay and everything like that, your total compensation, was it lower at NYS I than it was at  NYS II?
>
> A   Like I say, unless you hustle and -- and -- and -- and try to pick up bonus hours before  somebody else picked them up.
>
> Q   That's what you had to do at NYS I?
>
> A   Yes.  Because like I said, NYS II you was  guaranteed anywhere from 48 to 60 hours, you know, and then you can come up on your -- one of your off  days and get 72 bonus hours.
>
> Q   So were you able to work bonus hours, extra shifts over at NYS I?
>
> A   When the -- when the hours were available  or when somebody else didn't scarf them up.

Pl. Exh. 180 (Lee Depo. at 215-217).

Cornelius Bennet testified to the same economic loss from their transfer from NYSII to NYSI:

> Q   Mr. Bennett, how did you calculate the  $15,000 that you

48

claim you lost by being transferred from NYS II to NYS I?

    A    Well, over at NYS II, you're guaranteed 40 hours -- 48 hours -- you're guaranteed 60 hours. You have a certain amount of weeks of 40 hours and a certain amount of weeks of 60 hours, and all of -- all of it was bonus. You get a bonus for every hour you work except one hour on Sunday. You come in early on Sunday and you get 12 -- you work 13 hours, but you only get 12 hours' bonus.

    So I calculated you do 60 hours this week, 60 hours this week, 60 hours this week and you do 48 hours, 48 hours. I was getting paid a certain amount and then I was sent to NYS I and they took me down to 36 and 48 hours. Of 38 hours, you get only probably 30 -- I'm not sure -- 33 hours' bonus, 34 -- probably 36 hours' bonus. Forty-eight, you only get 44. And that times 12 months or 52 weeks, that's a big -- it's a big jump in hours that I was -- that I had lost.

    Q   Mr. Bennett, it's your position in your testimony today that you lost approximately $15,000 in earnings by being transferred from NYS II to NYS I; is that correct?

    A   Yes.

Pl. Exh. 181 (Bennett Depo. at 76:11-77:12).

Nucor's summary judgment motion disputes such testimony, but disputed facts cannot be the basis for summary judgment. Even if that were not the case, Nucor's version of the effect of the transfer is a *non-sequitur* at best. Bennett and Lee haven't claimed that their total compensation was less at NYSI, but that they had to work longer, harder and in a more difficult work environment just to replicate a similar level of total compensation. Pl. Exhs. 174, 177, 180 & 181; Pl. Exh. 144 at ¶¶19-20; Pl. Exh. 145 at ¶13. Nucor only presents their total compensation without any evidence of the hours they had to work or the other difficulties which they went through in order to achieve that compensation. Given that Nucor has such records and witnesses and has not produced them, and given too that the issue arises on summary judgment, the plaintiffs' version of the adverse effect of their transfer must be taken as true along with all reasonable inferences from such testimony and evidence.

Even if Bennett and Lee had *eventually* recaptured as much earnings at NYSI as they had at

NYSII, the Supreme Court has recently held that this fact doesn't always control because it is the adverse

effect of the action *at the time it was taken* that causes the chilling of opposition to racial discrimination

which the anti-retaliation statute was meant to protect.

> In our view, a plaintiff must show that a reasonable employee would have
> found the challenged action materially adverse, "which in this context
> means it well might have 'dissuaded a reasonable worker from making or
> supporting a charge of discrimination.' "
>
> * * *
>
> Burlington argues that the 37-day suspension without pay lacked statutory
> significance because Burlington ultimately reinstated White with backpay.
> * * * White did receive backpay. But White and her family had to live
> for 37 days without income. They did not know during that time whether
> or when White could return to work. Many reasonable employees would
> find a month without a paycheck to be a serious hardship. And White
> described to the jury the physical and emotional hardship that 37 days of
> having "no income, no money" in fact caused. 1 Tr. 154 ("That was the
> worst Christmas I had out of my life. No income, no money, and that
> made all of us feel bad. ... I got very depressed"). Indeed, she obtained
> medical treatment for her emotional distress. A reasonable employee
> facing the choice between retaining her job (and paycheck) and filing a
> discrimination complaint might well choose the former. That is to say, an
> indefinite suspension without pay could well act as a deterrent, even if the
> suspended employee eventually received backpay. Cf. *Mitchell,* 361
> U.S., at 292, 80 S.Ct. 332 ("[I]t needs no argument to show that fear of
> economic retaliation might often operate to induce aggrieved employees
> quietly to accept substandard conditions"). Thus, the jury's conclusion
> that the 37-day suspension without pay was materially adverse was a
> reasonable one.

*Burlington Northern,* 126 S.Ct. at 2415, 2417-2418. Lee and Bennett have shown in their Declarations

and in their original EEOC Charges that their demotion to NYSI had this type of chilling effect at the time

it occurred and that they were eventually only able to recapture the same level of earnings at NYSI by

working longer, harder and under more onerous working conditions than they had at NYSII. Pl. Exh. 44

at ¶¶19-20; Pl. Exh. 45 at ¶13.[20]

Summary judgment is also improper if it is assumed for the sake of argument that plaintiffs suffered

no economic loss when they were involuntarily demoted from NYSII to NYSI. An involuntary demotion

is obviously an adverse action that can reasonably deter participation in EEOC proceedings.

Nucor errs in arguing that "[t]he Eighth Circuit has held that, without a decrease in pay or

responsibilities, no adverse employment action exists." *Def.Br.* at 34 (citing *Buettner v. Arch Coal Sales*

*Co., Inc.*, 216 F.3d 707, 715 (8th Cir. 2000) If *Buettner* can be held to have said that in 2000, it was

overruled by the Supreme Court's decision in *Burlington Northern* this past June when the Court held

that:

> We phrase the standard in general terms because the significance
> of any given act of retaliation will often depend upon the particular
> circumstances. Context matters. "The real social impact of workplace
> behavior often depends on a constellation of surrounding circumstances,
> expectations, and relationships which are not fully captured by a simple
> recitation of the words used or the physical acts performed." *Oncale,*
> *supra,* at 81-82, 118 S.Ct. 998. A schedule change in an employee's
> work schedule may make little difference to many workers, but may

---

[20]The "separate but equal" doctrine would be given new life by any standard that allows employers to discriminate or retaliate so long as they provide equal wages or responsibilities. While tangible actions like hiring, firing, promoting, demoting or transferring an employee are directly covered by 42 U.S.C. §2000e-2, that provision also states that "[i]t shall be an unlawful employment practice for an employer . . . otherwise to discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment", or "to limit, segregate, or classify his employees or applicants in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee of such individual's race . . . ." 42 U.S.C. §2000e-2(a). If Nucor's "decrease in pay or responsibilities" standard were adopted, "separate but equal" racial segregation would once again become lawful so long as the segregated employees' pay and responsibilities were kept the same. *See Pullman Standard v. Swint*, 456 U.S. 273 (5th Cir. 1982. Lee and Bennett have shown in their Declarations that the mill areas in the NYSI had no black employees whatsoever and that they wanted to stay at the NYSII building to enhance their chances of obtaining a job in those areas of the plant. Pl. Exh. 44 at ¶21; Pl. Exh. 45 at ¶13. That is an action that tends to "limit, segregate, or classify employees" in the way prohibited by the plain terms of 42 U.S.C. §2000e-2(a).

matter enormously to a young mother with school age children. Cf., *e.g.,* *Washington, supra,* at 662 (finding flex-time schedule critical to employee with disabled child). A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination. See 2 EEOC 1998 Manual § 8, p. 8-14. Hence, a legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an "act that would be immaterial in some situations is material in others." *Washington, supra,* at 661.

