IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

| | | |
|---|---|---|
| CORNELIUS BENNETT, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO: |
| | ) | 3:04 CV 00291 SWW |
| | ) | JURY DEMAND |
| | ) | |
| NUCOR CORPORATION, et al., | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO SUMMARY JUDGMENT**

**VOLUME TWO OF TWO**

conscious, and a leader with a positive attitude. I exhibited all of these knowledges, skills and abilities in performing my job at Nucor and prior to Nucor. My prior experience, training and education before coming to work at Nucor also qualified me for such supervisory jobs.

22.    My previously filed Declaration in support of class certification discussed my supervisory claim in this case. To my knowledge, no decisionmaker has ever stated that I was not qualified for the supervisory job or that the persons selected were better qualified or had a better work, safety, discipline or training record than me. I had not been disciplined for anything in the three years prior to various white employees being promoted to Supervisor. White employees, however, had extensive prior disciplinary records before they were promoted to Supervisor and similar Leadman positions. For example, Howard Kelly was promoted to Supervisor in September 2002 with at least three prior disciplinary warnings for poor performance. I have also already listed several white employees promoted to Leadman with prior disciplinary records.

Pl. Exh. 40 at ¶¶21-22. The other plaintiffs proved their *prima facie* case for supervisory opportunities under *Winbush* in a similar way. In this circumstance, Eighth Circuit precedent excuses them from having to show that they applied for jobs that were not posted, had no application process, and for which it would have been futile to apply in light of the fact that no African-Americans ever became a Supervisor in the Roll Mill Department until well after the EEOC proceedings leading to this case began in 2002-2003. *Id.* Nucor has failed to address such claims or to dispel the presumption of racial discrimination created by their *prima facie* case, making summary judgment inappropriate under *Burdine*, 450 U.S. at 254.

## IV.    RODNEY WASHINGTON'S DISCHARGE CLAIM

Rodney Washington was disciplined and subsequently discharged for opposing racial abuse by white co-workers, such as Robert Despain and Doug Stacy. Pl. Exh. 40 at ¶¶28-31. Washington explained the racial hostility he was subjected to in his Declarations filed in this case. Pl. Exh. 2. He was initially given a disciplinary suspension when he reported such abuse to Nucor's management. Pl. Exh. 40 at ¶28. He reported in writing that Despain had constantly bullied, loud-talked, and intimidated him for a

long time, had called him and other black employees "lazy-ass niggers", had left his work station to come

to Washington's work cubicle in a physical rage, screaming and cursing at him and jerking open the cubicle

door three or four times in a physically intimating manner. *Id.* He also reported in writing that Doug Stacy

had been asked to stop Despain on his way to Washington's work cubicle, but he refused to help.[26] *Id.*

Despain was not a Leadman or Supervisor and had no authority to tell Washington what to do.[27] *Id.*

---

[26] Stacy admits he was the Leadman on the shift and saw Despain go to Washington's work cubicle and began "waving of arms or gesticulating", and became "animated" and "pointing at each other":

> Q   All right.  And what did you observe on that shift?
> A   Well, I was in a, first of all, a bad point of observation.  I was in a pulpit and couldn't leave it at that particular moment.  And I observed Robert approach Rodney and they had a few words and -- and then Robert left.
>                              * * *
> Q   Did you hear the words?
> A   No, sir.
> Q   Did you see anything in terms of waving of arms or gesticulating or anything that --
> A   I could see that they were animated.  They were pointing at each other and -- and that was really all I could see.
>                              * * *
> Q   And describe for us as best you can what you're saying was it that made you believe they were animated.
> A   Well, just like I said, they were pointing at each other and, you know, hands waving, that kind of thing, but -- it just appeared to be an argument.

*Stacy Depo.* at 13:12-19; 13:22-23-14:1-:5, 14:14-20.  Stacy testified that Despain "shall have perhaps been more calm and collected about it rather than going down there angry." *Stacy Depo.* at 45:7-13.

[27] Despain admits, however, that he was not acting as a leadman at the time:

> Q   He was off that day?
> A   The best I can remember, yes, he was off.
> Q   And you were the acting leadman?
> A   I was not the acting leadman.

* * *

    Q  Okay.  And you never told Mr. Washington you were the acting leadman?

    A  I never told Rodney Washington that I was acting leadman.

*Despain Depo.* at 139:8-12, 171:7-10. He also admits that he was never asked or authorized to direct anyone's work:

    Q  In a minute.  Who asked you to do that, to direct people as to what job to perform?

    A  Well, I never was just actually asked, no.

    Q  You just said I was asked to do it.  Who asked you?

    A  Well, I mis -- misstated, then, because I didn't -- I was never really asked to -- to put people -- I mean, it was just the -- it was just my -- Doug Patterson, I guess, would have been the one.

*Despain Depo.* at 145:13-146:2.  Despain admits that he never acted as a leadman before 2003:

    Q  Before you became a leadman, you said you became one in 2003 --

    A  Yes.

    Q  -- did you ever act as a leadman?

    A  I never acted as a leadman.

*Despain Depo.* at 56:1-5. Doug Stacy also testified that Despain had no authority over Washington and never acted as a leadman:

    Q  Was Mr. Despain ever a leadman over Mr. Washington?

    A  No, sir.

    Q  Did Mr. Despain ever have the authority to direct Mr. Washington as to what job to do?

    A  No, sir.

    Q  Did Mr. Despain ever have any capacity as an assistant leadman?

    A  No, sir.

    Q  Did Mr. Despain ever have the capacity to instruct Mr. Washington or any other employee as to the duties to perform?

    A.  No, sir.

    Q  Or the workstation to work?

    A  Not that I know of.

* * *

    Q  Do -- do you know of any authority that Mr. Despain had

Washington explained this to his supervisor, Doug Patterson, and asked that white co-workers like

Despain stop being allowed to exercise authority over him and boss him around in ways that they didn't

treat white employees. Nothing was done. *Id.* Two weeks later Despain began ordering Washington

around again as if he were a supervisor and Washington was a boy. *Id.* When Washington asked for

a meeting to avoid any further confrontations about the way he was being treated, or any

misunderstanding about what Despain was telling him to do, Despain muscled up to him again in the same

physically intimidating way that he had done two weeks earlier. *Id.* Washington stayed calm and tried

to get away from Despain to call his supervisor to get clarification of what to do, but Despain stalked him,

screaming. *Id.* When Washington couldn't get in touch with his supervisor or anyone else to help him,

he decided that the only way he could avoid being physically attacked would be to leave the plant. *Id.*

Washington had only come in on that shift on his off-day in a voluntary effort to fill-in for an absent

employee, and Despain told him he should leave the plant if he wasn't going to do what he told him to do.[28]

---

when you were absent that would make Mr. Washington feel like he was
under him or responsible to him or being directed by him?
    A Robert Despain had no authority. He was just simply there as
someone who could call maintenance when something happened,
something went wrong.

*Stacy Depo.* at 49:14-50:7, 55:19-56:4.

[28] Despain testifies that he told Washington it was his choice as to whether he wanted to go home
that evening and that he did nothing wrong in exercising the right of choice he was given by going home:

    Q You didn't testify that you told him to go home?
    A I asked him to work the I-bed, he said he didn't want to work
the I-bed, I said I don't need you if you don't want to work the I-bed,
that's where I need you.
    Q You told him to go home?
    A He -- he actually decided -- I mean, it was -- I gave him that

*Id.* Washington made it clear to management at his first opportunity that Despain was constantly

physically threatening him and using racial slurs and other abuse, that he had stalked him and told him to

leave the plant, that he had followed that instruction, that he had been isolated in the plant at that time and

couldn't get any help from other co-workers like Doug Stacy or his supervisor, and that if he hadn't left

the plant he feared things would have escalated into another physical attack. *Id.* Washington was still

suspended, but nothing was done to Despain or Stacy.[29] *Id.* Despain was subsequently promoted to two

---

      choice to either stay or go.  That's what I did.  He took the go.
      Q You gave him the choice of working  the I-bed or going home?
      A Because I didn't need him anywhere else.  He wasn't needed
anywhere else.

* * *

      Q Now, I understood your testimony to be this morning that you
simply gave Mr. Washington a choice, to either work the I-bed or go
home?
      A That's right.
      Q And you meant that to truly be a choice of his own, correct?
      A That's correct.

*Despain Depo.* at 142:13-143:4, 158-20-159:4.  Doug Stacy also admitted that whether Washington
worked was strictly voluntary on the shift for which he as suspended for not working.

      Q Do you recall what the procedures  were for filling a unexpected
vacancy on a shift?
      A At that time, it was pretty much voluntary.
      Q All right.
      A And if we couldn't get someone to  volunteer, then a lot of
times we just worked shorthanded.

*Stacy Depo.* a t 54:20-55:5.

   [29] Despain admitted in his deposition that he was never talked to about this incident except to be
told he had acted correctly.

      Q How long was it after the night  that you told him or the
afternoon that you told him to go home was it that Patterson told you that

84

different Leadman jobs.

The same pattern of abuse happened again on the work shift of September 26, 2003 that resulted in Washington's termination. This time Doug Stacy began to boss Washington around and treat him like a "boy" similar to the way Despain had done. Pl. Exh. 40 at ¶29.   Like Despain, Stacy was not a Leadman or Supervisor at the time and had no authority over Washington, but he told Washington to take over the job Stacy had been assigned in the South Piler and that he would take over Washington's regularly assigned job in the North Piler because it was easier. *Id.*[30] Washington politely told Stacy over

---

> you had handled it correctly?
> A  It was, if I'm not mistaken, the  next day or so, the day after.
> Q  Did you ever give a written statement about this set of events?
> A  No, sir.
>
>            \* \* \*
>
> Q  Were you ever disciplined about  these events?
> A  No, sir.

*Despain Depo.* at 151:1-11, 189:4-6. Doug Stacy also admitted that nothing was ever done to Despain about this incident.

> Q  Did you ever take a statement from  Robert Despain about the conflict?
> A  No.
> Q  Do you know if Robert Despain ever  gave a statement?
> A  I don't know.
> Q  Do you know what was done to investigate this conflict?
> A  I -- no, I don't.

*Stacy Depo.* at 57:9-17.

[30] Stacy admits that he tried to tell Washington to give him the North Piler and for Washington to take the South Piler that Stacy had been assigned.

> Q  So the conversation you said you  had with Rodney Washington about the -- the south piler, was that on the intercom?
> A  Yes, sir.
> Q  And you were telling Mr. Washington that you wanted him to come over and run  the south piler?

the intercom that he should do the job he was assigned in the South Piler, and that he would do the job he

had been assigned in the North Piler. *Id.* at ¶29. Stacy admits that Washington did not raise his voice

and was not impolite. *Id.*[31] A few minutes later, Washington's supervisor, Glen Ellis, barged into his

work cubicle and, without ever asking Washington what had happened, started accusing him of being

wrong not to do whatever Stacy tells him to do. *Id.* Stacy, however, had no such authority and never

presumed to boss anyone else around like that, and he was one of the employees who wore the

confederate cross do-rags that Nucor sold in the Company store. Pl. Exh. 2 at ¶18. *Id.* When

Washington told Ellis that Stacy had treated him like "a boy" just because he was black, Ellis became

------

> A  Yes, sir.
> Q  And you wanted to go run the north piler?
> A  Yes, sir.
> Q  And tell me as close as you can the exact words that were said between the two of you.
> A  It was something like hey, you need to be down here, this is the business end, you know, the busy end, and let me go up there where it's quiet and I can sit still for a little while, something along that line.
> Q  This is at the beginning of the shift?
> A  Yes, sir.

*Stacy Depo.* at 83:7-84:6.

[31] Stacy admits in his deposition that Washington did not talk or act in an angry manner.

> Q  Did he say anything to you that indicated he was angry?
> A  No, not that I'm --
>           * * *
> Q  Did Brannen ever say that Rodney was acting badly?
> A  No, sir.
> Q  Did you ever get the sense that Rodney was angry?
> A  No, I never did –

*Stacy Depo.* at 84:16-18, 85:13-18.

even more upset and accusatory towards him. *Id.* Ellis' attitude and statements belittled Washington to the point that Washington turned away from Ellis and hit the window of the door to his cubicle, falling to the floor crying in frustration with the way he was being treated. Pl. Exh.40 at ¶29. Ellis never accused Washington of being disrespectful to him or trying to hit him. *Id. See e.g. Young v. Time Warner Cable Capital, L.P.*, 443 F.Supp.2d 1109, 1128, 1129 2006) ("One way to establish pretext is to indirectly show that the employer's proffered explanation is unworthy of credence because it has no basis in fact. *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir.2006); *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir.2001).).

All this occurred shortly after Washington and the other plaintiffs began filing EEOC Charges over this and other forms of racial discrimination. *Id.* White employees have not been discharged when they phycially attacked other employees, rather than just a window in frustration. Pl. Exh. 40 at ¶31. Washington testified to such incidents as follows:

> 31.    White employees have not been discharged when they actually hit or struck other employees, rather than just a window. Just a few months before I was discharged, two white employees, Joe Wood and Michael Walker, were just suspended and told to attend anger management classes for grabbing, striking and cursing one another. Copies of Wood's and Walker's "Notice of Warning" for this altercation are attached. Wood grabbed Walker around the neck and choked, cursed and verbally abused him. Similar cursing and verbal abuse had been occurring between the two for several days. Neither Wood or Walker, however, were discharged as I was, however. Another white employee, James Hymas, was given just a two-day suspension for physically attacking and cursing a black employee on the job. I have already listed white employees who were promoted to similar jobs even though they had prior disciplinary records.

Pl. Exh. 40 at ¶31.

Washington's overall evidence regarding his termination goes far beyond a *prima facie* case.

Nucor, however, has not come forward with any evidence from the decisionmaker, Joe Stratman, that articulates a non-discriminatory reason for terminating Washington or for treating him differently than the white employees who engaged in workplace assaults far more serious than Washington's window breakage. It is undisputed that only the Plant Manager, Joe Stratman, can make those decisions or articulate the basis for his decision to treat Washington more harshly than the white employees who physically attacked other employees. Pl. Exh. 40 at ¶31. Nucor's failure to submit any evidence from the decisionmaker leaves Washington's *prima facie* presumption of discrimination standing and makes summary judgment inappropriate. *Burdine*, 450 U.S. at 254.

## V. THE QUESTION OF PRETEXT INVOLVES GENUINE ISSUES OF MATERIAL FACT

Even if Nucor had carried its burden of dispelling the *prima facie* inference of discrimination *arguendo*, plaintiffs have produced sufficient evidence for reasonable jurors to find that the reasons advanced were a pretext for unlawful discrimination and that race or retaliation was, in whole or in part, a motivating factor in the decisions at issue. The plaintiffs have submitted several different forms of such evidence, including: (1) the strength of their *prima facie* case itself[32]; (2) substantial evidence of a racially

---

[32] *Bogren v. State of Minnesota*, 236 F.3d 399, 404 (8th Cir. 2001) ("[A] plaintiff's prima facie case of discrimination, combined with sufficient evidence from which a reasonable fact finder could disbelieve an employer's nondiscriminatory explanation and make the ultimate fact-finding that illegal discrimination occurred, may form the requisite evidentiary basis upon which to submit to a jury the question of an employer's intentional, unlawful discrimination."); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1061, 1062 (8th Cir. 1997) (" In sum, we hold the evidence as a whole-evidence that the employer's proffered reasons were false, as well as the evidence establishing the elements of the prima facie case-was sufficient to permit the jury to find the ultimate fact of retaliation. Consistent with *Hicks*, no additional evidence of retaliation was required.").

hostile work environment[33]; (3) undisputed proof that two large physical areas of the plant — the mill areas

— are racially segregated and have their own Supervisors, Leadmen and crews who are still all white at

NYSII, and were all white but one at NYSI until well after this lawsuit was filed[34]; (4) falsely articulated

---

[33] Evidence of a racially hostile environment has been held relevant to proving a plaintiff's individual discharge or other *McDonnell Douglas* type of claim. *Williams v. Conagra Poultry Co.*, 378 F.3d 790, 794 (8th Cir. 2004) ("Evidence of widespread toleration of racial harassment and disparate treatment condoned by management was relevant to its motive in firing Mr. Williams. * * * Evidence of the extent of the hostile environment was thus probative on the matter of managerial motives.") (citing *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1102-03 (8th Cir.1988). The Court of Appeals also held that such evidence was relevant to the plaintiffs' punitive damage claim: "the issue of motive was relevant to Mr. Williams's eligibility for punitive damages on his harassment claim, even if the conduct of which he was unaware was not relevant to the question of whether he experienced actionable harassment." *Williams*, 378 F.3d at 794. The evidence showing such a racially hostile work environment is set forth at pages 91-123 *infra* and in plaintiffs' Declarations and other evidence.