* * *

First, Burlington argues that a reassignment of duties cannot constitute retaliatory discrimination where, as here, both the former and present duties fall within the same job description. Brief for Petitioner 24-25. We do not see why that is so. Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable. That is presumably why the EEOC has consistently found "[r]etaliatory work assignments" to be a classic and "widely recognized" example of "forbidden retaliation." 2 EEOC 1991 Manual § 614.7, pp. 614-31 to 614-32; see also 1972 Reference Manual § 495.2 (noting Commission decision involving an employer's ordering an employee "to do an unpleasant work assignment in retaliation" for filing racial discrimination complaint); EEOC Dec. No. 74-77, 1974 WL 3847, *4 (Jan. 18, 1974) ("Employers have been enjoined" under Title VII "from imposing unpleasant work assignments upon an employee for filing charges").

To be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " *Oncale,* 523 U.S., at 81, 118 S.Ct. 998. But here, the jury had before it considerable evidence that the track labor duties were "by all accounts more arduous and dirtier"; that the "forklift operator position required more qualifications, which is an indication of prestige"; and that "the forklift operator position was objectively considered a better job and the male employees resented White for occupying it." 364 F.3d, at 803 (internal quotation marks omitted). Based on this record, a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a

reasonable employee.

*Id.* at 2415-2417.[21]

Bennett's and Lee's Declarations and depositions establish this type of adverse effect. Pl. Exh. 144 at ¶¶19-20; Pl. Exh. 145 at ¶¶13-14; Pl. Exh. 174, 177, 180-181. Lee's EEOC Charge dated April 8, 2003, states under oath that his involuntary movement to NYSI was a "demotion" and "downgraded me from the position of second crew leader in NYSII to the position of roll shop employee in NYSI without my consent." Pl. Exh. 174. He states that he "had received positive evaluations in my regular position and when I served as acting crew leader", and that "in my new position I must perform more strenuous work, which will exacerbate a pre-existing medical condition [which] my supervisors were aware of . . . before my demotion." Pl. Exh. 174; Pl. Exh. 44 at ¶19. This is exactly what happened! His medial condition degenerated over the next several months to the point that he had to go on long term medical disability beginning March 19, 2004, and has since been permanently terminated from employment because of the disability resulting from his demotion to NYSI. Pl. Exh. 44 at ¶19. These are the type of "contextual facts" that the Supreme Court requires to be considered in deciding whether an action was sufficiently adverse that "it might well have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'". *Burlington Northern*, 126 S.Ct. at 2415. It falls in the same category of the example

---

[21] Contrary to Nucor's argument, the Eighth Circuit has also found adverse action in circumstances where there were no loss in pay or responsibilities. *Green v. Franklin National Bank of Minneapolis*, 459 F.3d 903, 916 n.9 (8th Cir. 2006) ("negative job reviews can constitute adverse employment actions"; citing *Smith*, 109 F.3d at 1266); *McClure v. Career Systems Development Corp.*, 447 F.3d 1133 (8th Cir. 2006) ("Suspending McClure without pay is an adverse employment action."); *White v. Burlington Northern & Santa Fe R. Co.*, 364 F.3d 789, 802 (6th Cir.2004) (employee suspended without pay suffers an adverse employment action even when reinstated with back pay); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir.2001) (suspension without pay for one week was an adverse employment action even though the employee was later reimbursed for lost wages).

given by the Court where "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." *Burlington Northern*, 126 S.Ct. at 2415. Cornelius Bennett has shown a similar adverse effect in his Declaration, albeit without the resulting physical injury suffered by Clifton Lee. Pl. Exh. 45 at ¶¶13-14.

Nucor's remaining argument is that there could have been no racial discrimination or retaliation because a white employee, Larry Sanders, was sent along with Lee and Bennet from NYSII to NYSI. Sanders, however, was soon sent back to NYSII while Lee's and Bennett's requests to be treated the same went unheeded. Pl. Exh. 44 at ¶21; Pl. Exh. 45 at ¶14. In addition, Lee stated under oath in his EEOC Charge that "[r]ather than downgrading me, Mr. Cable and Mr. Dugan could have downgraded a white employee with less seniority, Bruce Luttrell." Pl. Exh. 174; Pl. Exh. 44 at ¶14; Pl. Exh. 45 at ¶14. He and Mr. Bennett have also shown in their Declarations that there were other less senior white employees who should have been sent to NYSI, and that there was no real need for anyone to be sent there. *Id.* Two white employees had to be sent from NYSI to NYSII just to make room for Bennett and Lee. *Id.* There has been no explanation for why Sanders was sent as a third NYSII employee to NYSI, leaving a reasonable inference that this was done as a pretext to explain away a highly unusual and obviously retaliatory demotion of two of the leaders of the putative class action that was being pursued before the EEOC. There is also no evidence that Sanders was involuntarily demoted to NYSI or that his conditions of work changed in a material way similar to that described in the plaintiffs' Declarations.

Contrary to Nucor's argument that Bennett and Lee "had the same Roll Guide Builder job classification [and] identical duties" at NYSI as they had at NYSII, both plaintiffs testified that their duties and working conditions were materially different, harder, and more difficult. Pl. Exh. 44 at ¶¶19-20; Pl. Exh. 45 at 13-14; Pl. Exh. 174, 177. Summary judgment is not a proper means of resolving such

credibility choices.

### E.    Ozzie Green

Ozzie Green has submitted the same type of detailed evidence of his qualifications based on the

qualifications Nucor listed on the Job Posting of the following jobs he applied for and was denied:

| JOB | DATE POSTED | PERSON SELECTED |
| --- | --- | --- |
| Inspection Bed Operator | August 22, 2001 | Mark Warren |
| Inspection Bed Inspector | August 22, 2001 | Ronnie Cato |
| Leadman | January 22, 2003 | Shawn O'Neal |
| Roll Guide Builder | December 11, 2003 | Jerry Barkley |

Pl. Exh. 43 at ¶¶5-18, ¶¶21-25; Pl. Exh. 5 at ¶¶5-14. The persons selected were non-African American

except for Jerry Barkley, who was not an employee of Nucor-Yamato at the time and was given the Roll

Guide Builder job only after Ozzie Green and the other plaintiffs filed EEOC Charges and this lawsuit. *Id.*

Green was retaliated against for participating in such proceedings by being bypassed in favor of Barkley.

Pl. Exh. 43 at ¶¶4, 19-20.  Green has also stated under oath that he was interested and qualified for

supervisory jobs which were not posted and had no application process.   Pl. Exh. 43 at ¶¶14-15.

The Court has already noted Green's evidence in support of his claim regarding such promotions

in its earlier Order on class certification.

> Green began working for Nucor in 1992 and states that he "was never able to
> work anywhere but the finishing area of the roll mill department." Docket entry #71, Ex.
> 5, ¶4. Green states that he applied, unsuccessfully, for several open positions. Green
> recounts two instances where his bids were rejected in favor of less qualified white
> applicants. *Id.*, ¶¶9, 10. Green states that his chances of promotion were hurt by the
> "way the company applies factors like work experience, informal training on crews, time-
> in-job or length of service, formal training, and discipline." *Id.*, ¶9. Green claims that he
> would have bid on leadman jobs in the roll mill department but such jobs are awarded to
> "preselected white employees." *Id.*, ¶14.

*Order* at pp. 9-10 (Doc. 123).