[34]Evidence of racial segregation is obviously relevant to the issue of whether there was an intent to discriminate in order to maintain such racial segregation, and in showing the racial stereotypes of Nucor's managers who believe that African-Americans as a race are unsuited for the mill areas of the plant. This Circuit has recognized that evidence of racial segregation in a plant's physical layout and operation is probative on the issue of pretext and intent. *See e.g. Reed v. Arlington Hotel Co., Inc.*, 476 F.2d 721, 723 (8th Cir. 1973)("The statistics which show segregated departments and job classifications establish a violation of Title VII."); *Gilmore v. Kansas City Terminal Railway*, 509 F.2d 48, 50-53. (8th Cir. 1975) ("This suggests that the bargaining representative for those departments may have discriminated in the past and that vestiges of that discrimination endure within those departments. The fact of possible prior union discrimination is thus relevant to the determination of whether Terminal's promotion policy, which appears neutral on its face, actually carries forward the effects of prior discrimination."). Plaintiffs' expert, Dr. Bradley, has determined that crew assignments to the mill areas are significantly correlated with an employee's race and have disparate impact on African-Americans as a class:

> Within the Melt Shop, African-Americans are primarily assigned to duties in the Casting area, whereas non-African-Americans make up the majority of the Electric Arc Furnace ("EAF") and Yard areas. Within the Roll Mill, African-Americans are primarily assigned to duties in the Finishing and Roll Shop areas, whereas the Mill and Mechanic areas are almost exclusively non-African-American. The racial disparities in work area assignments within each department are statistically significant. For the Melt Shop department, the disparity in distribution of African-Americans among units was statistically significant at the .04 level of significance. For the Roll Mill department, the disparity in distribution of African-Americans among units was statistically significant at a level of significance less than .001. This analysis shows that work area/unit assignments have disparate impact and

reasons for the three jobs bid that a decisionmaker has addressed[35]; (5) a legitimate inference that the plaintiffs were the best qualified for the jobs they sought because their qualifications are the only ones before the Court and no decisionmaker has been willing to articulate any qualifications that made the white selectees better qualified except for one job — the Lubricator job given to Mike Smith over Rodney Washington[36]; (6) the complete absence of any decisionmakers for the remaining jobs that the plaintiffs bid on and showed they were qualified to fill; (7) statistical evidence of racial discrimination[37]; (8) evidence of disparate treatment in promoting employees with more discipline than the plaintiffs, in suspending and discharging Rodney Washington in circumstances that white employees were not disciplined or discharged,

----

are significantly correlated with the race of the assigned employees.

*Id.* (including fn. 24 in text; omitting other footnotes).

[35] *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000).

[36] *See e.g. Ledbetter v. Alltel Corporate Services, Inc.,* 437 F.3d 717, 723 (8th Cir. 2006) ("While a district court may not second-guess an employer's valid, non-discriminatory employment decisions, the court still must analyze whether the proffered reasons are a pretext for intentional discrimination.") [citing *Moschetti v. Chicago, Central & Pac. Railroad Co.,* 119 F.3d 707, 710 (8th Cir.1997)]); *Chambers v. Metropolitan Property and Casualty Ins. Co.,* 351 F.3d 848, 857 (8th Cir. 2003) ("Where 'the employer contends that the selected candidate was more qualified ... than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision.' If this comparison successfully challenges the employer's articulated reason for the employment decision, it might serve to support a reasonable inference of discrimination.") (citing *Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 864 (8th Cir.1997)); *Stallings v. Hussmann Corp.,* 2006 WL 1300593 *10 (8th Cir. 2006) ("Once the employer comes forward with evidence of a reason other than retaliation for the employee's discharge, the employee is "left with 'the opportunity to demonstrate that the proffered reason is not the true reason for the employment decision.'") (quoting *Wallace v. DTG Operations, Inc.,* 442 F.3d 1112, 1120 (8th Cir.2006).).

[37] *McDonnell Douglas,* 411 U.S. at 804-805 ("evidence that may be relevant to any showing of pretext includes ... petitioner's employment policy and practice with respect to minority employment": and "statistics ... of whether [plaintiffs' treatment] conformed to a general pattern of discrimination against blacks.").

Case 3:04-cv-00291-SWW   Document 147   Filed 10/31/06   Page 13 of 67

and in demoting Clifton Lee and Cornelius Bennett so as to give their jobs to two white employees and punish them for participating in the EEOC proceedings against Nucor;[38] and (9) use of highly subjective selection criteria that facilitate hidden racial stereotypes and bias of the all white supervisory and managerial staff throughout most of the liability period.

Most of such pretext evidence has already been noted, but three parts of it have been given special attention in Nucor's brief — the racial hostile environment evidence, the statistical evidence and the disparate impact evidence. These three areas are discussed in separate sections below.

## VI.   RACIALLY HOSTILE WORK ENVIRONMENT

### A.   Evidence Of A Racially Hostile Work Environment

The Court has already noted part of the evidence of a racially hostile work environment in its earlier Order regarding class certification. *Order* at 10-11, 28-29 (Doc. 123). The Court noted that "white employees burned a cross in the roll mill department and covered their heads with hoods", a supervisor hung "a chicken with a hangman's noose . . . in another black employee's workstation", and "repeated racial slurs, nooses and similar items hung in the roll mill department, and racially offensive graffiti on bathroom walls." *Id.* at 10-11, 28-29. Such evidence of "repeated racial slurs, nooses and similar items hung in the roll mill department", *Order* at 28-29, precludes summary judgment because "'[u]nquestionably, a working environment dominated by racial slurs constitutes a violation of Title VII.'" *Green v. Franklin National Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006) [quoting *Jackson v. Flint, Ink N. Am. Corp.*, 370 F.3d 791, 794 (8th Cir. 2005) and *Johnson v. Bunny Bread Co.*, 646

---

[38] *McDonnell Douglas*, 411 U.S. at 804-805 ("evidence . . . relevant to any showing of pretext includes facts as to petitioner's treatment of respondent during his prior term of employment [and] petitioner's reaction, if any, to respondent's legitimate civil rights activity.").

F.2d 1250, 1257 (8th Cir. 2004)].

The Court's prior Order recognized that such "repeated racial slurs, nooses and similar items in the roll mill department" established the named plaintiffs' claims in that department, but then questioned whether the same pattern of racial hostility had occurred throughout the other areas of the plant where the plaintiffs did not work: "The Court cannot assume that black employees, throughout the Blytheville plant, were subject to the same offenses as Plaintiffs and, like Plaintiffs, found them personally offensive." *Order* at 29 (Dkt. 123). This finding precludes summary judgment on the plaintiffs' individual claim because they are not required to show that other employees or departments were "subject to the same offenses" in order to prevail on their own individual claims.

Nucor concedes that "[t]o decide whether a work environment is objectively offensive . . . , this Court must examine all the circumstances, 'including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance.'" *Def. Br.* at 17 (quoting *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759 (8th Cir. 2004). A racially hostile environment need only be severe *or* pervasive, not both. *Bowen v. Missouri Dept. of Social Services*, 311 F.3d 878 (8th Cir. 2002) ("A claimant need only establish discriminatory conduct which is either pervasive or severe."). Nucor's argument compartmentalizes each incident rather than considering their severity or pervasiveness as a whole. The Supreme Court has held that "workplace conduct is not measured in isolation." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). This Circuit has rejected such an approach to the evidence:

> Workplace conduct is not measured in isolation; instead,
> 'whether an environment is sufficiently hostile or abusive' must be judged
> 'by looking at all the circumstances.' In analyzing Bowen's hostile

environment claim, the magistrate judge did not address all of the factors outlined in *Harris,* which factors determine whether a work environment is "hostile" or "abusive." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. The frequency of the discriminatory conduct, discussed by the magistrate, is only one of several factors to be considered. Other factors include the severity of the discriminatory conduct; whether the offensive conduct was physically threatening or humiliating, as opposed to a mere offensive utterance; and whether the offensive conduct unreasonably interfered with the employee's work performance. *Id.* Finally, a court should consider the effect of the misconduct on the victim's psychological well-being in determining whether the victim subjectively perceived the environment to be hostile or abusive. *Id.* "[N]o single factor is required." *Id.* Finally, the "[h]arassment need not be so extreme that it produces tangible effects on job performance or psychological well-being to be actionable." *Carter,* 173 F.3d at 702 (citing *Harris,* 510 U.S. at 22, 114 S.Ct. 367).

*Bowen,* 311 F.3d at 884-885 (quoting *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270(2001); *see also Edwards v. Midwest Clothiers, L.L.C.,* 2005 WL 3199674 *7 (S.D. Iowa 2005); *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 116 (2002); *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998); *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993)).

Nucor's summary judgment argument focuses too much on the frequency of the incidents to the exclusion of the other factors mandated by the Eighth Circuit. *See Green,* 459 F.3d at 911 (8th Cir. 2006: "We also consider physical threats in conjunction with racial harassment in determining whether a hostile work environment exists.") (citing *Harris,* 510 U.S. at 23); *Bowen,* 311 F.3d at 884-885 (8th Circuit: "Other factors include . . . whether the offensive conduct was physically threatening or humiliating, as opposed to a mere offensive utterance"). The critical role that physically intimidating comments or behavior play in satisfying the "severe or pervasive" requirement was recently explained by the Eighth Circuit as follows:

We refer particularly to Mr. Jackson's deposition testimony (which neither party pointed us to directly) that his name was written in a shower at his workplace and that there was an arrow connecting his name with a

93

> burning cross and a KKK sign.   We think that an objective observer
> would regard this combination of figures as a threat of serious bodily harm
> if not death to Mr. Jackson; and when this threat is combined with all of
> the other incidents that Mr. Jackson complained of, and which we detailed
> at length in our previous opinion, *see Jackson v. Flint Ink N. Am. Corp.,*
> 370 F.3d 791, 793-96 (8th Cir.2004), we conclude that the present case
> is governed by *Reedy v. Quebecor Printing Eagle, Inc.,* 333 F.3d 906
> (8th Cir.2003).

*Jackson v. Flint Ink North American,* 382 F.3d 869. 870 (8th Cir. 2004).

Comments that are physically threatening are actionable even when they are not obviously racially

motivated.

> While the comments were not in themselves obviously racially motivated,
> they do constitute the sort of physical threats that are significant in cases
> like this one.  Howard also told Green he liked to "get even" with people
> who wronged him.  Howard facilitated an atmosphere of intimidation that
> accentuated the effect of his racial slurs directed at Green.

*Green v. Franklin National Bank of Minneapolis,* 459 F.3d 903, 912 (8th Cir. 2006).  Severity or

pervasiveness, however, does not require racially explicit slurs or physically threatening behavior.

Nucor ignores the "severity" and "physically threatening or humiliating" aspect of the pattern of

racial hostility shown in this case. The Court has already noted the burning cross, hoods and "repeated

racial slurs, nooses and similar items hung in the roll mill department." *Order* at 10-11, 28-29 (Dkt. #123).

Lynching reenactments, like those at Nucor, are obviously "physically threatening or humiliating", and not

a "mere offensive utterance":

> Indeed, the noose is among the most repugnant of all racist symbols,
> because it is itself an instrument of violence. It is impossible to appreciate
> the impact of the display of a noose without understanding this nation's
> opprobrious legacy of violence against African-Americans. * * * The
> effect of such violence on the psyche of African-Americans cannot be
> exaggerated. * * * Racially motivated physical threats and assaults are the
> most egregious form of workplace harassment.

*Williams v. New York City Housing Authority*, 154 F.Supp. 2d 820, 824, 825-826 (S.D. N.Y. 2001);

*Brown v. Peterson*, 2006 WL 349805 at *9 (N.D. Tex. 2006); *Vance v. Southern Bell Telephone and*

*Telegraph Company*, 983 F.2d 1573, 1582 (11th Cir. 1993) (Fay, J. dissenting). This Circuit and the

Supreme Court have also recognized that "the burning of a cross is a 'symbol of hate,' " . . . , and that

"when a cross burning is used to intimidate, few if any messages are more powerful." *Jackson v. Flint Ink*

*North American*, 370 F.3d 791, 796 (8th Cir. 2004) (quoting *Virginia v. Black*, 538 U.S. 343, 123 S.Ct.

1536, 1546, 155 L.Ed.2d 535 (2003) and *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S.

753, 771 (1995) (Thomas, J., concurring)) *id.* at 1547, 115 S.Ct. 2440.

Plaintiffs' Declarations establish that the reenactments of lynching, nooses and confederate flags

at Nucor were physically intimidating and threatening because they were constant reminders of slavery and

the related violence historically directed at persons of their race. Pl. Exhs. 2-9; Pl. Exh. 40 at ¶33. Such

matters were particularly physically intimidating and threatening in the roll mill areas of the plant which was

already racially segregated. Pl. Exh. 40 at ¶4. The plaintiffs have also attested to a barrage of other

incidents and symbols of violence, slavery and humiliation. When black employees spoke on the radio

intercom system, a chorus of monkey or gorilla noises would be broadcast in reply. *Id.* Gorilla and

monkey stickers were glued to black employees' lockers, sent by e-mail, and superimposed over their

photographs. *See e.g.* Pl. Exh. 8 at ¶4; Pl. Exh. 6 at ¶14. Banana peels were strewn around black

employees' work areas; bathroom walls bore swastikas, "KKK", "nigger", and "lazy nigger"; plant toilets

were called the "white man's throne and a nigger's soup bowl"; and symbols of racial violence proliferated

throughout the plant, such as a hangman's noose hung from a beam in the finishing department, a dummy

hung by the neck in the repair bed area, a rubber chicken lynched by a supervisor with a hangman's noose

over a black employee's work area, a plant intercom announcement that a black plaintiffs should have a

noose around his neck, and "could get a hanging, a confederate flag flown from the crane in the Shipping

Department, and confederate symbols plastered on plant lockers, helmets, mobile maintenance trucks,

toolboxes, hard hats, t-shirts, scarves, headwear, "pulpits" and bathrooms throughout the plant. Pl. Exh.

2 at ¶¶18-19; Pl. Exh. 5 at ¶¶ 15-16; Pl. Exh. 7 at ¶¶ 8-9; Pl. Exh. 6 at ¶¶12 -14; Pl. Exh. 8 at ¶ 4; Pl.

Exh. 3 at ¶¶ 20-21; Pl. Exh. 4 at ¶ 19; Pl. Exh. 9 at ¶ 4.

A white Leadman, Doug Stacy, testified that he saw a confederate flag hanging from an overhead

crane in the plant in 2001-2002:

> Q Have you ever seen any other Confederate flags, emblems, or symbols?
> A I have.
> Q What?
> A I seen a flag.
> Q When?
> A Oh, it's been a number of years ago, four or five, perhaps.
> Q And where did you see it?
> A It was hanging on an overhead crane in the shipping bay.
> Q And did you ever see a written statement by the company admonishing people not to be doing that?
> A No, sir, I haven't.
> Q Have you ever seen a written statement in which the company expressed that it was not in favor of that?
> A No, sir, I haven't.
>
> * * *
>
> Q Okay. I'm just wondering if you -- if the company has ever made statements that -- that were -- were intended to let you or other employees know that these racial -- these Confederate flags, emblems, or symbols might be racially offensive?
> A The company has, to my knowledge, has never made that statement.
> Q All right. Has that ever come to your attention from any source, that it might be offensive to African-Americans?
> A I don't believe that's the case.
>
> * * *
>
> Q Have you ever been asked by anybody representing the company about what you may have seen or heard in regard to Confederate flags or emblems?

A  No, sir.

*Stacy Depo.* at  112:6-113:1, 113:16-114:5, 115:15-19.

It is undisputed that Nucor also sold headwear with confederate flags formed in the shape of a gibbet-like cross to employees in the Company store for them to wear in the plant, and that Nucor had such caps or "do-rags" stitched with the Company's logo. Exhs. 2-9.[39]  Exhibit 10 is a picture of one such item. The sale and display of such confederate flag apparel to employees occurred in the midst of a barrage of other racial hostility throughout the plant, as already shown above.  Pl. Exhs. 2-9.