Green has also submitted a second supplemental Declaration that state his qualifications for the jobs

he sought in even greater detail based on each discrete knowledge, skill or ability that Nucor listed on the

Job Postings for such jobs. Pl. Exh. 43 at ¶¶5-18, 21-25. His evidence is obviously not conclusory, and

Nucor has not identified any specific or generic knowledges, skills or abilities that he lacked for any of such

jobs. Nor has it submitted anyone's testimony or opinion that Green was unqualified or that the selected

white employees better satisfied the qualifications for any of the jobs he sought and was denied. Instead,

Nucor argues that two of the persons selected for the jobs sought by Green were African-American —

the Roll Builder vacancy awarded to an African-American non-employee new hire, Jerry Barkley, and an

*unrelated* Leadman vacancy awarded to another African-American, Craig Pry. The race of the person

selected, however, is irrelevant to a *prima facie* case of retaliation. Nucor's Pretrial Disclosures define

retaliation as one of the issues to be tried for Mr. Green. *Def. Pretrial Disclosures* (Dkt. #131). What

matters for purposes of such a retaliation claim is that the evidence shows that Barkley and Pry had not

opposed racial discrimination or participated in EEOC proceedings like Green had. Barkley had not even

been employed by Nucor-Yamato before he was selected for the Roll Mill Guide Builder job Job Posting

over Green. Pl. Exh. 43 at ¶¶21-23. This lawsuit was filed by Green on the same day of such Job Posting

— December 11, 2003 — just a month before Barkley was brought in to take the job Green had bid on

as an incumbent employee. *Id.* Nucor has not argued that it was unaware of Green's participation in the

current EEOC proceedings and lawsuit. In fact, it has already convinced the Court that it was conducting

a large scale investigation in October 2003 in anticipation of this lawsuit being filed, and so it was obviously

aware of Green's involvement and his EEOC Charge filed earlier that year. Defendants' officials were also

heard discussing the lawsuit's filing just a week after the Roll Guide Builder job was posted on December

11, 2003. Pl. Exh. 191 (Rogers Declaration in *Rogers v. Nucor*). In a highly unusual move, a month later

Nucor gave that job to Barkley who was a non-employee of Nucor-Yamato.[22] Pl. Exh. 43 at ¶¶21-23.

The race of the person selected for a *different vacancy* than the one the plaintiff sought is also irrelevant to a *prima facie* case of racial discrimination. *Furnco Construction Corp. v. Waters*, 438 U.S. 567 (1978). It is undisputed that Craig Pry was awarded a different Leadman job than the one given to Shawn O'Neal that is the basis for Ozzie Green's claim in this case. Pl. Exh. 43 at ¶10. O'Neal was Caucasian. Pl. Exh. 43 at ¶¶7-10. Craig Pry's selection for another Leadman job is irrelevant. *Id.* Plaintiffs aren't required to show that *every* African-American has been rejected or discriminated against has also long been recognized that actions taken after EEOC Charges or a lawsuit have been filed are suspect and "equivocal in purpose, motive and permanence." *See e.g. Craik v. The Minnesota State Univ. Bd.*, 731 F.2d 465, 478 (8th Cir. 1984) ("'[A]ctions taken in the face of litigation are equivocal in purpose, motive and permanence.' The magistrate did not recognize the different probative values of pre- and post-suit evidence. Rather, he mistakenly gave post-suit evidence as much weight as pre-suit evidence.")(citations omitted); *see also James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 325 n. 18 (5th Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978); *Jenkins v. United Gas Corp.,* 400 F.2d 28, 33 (5th Cir.1968). The Supreme Court has held that:

> The company's later changes in its hiring and promotion policies could be of little comfort to the victims of the earlier post-Act discrimination, and could not erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it.

*International Bro. of Teamsters v. United States*, 431 U.S. 1843, 1848 (1977) (citing *Albemarle Paper Co. v. Moody,* 422 U.S., at 413-423).

---

[22]Nucor contends that it is independent from Nucor-Yamato and that its employees are not Nucor-Yamato employees and *vice versa.*

Nucor provides no response to Green's *prima facie* case from a decisionmaker for any of the jobs that are the basis of his claim. He had no discipline in the year prior to his two bids in August 2001 or his January 2003 bid for Leadman or even in the four years prior to such bids. Pl. Exh. 43 at ¶¶8-9, 13, 15, 17, 19, 22-23, 25. Although he had been disciplined in the 1994-1997 time period, no decisionmaker has come forward to say that this was a consideration in the decisions made in the 2001-2003 time period at issue in Green's bids for the jobs given to Warren, Cato and O'Neal. As with the other plaintiffs, Green has submitted evidence of white employees who were selected for the same jobs he bid on, and similar jobs, despite having extensive disciplinary records at the time they were promoted. Pl. Exh. 43 at ¶¶8-9, 13, 15, 17, 19, 22-23, 25.

The same holds true regarding Green's retaliation claim regarding the Roll Mill Guide Builder position given to Jerry Barkley. He established a *prima facie* case regarding such job by demonstrating that he applied, was qualified, and was not selected just shortly after this lawsuit was filed and became known to Nucor. Pl. Exh.43 at ¶¶21-24. Nucor has not come forward with any decisionmaker who articulates a non-discriminatory reason for selecting a non-employee, like Barkley, over Green who was an incumbent employee. Nor has it come forward with anyone who articulates an opinion that Green was unqualified or that he had any discipline that was considered in making the decision to select Barkley over Green. Summary judgment is improper without such decisionmaker's testimony. Although Green had three disciplinary incidents in the year prior to the December 11, 2003 Job Posting that Barkley was awarded in January 2004, no decisionmaker has testified that this was known or deemed relevant to the decision to hire a non-employee like Barkley rather than promote Green. Even if such a decisionmaker had come forward as part of the record of this case, Green and the other plaintiffs have shown numerous white employees who have been promoted to the same or similar jobs with much more than three recent

disciplines. *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1108 (8th Cir. 2000) ("The district court credited the City's assertion that Bassett's work performance was deficient. Yet, a fair reading of the record shows that many of the deficiencies Roland pointed out were not accurate reflections of the situation.").

**F.    Sylvester Rogers**

### 1.    Shipper/Loader And Strandtender In February 2000

Sylvester Rogers' Declaration establishes his qualifications and *prima facie* case in a detailed, non-conclusory manner based on the knowledges, skills and abilities Nucor listed on the Job Posting of the following two jobs that he bid on in February 2000.

| JOB | DATED POSTED | PERSON SELECTED |
|---|---|---|
| Shipper/Loader | February 14, 2000 | Greg Moss |
| Strandtender | February 29, 2000 | Zach Moon |

Pl. Exh. 42 at ¶¶6, 18-19, 24-26.

The Court noted Roger's claims based on those jobs in its earlier Order regarding class certification:

> Rogers, a current Nucor employee, began working at the Blytheville plant in 1999 in the finishing area of the roll mill department, where he has remained throughout his employment with Nucor. Docket entry #71, Ex. 4. Rogers states that from 2000 to 2003, he applied for at least eighteen jobs in various departments, including the roll mill, shipping and melt shop. *Id.*, ¶4. Rogers claims that each time he bid on a job, he was rejected in favor of a white applicant. * * * *Id.*, ¶6.

*Order* at p. 9 (Doc. 123).

As with the other plaintiffs, Nucor has not identified any knowledge, skill or ability for these two jobs that Rogers lacked or that made him less qualified than Moss or Moon. No decisionmaker or other witness has stepped forward to articulate any opinion about Rogers' qualifications or discipline as

compared to either Moss or Moon. Nucor offers only the speculation of its attorneys that the decisionmakers might have thought he had "one of the worst employment records of all employees" because he had been "suspended three times" and been involved in "threats of violence against other employees", but these allegations are disputed and unsupported by any decisionmaker or other evidence. Pl. Exh.42 at ¶¶19 & 26. Rogers had only a single discipline— or verbal warning—at the time Moss or Moon were given the two jobs based on the February 2000 Job Postings, and he had never been suspended or given a written warning at the time he was denied those two jobs. *Id.* Nucor's records confirm that fact, Pl. Exhs. 95-98, 104-106, 186, as does its own list of Rogers' discipline at pages 47-48 of its brief which shows that Rogers had just two "Notice of Warnings" before the February 2000 Job Posting, and one of those two was a non-disciplinary "Notice of Counseling Session", not a "June 1999 Notice of Warning." Nucor's officials have testified that a "Notice of Counseling Session" form like the June 26, 1999 form given to Rogers s is not disciplinary in nature, and the six plaintiffs' Declarations confirm that to have been the case. Pl. Exh. 183 at 47; Pl. Exh. 42.