---

[39] The General Manager at Nucor-Yamato, Joe Stratman, admits that he personally saw such confederate flag "do-rags" for sale in the Company store and knew it was racially offensive:

Q  And these do-rags, you saw them yourself?
A  I saw an example of one, yes.
Q  Picked them up and looked at them?
A  Picked them up and looked at them? I don't know if I picked
it up.  I looked  at them.
Q  Okay.  But you saw that they -- the  confederate do-rags
yourself, didn't you?
A  Yes.
Q  And they had NYS on them, didn't  they?
A  Yes.
Q  And that stands for Nucor Yamato  Steel, correct?
A  Yes.

*Stratman Depo.* 263:22-264:2; 313:17-314:9 (Exh. 31).  Doug  Stacy also admits he  has seen the confederate do-rags being worn  in the plant.

Q  All right.  And have you ever seen any do-rags -- what -- do
you know what a do-rag is?
A  Yes, sir.  I wear one every day.
Q  Oh, okay.  And have you ever seen any that had Confederate
emblems on it?
A  I believe I have.

*Stacy Depo.* at 105:4-10.  Rodney Washington saw Stacy himself wearing such confederate "do-rags" while he served as "one of my Supervisors."  Pl. Exh. 2 at ¶18.

18.    The Confederate flag was allowed to be displayed throughout the plant. Nucor-Yamato sold bandannas and "do-rags" made to look like Confederate flags with the Company logo stitched on them. These were sold from the Company store from at least the 1990's through the time I left Nucor-Yamato in late 2003. In my work area, Doug Stacey, one of my supervisors, wore a Confederate/Nucor Yamato "do rag" as well as Jeff Gallagher, Scott Lindsay and Jim Gilmer. I have also seen Confederate flags flown from the overhead cranes in the plant on numerous occasions. Contractors' employees also wore the same Confederate "do rags" in the plant. The display of the Confederate flag was not isolated to one department or area of the plant, but occurred everywhere. Many of my white co-workers wore hard hats and had tool boxes plastered with the Confederate flag. The Company has never said anything to employees to indicate that it doesn't support the racial message carried by the confederate cross it sold to employees to be worn in the plant.

*Washington Decl.* ¶18 (Exh. 2).

Defendants' officials have now admitted that they knew at the time that the confederate flag was racially offensive and reasonably perceived as "a symbol of slavery." *Dugan* 315:11-16 (Exh. 28); *Prevost* 201-202 (Exh. 30); *Southard* 225:8-18 (Exh. 32); *Stratman* 263:22-264:2 (Exh. 31).

Q.   Do you consider it to be reasonable on the part of a black person to consider that to be a symbol of slavery?
A.   I can understand them thinking that --

*Dugan Depo.* at 315:11-16 (Exh. 28); *see also Prevost* 201:19-23-202:1-3 (Exh. 30); *Southard* 225:8-18 (Exh. 32); Pl. Exh. 10 (picture of one such item). Courts have found in a variety of contexts that "the confederate flag is a symbol of racial separation and oppression" and that it is "not an irrational inference that one who displays the confederate flag may harbor racial bias against African-Americans." *United States v. Blanding*, 250 F.3d 858, 861 (4th Cir. 2001)[40]. The Fourth Circuit has explained that:

---

[40] *See also Sons of Confederate Veterans, Inc. v. Comm'r of Va. Dep't.of Motor Vehicles,* 305 F.3d 241, 242 (4th Cir. 2002) (Wilkinson, C.J.) (Concurring in the denial of rehearing en banc) ("The vast majority of Virginians understand that one['s] proclamation of heritage is another's reminder of the

> It is the sincerely held view of many Americans, of all races, that the confederate flag is a symbol of racial separation and oppression. And, unfortunately, as uncomfortable as it is to admit, there are still those today who affirm allegiance to the confederate flag precisely because, for them, that flag is identified with racial separation. Because there are citizens who not only continue to hold separatist views, but who revere the confederate flag precisely for its symbolism of those views, it is not an irrational inference that one who displays the confederate flag *may* harbor racial bias against African-Americans.

*United States v. Blanding*, 250 F.3d at 861; *see also Dixon v. Coburg Dairy, Incorporated*, 369 F.3d

811, 823 (4th Cir. 2004) (Gregory, J. concurring).

The plaintiffs have testified that it was particularly physically intimidating to have such confederate

flags displayed and sold by Nucor itself with the Company logo embossed on them. Pl. Exhs. 2-9. The

Company publicly endorsed such racial hostility by placing the official Nucor logo at the most conspicuous

point at the foot of the confederate cross on the tail of the caps where it would be most prominent when

worn under a hardhat in the plant. Pl. Exh. 10. Such Company endorsement of the confederate flag in a

plant that was already racially segregated in large parts of the plant increased the spectre of incipient

violence that such flags represented. Nucor not only sold such items to employees and allowed them to

be worn in the plant, but it has never told the workforce that it does not, in fact, endorse the racial message

conveyed by the Nucor logo on such confederate emblems.  Exhs. 2-7, 10, 11.  It is a reasonable

inference for summary judgment purposes that Nucor's endorsement of the racial message of the

_____

unspeakable cruelties of human bondage. The vast majority of Virginians recognize the sad paradox of Confederate history—namely that individual southerners, so many good and decent in themselves, swore allegiance to a cause that thankfully was lost, and to practices that no society should have sought to defend.");*Augustus v. Sch. Bd. of Escambia County*, 361 F.Supp. 383, 389 (N.D.Fla. 1973) (finding the use of the Confederate battle flag by white students comparable to fighting words, as it became a source of violence and disruption, and the flag was 'specially dangerous in light of the numerical strength of the white students'), *modified by* 507 F.2d 152 (5th Cir. 1975).

confederate flags it sold to employees didn't just cause a fear of physical violence, but contributed to the atmosphere in which Rodney Washington and Ozzie Green were physically attacked. Pl. Exh. 40 at ¶¶28 & 29; Pl. Exh.43. *See e.g., Carter v. Kansas City Southern Railway Co.*, 456 F.3d 841, 849 (8th Cir. 2006) ("However, actions by management that show a hostility to complaints of racial harassment even when the plaintiff was not aware of those actions can create an inference sufficient to establish intentional discrimination.") (citing *see* Williams, 378 F.3d at 794.).

The constant broadcasting of gorilla and monkey noises and the display of gorilla pictures and spreading of banana peels were also racially degrading and humiliating.  Attached as Pl. Exh. 194 are the gorilla pictures and e-mails described in Danny Lee's Declaration submitted by the plaintiffs in support of their motion for class certification.  This Circuit has recently held that similar monkey or gorilla caricatures "'goes far beyond the mere unflattering'", is "'degrading and humiliating in the extreme'", and is often used "to intimidate African-Americans." *Green v. Franklin National Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006) [quoting in part, *White v. BFI Waste Services, LLC*, 375 F.3d 288, 298 (4th Cir. 2004)].[41]

There was also a barrage of other racially intimidation slurs by white supervisors and co-workers such as "nigger rigged", "coon", "big lip", "DAN", (acronym for "dumbass nigger"), "lazy ass niggers",

_____

[41] This Circuit noted in *Green, supra*, that "[t]he use of the term 'monkey' and other similar words have been part of actionable harassment claims across the country", citing the following examples: *See Jeffries v. Metro-Mark, Inc.*, 45 F.3d 258, 260 (8th Cir.1995) (plaintiff was called a "monkey"); *Webb v. Worldwide Flight Serv., Inc.*, 407 F.3d 1192, 1193 (11th Cir.2005) (plaintiff was called a "monkey"); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182 (4th Cir.2001) (plaintiff was called "monkey" and "dumb monkey"); *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 945 F.2d 906, 910 (7th Cir.1991) (plaintiffs were called "porch monkeys" and "baboons").  Primate rhetoric has been used to intimidate African-Americans and monkey imagery has been significant in racial harassment in other contexts as well. *Morgan v. McDonough*, 540 F.2d 527, 531 (1st Cir.1976) (in a school desegregation case, Caucasian students harassed African-American students by chanting "assassinate the nigger apes").

"working class niggers", "Martin Luther Coon day" and racial stereotypes characterizing African-Americans as thieves, clowns, incompetent and ignorant field hands, ridiculing black children as prone to "ebonics", stealing, and clowning and doing poorly in school, and white supervisor telling stories that stereotype black men's sexual anatomy. *See e.g.* Pl. Exh. 7 at ¶¶8-9; Pl. Exh. 5 at ¶15; Pl. Exh. 2 at ¶19. Plaintiffs testify that supervisors' and co-workers' statements like these were not isolated instances. They happened continuously. Pl. Exhs. 2-9; Pl. Exh. 40 at ¶33. Such slurs were often broadcast over the plant radio, which is a walkie-talkie everyone uses to communicate in the Blytheville plant, including all levels of management. *Id.* The only thing missing at Nucor was a written policy against such racial hostility. Plaintiffs' Declarations attested that Nucor has never had "a written or verbal policy regarding racial harassment" or "any training on racial harassment or harassment of any kind" at Nucor. Pl. Exh. 2 at ¶17; *see also* Pl. Exhs. 3-9. *Id.*

Nucor's current argument tries to parse and compartmentalize just a handful of the racially hostile incidents described in plaintiffs' original Declarations and to ignore all the others, many of which were severe in their own right. Nucor only disputes only how long it sold such confederate flag materials and whether it was done "accidently."[42] The picture submitted as Exh. 10 by plaintiffs to their class certification motion, however, shows that the confederate caps or do-rags could not have been sold in ignorance of what they were. Plaintiffs' Declarations state that such items were sold for more than five years until after EEOC Charges began to be filed in January 2003, and that the confederate emblem on the items for sale

---

[42] Nucor-Yamato admits in answer to interrogatories that "[b]andanas . . . that resemble the confederate flag were sold' in the Company store, but it contends they were sold to employees only for a "short time" and "without the knowledge of any Nucor employee." Exh. 39 (*Def. Resp. 2nd Interrgs.* signed by Keith Prevost, the Controller, "on behalf of Nucor-Yamato Steel Co. LP" on November 3, 2005).

was displayed in the store and sold over the counter in a way that Nucor's management and employees could not have failed to see what they were selling. Pl. Exh. 2 at ¶18; *see also* Exhs. 3-9. In fact, members of management wore the confederate do-rags themselves! Mr. Washington attests that "[i]n my work area, Doug Stacey, one of my supervisors, wore a Confederate/Nucor Yamato "do rag" as well as Jeff Gallagher, Scott Lindsay and Jim Gilmer." Pl. Exh. 2 at ¶18.

For summary judgment purposes, such evidence as a whole permits a reasonable inference that the Company's direct sale of confederate flag paraphernalia to employees was known to be racially offensive, as was the barrage of racial slurs, graffiti, and other hostility shown in the plaintiffs' Declarations.

Nucor argues that plaintiffs' evidence of "derogatory graffiti in the bathroom and confederate do rags . . . cannot withstand summary judgment" because they "cannot connect any of this alleged conduct to actual decisionmakers at Nucor-Yamato" and "never allege that any department manager ever uttered discriminatory language or wore any confederate flag." *Def. Br.* at 16. That is obviously untrue, however, because the confederate do-rags were designed and sold in the Company store itself, the Plant Manager and the Department Managers admitted that they knew such confederate items were a racially offensive symbol of slavery and forcible violence historically used against African-Americans, the Company store where such items were designed and sold was supervised by the Department Manager, Rick Ramsdell, and the Plant Manager, Joe Stratman. The "decisionmakers" also went beyond the Department Managers. Nucor submitted Declarations at the class certification stage in which the Department Managers emphasized the autonomous managerial authority of the Supervisors.

Nucor has not submitted any evidence from any Manager of Supervisor stating that they were unaware of the racial nooses, confederate flags and other symbols of violence and slavery, or that such items were not conspicuous to them in the plant in the same way they were conspicuous to the many

102

African-Americans who reported them to management. Pl. Exh. 40 at ¶33. The plaintiffs' Declarations

establish that such racial hostility was in open view in the presence of the Department Managers and

Supervisors, and they have also shown that at least 22 other African-Americans reported such racial

hostility to management in 2003 alone. Pl. Exhs. 40 at ¶33.

Nucor argues that not all of this racial hostility was directed at, or known, by each of the named

plaintiffs, but the plaintiffs dispute that in their Declarations. Pl. Ehs. 2-9, 40-46. Even if assumed

*arguendo*, racial hostility directed at other black employees, or black people generally, still contributes to

the severity or pervasiveness of the hostility brought to bear against each of the plaintiffs' own work

environments so long as they knew about and were personally offended by such harassment of others or

African-Americans generally. The Eighth Circuit has also held that one person's subjective experience of

racial hostility can bolster an inference that others were subjectively affected in the same way. *Williams*

*v. Conagra Poultry Co.*, 378 F.3d 790, 794 (8th Cir. 2004); *Carter v. Chrysler Corp.*, 173 F.3d 693,

701 & n.7 (8th Cir. 1999); *see generally Paxton v. Union National Bank*, 688 F.2d 552, 562 n.14 (8th

Cir. 1982) ("Hearsay testimony may be admitted to demonstrate typicality."); *Schwapp v. Town of Avon*,

118 F.3d 106, 111-12 (2d Cir.1997); *Jenson v. Eveleth Taconite Co.*, 139 F.R.D. 657, 662 (D. Mn.

1991); *Hall v. Gus Construction Co., Inc.*, 842 F.2d 1010, 1015 (8th Cir.1988); *Lake v. AK Steel*

*Corp.*, 2006 WL 1158610 *43 (W.D. Pa. 2006). Racial hostility unknown to the plaintiffs has been held

relevant in this Circuit to showing "widespread toleration of racial harassment and disparate treatment

condoned by management", and "[e]vidence] of the content of the hostile environment [is] probative on

the matter of managerial motives." *Williams v. Conagra Poultry Co.*, 378 F.3d 790, 794 (8th Cir. 2004).

Nucor's "stray comment" argument misunderstands the law on this subject. Even when racially-

biased statements are not made by the decisionmaker at the precise moment of announcing the reason for

103

his or her decision, such statements are still evidence of racial bias that must be considered at the pretext

stage of a *McDonnell Douglas* circumstantial case regardless of the fact that they do not establish a "direct

evidence" type of *prima facie* case. Statements or actions with "clear racial overtures" are enough to

satisfy that race was the "cause" of such statements or actions.

> The DSS argues, and the magistrate judge found, the evidence
> established nothing more than Lee had an extreme, intense dislike for
> Bowen unrelated to her race. We do not agree. Viewing, as we must,
> the evidence in the light most favorable to Bowen, we conclude she
> produced sufficient evidence from which reasonable jurors could infer that
> Lee's conduct toward Bowen was based on race. Lee's two "white
> bitch" epithets were explicitly racial and were directed specifically to
> Bowen, a white woman. Because the epithets carried clear racial
> overtones, they permit an inference that racial animus motivated not only
> her overtly discriminatory conduct but all of her offensive conduct towards
> Bowen.

*Bowen v. Missouri Dept. of Social Services*, 311 F.2d 878, 884  (8ᵗʰ Cir. 2002).

Nucor also ignores that all of the racial hostility noted by the Court in its earlier Order occurred in

the roll mill department and that it was this department that was racially segregated. Racial intimidation and

ridicule are even more threatening in an environment from which African-Americans are isolated and not

welcomed. The Eighth Circuit has insisted that the hostility of the work environment be considered in the

context of the employer's overall racial practices and attitude, including such things as a "pervasive practice

of using a double standard for evaluating and discipline white and  black employees." *Williams v.*

*Conagra Poultry Co.*, 378 F.3d at 795. The Eighth Circuit recognized such a double standard as part

of the severe or pervasive hostile environment in the latter case.

> This case . . . does not involve the kind of physically threatening behavior
> that we have relied on in other cases, *Reedy v. Quebecor Printing*
> *Eagle, Inc.*, 333 F.3d 906, 909 (8th Cir.2003). But we conclude
> nevertheless that there was a sufficient record to allow a jury to conclude
> that Mr. Williams was subjected to an unlawfully hostile environment

> based on his race. * * * Although ConAgra stresses the fact that Mr.
> Williams testified to only a single racial slur directed at him by the
> supervisor, the plaintiff and others testified that the supervisor's non-racial
> profanity and abuse was nevertheless more severe when directed toward
> black employees.