This is yet another example of why the Supreme Court and the Court of Appeals have insisted that the decisionmakers themselves articulate what they consider to have been the discipline or qualifications that mattered in their decisions, not the defendants' attorneys. Here, there is no basis whatsoever for believing that the decisionmakers considered the one minor verbal warning that Rogers had as of February 2000, in making their decision, or that they thought such warning was worse than the records of Moss and Moon. The decisionmakers' reasons for selecting Moss or Moon for these two Jobs Postings are simply absent in the record. Summary judgment is precluded in this circumstance because the *prima facie* inference of racial discrimination has gone unanswered by any *evidence* of the decisionmaker's reason for selecting Moss and Moon over Rogers. *Burdine*, 450 U.S. at 254.

Even if the decisionmakers had come forward to rest their decision on the one minor verbal warning that Rogers had before February 2000, there is ample other evidence that creates a disputed issue of fact about whether such discipline was a pretext for racial discrimination. First, Rogers has testified that he was "denied the job of Shipper/Loader . . . so that a white non-employee, Greg Moss, could be hired into that job" and that "Nucor's written policy forbids hiring a non-employee over an existing employee who bid on and was qualified for that job." Pl. Exh. 42 at ¶¶18, ¶23. Nucor's written Policy in the Employee Handbook states the following: "It is company policy to promote from within the corporate organization rather than fill jobs or positions from outside sources." Pl. Exh. 182, *Policy* at ¶1. It also states: "Any hiring from the outside will be done at the lowest level position possible." *Id. Policy* at ¶12. This Court has already noted this evidence in its Order regarding class certification: "Rogers claims that his bids for promotion have been rejected in favor of new hires, in contravention of Nucor's policy preferring current employees to fill vacancies." *Order* at p. 9 (Dkt. #123).

Second, the same thing happened to Larry McBride "when two white individuals who did not work at Nucor, Norman Jenkins and Delbert Hooker, were given the Shipper/Loader job that Larry McBride had bid on in July 2001." Pl. Exh. 4 at ¶23. McBride had no discipline whatsoever at the time, putting further cracks in the credibility of any decisionmaker that might ever say that discipline was the reason for preferring Moss or Moon over Rogers and McBride.

Third, such a hypothetical decisionmaker's credibility would be further taxed by the fact that white employees have been promoted into the Shipper/Loader and similar Shipping Department jobs with much lengthier and more serious disciplinary histories. Rogers testifies, and Nucor's records show, that:

> White employees . . . had extensive prior disciplinary records before they were promoted to Shipper/Loader and similar positions. Don-Andre Blansett had disciplinary incidents before he was given a Shipper/Loader

job on June 4, 2000. His disciplines included repeated poor performance and safety violations. Brian "Chris" Brizendine was promoted to Crew Leader in July 2002 with at least ten prior disciplinary incidents, including a suspension for safety violations causing injury to a co-worker and at least eight written warnings for poor performance, destruction of property and lack of safety. Larry Perrin was also promoted to Shipping Crew Leader in March 2002 with six prior disciplinary incidents for poor performance.

Pl. Exh. 42 at ¶19.

Similar evidence of pretext exists regarding any reason for selecting Zach Moon over Rogers that a decisionmakers might ever try to articulate. First, Rogers testified that "Zach Moon . . . was given the job without me being interviewed." Pl. Exh. 42 at ¶25. Nucor's officials have testified that every internal bidder is supposed to be interviewed. But Rogers testifies that he was never interviewed for Strandtender and he has "known other black employees treated the same" by being bypassed for jobs they bid on without being interviewed. Pl. Exh. 42 at ¶25. Two other plaintiffs, McBride and Washington, have also testified that this happened to them. Pl. Exhs. 40 & 41.

Second, Rogers has shown an additional group of white employees who were promoted to similar jobs despite with far more discipline than the one warning he had at the time of the February 2000 Job Posting for Strandtender:

> White employees. . . were promoted to similar jobs even though they had prior disciplinary records. Todd Gibson was promoted to LMF/Ladleman Assistant in December 2000 and to Ladleman in July 2002 with a disciplinary suspension less than one month earlier for poor performance, and with seven or more incidents of poor performance and safety. Brett Richardson was promoted to Cooling Bed Inspector in June 2004 with a written disciplinary warning for poor performance in the prior twelve months and a disciplinary suspension for poor performance in the prior fourteen months. The conduct which caused his suspension required the roll mill to be shut down for 36 hours and caused damage to the newly replaced refractory furnace. James Brandenburg was promoted to Repair Bed Helper on September 5, 2002 despite having been

suspended in the prior twelve months for poor performance and rules violations, and despite having a prior suspension and at least four disciplinary warnings for poor attitude, poor performance, misconduct and safety violations as well as numerous accidents. Matthew Estes was promoted to Charge Crane Operator with one prior disciplinary suspension and numerous disciplinary warnings for poor performance, attitude problems, and safety and for inadequate paperwork and rules violations. Robert Rayburn was moved from Repair Bed Helper to Cooling Bed Inspector in June 2000 after he had been disciplined for refusing to come to work while on call.

Pl. Exh. 42 at ¶26. Additional evidence of pretext common to all six plaintiffs is set forth in a later section *See* pp. 88-91 *infra*.

Given such evidence and the lack of any decisionmaker's testimony as to the reasons for the two February 2000 decisions to prefer two white applicants over Rogers, the presumption of racial discrimination from his *prima facie* case stands unanswered, summary judgment is precluded for this reason alone, and also because of the substantial evidence of pretext that would confront any decisionmaker who might ever adopt Nucor's attorneys' current argument that Rogers was not qualified, and was not selected, because of the two minor warnings he had at the time Moss and Moon were selected over him.

**2.      Roll Guide Builder And Inspection Bed Tagger Job Postings September 6, 2000**

Rogers' Declaration demonstrates his qualifications and *prima facie* case in a similar specific, non-conclusory manner based on Nucor's posted qualifications for two jobs posted September 6, 2000, the Roll Mill Guide Builder job awarded to a non-employee, William Hennenfent, and the Inspection Bed Tagger positions awarded to Jonathan Marshall. Pl. Exh. 42 at ¶¶20-23, 27-28. Nucor has not disputed Rogers' demonstration that he satisfied the posted knowledges, skills and abilities for such jobs. Nor has it identified any knowledge, skill or ability that he didn't satisfy, or has come forward with a decisionmaker

63

who states an opinion that he was unqualified or that Hennenfent and Marshall were better qualified. Nucor's brief and evidentiary submission never mention these two Job Postings despite Rogers' Declaration in February 2006 which addressed them. As with the hiring of Greg Moss above, Nucor's hiring of a non-employee like Hennenfent violated the written Policy in the Employee Handbook which states the following. "It is company policy to promote from within the corporate organization rather than fill jobs or positions from outside sources." Pl. Exh. 172. *Policy* at ¶1. It also states: "Any hiring from the outside will be done at the lowest level position possible." *Id. Policy* at ¶12.

Nucor's attorneys' speculation that Rogers had been suspended three times and disciplined more than any other employee is disputed. Rogers, in fact, had only two warnings and no suspensions in the year prior to the September 6, 2000 Job Postings for these jobs— one dated April 14, 2000 and a second dated May 2, 2000. Pl. Exh. 42 at ¶28. As already shown, discipline is considered only if it occurred in the twelve months before the Job Posting. This is shown on the face of Nucor's standard application form, and its expert's testimony, and from the plaintiffs' Declarations. Pl. Exh. 169.[23] No decisionmaker has come forward to say that they ever considered any discipline for Rogers that occurred more than twelve months before the two September 6, 2000 Job Postings he bid on, or that Rogers' two warnings in that

---

[23]Nucor's own list of Rogers' warnings, though greatly exaggerated, shows only the same two "Notice of Warnings" and no suspensions as of September 6, 2000 Job Postings. Even if the one year restriction or consideration of discipline for promotional purposes had not existed, Rogers had no suspensions and only three warnings in his entire career as of the September 6, 2000 Job Posting at Nucor. Nucor's list of his "Notice of Warnings" at pages 47-48 of its brief shows five such "Notice of Warnings", but one occurred September 19, 2000, and so couldn't have been a factor for the September 6, 2000 Job Postings because it had not yet occurred. Nucor's reference to a "June 1999 Notice of Warning" was a non-disciplinary counseling, not a Notice of Warning as already shown. As with all the plaintiffs and Job Postings, no decisionmaker has come forward to state that any such counseling was considered discipline or that Rogers' three pre-September 2000 Notice of Warnings were either known or of any importance to the promotion decisions regarding the two September 6, 2000 Job Posting.

twelve month period was a factor in the decision to award those jobs to Hennenfent and Marshall. Nucor's

hypothetical argument that Rogers' discipline might have been a factor is not a permissible response to

presumption of racial discrimination established by Rogers' *prima facie* case. *Burdine*, 450 U.S. at 254.