*Williams v. Conagra Poultry Co.*, 378 F.3d 790, 795-796 (8th Cir. 2004). Nucor also errs in arguing

that plaintiffs have never shown that the racial harassment affected their job performance. Plaintiffs'

depositions and Declarations have shown the same type of affect as that recently held sufficient by the

Eighth Circuit in *Williams v. Conagra*:

> The degree of the severity of the conduct of the supervisor and other
> employees is a closer question, but Mr. Williams testified to
> racially-motivated harassment that had a direct effect on the terms and
> conditions of his employment, such as work assignments. In addition, he
> testified that workplace harassment negatively affected his relationship with
> his wife and children, leading to uncharacteristic exhaustion, hostility, and
> impatience with family members. Furthermore, Mr. Williams testified that
> the verbal abuse that he suffered from his supervisor was continuous and
> extended over several years. We conclude that a reasonable jury could
> find on the basis of this evidence that Mr. Williams was subjected to
> actionable harassment.

*Williams v. Conagra Poultry Co.*, 378 F.3d 790, 795-796 (8th Cir. 2004). *See* Pl. Exhs. 40-45, 193.

The Supreme Court has also rejected Nucor's argument that racial harassment occurring before

December 1999 is irrelevant:.

> In determining whether an actionable hostile work environment claim
> exists, we look to "all the circumstances," including "the frequency of the
> discriminatory conduct; its severity; whether it is physically threatening or
> humiliating, or a mere offensive utterance; and whether it unreasonably
> interferes with an employee's work performance." *Id.*, at 23, 114 S.Ct.
> 367. * * * A hostile work environment claim is composed of a series of
> separate acts that collectively constitute one "unlawful employment
> practice." 42 U.S.C. § 2000e-5(e)(1). The timely filing provision only
> requires that a Title VII plaintiff file a charge within a certain number of
> days after the unlawful practice happened. It does not matter, for
> purposes of the statute, that some of the component acts of the hostile

work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

* * *

It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct. The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability. * * * Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116-118 (2002).

**B.    Nucor Knew Or Should Have Known Of The Racially Hostile Environment Because It Was Conspicuous And Was Reported To Management Many Times**

Nucor bears the substantive burden of proof on its affirmative defense under *Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998) and *Burlington Ind. v. Ellerth*, 524 U.S. 742, 764 (1998). Nucor concedes that such defense is available only "if *the employer* can prove" two things: (1) that it "exercised reasonable care to prevent and correct promptly any harassing behavior"; and (2) the plaintiffs' unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer." *Def. Br.* at 19 (Dkt. #129) [quoting *Ohruhlick v. Univ. of Arkansas*, 395 F.3d 872, 881 (8th Cir. 2005) and citing *Pennsylvania State Police v. Sudars*, 542 U.S. 129 (2004)]. As the party bearing the substantive burden of proof at trial on such affirmative defense, Nucor also bears that same burden at the summary judgment stage of the case. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Nucor argues that plaintiffs "rarely reported any of the alleged harassment at the time it occurred"

106

and that this "deprived Defendants of the ability to investigate and correct any inappropriate behaviors."

*Def. Br.* at 20. The evidence, however, is too disputed to permit summary judgment on such an affirmative

defense. Plaintiffs' Declarations state that Nucor had no racial harassment policy or procedure that

provided a means of making such a report, and that despite that failure they reported the overall pattern

of racial harassment, and many of the individual incidents comprising such pattern, through the means that

were available to them. Pl. Exhs. 2-9; Pl. Exh. 40 at ¶33. For example, the plaintiffs testified to the

following efforts to get management to respond to the racial harassment they were experiencing:

> 17.    Nucor-Yamato does not have a written or verbal policy
> regarding racial harassment. During the entire ten years I worked for the
> company, I never received any training on racial harassment or harassment
> of any kind.
>
> * * *
>
> 20.    I complained about this racial hostility I and other black
> employees were experiencing to Doug Stacy, another white supervisor,
> and tape recorded the conversation. I went to Dan Dimicco, who was the
> plant manager at that time, and complained and told him about the tape.
> Mr. Dimicco confiscated the tape but did nothing to stop the harassment.
> I asked Frankie Griggs, my Roll Mill Department manager, who was
> white, and Doug Patterson, a Roll Mill Department supervisor, who also
> was white, to get my tape back from Mr. Dimicco. Mr. Griggs told me
> in a threatening manner that I better not ask for the tape back anymore.
> I would still like to have the tape back.
>
> 21. I also expressed my concerns about the racial hostility and
> unfair selection and training practices to Dan Dimicco, Frankie Griggs,
> Mike Dugan, Doug Patterson, Keith Fowler, Glenn Ellis and Joe
> Stratman. Nothing was ever done in response. At the time I complained
> to Dimicco, he was the plant manager, and at Nucor-Yamato's
> Blytheville, Arkansas, plant at which I was employed, and he is now the
> President of Nucor Corporation in Charlotte, North Carolina.

Pl. Exh. 2 at ¶¶17, 20-21 (Washington Declaration, 2/21/06).

> 16.    Along with other African-American employees, I have
> expressed our joint concern directly to the plant manager, Joe Stratman,
> about Nucor-Yamato's employment practices and unfair treatment of

persons of our race. These concerns were raised at a meeting to discuss the results of the Mercer survey of Nucor-Yamato employees. One section of the survey specifically dealt with employee's concerns about whether they were being treated unfairly because of their race. Mr. Stratman and Nucor-Yamato have ignored our concerns.

\* \* \*

19.  Nucor-Yamato does not have a written or verbal policy regarding racial harassment. White employees are allowed to display the confederate flag in the plant. Nucor-Yamato sells merchandise embroidered with the confederate flag and the Company's name from the store in the plant, and uses payroll-deduction to aid employees' purchase of such items. The Company has never said anything to employees to indicate that it doesn't support the racial message carried by the confederate cross it sold to employees to be worn in the plant. Racial graffiti is allowed to stay on the walls of the bathrooms in the plant, and racial slurs, such as nigger, are used without any repercussions.

Pl. Exh. 3 at ¶¶16, 19 (McBride Declaration, 2/21/06).

16.  I along with other African-American employees have expressed our concerns directly to the plant manager, Joe Stratman, as well as other members of management at Nucor Yamoto about the employment practices and unfair treatment of African-Americans. Mr. Stratman and others have ignored our concerns.

\* \* \*

18.  Nucor-Yamato does not have a written or verbal policy regarding racial harassment. \* \* \*

Pl. Exh. 4 at ¶16, 18 ( Rogers Declaration, 2/21/06).

8.  I, along with other African-American employees, have expressed our concern directly to the plant manager, Joe Stratman, about Nucor-Yamato's employment practices and unfair treatment of African-Americans. I also expressed these concerns to supervisors Ed Cable, Gary Jackson, Frankie Griggs, and Mike Dugan. Larry McBride, also raised these same concerns at a meeting to discuss the results of the Mercer survey of the Nucor-Yamato employees. One section of the survey specifically dealt with employee's concerns about whether they were being treated unfairly because of their race. Mr. Stratman has ignored our concerns.

\* \* \*

12.  Nucor-Yamato does not have a written or verbal policy agreement racial harassment or hostility. \* \* \* I told Ed Cable, my white

108

supervisor, that the company store was selling confederate flags and he stated that this was the company store and that is it. White employees that I specifically remember wearing clothing or equipment depicting the confederate flag are John Wolf and Lonnie Patello. The Company has never said anything to employees to indicate that it doesn't support the racial message carried by the confederate cross it sold to employees to be worn in the plant.

Pl. Exh. 6 at ¶¶8, 12 (Clifton Lee, Sr., 2/21/06).

The plaintiffs have also shown that at least 22 other African-American employees reported the

same racially hostile work environment in 2003 alone (Pl. Exh. 40 at ¶33), including:

- Bruce Henley reported to management in 2003 that he had "seen other racially motivated signs, symbols, or depictions at Nucor-Yamato", had "seen confederate flags", that he had seen them "often and as recently as today", including "on license plates on personal employee vehicles, on head wraps/do rags and hard hats." He also reported that this was "offensive . . . to me" and that "[p]retty much everyone sees these because they are visible."

- James A. Hollis reported to management in 2003 that he had "seen a majority of the employees wear confederate flags on their hard hats", that he had never heard that "anyone has ever told these employees to remove rebel flags from their helmets", that "the whole issue is offensive to me", and that "[w]hy should I go and voice my complaint to management which has been in the media attention for years. I feel like I did not have any [way] to complain to management."

- Kenneth Nash reported to management in 2003 that he had seen "racially motivated signs, symbols, or depictions at Nucor-Yamato" and that they sold "confederate flag do rags" in "the Company store" and that he had seen them being worn in the plant as recently as "a couple of weeks ago."

- Gwendolyn Hooks reported to management in 2003 that she had seen "the rebel do rags . . . they sell in the employee Wal-Mart" and that this "represents slavery and is offensive." She also reported that her husband, Michael Hooks, had also "observed this at the break room in the maintenance shop" and had seen "'No Nigs' written on the chalkboard."

- Michael Hooks reported to management around the same time in 2003 that "[r]acially discriminatory comments have been directed toward me at Nucor-Yamato" by a "Leadman in the Maintenance Department" named Eddy Scott. He reported that approximately two years ago, Scott said, "I cannot believe you came

to work today, today is Martin Luther Coon Day." He told management that other employees had also heard this, like Lonnie Pattilo, Gary Hindrix, Danny Lee, Gary Cable, and James Bryan. He also reported to management that the supervisor, Jerry Vasser, had been told about Scott's statement "on the same day the comment was made", but Vassar had not "handled [his] complaint reasonably because he never heard of any action being taken." He also reported he felt like he had been "retaliated against because I felt I was treated differently after making the complaint."

- David A. Humphrey told management that he had been "subjected to 'bird-dogging' and "watched, pressured, motivated, shadowed, or monitored to an excessive degree at Nucor-Yamato because of my race" by a supervisor, Wayne Hunt.

- John Diamond reported to management in 2003 that he had seen "racially motivated signs, symbols, or depictions at Nucor-Yamato" in the "Finishing, Roll Mill, and Shipping Department", including "rebel flags on hard hats", and that "other employees who saw this are Danny Lee, Charlie Thomas, and James Newman." He also reported to management that two supervisors, Don Burns and Paul Flowers, were told about such Confederate flags on hard hats and that he "believe[s] that they may not have handled [his] complaint reasonably" because he "still saw the flags around the Department after [his] initial complaint."

- Edward Arnold reported to management in 2003 that "as recently as two weeks ago" he had "seen other racially motivated language and graffiti on the bathroom walls in other areas of Nucor-Yamato."

- John Bennett reported to management in 2003 that he had seen "racially motivated signs, symbols, or depictions at Nucor-Yamato", that he had "seen this over the course of my employment", and as recently as "today" when he "saw the rebel flag" on employees' "do rags" and "stickers on helmets."

- Charles C. Betts reported to management in 2003 that he had "seen rebel flags on occasion at the mill", including when "a crane operator hung a flag from his crane" and that "[t]here are still some flags on people's personal vehicles."

- Elroy Brown reported to management in 2003 that he had "seen employees with Confederate flags on their helmets and bandanas" and that "a manager would be able to see that even if the wearing of the flag is not meant to be racist, it could be perceived to be racist and offensive to some people."

- Johnny Brown reported to management in 2003 that he "see[s] Confederate flags on helmets or bandanas."

110

- Michael Brown reported to management in 2003 that "[r]acially discriminatory comments have been directed toward me at Nucor Yamato" by "Rocky Long [who] is in the position of supervisor." Long told Brown that he shouldn't get any boots like his because Brown would look like "a Nigger Cowboy." Brown also told management that Long "has made other comments about Blacks and Whites."

- Sammy Brown reported to management in 2003 that he sees "Confederate flag bandanas on employees' heads."

- David W. Shepherd, Sr. reported to management in 2003 "[t]here is only one Black guy in the Roll Mill and sixty percent of the Roll Shop is black", and that "[a]pproximately a year ago" Gary Steward stated, "Why are you black people so lazy?" and "[Y]ou know, you god damn black people are so lazy." He also reported that "[t]hirty minutes later, I went into the north bathroom, there was a statement written on the bathroom wall, '[i]t is so hard to train monkeys why do we think blacks are easier to work with.'"

- Michael Davis reported to management in 2003 that he had been "harassed at Nucor-Yamato because of my race" when a "spray painted doll" and a "dead crow" were left on the back of his truck, and someone wrote "boy" on his windshield.

- Gary Grice reported to management in 2003 that he had "seen racially motivated language, symbols, or depictions at Nucor-Yamato on rail cars and occasionally on the bathroom walls" and that "it still shows up on occasion."

- Anthony T. Jackson reported to management in 2003 "[r]acially discriminatory comments have been directed toward me at Nucor-Yamato" by a supervisor, Jeff Keenan "approximately about a month ago" when he called another black employee 'Buckwheat.'" Keenan repeated this comment "a few days ago as well."

- Isaac L. Johnson reported to management in 2003 that "[t]here is a general feeling in the community surrounding Nucor that Nucor does not like Blacks" and that he had "observed graffiti in the restrooms with racist material at Nucor-Yamato" as an "ongoing thing in the restrooms."

- Danny Lee reported to management in 2003 that he had "seen racially motivated signs, symbols, or depictions at Nucor Yamato . . . within the past year . . . throughout the work site." He also reported seeing "rebel flags on hard hats" and "tool boxes."

- Edward Rhodes reported to management in 2003 that he had "observed material

at Nucor-Yamato containing what I believe to be discriminatory content", that "[t]his occurred approximately four or five months ago in the Shipping Office bathroom", that he saw "writing on the wall that said, 'All niggers are stupid,'" and that "[i]t took about four to five months before the writing was painted over."

Despite having the burden of proof on this part of its affirmative defense, Nucor has not submitted evidence that it responded to any of such reports or to the overall racially hostile work environment that the plaintiffs themselves reported. Its claim that it had a racial harassment policy that provided a means for such reports is contested by its own officials and by each of the plaintiffs. Defendants' chief officer in charge of personnel, the Controller, Keith Prevost, admits that he knows of no written Nucor policy prohibiting racial harassment. Pl. Exh. 30 (*Prevost Depo.* 174, 201-202); *Dugan Depo.* at 320-322 (Pl. Exh. 28)l; *Cable Depo.* 29 (Pl. Exh. 35). Mr. Prevost testified:

> Q  Do you know of any written policy on racial harassment?
> A  Do I know of a written policy on racial harassment. Not -- not one that I can specifically identify.
>                          * * *
> Q  Do you know of anything in writing about confederate symbols?
> A  No.

*Prevost* Depo. at 174:5-9, 201:19-23-202:1-3 (Pl. Exh. 30). Similar answers were given to the same question by other Managers and Supervisors at Nucor. For example, one of Nucor's witnesses, Doug Stacy, testified that he too has never seen a written racial harassment policy or had any training on that subject.

> Q  Have you ever seen a written racial  harassment policy?
> A  No, sir.
> Q  Have you ever had any training in  racial harassment?
> A  In the Air Force.
> Q  No.  I mean at Nucor-Yamato.
> A  No, sir.

*Stacy Depo.* at 104:5-12 . Any doubt about such a policy for purposes of summary judgment is foreclosed

by the plaintiffs' direct testimony that there has never been "a written or verbal policy regarding racial

harassment" or "any  training on racial harassment or harassment of any kind." Pl Exh. 2 at ¶17

(Washington Decl.); *see also* Pl. Exhs. 3-9.[43]

Plaintiffs are only required to report the racially hostile environment itself, not each manifestation

or that environment long after further reports have become futile. The Supreme Court has held that racial

hostile environment claims are "different in kind from discrete acts" because "[t]heir very nature involves

repeated conduct." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). "'The

repeated nature of the harassment or its intensity constitutes evidence that management knew or should

have known of its existence.'" *Id.* 536 U.S. at 115 (quoting 1 B. Lindermann & P. Grossman,

Employment Discrimination Law at 348-349 (3d ed. 1996).

This Circuit has also held that direct complaints of the obvious are not always required. *Carter v.*

*Kansas City Southern Railway Co.*, 456 F.3d 841, 849 (8th Cir. 2006) ("[T]he use of racially offensive

language was so commonplace that a jury could find that members of management should have been aware

of it and taken prompt remedial action."). Liability was affirmed because the hostile environment was

conspicuous without being formally reported. *Id.* ("There was evidence that [the] locker was often visible

to everyone in the locker room which included managers.").[44]  *See also  Sims v. Health Midwest*

_____

[43]  The policy that Nucor refers to is from another plant, not the Blytheville, Arkansas plant.