An immediate credibility problem would arise if any decisionmaker were to ever to adopt discipline as part

of the reason for not selecting Rogers because Marshall had multiple disciplinary incidents of his own. He

had been given a Notice of Counseling Session on June 6, 1999 which stated that "job knowledge and

creativity are two areas . . . to improve his skills" Pl. Exh. 187 (1NYS005197), and then given a "written

verbal warning" for poor performance and leaving his work station without permission on June 28, 2000,

which was just three months before his promotions based on the September 6, 2000 Job Posting. Pl. Exh.

187 (1NYS005200). That disciplinary warning stated:

> 6-28-00. Kevin Keowal LMF Operator had Rolled next beat to come
> to the caster. He called out for John on the radio to unhook the hose on
> the Ladle. John asked Kevin to get the hose because he wasn't in the
> shop. He was in the lunchroom at 7:15 AM getting breakfast. John had
> not been to the L.M.F. to check stock or to do his duties there. John had
> been talked to before about his work performance by myself & Mike
> Gurley. This is a written verbal warning. The next time I have to talk to
> John about his work performance or his duties at the L.M.F or Ladle wall
> he will be given 3 days off without pay & loss of bonus. He has been
> trained throughly at the L.M.F. and Ladle wall. He has failed to beat the
> LMF when needed. Personally, there is nothing wrong with eating
> breakfast but the time & place was not then. The handbook clearly states
> this.

Pl. Exh. 187 (1NYS005200). No decisionmakers have stepped forward to say how they compared or

considered Rogers' and Marshall's discipline, or even if discipline was a factor in their decisions. Any such

contention would not have been credible for summary judgment purposes because of the numerous white

employees shown to have been promoted to these two jobs, and to similar ones, despite far more

discipline than Rogers had at the time. Pl. Exh. 42 at ¶¶11, 21, 26, 30.

The absence of any evidence from a decisionmaker articulating what was known or relied upon at the time of the decisions related to the two September 6, 2000 Job Postings leaves Rogers' *prima facie* inference of racial discrimination standing without need of anything more. Summary judgment is impermissible in this circumstance. *Burdine*, 450 U.S. at 254.

### 3. Mill Area Jobs In 2001

Rogers' Declarations establish his qualifications and *prima facie* case for four mill areas jobs in the same detailed and non-conclusory manner based on the qualifications Nucor listed on the following Job Postings that he bid on:

| JOB | DATED POSTED | PERSON SELECTED |
|---|---|---|
| Reheat Furnace Stocker | March 5, 2001 | Steve Edgar |
| Mill Crane/Operator & Utility | June 25, 2001 | Charles Brooks |
| Roll Mill Inspector | June 27, 2001 | Charles Ray Ault |
| Reheat Furnace Heater | December 28, 2001 | Brett Richardson |

Pl. Exh. 42 at ¶¶6-17. Once again, Nucor has not identified any qualification that Rogers lacked for these four jobs. It has not offered any evidence from a decisionmaker who articulates a non-discriminatory reason that white employees were preferred for these jobs. As already shown above, they were located in the racially segregated mill areas of the plant. Nucor's summary judgment brief, however, never mentions any of the mill area jobs Rogers sought and that he addressed in his earlier Declaration in February 2006.

Here, again the absence of any decisionmaker's testimony articulating a non-discriminatory reason for such decisions leaves the *prima facie* presumption of racial discrimination unanswered. *Burdine*, 450 U.S. at 254. Based on the case law already cited, Nucor's attorneys' opinion that Rogers had too much discipline to be promoted is not a permissible means of dispelling such a *prima facie* inference of racial discrimination. *See* pp.5-11. At the time of Rogers' bid for the December 28, 2001 Job Posting, he had

no discipline in the prior twelve months. At the time of his bid for the two June 2001 Job Postings, he had

just two Notice of Warnings in the prior year — one on November 15, 2000 and the other on September

19, 2000. Pl. Exh. 42 at ¶¶13 & 15. At the time of the March 5, 2001 Job Posting, he had three such

Notice of Warnings in the prior year. Pl. Exh. 42 at ¶9. None of such discipline is relevant, however,

because no decisionmaker has testified that they were a factor in selecting any of the four white employees

— Edgar, Brooks, Ault and Richardson — for these four mill area jobs. Nucor's attorneys' hypothetical

argument based on Rogers' discipline would not be credible if ever adopted by a decisionmaker because

numerous white employees were promoted to the same or similar jobs with as much or more discipline than

Rogers had at the time of these four 2001 Job Postings. Pl. Exh. 42 at ¶11.

Nucor's attorneys' hypothetical about Rogers' discipline confirms again why a decisionmaker's

testimony is essential once a *prima facie* presumption of discrimination is established. No decisionmaker

could ever credibly adopt Nucor's contention that Rogers' had more discipline than anyone else, or that

"only 1% of production employees were suspended more than once" while "Rogers was suspended three

times", (*Def. Br.* at 47), because that wasn't true. Pl. Exh. 42 at ¶¶9, 11, 13, 15. At the time of these

four mill area jobs were awarded in 2001, Rogers did not have more discipline than other employees who

were promoted to the same or similar jobs, and he had been suspended only once, not three times as

argued by Nucor's counsel. Even that one suspension is part of the racial discrimination contested in this

case. Pl. Exh. 42 at ¶9, 11, 13, 15. Nucor's representation that "1% of production employees were

suspended more than once" supports Rogers' claim because that 1% constitutes at least nine employees

who obviously had than the one suspension Rogers had at the time.

A decisionmakers' testimony and cross-examination are essential in this situation because it is that

person's knowledge of the applicants' comparative discipline *at the time of the decision* that is important,

not mere argument of counsel based on rummaging through raw personnel files without any witness who can state what was considered and how Rogers' discipline was viewed in relation to other bidders or employees. *Stegar*, 318 F.3d at 1075-1076; *Walker v. Mortham*, 158 F.3d at 1183-1184.

The importance of a decisionmakers' testimony is demonstrated a second time when Nucor's attorneys argue that Rogers was suspended for "insubordination and threats of violence." That refers to Rogers' December 11, 2001 warning for jokingly saying to a co-worker "If I lose my job over this, "I will kill you." This event, however, had not even happened yet when three of the four mill area jobs were filled based on Job Postings six to nine months earlier in March and June 2001. It is also mere hyperbole for Nucor's attorneys to say that such a joking comment "threatened to kill another employee." *Def. Br.* at 48. No decisionmaker for the Job Posting at issue has testified that he viewed the incident this way. Also, white employees who have actually physically attacked another employee were promoted shortly thereafter. Pl. Exh. 40 at ¶31; *see e.g. Bassett*, 211 F.3d at 1108 ( "In another incident in December 1993, Bassett requested permission to work at home to care for her daughter following surgery. Roland denied Bassett's request, citing the City policy that employees are not normally allowed to work at home. Roland had, however, granted permission to a white male co-worker to work at home following his hospitalization.").