[44] Another district court has also noted that:

> As the Eighth Circuit Court of Appeals explained, "notification of sexual
> harassment to an employer need not come solely from the victim of the
> harassment for knowledge to be imputed to the employer."

*Miller v. Woodharbor Molding & Millworks*, 80 F. Supp. 2d 1026, 1031-1032 (N.D. Iowa 2000).

*Physician Services Corp.,* 196 F.3d 915, 920 (8th Cir.1999); *Distasio v. Perkin Elmer Corp.,* 157

F.3d 55 (2d Cir.1998) (holding that, if a direct supervisor who had the responsibility to stop harassment

knew of and failed to act against it, the plaintiff has no further obligation to bring it to the employer's

attention); *see also Young v. Bayer Corp.,* 123 F.3d 672, 675 (7th Cir.1997) (finding it sufficient for a

plaintiff to give notice to someone who should reasonably be expected to stop the harassment or refer the

complaint up the chain of command to someone who can stop it); *Williamson v. City of Houston,* 148

F.3d 462, 467 (5th Cir.1998) ("an employer cannot use its own policies to insulate itself from liability by

placing an increased burden on a complainant to provide notice beyond that required by law").

    The current plaintiffs have established their case in precisely this manner. They have shown, in the

words of the Supreme Court in *Morgan,* that "'[t]he repeated nature of the harassment or its intensity

constitutes evidence that management knew or should have known of its existence.'" *Morgan,* 536 U.S.

at 115. They have also shown that they reported the racially hostile environment that was repeatedly

occurring, that the earliest such reports by Rodney Washington were met with retaliatory discipline, (Pl.

Exh. 40), that this retaliation and the lack of any other response chilled everyone's willingness to stick their

necks out again, but that they nevertheless continued to make reports of the pattern of hostility as much as

they were able given the lack of any racial harassment policy or any established procedure for it being

reported or investigated. Pl. Exhs. 2-9, 40-46. As the *Miller* Court noted:

> The EEOC enforcement guidelines specifically state: "An employer should
> make clear that it will not tolerate adverse treatment of employees because
> they report harassment or provide information related to such complaints.
> An anti-harassment policy and complaint procedure will not be effective
> without such assurance." *Enforcement Guidance: Vicarious Employer
> Liability for Unlawful Harassment by Supervisors,* EEOC Notice No.
> 915.002 (June 18, 1999).

*Miller,* 80 F. Supp. 2d at 1029 n.1. The plaintiffs have shown that any additional reporting was futile

because much of the hostile environment was in the plain sight of supervisors and nothing was done about

their prior reports about such hostility:

> 18.     * * *The display of the Confederate flag was not isolated
> to one department or area of the plant, but occurred everywhere.
> * * *
> 19.     * * * I complained about all of this to my supervisors and
> to the top man at the plant, but nothing was ever done. I would like to
> add that much of this did not require a complaint because it was done in
> the presence of supervisors and managers.

Pl. Exh. 2 at ¶¶18, 19 (Washington Declaration, 2/21/06).

> 19.     * * * Racial graffiti is allowed to stay on the walls of the
> bathrooms in the plant, and racial slurs, such as nigger, are used without
> any repercussions.
> 20.     The Confederate flag was allowed to be displayed
> throughout the plant.
> * * *
> 21.     * * * Black employees were often ridiculed after they used the
> radio. In the finishing area, a noose hanging a chicken was placed over Sylvester
> Rogers work station. Rogers has been told by a white co-worker that he could get
> a hanging over the plant radio. I have observed that black employees are openly
> ridiculed over the radio in a way not done to white employees. I have been
> referred to by my white co-workers as "Lay Down Larry". I would like to add
> that much of this did not require a complaint because it was done in the presence
> of supervisors and managers.

Pl. Exh. 3 at ¶¶19, 20, 21 (McBride Declaration, 2/21/06).

> 19.     The hostility that I have been subjected to includes, but is
> not limited to, the following incidents: (1) being told by fellow employee
> James May that I needed a noose around my neck; (2) having my
> supervisor, Durrell Warren, lynch a rubber chicken by the neck with a
> noose and hang it within a few feet of me in my work area; (3) being told
> by co-worker Allan Thomas over the plant radio that I "could get a
> hanging" (4) repeatedly being forced to see my Caucasian co-workers
> wearing bandannas, hardhats and tee-shirts with the confederate battle flag
> on them; (5) being repeatedly exposed to racist graffiti in the defendants'
> restrooms including the letters KKK; (6) seeing a hangman's noose tied
> and hung from a beam in the finishing department; (7) seeing a dummy
> hung by the neck in the in Repair Bed area; and (8) having to put up with

the Company selling Confederate items to white employees in the
company store with the Nucor logo sewn onto them in the shape of a
cross that hangs people. I have reported many of these instances to
management and managers and other supervisors saw many of these
racially hostile symbols and writings, themselves but took little or no steps
to stop them from recurring. The Company has never said anything to
employees to indicate that it doesn't support the racial message carried by
the  confederate cross it sold to employees to be worn in the plant.

Pl. Exh 4 at ¶19 (Rogers Declaration, 2/21/06).

15.    I have personally observed and experienced a racially
hostile work environment at Nucor-Yamato. I heard African-Americans
called "coon", "big lip" and "DAN", which means "dumbass nigger" at
Nucor-Yamato. I have also seen a chicken with a hangman's noose hung
in another black employee's work station where everyone could see it.
Racial slurs and other belittling comments about African-American
employees were routinely broadcast over the radio throughout the
workplace. A radio is like a walkie-talkie which everyone in the plant
uses to communicate with one another in the plant.  All levels of
management have the radio.  I have heard senior white operators
comment on the radio calling another black employee "Laydown Larry"
and "black boy." I did not report these incidents because the supervisors
themselves witnessed or heard these comments, and I feared retaliation.

16.    Just being at Nucor-Yamato was to experience racial
hostility and harassment. I saw KKK references written on the bathroom
walls,  as well as swastikas.   Confederate flags and items with
Confederate flags on them were prominently and widely displayed at work
in the plant on finishing cranes, mobile maintenance trucks, toolboxes, hard
hats, T-shifts, scarves and headwear and pulpits. Pulpits are tall structures
where supervisors and lead men observe and conduct the workforce in
the plant. In fact, Nucor-Yamato itself sold Confederate flag emblems
stitched with the Company logo to white employees in the Company store
and had them pay for them through the payroll deduction system in the
front office.  The Company has never said anything to employees to
indicate that it doesn't support the racial message carried by the
confederate cross it sold to employees to be worn in the plant. Racially
derogatory graffiti was allowed  in the restroom, such as a racially
offensive poem written on the bathroom wall saying "Black is beautiful.
Tan is grand.  But white is the color of the big boss man."

Pl. Exh. 5 at ¶¶15, 16  (Green Declaration, 2/21/06).

13.     * * * Supervisor Ed Cable told a racist joke to myself and Tim Pegues, another African-American employee, concerning an African-American child.

* * *

14.     Racial slurs, such as nigger, are used and there are no repercussions. Specifically, Rodney Washington was called nigger by Robert Despain and nothing was done. Moreover, Danny Lee, my brother and co-worker, has also been subjected to extremely degrading racial harassment. For example, in January of 2006, a picture of a gorilla was printed out off the Internet and left in his break area. In late 2005, a Gorilla Glue sticker was stuck to his locker. My brother complained to Sigmund Penkunas, Rick Ramsdale, and Joe Stratman, however, the harassment has continued. My brother also shared with me that within the last three or four months a fake driver's license was blown-up and printed out on a piece of paper and left in his break area at the computer table. The driver's license had a picture of a monkey on it and my brother's name was filled out as the licensee. Again my brother shared with me that he made a copy of this document and gave it to Rick Ramsdell who as before did nothing about it. My brother has shared with me that during the last two years other racist pictures have been left in and around his work area and in his locker. The pictures were of gorillas or monkeys. Also during this time frame, on multiple occasions banana peels were left in my brother's filing cabinet. It is of note that managers and supervisory personnel either condoned, aided, or participated in the creation of this racially hostile work environment and rarely if ever took any action to clean it up.

Pl. Exh. 6 at ¶¶13, 14 (Clifton Lee, Sr. Declaration, 2/21/06).

8.     * * * I have heard statements broadcast on the plant radio throughout the plant, such as, "I like my women like I like my coffee, black and strong." A radio is like a walkie talkie which everyone in the plant uses to communicate with one another. All levels of management have the radio. I have heard African-American employees referred to on the radio as "DAN", which is a word that stands for "dumbass nigger." I have also heard the word "nigger" used repeatedly on the radio and seen the words "lazy nigger" written on the bathroom walls at the plant.

Pl. Exh. 7 at ¶8 (Bennett Declaration, 2/21/06).

117

C.   **Nucor Has Not Taken Prompt Remedial Action Or Established A Written Policy Or Training Against Racial Harassment**

The absence of a written policy against racial harassment creates a genuine issue of material fact as to whether Nucor has ever "exercised reasonable care to prevent and correct promptly any . . . harassing behavior." *Walker v. Thompson*, 214 F.3d 615, 627 (5th Cir. 2000)("The lack of such a written policy procedure at Glasfloss certainly weighs in the appellants' favor in determining whether there is a genuine issue of material fact with regard to whether Glasfloss exercised reasonable care to prevent any racially harassing behavior."); *Miller v. Woodharbor Molding & Millworks*, 80 F. Supp. 2d 1026, 1028-1029, 1030 (N.D. Iowa 2000 ) (" To establish the first prong of the affirmative defense, Woodharbor must prove that "it exercised reasonable care to prevent and correct promptly any sexually harassing behavior." The primary purpose of Title VII is not to provide redress; rather, it is to prevent discrimination and the harm that results from such acts . While not required as a matter of law, the existence of an appropriate anti-harassment policy will often satisfy this first prong, because " 'Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms.'"). While such a written policy is not required as a matter of law, its absence provides a reasonable basis to infer that Nucor did not exercise reasonable care to prevent on-going racial harassment when it didn't bother to establish or disseminate a policy precluding rational harassment and providing a means for it to be reported.

Even if Nucor had a written policy prohibiting racial harassment and providing a means for reporting it, that would not carry its burden in establishing the affirmative defense under *Faragher/Ellerth*:

> In an environment with substantial racially hostile conduct, the employer cannot escape liability by merely pointing to its legally required investigation and anti-discrimination policies.

*Carter v. Kansas City Southern Railway Co.*, 456 F.3d 841, 849 (8th Cir. 2006) [quoting *Madison*

*v. IBP, Inc.,* 257 F.3d 780, 795-96 (8th Cir.2001)]; *see also Hurley v. Atlantic City Police Dept.,* 174 F.3d 95, 118 (3rd Cir.1999) ("*Ellerth* and *Faragher* do not, as the defendants seem to assume, focus mechanically on the formal existence of a sexual harassment policy, allowing an absolute defense to a hostile work environment claim whenever the employer can point to an anti-harassment policy of some sort."). Moreover, "in order for an employer to satisfy the duty of reasonable care to prevent harassment, the employer's harassment-prevention policy must be 'effective.'" *Miller,* 80 F. Supp. 2d at 1029 [quoting *Lissau v. Southern Food Serv., Inc.,* 159 F.3d 177, 182-83 (4th Cir.1998)]; *Reinhold v. Commonwealth of Virginia,* 151 F.3d 172, 176 (4th Cir.1998) ("complaint procedures must be effective"). Courts have explained that the "gravamen of an 'effective' anti-harassment policy includes: 1) training for its supervisors regarding sexual harassment; 2) an express anti-retaliation provision; and, 3) multiple complaint channels for reporting the harassing conduct." *Miller,* 807 F.Supp.2d at 1029.[45]

Nucor has also not come forward with any evidence that its approach to racial harassment was

---

[45] *See also Shaw v. AutoZone, Inc.,* 180 F.3d 806, 812 (7th Cir.1999) (explaining that the company's anti-harassment policy at issue was effective because it was distributed to every one of its employees, and it also regularly trained its managers regarding its policy); *Baty v. Willamette Indus., Inc.,* 172 F.3d 1232, 1242 (10th Cir.1999) (explaining that the small amount of training given the employees was inadequate in light of the severity of the problem); *see also Hollis v. City of Buffalo,* 28 F.Supp.2d 812, 821 (W.D.N.Y.1998); *Miller v. D.F. Zee's, Inc.,* 31 F.Supp.2d 792, 803 (D.Or.1998); , *see Montero v. AGCO Corp.,* 192 F.3d 856, 861-862 (9th Cir.1999) (finding that anti-harassment policy at issue to be effective because it contained, *inter alia,* an anti-retaliation provision); *Duran v. Flagstar Corp.,* 17 F.Supp.2d 1195, 1203 (D.Colo.1998); *Pritchard v. Earthgrains Baking Cos., Inc.,* 1999 WL 397910, *9 (W.D.Va. March 5, 1999). *See Shaw,* 180 F.3d at 811-12 (finding that the anti-harassment policy to be effective because it provided, *inter alia,* for multiple mechanisms for the prompt resolution of complaints); *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1035-36 (7th Cir.1998) (holding that employer exercised reasonable care to prevent sexual harassment where it adopted a policy prohibiting sexual harassment which provided multiple complaint mechanisms); *Young v. Bayer Corp.,* 123 F.3d 672, 675 (7th Cir.1997) (the employer had four authorized channels for lodging complaints); *Duran,* 17 F.Supp.2d at 1203 (stating that the first prong of the affirmative defense satisfied because employee handbook contained, *inter alia,* various channels through which to render a complaint, and provided a 1-800 number); *Pritchard,* 1999 WL 397910, *9 (citing same).

119

effective in this way. Nor has it shown that it took prompt remedial action regarding the hostile environment as a whole, or any individual component of such environment. Nucor's contention that it took "prompt and effective remedial" action is based on its argument about one aspect of the overall hostile environment — its own sale of confederate flag do-rags embossed with the Company logo. Nucor does not mention the other aspects of the racially hostile environment set forth in plaintiffs' affidavits — the barrage of racial nooses, crosses, slurs and ridicule. *See* Pl. Exhs. 2-9. It has not offered any evidence of prompt remedial actions regarding such hostility as a whole, or for any component or incident standing alone.

Even Nucor's one response concerning sale of the confederate flags is too disputed for summary judgment. Nucor's argument depends on the credibility of its representation that confederate flags were sold once in 2003, and it measures the "promptness" of its response from that date. In fact, however, the sale of items had gone uncorrected for at least five years by that time Pl. Exh. 2 at ¶18. By the time Rodney Washington was discharged in October 2003, nothing had been done concerning the sale of the confederate emblems and they were still being sold. *Id.* It was not until well after this lawsuit was filed contesting the sale and display of such confederate emblems that anything was done. Nucor's witness, Doug Stacy,[46] testifies that he never learned of anything prohibiting the confederate flag until late 2005 or early 2006 — long after the injury was done and this lawsuit had been filed:

> Q All right. Let's mark it as Exhibit 2259 for this deposition. Have you ever seen a do-rag like that?
> A I can't say that I have or I haven't. Probably.
>      * * *
> Q Would you agree that the picture in Exhibit 2259 displays a do-rag that resembles a Confederate flag?
> A It has stars and stripes, the bars. I guess if you want to call that a Confederate flag, you could.

---

[46] Stacy is listed by Nucor as a witness in its initial disclosures and pretrial disclosures.

Q Have you ever heard anything from anybody written or verbal that indicated that that type of do-rag should not be worn in the plant?

A I have.

Q From who?

A From Glenn Ellis.

Q When?

A I couldn't tell you exactly how long ago. It's -- it's been actually recently, but I don't know just exactly how long ago.

Q Last six months?

A Yes, sir.

Q Was it a group meeting or a one-on-one?

A No, sir, it was just he and I.

Q And what -- what was said?

A That a do-rag or -- or shirts or whatever with that emblem would be not appropriate.

Q What -- what caused that conversation between the two of you?

A I don't know.

Q Were you wearing something along those lines?

A I -- I have a multitude of these things, and I don't necessarily pick one for any certain emblem or anything, I just go for a variety of colors and that type of deal, so I may have had something that resembled something similar to that. I can't say that I did or I didn't.

* * *

Q Before the last six months when you had that one conversation with Ellis, had you had any information from Joe Stratman on down, from anybody in supervision or management which tried to explain why the company had sold these Confederate do-rags in the company store?

A I never heard of any explanation.

Q Did you ever hear of any effort to assure employees that that did not represent the company's attitude?

A Yes, sir, from Glenn.

Q Okay. You told us about six months ago, in the last six months on him, but other than that?