The Court noted part of Rogers' cross training and discipline claims in the following part of its Order regarding class certification:

> Rogers charges that his chances of promotion were hurt "by the way the Company applies factors like work area experience, informal training on crews, time-in-job or length of service, formal training, and discipline." *Id.*, ¶7. He states that "such factors are applied more harshly, and less leniently, to [black employees] . . . and were often used as excuses to bypass [him] in favor of a white employee." *Id.* For example, Rogers states that Nucor has denied his requests for cross training, but provides on-the-job cross training to white employees. *Id.* Further, he states that when he has received cross training, "it didn't

68

matter." *Id.*

*Order* at p. 9 (Doc. 123); *see also* Pl. Exh. 42 at ¶¶44-45.

### 4. Rogers' Seven Job Bids In 2002-2003

Rogers' Declarations establish his qualifications and *prima facie* case for the following seven jobs

in 2002-2003 in the same detailed and non-conclusory way based on Nucor's posted qualifications for

such jobs:

| JOB | DATED POSTED | PERSON SELECTED |
|---|---|---|
| Piler Operator | January 17, 2002 | Jason Simmons |
| Inspection Bed Operator | May 31, 2002 | Kelly Wilson |
| | | Jeff Gallagher |
| Repair Bed Helper | January 7, 2003 | Tim Richardson |
| Piler Operator | January 22, 2003 | Jeff Daly |
| Hot Saw Operator | August 7, 2003 | Adam Thomas |
| Shipping Table Operator | September 25, 2003 | Trang Nguyen |
| Piler Operator | October 7, 2003 | Allen Rice |

Pl. Exh. 42 at ¶¶6, 29-41. Nucor has not identified any knowledge, skill or ability that Rogers failed to

satisfy for such jobs. Nor has it submitted any evidence from a decisionmaker that states an opinion that

Rogers was unqualified, or that articulates why any of the foregoing non-African American applicants were

selected. Only two of the eight jobs — Inspector and Hot Saw Operator — are even mentioned in

Nucor's brief, and none are addressed by any decisionmaker in its evidentiary submission. The absence

of any such evidence precludes summary judgment without more. *Burdine*, 450 U.S. at 254. Rogers'

*prima facie* inference of racial discrimination has simply been ignored in Nucor's evidentiary submission.

Nucor's attorneys speculate hypothetically that the decisionmaker might have been concerned

about Rogers' disciplinary record, arguing that he had "three suspensions" and eight disciplinary warnings,

but this argument has the disadvantage of being both untrue and unsupported by any decisionmaker. Pl.

Exh. 42 at ¶¶30, 36, 38, 41. Rogers had no disciplinary warnings in the year prior to his bids on the three

job postings in August-October 2003 given to Thomas, Nguyen and Rice, and only one disciplinary warning in the relevant twelve-month period before his other four bids in 2002-2003. *Id.*[24] No decisionmaker before the Court has testified that any such discipline was a factor in the decisions about such Job Postings, or that discipline is ever considered if it occurred more than a year before the Job Posting. Any decisionmaker who might ever adopt discipline as a factor in their decisions for these jobs would not be credible because of the evidence that many white employees have been promoted with numerous disciplines, including discipline in the year prior to their promotion. Pl. Exh. 42 at ¶20. In addition to those already shown, Nucor's record show at least 67 white employees were promoted with disciplinary warnings or suspensions in the prior twelve months prior to their promotions. *See* Pl. Exh. 188.

### 5. Rogers Does Not Challenge Two Additional Inspector Jobs Given to Two Black Employees

Nucor argues that Rogers cannot establish a *prima facie* case for two more Inspector jobs awarded to two black employees, one of whom was plaintiff Larry McBride. No claim, however, has ever been made for these two entry level jobs. Neither of them were promotions for Rogers. Pl. Exh. 42 at ¶14. Summary judgment is inappropriate regarding non-claims.

### G.   Cornelius Bennett

The Court noted the following about Bennett's claim in the Order on class certification:

> Plaintiff Bennett, a current Nucor employee, began working for Nucor in 1993 and has never applied for a promotion. *See* docket entry #71, Ex. 7 (Bennett Aff.). He

---

[24] For the January 27, 2002 Job Posting for Piler Operator and the May 31, 2002 Job Posting for Inspection Bed Operator, Rogers had only the Notice of Warning dated December 11, 2001. Pl. Exh. 42 at ¶¶30, 36, 38, 41. For the January 7, 2003 Repair Bed Helper and January 22, 2003 Piler Operator Job Postings, he had only the Notice of Warning dated August 2, 2002. *Id.*

claims that he "could see that it was a waste of time of . . . time to try to bid on jobs that
had always been passed down from one white employee to another." *Id.*, ¶7. Bennett
states that his chances of promotion were hurt by the "way the Company applies factors
like work-area experience, informal training on crews, time-in-job or length of service,
formal training, and discipline. *Id.*, ¶10.

Bennett claims that race affects "how [employees] are treated and viewed for
discipline, promotions, and training" and that "[d]iscipline, attendance, and safety . . . are
factors that are not equally applied and that have been used as an excuse to deny
promotions to [black] persons." *Id.* According to Bennett, black employees "are
watched closer and disciplined quicker and more often than white employees . . . in similar
circumstances." *Id.* Bennett states that he has received harsher discipline than white
employees on several occasions. For example, in 2003, he was disciplined for sleeping
on the job, and he received harsher discipline than white employees guilty of the same
conduct. *Id.*

*Order* at pp. 5-6 (Doc. 123).

Plaintiffs' *Complaint* alleges, and their Declarations prove, that defendants "deter African-

American employees and/or applicants from seeking promotions and desirable job assignments [and] fails

to select and/or train African-Americans for desirable job assignments." *Third Amended Complaint*, Dkt.

#18 at ¶16. Plaintiffs further claim that such deterrence and discrimination is accomplished through the

following additional racially discriminatory practices set forth in the *Third Amended Complaint*:

> 1) reliance upon subjective procedures and criteria which permit and
> encourage the incorporation of racial stereotypes and bias of a
> predominantly white managerial staff; 2) refusal to establish or follow
> policies, procedures, or criteria that reduce or eliminate disparate impact
> and/or intentional racial bias or stereotypes in decisionmaking; 3) refusal
> to post or announce vacancies or employment opportunities in a manner
> that allows African-Americans to learn about such opportunities and
> compete for them before they are filled by white employees or applicants;
> 4) pre-selection of whites before vacancies or opportunities become
> known; and 5) discouragement of applications and expressions of interest
> by African-Americans through a reputation for racial bias, racially hostile
> conditions of work, and unequal terms and conditions of employment in
> such areas as work hours and position assignments.

*Third Amended Complaint*, Dkt. #18 at ¶54. Supervisory jobs were not posted prior to 2005. Before

then, there was no formal application process for supervisory vacancies or opportunities.

Cornelius Bennett's Declarations show that he was qualified for the following jobs based on the

qualifications that Nucor listed on the Job Postings for such jobs:

> 5. **Mill Area Jobs:** The roll mill production area is a large physical section of the plant where steel beams are fabricated and then sent to the finishing and shipping areas for loading and transportation to the customer. This section of the plant has its own separate Supervisors, Leadmen and crews. My first Declaration described how the mill area of the plant was racially segregated except for one token black employee, Reginald Stewart, who was put in the mill area at NYSI in the mid-1990's. During the period covered by this lawsuit, there have never been any black employees in the mill area of the NYSII building. * * * During the prior four years covered by this case, every black employee who applied for one of these mill crews or jobs was rejected, including Rodney Washington, Larry McBride, Jimmy Wells, Rickey Logan, Danny Wells, Wilson Done, Sylvester Rogers and others.