A No, sir.

*Stacy Depo.* at 105:23-106:4, 107:19-109:11, 127:1-19 (objections omitted). Washington attests that

Stacy was one of the white employees who "wore a Confederate/Nucor-Yamato 'do rag.'" Pl. Exh. 2 at

¶18.

The plaintiffs' Declarations establish Nucor's lack of reasonable care even more directly. Each

121

of them attest that Nucor "has never said anything to employees to indicate that it doesn't support the racial message carried by the confederate cross it sold to employees in the plant." Pl. Exh. 2 at ¶18; Pl. Exhs. 3-9. Nucor's argument that it was unaware that it was selling such confederate crosses in the Company store is directly disputed by the plaintiffs' testimony and by common sense. Plaintiffs have shown that such confederate symbols and the way they were sold across the counter in the Nucor store were too obvious to be overlooked or misunderstood, and that they were, in fact, bought and worn in the plant *by the supervisors* themselves. Pl. Exhs. 2-9. A reasonable jury could well find that Nucor's alleged remedial action came only after five years and the filing of this lawsuit, not by the alleged accidental discovery of a one-time sale of such items. Even that belated response was too little, too late, because the Company: (1) never publicly or privately disclaimed the racially hostile message carried by the Nucor logo on the confederate symbols it sold to employees; (2) never had a recall of the items sold; and (3) never required employees to stop wearing such confederate symbols in the local community stitched with the Company's logo. Black employees' complaints about the confederate flag to the plant manager weren't even taken seriously enough to be sent to their Department Managers for redress. *See e.g. Dugan* 316-320 (Exh. 28). Nucor has not even produced a written statement to employees that addresses racial graffiti on the Company's walls or equipment or the display of confederate flags or symbols in the plant

The credibility choices inherent to Nucor's affirmative defense under *Farragher/Ellerth* must be made by a jury, not on summary judgment.

> SPFD argues that there are many plausible, non-racial explanations for the actions alleged by the Appellants. SPFD essentially invites us to make credibility determinations and to draw inferences in its favor which we will not do. First, credibility determinations fall within the fact finder's purview, not ours.
>
> * * *
>
> Although the evidence shows that SPFD often investigated complaints and

> that specific behavior was seldom repeated, the evidence also shows that
> racially offensive behavior continued in other forms. Therefore, whether
> the SPFD's remedial actions were effective is a jury question.

*Mems v. City of St. Paul, Dept.*, 224 F.3d 735, 739 (8ᵗʰ Cir. 2000) (citing *See Carter v. Chrysler*

*Corp.*, 173 F.3d 693, 699 (8th Cir.1999));*Smith*, 2006 WL 715788 at *5.

## VII.   PATTERN-OR-PRACTICE EVIDENCE OF PRETEXT

Nucor argues that plaintiffs cannot bring a pattern-or-practice *claim* without certification of a class,

and therefore cannot rely upon pattern-or-practice *evidence* as part of their *McDonnell Douglas* claims.

The Supreme Court, however, has rejected that latter contention and held that:

> [E]vidence that may be relevant to any showing of pretext includes facts
> as to the petitioner's treatment of respondent during his prior term of
> employment; petitioner's reaction, if any, to respondent's legitimate civil
> rights activities; and petitioner's general policy and practice with respect
> to minority employment. On the latter point, statistics as to petitioner's
> employment policy and practice may be helpful to a determination of
> whether petitioner's refusal to rehire respondent in this case *conformed
> to a general pattern of discrimination against blacks.*

*McDonnell Douglas v. Green*, 411 U.S. 792, 804-805 (1973) (emphasis added)[47]; *see also Easley v.*

*Anheuser-Busch, Inc.*, 758 F.2d 251, 260 (8ᵗʰ Cir. 1985) (" Nevertheless, with respect to individual

claims of discrimination, statistics may be of probative value on the issue of intent.").[48]

---

[47]Although the plaintiffs are *allowed* to bring an individual pattern-or-practice claim *qua* claim, *Cox v. American Cast Iron Pipe Co.*, 784 F.2d1546 (11ᵗʰ Cir. 1986), they are not *required* to do so and may instead raise their pattern-or-practice evidence at the pretext stage of a *McDonnell Douglas* claim. Thus, Nucor's argument is moot to the extent that it contends that plaintiffs cannot rely upon a pattern-or-practice *claim* without class certification. Plaintiffs disagree with that contention, but it is unimportant because each of the individual plaintiffs voluntarily rely on the *McDonnell Douglas* mode of proof and analysis for their disparate treatment claims now that class certification has been denied.

[48]*Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 471 (8th Cir.1984); *Harper v. Trans World Airlines, Inc.*, 525 F.2d 409, 412 (8th Cir.1975); *King v. Yellow Freight System, Inc.*, 523 F.2d 879, 882 (8th Cir.1975). (A pattern of discrimination "is a form of circumstantial evidence from which an

Nucor argues that the plaintiffs' statistical evidence should not be considered as part of the pretext evidence because it does not control for sufficient "minimum qualifications", but the plaintiffs' expert has shown that he controlled for all the "qualifications" that are capable of being quantified or measured or that Nucor has identified. Pl. Exh. 13 at p. 15; Pl. Exh. 190. Plaintiffs' statistics controlled for job posting, training, discipline, and "proximity" or crew assignment and determined that black bidders' promotion rates were still significantly less than white bidders even after such factors were included in the analysis. Pl. Exh. 12A and 13 at p. 15. Dr. Bradley reported: "Assuming for argument's sake that Dr. Welch's adjustment of any calculations appropriately includes the effect of the four factors he advocates, the racial differences in selection rates still meet the .05 level of significance for the question of interest in this case: whether African-Americans are selected for posted positions at a rate significantly less than non-African-Americans." Pl. Exh. 13 at ¶ 15.

Nucor has never identified any additional factors that could be quantified or included in the statistical analysis. Without specifying what additional factors it would want to include in the regression analysis, Nucor still insists that something more be controlled for beyond the four factors that its expert identified and that Dr. Bradley included in his regression — job posting, training, discipline and "proximity" or crew assignments. *Id.* It is impossible to further isolate the effect of individual components of the

---

inference of discriminatory animus may be drawn."); *Heymann v. Tetra Plastics Corp.*, 640 F.2d 115, 123 (8th Cir. 1981) ("We have previously found statistics to speak loudly in discrimination cases.") [citing Eubanks v. Pickens-Bond Const. Co., 635 F.2d 1341, 1347 (8th Cir. 1980) and *Cedeck v. Hamiltonian Federal Savings & Loan Ass'n*, 551 F.2d 1136, 1138 (8th Cir. 1977).]; *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 778 (8th Cir. 1995) ("statistical evidence "may support a finding of pretext, particularly where there are independent, direct grounds for disbelieving the employer's explanation for discharge."); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1059 (8th Cir. 1997) ("in addition to other evidence that the proffered reason was false, pretext was established by evidence that out of 3,500 employees, only 2 management employees in 25 years were nonwhite").

supervisors' *subjective opinions* precisely because they are subjective and not capable of separation for

analysis. Pl. Exh. 190. Nucor argues that the Court has already determined in its class certification Order

that Dr. Bradley's analysis is just "a bottom-line analysis", but none of the experts have been able to show

that Nucor's selection process can be parsed any further beyond the four factors that have already been

included in Dr. Bradley's analysis. *Id.* The Court's Order didn't identify any other criteria that could be

quantified or measured.[49]

The Eighth Circuit has held that the weight to be given to "omitted variables" in each party's

statistics is for the jury, not the Court:

> . . . a regression analysis does not become inadmissible as evidence
> simply because it does not include every variable that is quantifiable and
> may be relevant to the question presented. * * * That is, if a regression

---

[49] Dr. Bradley's last report made further effort to integrate additional factors into the analysis beyond those recommended by defendants' expert, but he reported that this proved impossible because they were not capable of measurement or separation for analysis. He reports that:

> The statements I made in my original report of November 18, 2005
> concerning the defendants' lack of records or data that would allow
> components of Nucor-Yamato's selection process to be separated for
> statistical analysis also applies to any selection procedures developed or
> administered by Dr. Seres. The statistical correlations of race and
> disparate impact that were shown in my original and rebuttal reports
> include the racial effect of selection procedures developed or administered
> by Dr. Seres to the extent they are used by Nucor-Yamato. As I stated
> in my earlier reports, Nucor-Yamato combines the various components
> of its selection process in such a manner that the individual components
> and procedures cannot be separated for analysis beyond what I have
> already analyzed in my earlier reports. Such components, including, but
> not limited to, those procedures developed or administered by Dr. Seres,
> are not capable of further separation for analysis because of the way they
> are used and the lack of any quantifiable or reliable data regarding their
> use at Nucor-Yamato.

Pl. Exh. 190, *Bradley Supp. Report* at pp. 1-2 (3/16/06).

> analysis omits variables, it is for the [jury] to consider the variables that
> have been left out of an analysis, and the reasons given for the omissions,
> and then to determine the weight to accord the study's results. . . .

*Maitland v. Univ. of Minnesota,* 155 F.3d 1013, 1017 (8th Cir. 1998).

The Supreme Court has also held that "it is clear that a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiffs' case" of employment discrimination. *Bazemore v. Friday,* 478 U.S. 385, 400 (1986); *see also Dothard v. Rawlinson,* 433 U.S. 321, 331 (1977) ("If the employer discerns fallacies or deficiencies in the data offered by the plaintiff, he is free to adduce countervailing evidence of his own. In this case no such effort was made."). The Sixth Circuit has explained:

> The fact that this statistical study did not include the employee's education
> or prior work experience does not make it irrelevant. *Bazemore,* 478
> U.S. at 400 n. 10, 106 S.Ct. at 3009 n. 10. Throughout this litigation,
> Bradford has claimed that it bases its promotion decisions on highly
> subjective criteria. It cannot now claim that plaintiff's statistics are
> unreliable for not including factors that it never claimed to be important in
> the decision-making process. Bradford was free at all times to rebut
> these statistics with evidence of what factors it considered in making its
> promotion decisions. " 'If the employer discerns fallacies or deficiencies in
> the data offered by the plaintiff, he is free to adduce countervailing
> evidence of his own.' " *Watson,* 487 U.S. at 996, 108 S.Ct. at 2789
> (quoting *Dothard v. Rawlinson,* 433 U.S. 321, 331, 97 S.Ct. 2720,
> 2727, 53 L.Ed.2d 786 (1977)). Bradford has failed to do so in this case.
> We, therefore, reverse the decision of the district court with respect to
> Scale's disparate impact claim.

*Scales v. J. C. Bradford and Co.,* 925 F.2d 901, 908-909 (6th Cir. 1991),[50] *Smith v. Virginia*

---

[50] The statute itself places an affirmative duty on the defendant to come forward with its own proof that the practice at issue "does not cause the disparate impact" once the plaintiff proffers *prima facie* evidence of such causation. 42 U.S.C. §2000e-1(k)(l)(B)(ii) ("If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.").

*Commonwealth Univ.*, 84 F.3d 672, 676 (4th Cir.1996) (Defendants "cannot rely on *Bazemore* at

summary judgment to establish as a matter of law that the multiple regression analysis was sufficient to

determine manifest imbalance.").

The "omitted variables" that the Eighth Circuit held to be inappropriate for the court to resolve by

summary judgment in *Maitland* were very similar to what Nucor argues here.

> The divergent outcomes of the studies are the result of the different
> variables that were included in the models.   Maitland claims certain
> variables should have been included in the Striebel study, and that the
> failure to do so skewed the results.  It is true, as the University and the
> District Court point out, that a regression analysis does not become
> inadmissible as evidence simply because it does not include every variable
> that is quantifiable and may be relevant to the question presented. But we
> are reviewing a decision to grant summary judgment, and the admissibility
> of the evidence is not the question here;  whether that evidence might be
> believed by a jury is, and "failure to include variables *will* affect the
> analysis' *probativeness.*" That is, if a regression analysis omits variables,
> it is for the finder of fact to consider the variables that have been left out
> of an analysis, and the reasons given for the omissions, and then to
> determine the weight to accord the study's results-in this case, whether
> those results show a manifest or conspicuous imbalance in salaries.
>
> \* \* \*
>
> By concluding that the Striebel study "logically justified the non-use of
> variables," the District Court chose one study on which to rely and thus
> was able to find the necessary salary imbalance to justify the plan. The
> court, however, thereby resolved a genuine issue of material fact, and so
> summary judgment (for either side) was inappropriate.

*Maitland v. Univ. of Minnesota*, 155 F.3d 1013, 1017 (8th Cir. 1998) (footnote and citations omitted).

The Tenth Circuit applied *Maitland* in reaching a similar result in *Bullington v. United Air Lines,*

*Inc.*, 186 F.3d 1301 (10th Cir. 1999):

> This is not to say Ms. Bullington's statistics are without fault.  As
> the district court noted, her analysis fails to account for differences in male
> and female interviewees' aeronautical experience--a potentially non-
> discriminatory explanation for the disparate impact.  However, we do not
> believe that fault renders Ms. Bullington's statistics incapable of raising a

127

> genuine issue of material fact. We emphasize that Ms. Bullington's burden
> as the nonmovant is to set forth specific facts establishing a genuine issue
> for trial. The issue of material fact, here the existence of a significant
> statistical disparity, need not be resolved conclusively in Ms. Bullington's
> favor. Rule 56 requires only that she present "sufficient evidence
> supporting the claimed factual dispute ... to require a jury or judge to
> resolve the parties' differing versions of the truth at trial." Ms. Bullington's
> statistics, for the reasons discussed above, are sufficiently reliable to make
> this showing and her failure to include one potentially relevant factor (*i.e.,*
> education level) does not undermine the probativeness of the statistics to
> such a degree that no reasonable jury could return a verdict in her favor.

*Bullington*, 186 F.3d at 1314 (citations omitted). The plaintiffs also adopt their prior briefs on this subject. *See* Dkt. nos. 71, 89, 107.

Nucor's argument fails to address the expert and other evidence that Nucor's decisionmaking was too subjective to allow additional components of supervisors' opinions to be identified or separated for analysis beyond those already included in plaintiffs' experts analysis. Pl. Exhs. 12-16. Each decisionmaker subjectively decided for themselves what they would consider, making it impossible to know if any particular qualification, discipline, training or proximity was applied in a given promotion decision or, if applied, what weight it carried when combined with other unidentifiable components of the final decision.[51] Nucor has never been able to provide any explanation for how such subjective qualifications could possibly have been quantified or separated for analysis any more than has already been done. Despite not knowing what each decisionmaker actually considered or subjectively combined into a final promotion decision,

---

[51] So it was unknown, for example, if discipline or training years ago was considered or not, or the degree of discipline (verbal warning versus written warning versus suspension) or the nature of the incident (e.g., prior tardiness versus major insubordination or dangerous safety violations) that was considered or weighted into the subjective decisionmaking. Nucor calls its promotion process "decentralized" or "autonomous", but that is just another way of describing how totally subjective the entire process was at the Blytheville plant. It wasn't just that each of the five department managers acted on their own subjective opinions, but that over 60 different supervisors in those five departments were vested with such subjective discretion.

128

plaintiffs' statistics controlled for all the factors that were capable of separation for analysis — job posting,

training, discipline, and "proximity" or crew assignment — and determined that black bidders' promotion

rates were still significantly less than white bidders even after such factors are included in the analysis. Pl.

Exh. 13 at p. 15. Statistical evidence should not be excluded where the subjectivity of the practice at issue

makes it impossible to better refine the statistical evidence. Even the effect of omitting any *measurable*

variable is an issue for trial, not summary judgment. *Maitland*, 155 F.3d at 1017.

     In addition, the following table shows that the disparity in the rate of disciplining African-American

employees is statistically significant by more than three, and as much as -5.66 standard deviations from

what would be expected in the absence of race as a factor (or, stated another way, from what would be

expected if race and discipline were not correlated at Nucor-Yamato).

### Analysis of Discipline Actions

| Type of Discipline | African-American Rate | Non-African-American Rate | Number of Standard Deviations | Adverse Impact Ratio |
|---|---|---|---|---|
| Verbal Warning | 35.12% | 19.17% | -4.55 | 54.6% |
| Written Warning | 36.31% | 16.97% | -5.68 | 46.7% |
| Suspension | 14.88% | 6.84% | -3.46 | 46.0% |
| Any Action | 55.95% | 32.84% | -5.66 | 58.7% |

Pl. Exh. 13 at 11-12. Plaintiffs' Declarations give anecdotal examples of how this disparity in discipline

adversely affected them individually and how discipline has been used as an excuse to keep black

employees out of the traditionally white jobs and work areas. Pl. Exhs. 2-9.