> 6. The all white composition of the crews and supervisors in such a large physical section of the plant was obvious as you worked there everyday. In my experience, the mill areas were too large physically, and had too many employees, to have become racially segregated by accident. The plant had plenty of black employees in other work areas and drew its employees from a geographical area in Arkansas that had a sizable African-American population experienced in similar industrial work. * * * The experience of Rodney Washington, Larry McBride, Sylvester Rogers and other black employees in applying for mill area jobs reinforced my perception that such areas and crews were reserved for white employees and not open to black employees like me. My qualifications for mill area jobs came from my experience and training before Nucor and my experience as a Roll Guide Builder at Nucor. My jobs at Nucor were in the physical section of the plant adjacent to the mill area.

> 7. From my own experience at Nucor throughout the 1990's, and from what I saw of other black employees' efforts to promote into work areas where the better jobs were located, I could see that it would be a waste of time to try to bid on jobs that had always been passed down from one white employee to another. It is usually well known who has been selected for a job before it is posted. Nucor preselects the person it plans to succeed the current employee in the job and begins grooming such person in ways that make it obvious that he will receive the job when it comes open. The favored employee is allowed to

72

perform the job and given other training on his regular shift that is not open to other employees, and the person is almost always white if the job is one already or traditionally held by whites. Large sections of the plant are segregated by race in the way I described in my earlier Declaration filed in February of this year. Such preselection and grooming of favored employees before a job is posted makes bidding a waste of time for most jobs, especially those traditionally held by white employees or that are located in the white areas of the plant's operations. * * * During my employment, all the employees given training on mill area jobs were white except Reginald Stewart. This included more than 40 white employees who were trained as Sample Inspector, more than 40 white employees who were trained as Mill Operator, more than 30 white employees who were trained as a Reheat Stocker, more than 20 white employees who were trained as a Reheat Heater, more than 20 white employees who were trained as a Reheat Furnace Operator, more than 10 white employees who were trained as Utility Man,  more than 5 white employees who were trained as Extra Man, and more than 30 white employees who were trained as Roll Mill Mechanic.

        8.     I was interested in jobs in the roll mill area and crews because they were better jobs with a greater future and paid more than jobs that were open to black employees in my area of the plant. I would have bid on such jobs if I hadn't seen that they were never open to black employees, such as the Mill Utility job given to Todd McKellup, the Mill Inspector job given to Charles Ray Ault, the Reheat Operator job given to Phillip White and Denny Elliott, the Extra Person positions given to Jeffrey Cable, Cameron Strawn and Gary Steward, the Mill Crane or Utility jobs given to Charles Banks, Chris Gee, Kevin Austin, Keith Neal and Darren Hawkins, the Sample Inspector jobs given to Paul Towery, William Vasser, Cameron Strawn, Wade Hunt, Mitch Craig, Tracy Kelly and James Morris, the Reheat Stocker jobs given to James Hymas, Steve Edgar, Alan Buchanan, Ricky Brothers, Erick Rouse, Mark Rogers, Lester Mann and Michael Going, and the Mill Leadman jobs given to Stephen Murphy, Martin Hawkins, and others. I was also qualified and would have applied for the other Mill Operator jobs given to other white employees, such as Charles Banks, Rickey Brothers, Stephen Murphy, Chris Gee, Mike Gentry, Jeffrey Stobaugh,  J. C. Carter, Scotty Smothers, and Roger Jefferson, except for the fact that I knew this area of the plant was not really open to black employees. Stephen Murphy and Roger Jefferson went on to become Leadmen. A number of the white employees promoted to such jobs had prior disciplinary incidents. * * *

        9.     In the absence of pre-selection and the other practices challenged in this lawsuit, I would have bid on several leadman jobs which were awarded to pre-selected white employees. I would have also bid

on Lubricator, Mill Roller, Mill Controller, the Reheat Operator, Strandtender, the Piler Operator, Rotary Straightener Operator, and Roller jobs which were given to white employees. Nucor's Job Postings for such jobs required the same or similar knowledges, skills and abilities as that required to perform my job as Roll Guide Builder. All of such Job Postings listed "mechanical skills" or "mechanically inclined", good communication skills and the ability to perform multiple tasks simultaneously. Most required good math skills, organizational or recordkeeping ability, basic computer skills, good depth perception and hand/eye coordination and other characteristics that were required for my own job of Roll Guide Builder. To perform my job, I had to have the same knowledges, skills, abilities and personal characteristics as those Nucor posted for the jobs that I applied for. * * * My previously filed Declaration in support of class certification discussed my interest and qualifications for such jobs. To my knowledge, no decisionmaker has stated that I was not qualified for such jobs or that the person selected was better qualified or had a better work, safety, discipline or training record than me.

Pl. Exh. 45 at ¶¶5-9.

Nucor's summary judgment submission mentions nothing which indicates that Bennett was unqualified for any of the jobs he listed in his earlier Declarations as ones he would have applied for if it had not been futile. Nor does it argue that he had any relevant discipline or deficiency in his work or attendance record that would have caused him not to be promoted to any such jobs. Nucor's sole argument regarding Bennett's claim is that he didn't file a formal application for promotion, but that's not required where "applications is futile due to the defendants' decisionmakers practices. *Winbush*, 66 F.3d at 1481. This Circuit has held that "[i]t is well settled that plaintiffs need not prove they formally applied for a position if ... application was futile due to the defendants' discriminatory practices." *Winbush v. State of Iowa, by Glenwood State Hospital*, 66 F.3d 1471, 1481 (8th Cir. 1995). The Court quoted the following holding from the Supreme Court's decision in *Teamsters*:

> A policy of discrimination can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices--by his

> consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups.

*Id.* at 1481 (quoting *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 34 (1977).[25] *See also McClure v. Career Systems Development Corp.*, 447 F.3d 1133, 1136 (8th Cir. 2006) ("True, a plaintiff who does not apply may establish a prima facie case if the employer's discriminatory practices make application futile."); *Dothard v. Rawlinson,* 433 U.S. 321, 330(1977) ("The application process itself might not adequately reflect the actual potential applicant pool, since otherwise qualified people might be discouraged from applying because of a self-recognized inability to meet the very standards challenged as being discriminatory."); *Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 869 n.53 (D. Minn. 1993) ("Of course, the fact that no woman has ever been promoted to step-up foreman may explain why women have not shown any interest in the position."). This Circuit has also held that:

> A selection process that is subjective and dominated by men requires particularly close scrutiny.   It might account not only for women's failure to win elections against men, see discussion of Craik's unsuccessful chair bid, Part IV.A, *infra,* it might also account for women's reluctance to run.

*Craik v. The Minnesota State Univ. Bd.*, 731 F.2d 465, 474-475 (8th Cir. 1984) (citing *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 563 n.15 (8th Cir.1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983); *Royal v. Missouri Highway & Transportation Commission, 655 F.2d*

---

[25] The Eighth Circuit cited the following precedent in *Winbush: Paxton v. Union Nat'l Bank,* 688 F.2d 552, 568 (8th Cir.1982), *cert. denied,* 460 U.S. 1083 (1983); *Royal v. Missouri Highway & Transp. Comm.,* 655 F.2d 159, 163 n. 5 (8th Cir.1981); *Holsey v. Armour & Co.,* 743 F.2d 199, 208-09 (4th Cir.1984), *cert. denied,* 470 U.S. 1028 (1985); *Carmichael v. Birmingham Saw Works,* 738 F.2d 1126, 1133 (11th Cir.1984); *Gifford v. Atchison, Topeka & Santa Fe Ry.,* 685 F.2d 1149, 1154 (9th Cir.1982).

159, 164 (8th Cir.1981)).

Part of the evidence which excused formal applications in *Winbush* was "evidence of discriminatory practices and hostile work environment", *id.* at 1480, including evidence that "supervisors . . . overlooked rule violations by Caucasians but disciplined similar transgressions by African-American employers", that "African-American employees were disproportionately assigned more menial and demanding tasks", that some of the plaintiffs "testified to hearing racial slurs by Caucasian supervisors or to observing African-American residents receive degrading treatment from Caucasian employees", and that African-Americans "either . . . did not know how or when to apply or . . . were led to believe that applying would do no good." *Winbush*, 66 F.3d at 1480-1481. The evidence in this case is very similar.