     Dr. Bradley also used defendants' expert's data to analyze the racial effect of formal training

standing alone. *Bradley Rebut. Rpt.* at 12 (Exh. 13). He found that "African-Americans have received

such training at approximately half the rate of their non-African-American counterparts" and that this

129

difference is -2.48 standard deviations from what would be expected in the absence of race as a factor." *Id.* He explained that "[t]his shows that race and training are significantly correlated at Nucor-Yamato and that such correlation is not likely a chance occurrence." *Id.*

Opportunities were racially stratified even in the finishing and roll shop crews where all the black employees but one have been kept for most of the liability period. Exhs. 2-7 & 13. For example, there were no black promotions to non-leadman jobs above pay grade 4. All the employees in those higher paying jobs were white in 1999, including all the Cold Saw Operators, Gag Press Operator Repairman and Rotary Straightener Operators, and *all* of the promotions to those jobs were also handed down to other whites during the 1999-2005 time period covered by this case. Even all of the supervisors were white in the finishing and roll shop areas where the black employees made up a large percentage of the workforce. That didn't change, as already mentioned, until late 2003 after the current EEOC Charges began to be filled in 2002-2003. *Id.*

Nucor's argument that "bottom-line racial disparities" were prohibited in *Ward's Cove v. Atonio*, 490 U.S. 642 (1989), overlooks that this decision was modified by Congress in the Civil Rights Act of 1991. The new Act provides that "if . . . the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice." 42 U.S.C. 2000e(K)(1)(B)(i).[52] Plaintiffs' statistics comply with such requirement by: (1)

---

[52] *See e.g., Smith v. City of Jackson, Mississippi*, 2005 WL 711605 *7 (2005) ("One of the purposes of that amendment was to modify the Court's holding in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), a case in which we narrowly construed the employer's exposure to liability on a disparate-impact theory. . . . [T]he relevant 1991 amendments expanded the coverage of Title VII. . . ."). The Court's class certification *Order* quotes language from *Watson v. Forth Worth National Bank*, 108 S.Ct. 2777, 2788-2789 (1998), that is similar to *Ward's Cove*, but that part of the *Watson* Opinion was not adopted by a majority of the Supreme Court until the next term in *Ward's Cove*, and the quoted language from both *Watson* and *Ward's Cove* was ultimately modified by the 1991 amendments to Title

measuring the racial effect of all discrete criteria that are "capable of separation of separation for analysis;" and (2) controlling each job posting separately and for all independent variables that are not themselves racially tainted or a stand-in for the very practices at issue in this case. Pl. Exh. 13.

A second problem with Nucor's statistical argument is that those few criteria that are "capable of separation for analysis" are themselves discriminatory and should not be included as regression factors. *See* e.g. *Morgan v. United Parcel Service*, 380 F.3d 459, 463, 470 (8th Cir. 2004) ("But, illegitimate reasons--reasons themselves representative of the unlawful discrimination at issue--should be excluded from the regression (or otherwise dealt with) to avoid underestimating the significance of a disparity. * * * . . . the variable can be omitted from a regression if tainted by the discrimination at issue."). Although Nucor disagrees with excluding such discriminatory criteria from the analysis, the Eighth Circuit has held that criteria having disparate impact should *not be included* as "independent" or "non-discriminatory" variables because that would make the statistical analysis circular and non-sensical. *See e.g., Morgan*, 380 F.3d at 463;  *Craik v. The Minnesota State Univ. Bd.*, 731 F.2d 465, 476 (8th Cir. 1984) ("The defendants were required to rebut the plaintiffs' evidence by showing that it was inaccurate or insignificant or by providing a *nondiscriminatory* explanation for the apparently discriminatory result.") (emphasis added); *Morgan*, 380 F.3d at 47.[53] The Eighth Circuit prohibits *a priori* statistical assumptions that ignore

---

VII.  *Compare Order* at 25-26 (Dkt. #123) quoting *Watson*, 108 S.Ct. at 2788-2789 *with* 42 U.S.C. §2000e-2(k)(1)(B)(1) and *Ward's Cove*, 490 U.S. at 656-658.

[53]*Morgan* addressed a racially neutral decision in the present which had the unintentional impact of perpetuating the effect of past discrimination into the liability period. *See also Rogers v. International Paper Co.*, 510 F.2d 1340, 1348 (8th Cir. 1975) ("First, the statistical population itself, incumbent employees seeking transfer, represents a *discriminatorily conceived pool* and does not reflect a typical composition of applicants. . . .") (emphasis added); *see also, Powers v. Ala. Dept. of Educ.*, 854 F.2d 1294 (11th Cir. 1988) (requiring analysis of disparate impact before including defendants' explanatory variables without any proof of job relatedness); *Griffin v. Carlin*, 755 F.2d 1516, 1529 (11th Cir. 1985)

whether variables included in the analysis are themselves discriminatory.[54]

## VIII.  DISPARATE IMPACT

Nucor argues that plaintiffs cannot pursue a disparate impact claim because their claims are more like disparate treatment than anything else. The Supreme Court, however, has rejected this contention and held that plaintiffs may *simultaneously* challenge their treatment on both disparate impact or disparate treatment grounds. *Teamsters v. United States*, 431 U.S. 324, 335 n.14 (1977) ("Either theory may, of course, be applied to a particular set of facts."). The Eighth Circuit has twice held that "oth the disparate impact and the disparate treatment theories of discrimination can be applied to the particular facts in the present case. Accordingly, we analyze the claims under both theories..." *Jones v. International Paper Co.*, 720 F.2d 496. 499 (8th Cir. 1983); *Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251, 256 n.6 (8th Cir. 1985) ("oth theories may be applied to a particular set of facts."); *see also Craig v. Alabama State*

---

(same).

[54] Nucor argues that only criteria involving intentional discrimination or "manipulations" should be excluded from the statistical analysis. Title VII, however, states that criteria having disparate impact constitute unlawful "discrimination" unless demonstrated *by the employer* to be "job related . . . and consistent with business necessity." 42 U.S.C. §2000e-2(k)(i). Similar racial stereotypes are the only basis proffered for Dr. Welch's contention that African- Americans have a "propensity to apply for positions in higher grades, other departments, or for which [they have] not trained." Dkt. #76, Exh. A at 4. His willingness to raise these issues without any evidence that black employees have, in fact, exhibited a greater "propensity to bid on a position without adequate qualifications" is just another form of racial stereotyping. Dr. Welch was under a legal obligation to offer statistical *evidence* of the racial propensities he advances, not mere speculation that assumes an entire race at a plant to be "poorly qualified" or to have a "propensity to bid on a position without adequate qualifications." Dkt. #76, Exh. A at 4. *See e.g.*, *Dothard v. Rawlinson*, 433 U.S. 321, 331 (1977). Dr. Welch's report shows an unwillingness to really consider the possibility that racial discrimination may be what is causing the observed racial disparities, either alone or in combination with other explanatory variables. For example, he argues that the disparate impact in this case "may" be the product of African Americans being "more likely than others to bid on positions for which they are poorly qualified" or that they have a "propensity to bid on a position without adequate qualifications," but he never acknowledges that *race* might also be the cause of the disparate selection rate for black employees and applicants. *See Bradley Supp. Report* (Dkt. #88).

*University*, 804 F.2d 682, 686 (11th Cir. 1986)("Any given case . . . may be analyzed in terms of disparate treatment or disparate impact."); *see generally Watson v. Forth Worth Bank and Trust*, 487 U.S. 977, 988, 990-991 (1988) ("subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases.").

For this reason, just because the plaintiffs contend that there was an intent to discriminate does not mean that they may not also contend, in the alternative, that the Act was violated under disparate impact principles even in the absence of an intent to discriminate. The proof in the two types of cases often merge when the reason articulated in response to a *McDonnell Douglas* type of *prima facie* case has disparate impact on the plaintiffs' race. *See e.g. Griffin v. Carlin*, 755 F.2d 1516, 1526-1528 (11th Cir. 1985); *Segar v. Smith*, 738 F.2d 1249, 1268-1271 (D.C. Cir. 1984); *Powers v. State of Alabama*, 854 F.2d 1285, 1293-1294 (11th Cir. 1988). An employer's articulated reasons or selection criteria are not "legitimate or non- discriminatory" if they have a racially disparate impact or effect. *Id.* This Circuit applied similar principles in *Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251, 256-257. (8th Cir. 1985), and *Winbush v. State of Iowa, by Glenwood State Hospital*, 66 F.3d 1471, 1481 & n.16 (8th Cir. 1995). In *Easley* the Court held that:

> The articulated reason for rejecting Easley and Griffin was their failure to pass the pre-employment test.   The court found that because Anheuser-Busch instituted the test with knowledge of its adverse impact, and because the test clearly was not valid, the Company's explanation did not provide a "legitimate defense." *Id.* 572 F.Supp. at 414.   The court further concluded that statistical evidence showing gross disparities in the hiring of black and white bottlers, along with the scheduling of applicants for testing in a manner which resulted in the ineligibility of a majority of black applicants, compelled a finding of intentional discrimination as to all three appellees.

*Id.* at 256-257.

In *Winbush*, the Court held that a defendant cannot articulate a *discriminatory* reason or qualifications that may be the byproduct of such disparate impact:

> Likewise, the defendants' discriminatory practices and the hostile working environment they created appropriately excuse the plaintiffs from the need to obtain formal IDOP certification. The defendants argue that IDOP certification process is the only method by which the plaintiffs could demonstrate they were qualified for supervisory positions. IDOP certification involves scoring applicants based on education, experience, and (for certain supervisory positions) test scores based on a written examination. Without IDOP certification, the defendants claim that they could not have promoted the plaintiffs. The defendants did not, however, introduce any evidence that IDOP testing and certification was necessary or effective in identifying and excluding unqualified candidates. All prevailing plaintiffs met the experience and educational requirements for the positions to which the district court assumed they should have been promoted. * * * Under these facts, we think the district court adequately evaluated the individual qualifications of each plaintiff and appropriately excused the plaintiffs from showing formal qualification through IDOP certification.
>
> On our review of the record, we find no evidence establishing that the tests and interviews are significant screening mechanisms. At oral argument, however, the defendants maintained that it was not their burden to prove that IDOP certification was meaningful. This is consistent with their position that the plaintiffs had failed to make a prima facie case and therefore the defendants never had the burden of production. The defendants fail to recognize, however, that their discriminatory practices can excuse plaintiffs from making a typical prima facie case of employment discrimination.

*Id.* at 1481 & n.16.

Nucor has occasionally argued, for example, that crew experience or training might be the reason for certain promotion decisions (albeit without any decisionmaker ever saying so). Such crew experience, however, has been shown to be the byproduct of racial segregation of large swaths of the plant floor and crews at Blytheville. Pl. Exhs. 2-7, 40-45. Although plaintiffs are *allowed* to prove that such segregation was intentional, they are *not required* to do so or to go beyond proof that whatever crew experience

134

Nucor's decisionmakers may ever articulate in this case would have disparate impact under the foregoing precedent. The use of "experience" or training as selection criteria is subject to the same type of disparate impact analysis as the test and education requirements at issue in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). *See e.g., Walker v. Jefferson County Home*, 726 F.2d 1554 (11th Cir. 1984); *Craig v. Alabama State University*, 804 F.2d 682, 686 (11th Cir. 1986). The *Uniform Guidelines on Employee Selection Procedures* issued by three federal Title VII enforcement agencies — Justice, Labor and the EEOC — specifically include experience and training in the definition of "selection procedures" that must be validated if they have disparate impact. 29 C.F.R. §1607. Those regulations also have specific requirements for validation of experience or training as a selection criteria. *See* 29 C.F.R. § 1607.

Nucor argues that plaintiffs cannot prove that race "caused" such disparate impact, but that argument is inconsistent both with the law and the evidence. Race need not "cause" the disparate impact in the sense that the racial effect was *intended* to be discriminatory. *Griggs v. Duke Power Co.*, 401 U.S. 424, 430-431 (1971). Disparate impact requires no proof of intent as the cause of the discriminatory effect. *Id.* All that the plaintiff must show is that the *contested practice*, not race itself, caused a significant racial disparity, regardless of whether race was "intended" as the "cause" of such disparity. The normal way of proving that the challenged practice caused the racial disparity is to show that such disparity is too large to be the result of chance. The federal agencies charged with establishing such standards have determined that this occurs when the selection rate for one race is only 80% of that of the other race. For example, the Eighth Circuit held in *Easley, supra*, that:

> Of the nearly 1,500 applicants tested (679 black and 798 white), only 30% of the blacks passed the test, while 50% of the white applicants passed. As the district court noted, these results indicate that the test had a material adverse impact under the "four-fifths" or "80%" rule established in the EEOC's Uniform Guidelines on Employee Selection Procedures,

because the black pass rate was less than four-fifths of the white pass rate. 572 F.Supp. at 406.   Moreover,

> [u]nder the chi-square test of statistical significance, the probability that the difference in pass rates was the result of chance rather than race is less than one in 1,000. Applying the standard deviation method, comparing the expected pass rate for blacks (if race were not a factor in passing the test) to the actual or observed pass rate for blacks, the difference is 6.64 standard deviations.

*Id.* The Supreme Court has noted that a difference greater than two or three standard deviations would appear to be statistically significant. *Castaneda v. Partida,* 430 U.S. 482, 496-97 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977). *See also Hameed v. International Ass'n. of Bridge, Structural and Ornamental Iron Workers, Local 396,* 637 F.2d 506, 513-14 n. 8 (8th Cir.1980).

*Easley v. Anheuser-Busch, Inc.,* 758 F.2d 251, 256 n.8 (8th Cir. 1985). This Circuit has held that the *Uniform Guidelines* should be followed in cases like that now before the Court. *See e.g. Firefighters Institute v. City of St. Louis,* 549 F.2d 506, 510 & n.6 (8th Cir. 1977) (applying *Uniform Guidelines*); *Mems v. City of St. Paul,* 224 F.3d 735, 740 (8th Cir. 2000) (applying four-fifths rule from Uniform Guidelines); *see generally, Phillips v. Cohen,* 400 F.3d 388, 399 (6th Cir. 2005) (same); *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 425 (1975) (applying *Uniform Guidelines*).

Plaintiffs are not required to prove that the contested criteria "caused" any greater racial effect than the 80% rule, or that such racial effect was due to race itself or a racial intent: "Criteria which disproportionately exclude one racial group are 'used' to discriminate within the meaning of the Act unless the user can show a business necessity for their use.". *Hameed v. Ironworkers, Local 396,* 637 F.2d 506, 512-513 (8th Cir. 1980); *see also Craik,* 731 F.2d at 476. The four federal Title VII enforcement agencies — Justice, Labor, the EEOC and Civil Service — have also defined unlawful "discrimination" in the *Uniform Guidelines On Employee Selection Procedures* to include criteria having disparate impact. As stated at 29 C.F.R. §1607.3A:  a "[p]rocedure having adverse impact constitutes

136

discrimination unless justified."[55]

The plaintiffs' expert has established that the only criteria which are "capable of separation for

analysis"—crew experience, training and discipline— have such a cause-effect relationship because the

black rate of satisfying such criteria is less than 80% of the white rate. Pl. Exhs. 12 & 13. "Stated in terms

of the 80% standard of the *Uniform Guidelines*, African-American employees receive formal training in

the posted jobs only 58.1% as often as non-African-American employees." Pl. Exh.13 at 12-13 (*Bradley*

*Rebuttal Rpt.*, 2-13-06). Stated in terms of the 80% rate of disparity defined as significant by the

*Uniform Guidelines*, the rate of discipline of non-African-American employees is less than 60% of the rate

that African-American employees are disciplined, and only 46% of the rate that African-American

employees are suspended. Pl. Exh. 13 at 11-12. Plaintiffs' Declarations provide anecdotal examples of

how each factor adversely affected them and has been provided on a racially discriminatory basis. Pl.

Exhs. 2-9. Plaintiffs' expert further found that "[t]he "work area/department" factors included in Dr.