> Another court, faced with a subjective promotions process, has held that a plaintiff has a lighter burden when attempting to make a prima facie case of failure to promote than in a situation involving objective promotions criteria:
>
>> [A] prima facie showing can be made through credible evidence that a plaintiff was qualified even if that evidence was disputed by the employer, and ... this burden may be met through the plaintiff's own testimony and that of co-workers who were in a position to know the plaintiff's qualifications.
>
> *Thomas v. Denny's, Inc.,* 111 F.3d 1506, 1510 (10th Cir.), *cert. denied,* 522 U.S. 1028, 118 S.Ct. 626, 139 L.Ed.2d 607 (1997) (citation omitted). This lighter burden at the prima facie stage is justified by the fact that subjective criteria for promotions "are particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case and mask discrimination." *Id.* (citing *Ellis v. United Airlines, Inc.,* 73 F.3d 999, 1005 n. 8 (10th Cir.), *cert. denied,* 517 U.S. 1245, 116 S.Ct. 2500, 135 L.Ed.2d 191 (1996)). We agree; a plaintiff alleging a prima facie case of failure to promote should not bear the same burden when the criteria are subjective and the process "vague and secretive" as when the case involves "objective hiring criteria applied to all applicants." *Id.*

*Lyoch v. Anheuser-Busch Companies, Inc.*, 139 F.3d 612, 615 (8th Cir. 1998)

Bennett's Declarations, along with those of the other plaintiffs who tried and failed to break into

the segregated mill area crews, establish the type of futility for which *Winbush* and other precedent excuse

the failure to fie a formal application. Pl. Exh. 45 at ¶¶5-9; Pl. Exh. 40 at ¶¶4-5, 9-10; Pl. Exh. 41 at ¶¶4-

6, 8-9; Pl. Exh. 42 at ¶¶7-9.

### H.    Claims Based On Futility of Bidding

All six plaintiffs have demonstrated the futility of bidding on jobs traditionally reserved or held only

by white employees. Pl. Exh. 40 at ¶¶4-5, 9-10; Pl. Exh. 41 at ¶¶4-6, 8-9; Pl. Exh. 42 at ¶¶7-9,. 16-17;

Pl. Exh. 43 at ¶¶5-6, 11-13; Pl. Exh. 44 at ¶¶12-16; Pl. Exh. 45 at ¶¶5-9. Each of the six named plaintiffs,

including Cornelius Bennett, have stated under oath that they were deterred from bidding on other jobs,

crews or work areas that were exclusively or almost exclusively occupied by white employees, and that

they could not bid or apply for supervisory jobs because they were not posted and there was no application

process. *Id.* In addition to the jobs each plaintiffs bid on and were denied, they also testify to reaching

a point that further bidding became futile because it was clear that certain areas of the plant and certain jobs

were reserved for white employees who were being groomed in advance of the Job Posting to take over

the job. *Id.*   Each plaintiffs' Declaration shows that they applied for numerous jobs in the racially

segregated mill areas and list their qualifications for such jobs in pains taking detail. *Id.*   Throughout the

liability period preceding the filing of this lawsuit, however, not one African-American was given training

for these mill area jobs and not one African-American was assigned to work in such areas except for

Reginald Stewart who worked in the NYSI mill area. *Id.* and Pl. Exh. 164. Plaintiffs' Declarations and

other evidence established the futility of further bidding on such jobs. *Id.*; *see Winbush*, 66 F.3d at 1481.

For summary judgment purposes, the plaintiffs have established a *prima facie* case for the jobs

listed in their Declarations as ones they were qualified to fill and would have bid on in the absence of the

clear message that the mill areas were to remain racially segregated. *Id.*; *see e.g. Winbush*, 66 F.3d at

1481; *Lynoch*, 139 F.3d at 615. Most of that evidence was contained in the plaintiffs' Declarations and other evidence submitted last February. Pl. Exhs. 1-11.

Nucor has not responded with any evidence that disputes the futility of bidding on mill area jobs or crews and other jobs traditionally held only by white employees. Nor has it come forward with decisionmakers who articulate a legitimate, nondiscriminatory reason that the plaintiffs would not have been selected even if they had bid. Thus, plaintiffs' *prima facie* case for the jobs they have shown they were qualified for and would have bid on had gone unanswered by any evidence from the decisionmakers or from Nucor itself. Summary judgment cannot be entered in this situation because of the plain teachings of *Burdine*, 450 U.S. at 254.

Plaintiffs were also prevented from bidding on Supervisory jobs for the additional reason that they were not posted and Nucor provided no applications or application procedure before 2005. *Winbush*, 66 F.3d at 1480-1481; *Carmichael*, 738 F.2d at 1133. Each plaintiff has testified to their interest in, and qualifications for, various unposted supervisory jobs. Pl. Exh. 40 at ¶21; Pl. Exh. 41 at ¶37; Pl. Exh. 42 at ¶46; Pl. Exh. 43 at ¶¶14-15; Pl. Exh. 44 at ¶25; Pl. Exh. 45 at ¶¶9-11. Nucor has elected, however, to ignore the plaintiffs' supervisory claims in spite of the *prima facie* presumption of discrimination established under *Winbush* by their evidence. For example, the Court noted Rodney Washington's supervisor-based claim in its prior order, and it is addressed in his Declaration as follows:

> 21.    **Supervisory Jobs:** My prior education and experience also made me interested in supervisory jobs which were not posted and which were usually filled before I knew about the chance to say I was interested, such as the Supervisor position for my crew that was given to Glenn Ellis in 2001. Persons considered for such supervisory jobs were handpicked in a secretive manner. No supervisory jobs were ever posted, so black employees like myself would never have a chance to know about the opportunity. Also, there was also no formal application or selection process for supervisory jobs that I was able to find out about.

Nucor's refusal to promote me to better job opportunities hurt my opportunity to be fairly considered for higher-level supervisory and non-supervisory jobs. There were no black supervisors or managers in the Maintenance Department or the Roll Mill Department during my ten years of employment at Nucor. There were over sixty white supervisors and only one black supervisor in the plant as a whole during my employment from 1993 to 2003, and that one black supervisor was in the Melting Department. During my last five years of employment, there were no black employees promoted to supervisor anywhere in the plant until well over a year after EEOC Charges alleging race discrimination began to be filed in 2002. Everyone above supervisor was also white, including all the Department Managers. I was qualified to be a Supervisor based on the qualifications that Nucor eventually posted in 2005 for such jobs.

> Commitment to Safety and Safety Programs
> Positive Attitude
> Communication and Leadership Skills
> Self Starter
> Make Decisions Based on What is Best for NYS
> Commitment to Fairness, Employees Development, and
> Continual ____ all phases of our process
> Must accept the Role of a Leader and Role Model
> Must be knowledgeable of the Rolling Process
> Must be Able to Work Extra Hours as Needed for Shift
> Coverage, __ Meetings and Training. This Could Include
> Holidays, Weekends, and Days Off.
> Must "Take Care of Our Customers"

In addition to my prior experience and training before Nucor, I was qualified for supervisory jobs based on my experience and knowledge in my own jobs of Piler Operator and Inspection Bed Inspector which required that I exhibit "strong communications skills", the "ability to perform multiple functions simultaneously", a "knowledge of the Rolling Process" and the "ability to work under pressure associated with Rolling Process pace", good "quality control/quality assurance" skills, good organizational skills and the "ability to keep detailed records and prepare inspection reports according to ISO standards", an "ability to operator forklift equipment"and cranes, good math skills, "good mechanical skills", the ability to "inspect product" and "identify defects and communicate this information", knowledge and ability to "track cut patterns", use of precision instruments and measuring devices (including calipers, micrometers and depth gauges), an "excellent work and attendance record", and that I be "safety minded", "team oriented", quality