Welch's analysis are significantly related to race and have had adverse impact against African-American

applicants at Nucor-Yamato." Pl. Exh. 13 at 3 (*Bradley Rebut. Rpt.*).[56]

---

[55]*See also Firefighters Institute for Racial Equality v. City of St. Louis*, 549 F.2d 506, 510 (8th Cir. 1977) ("It is a distinguishing feature of a Title VII cause of action that discriminatory impact suffices to establish a prima facie showing of discrimination."); *Rogers v. International Paper Co.*, 510 F.2d 1340, 1348-1349 (8th Cir. 1975) ("The use of any unvalidated test which adversely affects hiring, promotion, transfer or any other employment . . . opportunity of classes protected by Title VII **constitutes discrimination**. 29 C.F.R. § 1607.3.") (emphasis added); *Green v. Missouri Pacific RR Co.*, 523 F.2d 1290, 1293 (8th Cir. 1975) ("Although the employment practice in question is facially neutral, an employment test or practice which operates to exclude a disproportionate percentage of blacks violates Title VII unless the employer can establish that the practice is justified as a business necessity.").

[56] Nucor's argument that such analysis of discrete criteria is a prohibited "bottom-line analysis" ignores the undisputed fact that such criteria is not further "capable of separation for analysis." Nucor's experts have not shown that any of such criteria are "capable of separation for analysis beyond the degree already separated by plaintiffs' analysis and, as a result, the components of such practices separated by

Nucor reluctantly concedes that in its class certification that its expert, Dr. Welch, "testified that some of the specific criteria he used as control variables — disciplinary history, formal training, and the physical proximity of the applicants' current job with the posted job — disfavored African-American employees." *Def. Br.* at 68 (Dkt. #79); *see Welch Depo.* 260-262, 269-270 (Exh. 18). Dr. Welch testified that the disparity in the black selection rate was statistically significant before he added such criteria, but not after, and that this demonstrates that such criteria "favor non-African American candidates."

> Q. Well, have you seen, for example, any analysis in this case where there was a disparate impact in training at Nucor-Yamato Steel?
> A. Well, as indicated in this last piece of analysis we went through I don't recall the specific components but when I take together whether the grade is lower, whether the disciplinary history, the job proximity and training, on average those variables do favor people other than African Americans. That's the reason the adjusted differentials are smaller than the unadjusted differentials.
> Another way of saying it is that control for the variables that we considered helps explain the observed race differentials in selection success.

*Welch Depo.,* pp. 270:17-23;271:1-13(Exh. 18; objections omitted). On re-cross, Dr. Welch testified that this meant that his analysis "identifies what is **causing** those race differences."

> Q. ... You said another way of saying that is that those indicators help explain the race differences. Is that the same thing as saying that it identifies what is causing those race differences?
> A. Yes.

---

the plaintiffs may be analyzed as one employment practice in the manner provided by 42 U.S.C. §2000e-2(k)(1)(B)(1). If "the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice."). *Welch Depo.* 260:3-262:20, 270:17-271:13; 277:14-278:1-3 (Exh. 18). Dr. Welch testifies that he included all the selection criteria capable of separation for analysis. Dr. Bradley agrees that there are no other measurable criteria capable of separation for analysis beyond those analyzed by he and Dr. Welch. Exh. 13. *See* 42 U.S.C. § 2000e-2(k)(1)(B)(i) (1991 amendment to Title VII modifying effect of *Wards Cove v. Atonio,* 490 U.S. 642 (1989)).

*Welch Depo.*, pp. 277:14-23-278:1-3 (Pl. Exh. 18).[57]

## IX.  PLAINTIFFS MAY RELY ON THE EARLIEST EEOC CHARGE FILED AND NEED NOT FILE REPETITIVE CHARGES

Nucor argues that the Title VII claims of Larry McBride and Ozzie Green are barred because they never filed an EEOC Charge separate from that of the other plaintiffs with whom he was participating in EEOC proceedings in 2002-2003. It also argues that Clifton Lee failed to file suit within 90 days of receipt of a right-to-sue letter from the EEOC on his separate charge. Each of these three plaintiffs, however, have the right to rely on the other EEOC Charges filed against Nucor by other plaintiffs alleging similar racial discrimination on behalf of themselves and other black employees, like Rogers, Washington, Bennett and the original plaintiffs who filed this case from South Carolina.  As explained by the Eighth Circuit:

> Our decision in *Kloos v. Carter-Day Co.*, 799 F.2d 397, 400 (8th Cir. 1986), permitted plaintiffs who had not filed administrative charges to "piggyback" on the timely filing of an administrative charge filed by another claimant who purported to represent the interests of a class of similarly situated employees. We held "it is sufficient for one or more plaintiffs to the action to have properly filed a charge." *Id.* For those plaintiffs who have never filed an administrative charge and who are allowed to

---

[57] The Court has previously found that "[a]lthough Dr. Welch found that the variables he considered tend to favor white applicants, he did not conclude that the observed race differentials stem from race discrimination." *Order* at 17 n.5. As shown above, however, disparate impact looks only at the racial effect, not whether it is caused by, or "stems from race discrimination" or an intent to discriminate. The Court also noted that Dr. Welch answered "no" to the question at page 271 as to whether he found "any adverse impact", but he clearly answered the opposite in his testimony as a whole and a reasonable jury, as the finder of fact, could easily find that he was putting a unique twist on the term "adverse impact" at page 271 that was contradicted by his more direct testimony from his earlier published peer-review article discussed at pages 260-262, 270-271 and 277-278 of his deposition.  Defendants concede that Dr. Welch testified that the fact that "these control variables *favor* non-African-Americans explains the observed race differentiates in this selection process." *Def. Br.* at 68-69. When asked if this meant they "caused" such racial differences in selections, he answered "yes." *Welch Depo.* at 277-278.  Nucor disagrees only with whether Dr. Welch admitted such "disfavoring" to be "statistically significant" or "discriminatory." *Id.* Dr. Welch, however, clearly conceded both points in his deposition. *See* Dr. Welch's Depo. at 260-262, 269-270).

> piggyback on the filed claim of another, we deem it reasonable to permit
> them to join suit as long as the claimant on whose administrative filing they
> have relied timely files suit after receiving right-to-sue letters from the state
> and federal agencies.

*Anderson v. Unisys Corp.*, 47 F.3d 302, 308-309 (8th Cir. 1995); *Greenwood v. Ross,* 778 F.2d 448,

451 (8th Cir.1985) (quoting *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1311 (10th Cir.1980));

*Winbush*, 66 F.3d at 1478 "[O]nce a single plaintiff has filed an EEOC complaint, other non-filing plaintiffs

may join in the action if they allege facts showing that they were similarly situated and that their claims arose

out of similar discriminatory treatment.") [citing *Foster v. Gueory,* 655 F.2d 1319, 1323 (D.C.Cir.1981),

and *Behlar v. Smith,* 719 F.2d 950, 953 (8th Cir.1983) (per curiam), *cert. denied,* 466 U.S. 958, 104

S.Ct. 2169, 80 L.Ed.2d 552 (1984)); *Robinson v. Sears, Roebuck & Co.*, 111 F. Supp. 2d 1101, 1117

(E.D. Ark. 2000) ("Courts have regularly held that the timely filing of an administrative charge by a named

plaintiff in a class action satisfies the charge obligation of all members of the class.  This is known as the

"piggybacking" rule, and it will be applicable if two essential requirements are met:  (1) the charge being

relied upon must be timely and not otherwise defective;  and (2) the individual claims of the filing and

non-filing plaintiffs must have arisen out of similar discriminatory treatment in the same time frame.").

Those class-based claims tolled the limitations period for all members of the putative class, including

McBride, Green and Lee.  Although it isn't necessary, all three plaintiffs testify that they knew about and

relied upon the EEOC Charges of the original plaintiffs in this case, including those later severed for transfer

to the South Carolina case against Nucor, that began to be filed in February 2002 and that continued to

be filed through mid-2003.  Pl. Exh. 40 at ¶27.

Clifton Lee was just a class member when this case was originally filed.  He states in his Declaration

that he didn't receive a right-to-sue letter until April 28, 2004, and he joined this case on March 23, 2004.

140

Pl. Exh. 44 at ¶4. *Jones v. American State Bank*, 857 F. 2d 494, 499-500 (8th Cir. 1988) (holding that

the failure to obtain a right-to-sue letter prior to the commencement of a suit is a curable defect because

the receipt of a right-to-sue notice is a condition precedent to a filing a Title VII claim, curable after the

action has commenced and is not a jurisdictional requirement) (citing cases). *Accord McCaslin v.*

*Cornhusker State Industries*, 51 F. 3d 277 at *1 (8th Cir. 1995) (finding that the "receipt of a right-to-

sue notice is not a jurisdictional prerequisite, but rather is a condition precedent to filing a Title VII claim,

curable after the action has commenced."); *Whitmore v. O'Connor Management, Inc.*, 156 F.3d 796,

800 (8th Cir. 1998) (citing *Jones, supra,* with approval and stating that the court believes that the Missouri

courts would consider a right-to-sue letter 'as a condition precedent, although not a jurisdictional

prerequisite, to bringing an action under [the state's anti-discrimination law which parallels Title VII] and

suggesting that it would have been perhaps "possible to cure the defect [of filing the complaint previous to

receiving the right-to-sue letter] by obtaining a right-to-sue letter after filing the case"); *Kent v. Missouri*

*Department of Elementary and Secondary Education and Division of Vocational Rehabilitation*, 989

F. 2d 505, at *1 (8th Cir. 1993) (finding that plaintiff had exhausted his administrative remedies when right-

to-sue letter was received after filing an appeal from district court dismissal of action for not having received

the right-to-sue letter).

   These three employees also still have the same claims under §1981 which doesn't require an EEOC

Charge and has its own independent four year limitations period.

## X.   NUCOR HAS FAILED TO SATISFY ITS INITIAL PROCEDURAL BURDEN REGARDING PLAINTIFFS' RETALIATION CLAIMS

   Nucor's summary judgment brief and submission never mention plaintiffs' retaliation claims. The

movant for summary judgment bears the initial procedural burden of identifying the basis for its motion and

the issues for which there is a lack of genuine issue of material fact. *Hartnagel*, 953 F.2d at 395; *Celotex*, 477 U.S. at 323; *see also* pp. 141-144 *supra*. Nucor has not attempted to satisfy such burden regarding plaintiffs' retaliation claims, even though it listed them prominently as claims to be tried in its recent *Pretrial Disclosures* (Dkt. 131. Summary judgment is improper for this reason.

Each of the plaintiffs have shown in their Declarations that they began to be retaliated against as soon as they started to oppose Nucor's racial discrimination or to participate in EEOC proceedings in 2002-2003 with the original plaintiffs from South Carolina who jointly filed this case with them. Pl. Exhs. 40-45. They have established a *prima facie* case of retaliation through evidence of disparate treatment vis-a-vis employees who did not participate in EEOC proceedings, the timing of the adverse action after the participatory activities, and a combination of those factors and others. *See e.g. McClure v. Career Systems Development, Inc.*, 447 F.3d 1133 1137-1138 (8th Cir. 2006) ("The district court failed to consider two material facts. First, viewing the record favorably to McClure, CSD knew about McClure's educational situation all along, but did not suspend him until after he filed the complaint. Second, CSD did not suspend Walkley, who committed the same infraction as McClure. Instead, CSD overlooked her infraction." ); *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1115, 1120, 1123 (8th Cir.2006) (reversing district court's summary judgment on retaliation claim, in part because of evidence that employer treated plaintiff differently from other employees).[58]

---

[58]*See also Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 761 (8th Cir. 2004) ("In this case, Bainbridge left immediately on vacation after his last complaint, and was fired just six days later, before he returned to work. In addition, although there are documents and testimony produced immediately before or after Bainbridge's termination, Bainbridge had no extensive disciplinary record, despite Loffredo Gardens's claim that it had problems with Bainbridge from the beginning." * * * A reasonable jury could infer Loffredo Produce tried to paper Bainbridge's file to justify his termination."); *Kobrin v. Univ. of Minnesota*, 34 F.3d 698, 704-705 (8th Cir. 1994) (Holding that adverse action "followed the protected activity so closely in time as to justify an inference of retaliatory motive." [citing

Generally, "the threshold of proof necessary to establish a prima facie case is minimal." *Young v.*

*Warner-Jenkinson Co.,* 152 F.3d 1018, 1022 (8th Cir.1998); *Green v. Franklin National Bank of*

*Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006). The plaintiffs have shown they were disciplined and

denied promotions because of such discipline (according to Nucor's attorneys) in rapid succession

following each occasion they participated in EEOC proceedings during 2002 and 2003. Pl. Exhs. 40-45.

McBride had no discipline before he began participating in the EEOC proceedings in 2003 and then quickly

had discipline imposed in July 18, 2003 and was denied the Piler Operator and other jobs beginning in

2003. Pl. Exh. 41.   Rodney Washington participated in the EEOC proceedings in late 2002 and was

denied the Leadman job given to Robert Despain in February 2003 and from other jobs over the next six

months, and then was discharged September 26, 2003 just a few months after his own EEOC Charge was

filed.  Pl. Exh. 40.  Ozzie Green hadn't been disciplined in more than five years when he began to

participate in such EEOC proceedings in late 2002, but he quickly compiled four disciplines in eleven

months beginning with his February 19, 2003 warning about talking to his wife while off-duty, and he was

denied several different jobs he was well qualified to fill right after that. Pl. Exh. 43. Clifton Lee began

---

*Rath v. Selection Research, Inc.,* 978 F.2d 1087, 1090 (8th Cir.1992)."); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1107-08 (8th Cir.2000); *Young v. Time Warner Cable Capital, L.P.*, 443 F.Supp.2d 1109. 1127-1128 (W.D. Mo. 2006) ("Giving the benefit of all reasonable inferences to plaintiff, the court finds that the combination of temporal proximity, Baker and Bennett's involvement in (and/or knowledge of) the Carlson investigation and in plaintiff's suspension and termination, and Baker's skepticism of plaintiff's complaint, is sufficient to establish a causal connection. Therefore, plaintiff has established a prima facie case of retaliation."); *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819-820 (8th Cir. 1998) ("Moreover, this Court has found that periods of time between statutorily protected activity and adverse employment actions longer than the three-month period in the instant case were sufficient to create an inference of the requisite causal connection. * * * She presented evidence that management at Riceland confronted her about filing her charge and that other employees who had not filed charges of discrimination were not investigated as closely or punished as severely as she was, even though they had been paid for time spent in the Case Center on days when they had no lesson time."); *Kim*, 123 F.3d at 1061.

participating in the EEOC proceedings in mid-2002 and was quickly disciplined two times on August 21, 2002 and September 17, 2002, and was denied the Rotary Straightener Operator and Cold Saw Operator job he bid on six months in March 2003. Pl. Exh. 44. Sylvester Rogers began participating in such proceedings in mid-2003 and was quickly disciplined on August 2, 2002 on a frivolous charge that he was disrespectful to others. Pl. Exh. 42. He was then denied several promotions that he was well qualified to fill over the next few months. *Id.* Cornelius Bennett had only two disciplines in over ten years at Nucor before he began participating in EEOC Charges in 2002-2003, but he was disciplined for being five minutes late in March 2003 and demoted in April 2003. Pl. Exh. 45.

Nucor has not articulated any non-retaliatory reason for any of such actions or any of the plaintiffs' retaliation claims. Summary judgment would be improper under *Burdine*, 450 U.S. at 254, even if Nucor had tried to satisfy its initial procedural burden by mentioning plaintiffs' retaliation claims in its summary judgment submission or brief.

## CONCLUSION

For all the foregoing reasons, summary judgment should be denied.

Respectfully submitted this 31st day of October, 2006.

/s/Robert L. Wiggins, Jr.
Robert L. Wiggins, Jr., ABS-1754-G-63R
Ann K. Wiggins, ABS-7006-I-61A
Benjamin J. De Gweck, ABS-8943-B-46-D
Susan Donahue ASB-4525-A-48-D
Wiggins, Childs, Quinn & Pantazis, LLC
The Kress Building, 301 19th Street North
Birmingham, Alabama 35203
205/314-0500
205-254-1500 (Facsimile)

144

Philip E. Kaplan, AR Bar No. 68026
Kaplan, Brewer, Maxey & Haralson, P.A.
415 Main Street
Little Rock, Arkansas 72201
(501) 372-0400
(501) 376-3612 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Richard D. Alaniz
Cary A. Farris
Terry E. Schraeder
Micah Heilbrun
ALANIZ & SCHRAEDER, LLP
2500 City West Blvd.
Suite 1000
Houston, Texas 77042

D. P. Marshall, Jr.
BARRETT & DEACON
P. O. Box 1700
Jonesboro, AR 72403

/s/Robert L. Wiggins, Jr.
Of Counsel