**40**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

CORNELIUS BENNETT, SYLVESTER )
ROGERS, RODNEY WASHINGTON, )
CLIFTON LEE, SR., OZZIE GREEN, and )
LARRY MCBRIDE, individually and on behalf of )
the class they seek to represent, )
                               )
      Plaintiffs, )
                               )
v.                               )      CASE No. 3:04CV00291 SWW
                               )
NUCOR CORPORATION; NUCOR-YAMATO )
STEEL COMPANY, L.P.; and NUCOR )
STEEL-ARKANSAS, )
                               )
      Defendants. )

## SECOND DECLARATION OF RODNEY WASHINGTON

     Pursuant to 28 U.S.C. §1746, I, Rodney Washington, declare the following under penalty of

perjury:

     1.      I am an African-American former employee of Nucor-Yamato Steel Company LLP in

Blytheville, Arkansas. This Declaration is based on personal knowledge from my work and experience

with Nucor-Yamato Steel Company and Nucor Corporation.

     2.      **Qualifications Before Nucor:** I graduated from Simmons High School in Hollandale,

Mississippi, and was on active duty in the United States Air Force from March 1987 until I was honorably

discharged in May 1993. While in the Air Force, I served as a military police officer at Eaker Air Force

base in Blytheville, Arkansas, from March 1997 to May 1992 and at Bindburg Air Force base in Germany

from May 1992 to May 1993. I served at Eaker during the Desert Shield/Desert Storm conflicts in Iraq.

1

At Eaker, I was responsible for securing the Air Force installation from hostile threats, preventing unlawful

entry into nuclear storage areas and other security measures. At Binburg, I supervised twenty military

police officers in basic law enforcement. I was also responsible for training individuals on the use of deadly

force and guarding multi-million dollar aircraft. I received the following awards for my military service:

Good Conduct Medal, Outstanding Unit Award, National Defense Service Medal, Small Arms Expert

Marksmanship Ribbon, Certificates of Achievement, and Certificates of Appreciation. Prior to coming to

work for Nucor in January 1999, I had extensive training and experience in similar jobs with other

companies. I have attached a copy of my resume that was submitted with my promotion application in

June 1993 that summarizes my background and work experience at that time. I began my employment

with Nucor in June 22, 1993.

      3.    **Jobs Bid On At Nucor:** I bid for the following jobs based on the Job Postings listed

below for such jobs:

| JOB BID ON | DATE POSTED | PERSON SELECTED |
|---|---|---|
| Mill Operator | May 29, 2001 | Jeffrey Stobaugh |
| Lubricator | July 18, 2002 | Michael Smith |
| Leadman | February 3, 2003 | Robert Despain |
| Rotary Straightener | March 18, 2003 | Jim Gilmer |
| Lubricator | August 3, 2003 | Tim Rudick |
| Roll Turner | September 16, 2003 | Rudi Cagle |
| | | Bruce Luttrell |
| Leadman | September 12, 2003 | Mark Warren |
| | | Danny Roberts |

The persons selected were non-African-American. White employees were given all these jobs, and the

persons making such decisions all were white. I explained my applications and qualifications for these six

posted job vacancies and for unposted supervisory vacancies in my Declaration filed in support of class

2

certification in February 2006.

4.    **Mill Area Jobs:** The roll mill production area is a large physical section of the plant where steel beams are fabricated and then sent to the finishing and shipping areas for loading and transportation to the customer. My first Declaration described how this section of the plant was racially segregated except for one token black employee, Reginald Stewart, who was put in the mill area of the at NYS I in the mid-1990's. During the period covered by this lawsuit, there were never any black employees in the mill area of the NYSII building. NYSI is the building at the Blytheville plant opened in 1988, and NYSII is the building opened in 1993. These two large mill areas have their own separate Supervisors, Leadmen and crews. All the Supervisors and Leadmen were white in such areas, as were all the crew members at NYSII and all but one of the crew members at NYSI (Reginald Stewart). During my employment, *every* black employee who applied for one of these mill crews or jobs was rejected, including me, Larry McBride, Jimmy Wells, Rickey Logan, Danny Wells, Wilson Done, Sylvester Rogers and others.

5.    The all white composition of the crews and supervisors in such a large physical section of the plant was obvious as you worked there everyday. The mill areas were too physically large and had too many employees to have become racially segregated by accident in a plant that had plenty of black employees in other work areas and a surrounding geographical community that also had a sizable population of industrially experienced African-Americans. These facts which were well known to me and other black employees, made it a waste of time to apply for job opportunities in the mill areas of the plant. My own experience in applying for Mill Operator reinforced the perception that the mill areas and crews were reserved for white employees and not open to black employees like me. I applied for the Mill

3

Operator job that was posted May 29, 2001, at pay grade 8 because I was well qualified by my past experience and training. After I submitted my bid for that job, I told one of the supervisors, Keith Fowler, about my bid and that I was very interested in the job, but he told me I was out of luck because a white employee, Jeffrey Stobaugh, had already been chosen before the job was ever posted for bids. All the supervisors and managers involved in that decision or who worked in that department were white. In fact, all of the more than twenty supervisors and managers in the Roll Mill Department as a whole were white both at that time and throughout my employment at Nucor. The Mill Operator job I bid on involved work in a glass-enclosed compartment that was commonly referred to as "the white-house", because of the race of the employees who worked in it. My qualifications for the Mill Operator job I bid on and other mill area jobs came from my experience and training before Nucor and my experience as a Piler Operator and Inspection Bed Inspector at Nucor. These were two jobs in the finishing area, which was the next physical section of the plant after the steel beams were made in the mill area.

6.    Nucor's posted qualifications for the Mill Operator job required "excellent mechanical aptitude and ability", "good math skills", "good hand-eye coordination", "good organizational skills", "good communication skills", "ability to keep legible and accurate records", "ability to make quick and accurate decisions under pressure as well as deal with stress associated with the rolling process", "able to carry out tasks with minimal supervision", "good physical condition" and a "willingness to learn several jobs." I had to have these same or similar knowledges, skills and abilities in performing my own jobs of Piler Operator and Inspection Bed Inspector at Nucor and in my prior jobs before coming to work there. Nucor's posted qualifications for performing my job stated that I had to have good "mechanical aptitude and ability", a "strong communications skills", the "ability to perform multiple functions simultaneously", a "knowledge of

4

the Rolling Process" and the "ability to work under pressure associated with Rolling Process pace", forklift

operating experience, an ability "to work under the stresses associated with the production process", the

ability to use precision instruments and measuring devices (including calipers, micrometers and depth

gauges), the "ability to keep detailed records and prepare inspection reports according to ISO standards",

"knowledge of basic hydraulics", an "ability to operate forklift equipment" and cranes, good "quality

control/quality assurance" skills, "good math skills, the ability to "inspect product" and "identify defects

and communicate this information", the knowledge and ability to "track cut patterns", and that I be "safety

minded" and "team oriented." I have attached a copy of Nucor's posted knowledges, skills and abilities

for the type of Piler Operator and Inspection Bed Inspector jobs that I held at the time. I exhibited all of

these knowledges, skills and abilities in performing my jobs of Piler Operator and Inspection Bed Inspector

at Nucor prior to the time I applied for promotion to Mill Operator. My prior experience, training and

education before coming to work at Nucor also qualified me for the Mill Operator promotion I sought and

satisfied Nucor's posted qualifications for such job. At Nucor, I also had prior experience on the jobs of

Repair Bed Operator, Cooling Bed Inspector, Gag Press Operator, Conditioning Inspector, Product

Coordinator, Internal Quality Control Auditor and in team building, ISO 9000 standards, safety standards

and computer skills. Black employees like me, however, were not able to get any training or experience

on the Mill Operator job itself job of this pattern. Not only were all of the Mill Operators white but one,

but all of the 46 employees who were given training to become a Mill Operator were also white at the

NYSII building, and all but one were white at the NYSI building.

7.      My previously filed Declaration in support of class certification discussed the denial of my

application for the Mill Operator job. To my knowledge, no decisionmaker has ever stated that I was not

5

qualified for such job or that the person selected was better qualified or had a better work, safety, discipline or training record than me. I had no discipline in the nearly three years before my bid for Mill Operator in 2001. Nucor's management has stated that discipline will be considered only if it occurred in the twelve months before an application or bid for promotion. Nucor's standard application form for promotions, known as a "Job Bid Form", asks only for written disciplines "in the past 12 months." The questions on the Job Bid Form are: "In the past 12 months have you received any written disciplinary warnings. If yes, for what reasons." A copy of such standard application form is attached. Even without that 12-month restriction, I had no "Notice of Warning" in the three years preceding my rejected efforts in 2001-2003 to obtain a job in the mill area of the plant. Discipline at Nucor is put on an official form known as a "Notice of Warning", and I had not been issued such a disciplinary notice since mid-1998. Nucor's "Notice of Warning" form has three standard forms of progressive discipline listed on it: "verbal warning", "written warning" and "suspension." Verbal warnings considered to be discipline are placed on this form rather than a separate standardized form called a "Notice of Counseling." "Notice of Counseling" forms are not to be considered to be "discipline." Such Notice of Counseling forms sometimes included positive commendations or congratulations that were obviously not disciplinary in nature. The suspension that Nucor refers to in its summary judgment brief was the time that I was sent home for three days without pay for opposing Robert Despain's racial harassment and physical attack on my work cubicle. This is explained in relation to my discharge at a later part of this Declaration.

8.        Many of the white employees promoted to mill area jobs had prior disciplinary records. For example, James Hymas was promoted to Reheat Stocker in the mill area even though he had been previously disciplined for starting a heated argument in which he physically pushed and cussed a black

employee, Michael Brown, and was given a two-day suspension with loss of bonus. Hymas was promoted to Reheat Stocker on October 12, 2001 in the mill area crews with at least five prior disciplinary warnings, including a disciplinary suspension for cursing and pushing a fellow employee, for poor performance, safety and rules violations. Earl Draughn was promoted to temporary Utility Man on October 27, 2003, permanently to the position on November 17, 2003 in the roll mill area with at least two prior suspensions for misconduct and poor performance, and at least seven other disciplinary incidents for poor performance, poor attendance, punctuality and safety. Roger Jefferson was promoted to Mill Operator in July 2001 in the mill area crews with a prior disciplinary suspension for rules violations and three prior disciplinary warnings for misconduct, poor attendance and poor performance. He was then promoted to Roll Mill Leadman in March 2003 in the mill area with this same disciplinary history. Tracy Kelly was promoted to Sample Inspector in July 2001 with a safety issue in the prior twelve months and then promoted to Roll Guide Builder in September 2003 with a written warning for poor performance and safety in the prior twelve months and at least five other disciplinary incidents for poor attitude, communication, performance and safety in the prior two years. Scott Lindsey became a Relief Operator in March 2002 with two disciplinary suspensions in the prior twelve months. Erick Rouse was promoted to Utility/Crane in the mill area in 2003 with at least two prior disciplinary warning for safety violation causing injury. Robert Sharp was promoted to Reheat Heater in the mill area in 2005 with at least two prior disciplinary suspensions for poor performance and at least four other disciplinary warnings for poor attitude, performance and safety. William Vasser was promoted to Sample Inspector in May 2004 with a disciplinary warning for poor attendance in the prior twelve months and a disciplinary warning for poor performance in the prior two years. Lester Mann was promoted to the Reheat Stocker job in the mill area of the plant on January

11, 2004 despite the fact that two months earlier on November 4, 2003 he had been written up for poor job performance that caused a loss of 380 tons of steel which had to be scrapped.

9.       I was also extremely interested in other jobs in the roll mill area and crews because they were better jobs with a greater future and paid more than jobs that were open to black employees in my area of the plant. My qualifications for the other mill area jobs were the same as I have already described in relation to my bid for the Mill Operator posting above. I had the same qualifications for and interest in the other mill area jobs, and the other vacancies in the Mill Operator job itself, and would have bid on such jobs if I hadn't seen that they were never open to black employees like me. If this had not been the case, I would have applied for the Mill Utility job given to Todd McKellup; the Mill Inspector job given to Charles Ray Ault; the Reheat Operator job given to Phillip White and Denny Elliott; the Extra Person positions given to Jeffrey Cable, Cameron Strawn and Gary Steward; the Mill Crane or Utility jobs given to Charles Banks, Chris Gee, Kevin Austin, Keith Neal and Darren Hawkins; the Sample Inspector jobs given to Paul Towery, William Vasser, Cameron Strawn, Wade Hunt, Mitch Craig, Tracy Kelly and James Morris; the Reheat Stocker jobs given to James Hymas, Steve Edgar, Alan Buchanan, Ricky Brothers, Erick Rouse, Mark Rogers, Lester Mann and Michael Going; and the Mill Leadman jobs given to Stephen Murphy, Martin Hawkins, and others. I was qualified and would have applied for the other Mill Operator jobs given to other white employees, such as Charles Banks, Rickey Brothers, Stephen Murphy, Chris Lee, Mike Gentry, J. C. Carter, Scotty Smothers, and Roger Jefferson, except for the fact that I knew this area of the plant was not really open to black employees. Stephen Murphy and Roger Jefferson went on to become Leadmen. I have already listed white employees who were promoted to similar jobs even though they had prior disciplinary records.

10.     It is usually well known who has been selected for a job before it is posted. Nucor preselects the person it plans to succeed the current employee in the job and begins grooming such person in ways that make it obvious that he will receive the job when it comes open. The favored employee is allowed to perform the job and given other training on his regular shift that is not open to other employees, and the person is almost always white if the job is one already or traditionally held by whites. Large sections of the plant are segregated by race in the way I described in my earlier Declaration filed in February of this year. Such preselection and grooming of favored employees before a job is posted makes bidding a waste of time for most jobs, especially those traditionally held by white employees or that are located in the white areas of the plant's operations. In my experience at Nucor, this practice has had an adverse impact or effect on African-Americans' rate of bidding and promotion. It has had that effect on me in the way I have described in this Declaration and in the earlier one I filed in February of this year. During my employment, all the employees given training on such mill area jobs were white except Reginald Stewart. This include more than 40 white employees who were trained as Sample Inspector, more than 40 white employees trained as Mill Operator, more than 30 white employees trained as a Reheat Stocker, more than 20 white employees trained as a Reheat Heater, more than 20 white employees trained as a Reheat Furnace Operator, more than 10 white employees trained as Utility Man, more than 5 white employees trained as Extra Man, and more than 30 white employees trained as Roll Mill Mechanic.

11.     In early to mid-2002, I began to participate in meetings and other proceedings with other employees opposing racial discrimination at Nucor's Blytheville, Arkansas, and Charleston, South Carolina, plants. This group joined together to bring joint, classwide EEOC Charges and were the original plaintiffs who followed-up by filing this lawsuit in 2003 before it was separated into two different cases in 2004. The

first EEOC Charges filed by one of the leaders of the group that I was participating with in 2002 were

Sheldon Singletary's Charge in February 2002 and Ramon Roane's Charge in March 2002. The EEOC

proceedings on Mr. Singletary's and Mr. Roane's Charges challenged a pattern or practice of racial

discrimination by Nucor at a number of its plants, including the one in Blytheville at which I worked. For

example, I have attached a written request to continue the investigation of such EEOC Charges dated

October 4, 2002, which specifically listed employees from the Blytheville plant, such as Clifton Lee, Larry

McBride, Ozzie Green and Sylvester Rogers, as part of such Charges and the scope of the investigation.

*See* attached Memo of October 4, 2002. On October 24, 2002, the EEOC issued a formal notice of

intent to continue the investigation of such EEOC Charges in light of such allegation and request. My

participation as part of the group bringing such Charges against Nucor was well known at the Blytheville

plant by mid-2002. That participation and opposition to racial discrimination at Nucor included a joint

meeting in 2002 of the African-American employees from both the Blytheville, Arkansas, and Charleston,

South Carolina, plants who were bringing such EEOC Charges and who eventually filed this lawsuit

together. I filed a supplemental EEOC Charge with similar classwide allegations of racial discrimination

on March 3, 2003.

     12.    Once EEOC Charges alleging racial discrimination began to be filled against Nucor in

2002, I decided to try to bid again on a mill area job opportunity when a Roll Mill Leadman jobs was

posted on January 22, 2003, but the white employee who had racially harassed me, Robert Despain, was

selected for this job. Mr. Despain was selected for this supervisory position even though I had already

reported to management in writing the fact that he referred to me and other African-American employees

as his "working class and lazy ass niggers." He used the word "nigger" on a daily basis and routinely

threatened and belittled me in a way that white employees did not have to go through. Despain also used

the Company's e-mail system to send racially offensive emails throughout the plant. Nucor's records show

that Robert Despain was promoted to Roll Mill Leadman from a different crew and without any prior

cross-training in that job. I bid on the February 3, 2003 Job Posting for Roll Mill Leadman, which was

a paygrade 9 job, because I was well qualified.  I was qualified for such  Leadman based on the

knowledges, skills and abilities Nucor listed on the Job Postings of January 23, 2003, and September 12,

2003.  These included:

> Good communications skills and commitment to working in a team
> atmosphere
> Must be able to work with no supervision, direct crew as in a supervisor position
> Willingness to work overtime, vacation coverage, and extended hours as needed
> Ability to withstand extreme hot and cold conditions
> Keep accurate, consistent and legible records
> Must understand the cut sheet and rolling order
> Must understand customer satisfaction and delivery
> Good math skills
> Good mechanical aptitude and ability
> Must be able to read and record accurate data using
> micrometers/caliphers
> Ability to make quick accurate decisions in a production atmosphere
> Understanding of the rolling process, mill drafting, and pass schedules
> Possess basic computer knowledge, tracking programs, and pass
> schedules
> Understanding of roll change and mill set up
> Organizational skills with ability to prioritize safety, quality and productivity
> Ability to operate overhead crane safely
> Ability to record and maintain ISO records
> Basic understanding of roll mill operations, mechanical, electrical and basic
> trouble shooting experience
> Person must have ability to direct and make positive decisions regarding
> safety, quality, production
> Agree to outside evaluation and testing

In addition to my prior experience and training before Nucor, I was qualified for Leadman based on my

11

experience and knowledge in my own jobs of Piler Operator and Inspection Bed Inspector. Nucor's posted qualifications for the jobs I performed show that they required me to exhibit good organizational skills and the "ability to keep detailed records and prepare inspection reports according to ISO standards", "strong communications skills", the "ability to perform multiple functions simultaneously", a "knowledge or the Rolling Process" and the "ability to work under pressure associated with Rolling Process pace", good "quality control/quality assurance" skills, "strong math skills", "good mechanical skills", the ability to "inspect product" and "identify defects and communicate this information", a knowledge of beam defects and ASTM tolerances, operator interfaces and mechanical/electrical control systems, good computer skills and tracking ability, good trouble shooting skills, the knowledge and ability to "track cut patterns", the ability to use precision instruments and measuring devices (including calipers, micrometers and depth gauges), an "excellent work and attendance record", an "ability to operate forklift equipment" and cranes, and that I be "safety minded" and "team oriented." I exhibited all of these knowledges, skills and abilities, including an understanding of the cut-sheet and rolling order, the mill set-up sheet, and the ability to make quick, accurate decisions in a production atmosphere in performing my job of Piler Operator at the time I applied for promotion to Leadman. My prior experience, training and education before coming to work at Nucor also qualified me for such job. In addition, I had prior experience at Nucor as a Roll Builder Repair Bed Operator, Cooling Bed Inspector, Gag Press Operator, Conditioning Inspector, Product Coordinator, Internal Quality Control Auditor and in team building, ISO 9000 standards, safety standards and computer skills.

13.     My previously filed Declaration in support of class certification discussed the denial of my applications for Leadman jobs. To my knowledge, no decisionmaker has ever stated that I was not

12

qualified for the Leadman job or that the person selected was better qualified or had a better work, safety, discipline or training record than me. I had not been disciplined for anything in the five years preceding my bids for Leadman. White employees, however, had extensive prior disciplinary records before they were promoted to Leadman positions. Mikle Crawford was promoted to Leadman in the Roll Mill Department in November 2002 with at least five disciplinary incidents for misconduct, poor attendance, poor performance, rules violations and safety violations and he continued the same pattern with at least two additional disciplinary warnings for poor attitude, poor attendance and misconduct after he became Leadman. Johnnie Hawkins was promoted to Ladleman in 2003 with at least four prior disciplinary warnings for poor attendance and performance and rules violations. Paul Williamson was promoted to Repairman Helper in March 2002 and later to Leadman in 2005 with at least eight prior disciplinary incidents for poor performance, safety and rules violations. Glenn French was promoted to Leadman in the Roll Mill on August 6, 2001 despite the fact that he received a written warning two months earlier on June 12, 2001 which caused 250-260 tons of steel to be scrapped. The mistake was characterized as a "devastating time, tons of revenue loss." Howard Kelly was promoted to Supervisor in September 2002 with at least three prior disciplinary warnings for poor performance.

     14.     Nucor's Job Postings for the other jobs I bid on required the same or similar knowledges, skills and abilities as the Mill Operator and Leadman job postings I have already discussed. All of such Job Postings listed "mechanical skills" or "mechanically inclined", good communication skills and the ability to perform multiple tasks simultaneously. Most required good math skills, organizational or recordkeeping ability, basic computer skills, good depth perception and hand/eye coordination and other characteristics that were required for me to perform my own jobs of Piler Operator and Inspection Bed Inspector. As

13

earlier stated, I exhibited and satisfied the same knowledges, skills, abilities and personal characteristics in my own existing job that were posted for the jobs that I applied for, and I wouldn't have applied if I had not met the posted qualifications. To my knowledge, no supervisor or manager has ever stated that I was unqualified for any of the jobs I sought or otherwise identified any knowledges, skills or ability that I lacked for such jobs.

15.     **Lubricator:** I bid on two openings in the Lubricator job in 2002-2003. I applied and was qualified for Lubricator vacancies posted on July 18, 2002 and on July 23, 2003. I applied because I met the qualifications Nucor listed on such Job Postings. Nucor's Lubricator Job Postings that I bid on stated that applicants' qualifications will be determined by "written and oral testing", and that such qualifications included an ability to "interpret drawings and manuals for the repair, installation and maintenance system", and the ability "to keep accurate reports." The Maintenance Supervisor who administered the Lubricator test, Jerry Vasser, told me that I had the highest test score of all the applicants. However, a lower-scoring white employee, Mike Smith, was given the job anyway. I was never given any reason for not being selected.

16.     The Lubricator job is one of the few jobs in the plant that requires a written test. Nucor initially tried to prevent me from taking the test by not telling me the date or time that I was scheduled to take it. I objected to this and was later allowed to take the test. I was given an initial interview by Mr. Vasser and several of the Lubricators themselves, but my Roll Mill Department supervisor, Glen Ellis, then interfered again by placing false information about my attendance record in my file. I objected to this and to the fact that Roll Mill Department supervisor was being allowed to interfere with my consideration for a Maintenance Department job. Ellis subsequently removed his false information about my attendance, but

14

his negative input still hurt my chances of being chosen as compared to Mike Smith. Smith and his supervisor were both white, as was my supervisor, Glenn Ellis. I am not white, but I was better qualified than Smith.

17.    The Job Posting for Lubricator also stated that Nucor "preferred" mechanical background and experience or lubricating background and experience. Other posted qualifications included the ability to work at heights and perform the physical requirements of the job, the ability to operate forklifts, and the ability to "work well with other team members." My application and experience for the Lubricator job made it clear that I satisfied all of the posting qualifications. I wouldn't have applied if I had not satisfied them. In addition to my prior experience and training before Nucor, I was qualified for Lubricator based on my experience and knowledge in my own jobs of Piler Operator and Inspection Bed Inspector which required that I exhibit good "mechanical aptitude and ability", a "knowledge of basic hydraulics", "strong communications skills", the "ability to perform multiple functions simultaneously", a "knowledge of the Rolling Process" and the "ability to work under pressure associated with Rolling Process pace", forklift operating experience, an ability "to work under the stresses associated with the production process", the ability to use precision instruments and measuring devices (including calipers, micrometers and depth gauges), the "ability to keep detailed records and prepare inspection reports according to ISO standards", an "ability to operate forklift equipment" and cranes, good "quality control/quality assurance" skills, "basic math skills", ability to "inspect product" and "identify defects and communicate this information", knowledge and ability to "track cut patterns", an "excellent work and attendance record", and that I be "safety minded" and "team oriented." I exhibited all of these knowledges, skills and abilities, including a knowledge of basic hydraulics in performing my jobs of Piler Operator and Inspection Bed Inspector prior to the time

I applied for promotion to Lubricator. I had prior experience as a Roll Builder, Repair Bed Operator,

Cooling Bed Inspector, Gag Press Operator, Conditioning Inspector, Product Coordinator, Internal Quality

Control Auditor and in team building, ISO 9000 standards, safety standards and computer skills relevant

to this job. I subsequently applied for another Lubricator job in the Maintenance Department in July

2003, but I was not selected for it either. The same qualifications were listed on the July 23, 2003 Job

Posting for Lubricator that I had applied for and was qualified to fill based on the earlier July 18, 2002

posting that I had bid on.

18.     My previously filed Declaration in support of class certification discussed the denial of my

applications for the Lubricator job. To my knowledge, no decisionmaker has ever stated that I was not

qualified for the Lubricator job or that the person selected was better qualified or had a better work, safety,

discipline or training record than me. I had not been disciplined in the four years preceding my Lubricator

bids in 2002-2003. White employees, however, had extensive prior disciplinary records before they were

promoted to Lubricator positions. For example, Wencel Beggs had numerous disciplinary warnings,

including two disciplinary suspensions, before he was made a Lubricator in August 2002. Beggs also had

been disciplined in the twelve months prior to his promotion to Lubricator in August 2002. His two prior

disciplinary suspension were for "blatant" insubordination" and leaving his assigned work area without

authorization. I have already listed white employees who were promoted to similar jobs even though they

had prior disciplinary records.

19.     **Rotary Straightener Operator:** On March 18, 2003, I applied for a Rotary Straightener

Operator job at pay grade 6 that was later given to Jim Gilmer, a white employee, by a white supervisor,

Glen Ellis. Ellis was very hostile and demeaning towards me in my interview. I was qualified for the Rotary

16

Straightener Operator job based on the following qualifications Nucor listed for such Job Posting of March

13, 2003, that I bid on:

> Must be safety-minded, concerning self and co-workers.
> Must be quality conscious.
> Must be team oriented with strong communication skills.
> Must have excellent work and attendance record.
> Must have good hand-eye coordination.
> Must have the ability to perform multiple functions simultaneously.
> Must be able to work under the stresses associated with the production process.
> Strong math skill required.
> Ability to develop and maintain accurate records for product set-up, as well as machine performance and maintenance.
> Previous production equipment operating experience required.
> Mechanical aptitude and ability preferred.
> Forklift operating experience preferred.
> Knowledge of basic hydraulics a plus.
> Willingness to work over-time, vacation coverage and extended hours as needed.

My prior experience made it clear that I satisfied these qualifications. I wouldn't have applied if I had not

satisfied them. In addition to my prior experience and training before Nucor, I was qualified for Rotary

Straightener Operator based on my similar experience and knowledge in performing my own jobs of Piler

Operator and Inspection Bed Inspector. Nucor's posted qualifications for my jobs show that to perform

them I had to have "strong communications skills", the "ability to perform multiple functions simultaneously",

a "knowledge of the Rolling Process" and the "ability to work under pressure associated with Rolling

Process pace", good "quality control/quality assurance" skills, "strong math skills", ability to "inspect

product" and "identify defects and communicate this information", the knowledge and ability to "track cut

patterns", good mechanical aptitude and skills, the ability to use precision instruments and measuring

devices (including calipers, micrometers and depth gauges), the "ability to keep detailed records and

17

prepare inspection reports according to ISO standards", an "ability to operate forklift equipment"and

cranes, an "excellent work and attendance record", and that I be "safety minded", "team oriented" and

"quality conscious." I exhibited all of these knowledges, skills and abilities in performing my jobs of Piler

Operator and Inspection Bed Inspector prior to the time I applied for promotion to Rotary Straightener

Operator. My prior experience, training and education before coming to work at Nucor also qualified me

for such job. My records at Nucor showed that I had prior experience or training as a Roll Builder,

Repair Bed Operator, Cooling Bed Inspector, Gag Press Operator, Conditioning Inspector, Product

Coordinator, Internal Quality Control Auditor, and in team building, ISO 9000 standards, safety standards

and computer skills relevant to this job.

      20.     My previously filed Declaration in support of class certification discussed the denial of my

application for the Rotary Straightener job. To my knowledge, no decisionmaker has ever stated that I was

not qualified for the Rotary Straightener Operator job or that the person selected was better qualified or

had a better work, safety, discipline or training record than me. I had not been disciplined for anything in

the four years prior to the Rotary Straightener job being given to Gilmer in 2003. White employees were

promoted to similar jobs, however, even though they had prior disciplinary records. For example, Brett

Richardson was promoted to Cooling Bed Inspector in June 2004 with a written disciplinary warning for

poor performance in the prior twelve months and a disciplinary suspension for poor performance in the

prior fourteen months. The conduct which caused his suspension required the roll mill to be shut down

for 36 hours and caused damage to the newly replaced refractory furnace. James Brandenburg was

promoted to Repair Bed Helper on September 5, 2002 despite having been suspended in the prior twelve

months for poor performance and rules violations, and despite having a prior suspension and at least four

18

disciplinary warnings for poor attitude, poor performance, misconduct and safety violations as well as

numerous accidents. Matthew Estes was promoted to Charge Crane Operator with one prior disciplinary

suspension and numerous disciplinary warnings for poor performance, attitude problems, and safety and

for inadequate paperwork and rules violations. Robert Rayburn was moved from Repair Bed Helper to

Cooling Bed Inspector in June 2000 after he had been disciplined for refusing to come to work while on

call.

21.     **Supervisory Jobs:** My prior education and experience also made me interested in

supervisory jobs which were not posted and which were usually filled before I knew about the chance to

say I was interested, such as the Supervisor position for my crew that was given to Glenn Ellis in 2001.

Persons considered for such supervisory jobs were handpicked in a secretive manner. No supervisory

jobs were ever posted, so black employees like myself would never have a chance to know about the

opportunity. Also, there was also no formal application or selection process for supervisory jobs that I was

able to find out about. Nucor's refusal to promote me to better job opportunities hurt my opportunity to

be fairly considered for higher-level supervisory and non-supervisory jobs. There were no black

supervisors or managers in the Maintenance Department or the Roll Mill Department during my ten years

of employment at Nucor. There were over sixty white supervisors and only one black supervisor in the

plant as a whole during my employment from 1993 to 2003, and that one black supervisor was in the

Melting Department. During my last five years of employment, there were no black employees promoted

to supervisor anywhere in the plant until well over a year after EEOC Charges alleging race discrimination

began to be filed in 2002. Everyone above supervisor was also white, including all the Department

Managers. I was qualified to be a Supervisor based on the qualifications that Nucor eventually posted

19

in 2005 for such jobs.

> Commitment to Safety and Safety Programs
> Positive Attitude
> Communication and Leadership Skills
> Self Starter
> Make Decisions Based on What is Best for NYS
> Commitment to Fairness, Employees Development, and Continual ___ all phases of our process
> Must accept the Role of a Leader and Role Model
> Must be knowledgeable of the Rolling Process
> Must be Able to Work Extra Hours as Needed for Shift Coverage, __ Meetings and Training. This Could Include Holidays, Weekends, and Days Off.
> Must "Take Care of Our Customers"

In addition to my prior experience and training before Nucor, I was qualified for supervisory jobs based on my experience and knowledge in my own jobs of Piler Operator and Inspection Bed Inspector which required that I exhibit "strong communications skills", the "ability to perform multiple functions simultaneously", a "knowledge of the Rolling Process" and the "ability to work under pressure associated with Rolling Process pace", good "quality control/quality assurance" skills, good organizational skills and the "ability to keep detailed records and prepare inspection reports according to ISO standards", an "ability to operator forklift equipment" and cranes, good math skills, "good mechanical skills", the ability to "inspect product" and "identify defects and communicate this information", knowledge and ability to "track cut patterns", use of precision instruments and measuring devices (including calipers, micrometers and depth gauges), an "excellent work and attendance record", and that I be "safety minded", "team oriented", quality conscious, and a leader with a positive attitude. I exhibited all of these knowledges, skills and abilities in performing my job at Nucor and prior to Nucor. My prior experience, training and education before coming to work at Nucor also qualified me for such supervisory jobs.

20

22.     My previously filed Declaration in support of class certification discussed my supervisory

claim in this case.  To my knowledge, no decisionmaker has ever stated that I was not qualified for the

supervisory job or that the persons selected were better qualified or had a better work, safety, discipline

or training record than me.  I had not been disciplined for anything in the three years prior to various white

employees being promoted to Supervisor.  White employees, however, had extensive prior disciplinary

records before they were promoted to Supervisor and similar Leadman positions.  For example, Howard

Kelly was promoted to Supervisor in September 2002 with at least three prior disciplinary warnings for

poor performance.  I have also already listed several white employees promoted to Leadman with prior

disciplinary records.

23.     **Roll Turner:**  I applied and was qualified for the  Roll Turner position posted on

September 4, 2003.  The Roll Turner job required knowledges, skills and abilities similar to those I had

to have for my own jobs of Piler Operator and Inspection Bed Inspector and my prior jobs before coming

to Nucor.  Nucor's posted qualifications for performing my jobs required good mechanical and knowledge

skill, use of precision instruments and measuring devices (including calipers, micrometers and depth gauges)

, the "ability to keep detailed records and prepare inspection reports according to ISO standards", "strong

communications skills", the "ability to perform multiple functions simultaneously", a "knowledge of the

Rolling Process" and the "ability to work under pressure associated with Rolling Process pace", good

"quality control/quality assurance" skills,  good math skills, "good mechanical skills",  the ability to "inspect

product" and "identify defects and communicate this information", the knowledge and ability to "track cut

patterns", an "excellent work and attendance record", an "ability to operate forklift equipment" and cranes,

and that I be "safety minded" and "team oriented." I exhibited all of these knowledges, skills and abilities

21

in performing my job of Piler Operator and Inspection Bed Inspector at the time I applied for promotion to Roll Turner. I also had prior experience or training as a Roll Builder, Repair Bed Operator, Cooling Bed Inspector, Gag Press Operator, Conditioning Inspector, Product Coordinator, Internal Quality Control Auditor, and in team building, ISO 9000 standards, safety standards and computer skills relevant to this job.

24.     To my knowledge, no decisionmaker has ever stated that I was not qualified for the Roll Turner job or that the person selected was better qualified or had a better work, safety, discipline or training record than me. I had not been disciplined for anything during the five years prior to my bid for Roll Turner. The person selected for promotion to the Roll Turner job I bid on, Bruce Luttrell, had been given a disciplinary suspension for sleeping on the job and had eight other disciplinary incidents for refusal to perform, misconduct and poor performance and safety.  Rudi Cagle was promoted to Roll Turner on October 26, 2003 with a disciplinary warning in the prior twelve months for poor performance and at least one other disciplinary warnings for other performance problems.

25.     **Adverse Effect On Bidding and Promotions:**  Nucor claims to consider the same background factors of discipline, training, work experience for all jobs and departments.  However, my experience in ten years at the plant has shown that such factors are applied more harshly, and less leniently, to persons of my race. My chances of promotion were hurt by the way the Company applies factors like work area experience, informal training on crews, time-in-job or length of service, formal training and discipline. When I satisfied such experience or training, it did not matter, but when I did not have it or had been disciplined, then that became an excuse not to promote me.  Discipline, attendance, and safety allegations are similar factors that are not equally applied and that have been used as an excuse to deny

22

promotions to me and other persons of my race. The attitudes I have experienced with white supervisors

leads me to believe that my race and that of other black employees makes a difference in how we are

treated and viewed for discipline, promotions and training. It has been my experience that persons of my

race are watched closer and disciplined quicker and more often than white employees I have known in

similar circumstances. In my experience at Nucor, this practice has had an adverse impact or effect on

African-Americans' rate of bidding and promotion. It has had that effect on me in the way I have described

in this Declaration and the earlier one I filed in February of this year.

26.     It has also been my experience at Nucor that promotions depend on your race and the

whim of your supervisor, which is often the same thing. I was directly affected by the selection system I

am challenging in this case, and did not receive the job or training opportunities afforded white employees

and applicants with whom I am familiar. This has caused me to be given discipline that I do not believe I

would have been given if I were of a different race or had not opposed such racial discrimination and

participation in the proceedings that led to this lawsuit.

27.     When I began to oppose the pattern of racial discrimination and harassment at Nucor in

2002-2003, my supervisors began to watch and needle me more than they had before. Prior to my

participation with the EEOC, I had not received any discipline in more than five years. My conduct and

performance after I began opposing Nucor's racial discrimination in 2002 was no different than it had been

in the prior five years when I wasn't disciplined or counseled about anything, but as soon as I began my

opposition and participation with other employees in EEOC proceedings in 2002 I began to be singled out

for closer scrutiny for things that had previously been permissible and that weren't any different than what

other employees were allowed to do who had not participated in EEOC proceedings. I did nothing wrong,

however, and followed the normal procedure that everyone else did in similar circumstances. I was also

given a non-disciplinary "Notice of Counseling Sessions" in the 2002-2003 time period that I was acting

in concert with other black employees to oppose Nucor's racial discrimination and to bring such matters

to the attention of the Equal Employment Opportunity Commission. The other plaintiffs who were

participating with me in opposing Nucor's racial discrimination in 2002 also began to be singled out for

discipline and "counseling" in the same way. Larry McBride had never been disciplined before he began

participating in such EEOC proceedings, but in an eleven month period of July 18, 2003 to June 7, 2004

following his participation he was given five Notice of Warnings for petty matters that other employees

were not disciplined about. Ozzie Green had not been disciplined in more than five years before he began

participating in the same EEOC proceedings, but in a similar eleven month period between February 19,

2003 and January 23, 2004 he was given four Notice of Warnings for petty matters that would not

normally result in discipline. The other plaintiffs who participated with me in the same EEOC Charges in

2002-2003 were also disciplined in the period immediately following such participation for things that

normally did not result in discipline. Cornelius Bennett was disciplined for being five minutes late in March

2003; Clifton Lee was disciplined for asking a question in August 2002, for a minor safety issue in

September 2002, and for talking to a cook in the cafeteria while off-duty in September 2003; and

Sylvester Rogers, who had not had any discipline in the prior two years, was suddenly disciplined for

making a joke about watermelon to several black co-workers in 2004. I too hadn't been disciplined in

more than five years, but I was suddenly discharged in September 2003 a few months after I filed EEOC

Charges against Nucor.

    28.    **Termination Of My Employment:** I was required by Nucor's management to submit

to racial abuse by white co-workers, such as Robert Despain and Doug Stacy. I was first disciplined with a suspension from work for reporting and opposing such abuse. I told management in writing that Despain had constantly bullied, loud-talked, and intimidated me for a long time, and had called me and other black employees "lazy-ass niggers." I also told management in writing that Despain had left his work station to come to mine in a physical rage, screaming and cursing at me and jerking the door of my work cubicle open three or four times in a physically intimating manner, and that Doug Stacy had stood by and done nothing when I asked him to stop Despain on his way to my work cubicle in an obvious rage. Despain was not a Leadman or Supervisor, and he had no authority to be ordering me around like a boy. I explained what happened to my supervisor, Doug Patterson, and asked that white co-workers like Despain stop being allowed to exercise authority over me and boss me around in ways that they didn't treat white employees. Nothing was done. Two weeks later Despain began ordering me around again as if he were my supervisor. When I asked for a meeting to avoid any further confrontations about the way he was treating me or any misunderstanding about what he was telling me to do, Despain muscled up to me again in the same physically intimidating way that he had done two weeks earlier. I stayed calm and tried to leave his presence to call my supervisor to get clarification of what to do, but Despain followed screaming at me. When I couldn't get in touch with my supervisor or anyone else to help me, I decided that to avoid a physical fight I would have to leave the plant as Despain had ordered me to do. When I was finally able to get in touch with management to report such abuse, I was suspended from work for three days on the grounds that I shouldn't have questioned Despain telling me what to do even though he was only a co-worker and not a supervisor or leadman. I made it clear to management that Despain was constantly physically threatening me and using racial slurs and other abuse, and that he was the one who told me to

25

leave the plant. I followed that instruction. I also explained to management that I had been isolated at

the plant and couldn't get any help from other co-workers like Doug Stacy or my supervisor, and that if

I hadn't left the plant I feared things would have escalated into another physical attack on me. I was still

suspended for leaving work, however. Nothing was done to Despain or Stacy. Despain was subsequently

promoted to two different Leadmen jobs. The continued racial harassment and hostility I experienced after

that is described in my first Declaration filed last February.

29.     This same pattern of racial abuse happened again on the work shift of September 26,

2003, and resulted in my termination. This time Doug Stacy began to boss me around and treat me like

a boy in the same way Despain had done, telling me that I would have to run the job he had been assigned

in the South Piler because it was harder than my regular job, and he would take over my job in the North

Piler. Stacy was not a leadman or supervisor, but just a co-worker who ordinarily had no such power

over white co-workers. But he thought, like Robert Despain, that he could tell black co-workers like me

what they could and could not do. I politely told him over the intercom that I would do the job I was

assigned in the North Piler (this was my normal job every day), and that he should do the job he had been

assigned in the South Piler. Stacy later admitted that I had not raised my voice or been impolite. A few

minutes later, my supervisor, Glen Ellis, barged into my work cubicle and started saying that Stacy was in

the right and that I was in the wrong. He did so without ever asking me what had happened. The only thing

the Ellis said I had done wrong was in not letting Stacy tell me what to do and to switch jobs with him.

Stacy, however, had no such authority and never presumed to boss any white employees around that way.

When I told Ellis that Stacy had treated me like a boy just because I was black, he became even more

upset and accusatory towards me, but he never said I had done anything wrong except for not submitting

to Stacy when he told me to give him my job. Ellis' attitude and statements were so belittling that I turned

away from him and hit the window of the door to my cubicle and fell to the floor crying in total frustration.

The whole incident seemed orchestrated to bait and entrap me. It was well known that I objected to white

co-workers, like Despain and Stacy, presuming an authority over me that they didn't have over white

employees. EEOC Charges had already begun to be filed over this and other racial discrimination shortly

before this incident. My frustration when I hit the window was from the string of racial harassment and

discrimination that I had been experiencing and that managers, like Glen Ellis, endorsed.

      30.    Nucor's summary judgment brief argues that I was discharged because I "punched and

broke a glass window which was within inches of supervisor Glenn Ellis' face." *Def. Br.* at 53. I never

punched at Glenn Ellis, and he never accused me of that. Ellis was in my work cubicle, which is a very

small space, but I never swung at him or showed him any disrespect whatsoever. Ellis never accused me

of being disrespectful to him or any other supervisor or manager.

      31.    White employees have not been discharged when they actually hit or struck other

employees, rather than just a window. Just a few months before I was discharged, two white employees,

Joe Wood and Michael Walker, were just suspended and told to attend anger management classes for

grabbing, striking and cursing one another. Copies of Wood's and Walker's "Notice of Warning" for this

altercation are attached. Wood grabbed Walker around the neck and choked, cursed and verbally abused

him. Similar cursing and verbal abuse had been occurring between the two for several days. Neither

Wood or Walker, however, were discharged as I was, however. Another white employee, James Hymas,

was given just a two-day suspension for physically attacking and cursing a black employee on the job. I

have already listed white employees who were promoted to similar jobs even though they had prior

disciplinary records.

32.     **Job And Crew Segregation:** I adopt my Declaration and those of the other plaintiffs and other black employees filed in February for class certification. Those Declarations showed that large blocks of Nucor's plant were occupied only by white employees.

33.     **Racially Hostile Work Environment:** I also adopt my earlier Declaration and those of other plaintiffs and African-American Nucor employees filed in February for class certification. I have read the description of the racially hostile work environment at Nucor set forth in the Declarations of Rodney Washington, Larry McBride, Sylvester Rogers, Clifton Lee, Cornelius Bennett and Danny Lee. I have experienced and knew about the same racially hostile incidents and environment they describe. My own experience with such work environment has been very similar to theirs. To avoid repeating the same things, I agree with the description of the racially hostile environment that they have provided in their Declarations. In addition, I have seen that at least 22 other African-American employees reported the same racially hostile work environment in 2003 alone, including the following:

- Bruce Henley reported to management in 2003 that he had "seen other racially motivated signs, symbols, or depictions at Nucor-Yamato", had "seen confederate flags", that he had seen them "often and as recently as today", including "on license plates on personal employee vehicles, on head wraps/do rags and hard hats." He also reported that this was "offensive . . . to me" and that "[p]retty much everyone sees these because they are visible."

- James A. Hollis reported to management in 2003 that he had "seen a majority of the employees wear confederate flags on their hard hats", that he had never heard that "anyone has ever told these employees to remove rebel flags from their helmets", that "the whole issue is offensive to me", and that "[w]hy should I go and voice my complaint to management which has been in the media attention for years. I feel like I did not have any [way] to complain to management."

- Kenneth Nash reported to management in 2003 that he had seen "racially

motivated signs, symbols, or depictions at Nucor-Yamato" and that they sold "confederate flag do rags" in "the Company store" and that he had seen them being worn in the plant as recently as "a couple of weeks ago."

- Gwendolyn Hooks reported to management in 2003 that she had seen "the rebel do rags . . . they sell in the employee Wal-Mart" and that this "represents slavery and is offensive." She also reported that her husband, Michael Hooks, had also "observed this at the break room in the maintenance shop" and had seen "'No Nigs' written on the chalkboard."

- Michael Hooks reported to management around the same time in 2003 that "[r]acially discriminatory comments have been directed toward me at Nucor-Yamato" by a "Leadman in the Maintenance Department" named Eddy Scott. He reported that approximately two years ago, Scott said, "I cannot believe you came to work today, today is Martin Luther Coon Day." He told management that other employees had also heard this, like Lonnie Pattilo, Gary Hindrix, Danny Lee, Gary Cable, and James Bryan. He also reported to management that the supervisor, Jerry Vasser, had been told about Scott's statement "on the same day the comment was made", but Vassar had not "handled [his] complaint reasonably because he never heard of any action being taken." He also reported he felt like he had been "retaliated against because I felt I was treated differently after making the complaint."

- David A. Humphrey told management that he had been "subjected to 'bird-dogging' and "watched, pressured, motivated, shadowed, or monitored to an excessive degree at Nucor-Yamato because of my race" by a supervisor, Wayne Hunt.

- John Diamond reported to management in 2003 that he had seen "racially motivated signs, symbols, or depictions at Nucor-Yamato" in the "Finishing, Roll Mill, and Shipping Department", including "rebel flags on hard hats", and that "other employees who saw this are Danny Lee, Charlie Thomas, and James Newman." He also reported to management that two supervisors, Don Burns and Paul Flowers, were told about such Confederate flags on hard hats and that he "believe[s] that they may not have handled [his] complaint reasonably" because he "still saw the flags around the Department after [his] initial complaint."

- Edward Arnold reported to management in 2003 that "as recently as two weeks ago" he had "seen other racially motivated language and graffiti on the bathroom walls in other areas of Nucor-Yamato."

29

- John Bennett reported to management in 2003 that he had seen "racially motivated signs, symbols, or depictions at Nucor-Yamato", that he had "seen this over the course of my employment", and as recently as "today" when he "saw the rebel flag" on employees' "do rags" and "stickers on helmets."

- Charles C. Betts reported to management in 2003 that he had "seen rebel flags on occasion at the mill", including when "a crane operator hung a flag from his crane" and that "[t]here are still some flags on people's personal vehicles."

- Elroy Brown reported to management in 2003 that he had "seen employees with Confederate flags on their helmets and bandanas" and that "a manager would be able to see that even if the wearing of the flag is not meant to be racist, it could be perceived to be racist and offensive to some people."

- Johnny Brown reported to management in 2003 that he "see[s] Confederate flags on helmets or bandanas."

- Michael Brown reported to management in 2003 that "[r]acially discriminatory comments have been directed toward me at Nucor Yamato" by "Rocky Long [who] is in the position of supervisor." Long told Brown that he shouldn't get any boots like his because Brown would look like "a Nigger Cowboy." Brown also told management that Long "has made other comments about Blacks and Whites."

- Sammy Brown reported to management in 2003 that he sees "Confederate flag bandanas on employees' heads."

- David W. Shepherd, Sr. reported to management in 2003 "[t]here is only one Black guy in the Roll Mill and sixty percent of the Roll Shop is black", and that "[a]pproximately a year ago" Gary Steward stated, "Why are you black people so lazy?" and "[Y]ou know, you god damn black people are so lazy." He also reported that "[t]hirty minutes later, I went into the north bathroom, there was a statement written on the bathroom wall, '[i]t is so hard to train monkeys why do we think blacks are easier to work with.'"

- Michael Davis reported to management in 2003 that he had been "harassed at Nucor-Yamato because of my race" when a "spray painted doll" and a "dead crow" were left on the back of his truck, and someone wrote "boy" on his windshield.

- Gary Grice reported to management in 2003 that he had "seen racially motivated

language, symbols, or depictions at Nucor-Yamato on rail cars and occasionally on the bathroom walls" and that "it still shows up on occasion."

- Anthony T. Jackson reported to management in 2003 "[r]acially discriminatory comments have been directed toward me at Nucor-Yamato" by a supervisor, Jeff Keenan "approximately about a month ago" when he called another black employee 'Buckwheat.'" Keenan repeated this comment "a few days ago as well."

- Isaac L. Johnson reported to management in 2003 that "[t]here is a general feeling in the community surrounding Nucor that Nucor does not like Blacks" and that he had "observed graffiti in the restrooms with racist material at Nucor-Yamato" as an "ongoing thing in the restrooms."

- Danny Lee reported to management in 2003 that he had "seen racially motivated signs, symbols, or depictions at Nucor Yamato . . . within the past year . . . throughout the work site." He also reported seeing "rebel flags on hard hats" and "tool boxes."

- Edward Rhodes reported to management in 2003 that he had "observed material at Nucor-Yamato containing what I believe to be discriminatory content", that "[t]his occurred approximately four or five months ago in the Shipping Office bathroom", that he saw "writing on the wall that said, 'All niggers are stupid,'" and that "[i]t took about four to five months before the writing was painted over."

The racial hostility and harassment that I experienced, witnessed and knew about adversely affected the performance of my job by making me self-conscious about my race and how I was perceived, anxious and full of self-doubt about my safety and capabilities, nervous about operating machinery, upset at the lack of support I was receiving from co-workers and supervisors, and doubtful of my ability to continue to do my job effectively in such an intimidating environment. I took all of this worry home with me and it adversely affected my relationship with friends and family. This in turn made things even worse at work and adversely effected my performance and my willingness to continue seeking promotions and training in an environment that made such efforts seem futile.

31

The above and foregoing is true and correct to the best of my knowledge.

Rodney Washington

_10-19-06_
Date

Law Offices
## GORDON, SILBERMAN, WIGGINS & CHILDS
A PROFESSIONAL CORPORATION

7 DUPONT CIRCLE, N.W.
SUITE 200
WASHINGTON, D.C. 20036
TELEPHONE (202) 467-4123
FACSIMILE (202) 467-4419

October 4, 2002

**VIA FACSIMILE: 704-344-6734**
Gloria J. Barnett, Director
EEOC-Charlotte District Office
129 W. Trade Street, Suite 400
Charlotte, NC 28202

> Re:    *Ramon Roane v. Nucor Steel Berkley*
>          *Charge No., 146A200352*
>
>          *Sheldon Singletary v. Nucor Steel Berkley*
>          *Charge No., 146-A20-0329*
>
>          *Request for Withdrawal of Right to Sue Notices for 60 Days*

Dear Ms. Barnett:

This office represents the above-referenced charging parties regarding their discrimination claims against Nucor Steel. My law firm, Gordon, Silberman, Wiggins & Childs is the largest civil rights law firm in the United States and specializes in class action discrimination lawsuits. We have, for example, successfully pursued discrimination claims against major companies such as Coca Cola, CSX Railroad, Norfolk & Southern Railroad, Toshiba, TRW, Boeing, Winn Dixie and the Cooker Restaurant Corporation. We currently have pending class action discrimination lawsuits against companies such as Cracker Barrel restaurants, Kroger's grocery stores, Amtrak railroad and Union Pacific railroad, among others.

According to our records, the charging parties, Ramon Roane and Sheldon Singletary, received their right to sue notices from your office on approximately August 14, 2002. Due to the exigent circumstances more fully explained below, we respectfully request a withdrawal of their right to sue notices for a 60-day period for the following reasons:

1.    **Ramon Roane and Sheldon Singletary**

Mr. Roane filed a charge with the EEOC on March 4, 2002 without the benefit of counsel. Similarly, Mr. Singletary filed a charge with the EEOC on February 20, 2002 without the benefit of counsel. My firm was retained by Mr. Roane and Mr. Singletary shortly before they received their right to sue notices. We began our

Gloria J. Barnett
Page 2

investigation of Nucor about four weeks ago. Grant Morris, our co-counsel, met for the first time with a group of the Charleston employees on September 20, 2002.

2.      **Classwide discrimination at several Nucor plants.**

Our investigation of Nucor reveals a pattern of flagrant race discrimination practices against African American employees and applicants even though we are in the early stages of our investigation. Some of these practices include:

- the use of discriminatory selection, training and promotion procedures
- the existence and perpetuation of a racially hostile work environment
- discriminatory terms and conditions of employment

3.      **Witnesses who can provide information at the Nucor plants in Huger, SC, Armorel, AR and Auburn, NY.**

Although we are in the early stages of our investigation, we have spoken with and plan to file classwide charges with the following employees:

Huger, SC

- Quentin Brown
  8006 Highway 164
  Hollywood, SC 29449
  (843) 889-8643

- Aaron Butts
  7350 Stafford Road, B1
  North Charleston, SC 29406
  (843) 824-2639

- Eric Conyers
  2131 Lucy's Lane
  Mount Pleasant, SC 29446
  (843) 849-8355

- Jason Guy
  2072 Green Park Avenue
  Charleston, SC 29414
  (843)767-3265

Gloria J. Barnett
Page 3

- Bobby Moody
  (843) 881-2130

- Alvin Simmons
  407 Ashburton Drive
  Goose Creek, SC 29445
  (843) 209-6946

- Gerald White
  406 Meritha Lane
  Wando, SC 29492
  (843) 849-6248

Armorel, AR

- Oz Green
  4540 East State Highway 18, Apt. 21
  Blytheville, AR 72315
  (870) 763-8467

- William Ford
  Route 2, Box 690
  Haypi, Missouri 63851
  (573) 359-0592

- Clifton Lee
  (870) 762-2070

- Larry McBride
  2001 C. Fern Court
  Blytheville, AR 72315
  (87) 532-5652

- Terry McBride
  534 Cook St.
  Blytheville, AR 72315
  (870) 532-2631

- Marty Orr
  3832 North County Road, Apt. 679
  Blytheville, AR 72315
  (870)763-5814

Gloria J. Barnett
Page 4

- Donald Riley
  P.O. Box 673
  Blytheville, AR 72316
  (573) 717-7006

- Sylvester Rogers
  (870) 762-2731

- Pat Strickland-Green
  4540 East State Highway 18, Apt. 21
  Blytheville, AR 72315
  (870) 763-8467

Auburn, NY

- Jerry Dale
  (315) 253-4661

- Fred Fletcher
  (315) 258-0146

- Eli Smith
  32 Fitch Ave.
  Auburn, NY 13021
  (315) 255-0912

- Andre Tellfair
  Z147 Oak Creek
  Auburn, NY 13021
  (315) 255-5312

We will be filing classwide charges with the EEOC on behalf of these employees. We are prepared to provide you with affidavits from these employees to confirm our representation and to outline their systemic claims.

4.     **Race Discrimination Class Action Against Nucor.**

On the basis of the overwhelming evidence of discrimination which we have uncovered, my law firm intends to file a nationwide race discrimination class action against Nucor. With 60 additional days to complete our investigation, we will be in

Gloria J. Barnett
Page 5

a better position to obtain more evidence, evaluate more witnesses, and file additional charges.

Under these circumstance, we respectfully request a withdrawal of the right to sue notices for a 60-day period. We appreciate your generous time and consideration.

Sincerely yours,

David W. Sanford

cc: Grant Morris (Co-counsel)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Charlotte District Office**

129 West Trade Street, Suite 400
Charlotte, NC 28202
(704) 344-6682
TTY (704) 344-6684
FAX (704) 344-6734 & 6731

Charge No: 146A200329

Mr. Sheldon Singletary
2652 Forsemen Street
Charleston, SC 29405                               Charging Party

Nucor Steel Berkley
P.O. Box 2259
Mount Pleasant, SC 29465                          Respondent

## NOTICE OF INTENT TO RECONSIDER

Pursuant to the Commission's Procedural Regulations, 29 CFR 1601.19(b), I hereby give notice of my intent to reconsider the final determination issued in the above referenced matter. This notice rescinds the Dismissal Notice of Right to Sue previously issued on August 14, 2002.

A representative of the Commission will be in contact with the parties as necessary to continue with the processing of this matter.

On Behalf of The Commission:

10/24/02
Date

Gloria J. Barnett
Acting District Director

## Nucor-Yamato Steel Company
## 2005 Job Bid Form

*FAILURE TO COMPLETE 100% OF THIS FORM WILL DISQUALIFY YOUR
APPLICATION*

Name _Greg Lark_          Emp# _1378_ Current Dept: _2548_

Current Job Title: _FBed NYS II_   Current Pay Grade _3_

Current Supervisor _Glenn Ellis_

Position interested in: _ Pizr Operator  NYS II_

Supervisor on job posting: _Glenn Ellis_

Have you cross-trained on this job? _yes_ Did you complete training? _____

Are you familiar with this job and how? _by cross training and_
_observing the job been done._

Explain how you meet the qualifications listed on this job posting. _The Qualifications_
_listed on the bid Job posting, are mainly_
_the qualification of my current job_

What previous jobs and supervisors have you had at NYS? _J.A. Swinford (Lab)_
_David Warren (F Bed NYS I)_

What job would you like to be doing 5 years from now? _Leadership_
_position_

1NYS-199202

List previous work experience other than NYS. _____

Quality Inspection (Maverick Tube)
General Manager (Popeyes - Krystal)
Quality Control (USAF)

List training courses or classes that you have taken. _____

Safety Classes (nys)
Leadership Class (nys)

References:  Please list 3 NYS peers we can contact for references.

| **Name** | **Dept:** |
|---|---|
| Jim Swinford | Q.C (Lab) |
| Keith Shelton | Roll mill |
| Donald Warren | Finishing NYSI |

References:  Please list 3 external references.

| **Name** | **Phone #** |
|---|---|
| Jo Mhoon | 870 832 1193 |
| Edward Collins | 870 623 1234 |
| Sonny Weems | 870 235-4896 |

What is your best idea to improve our safety performance at NYS? ___ Make
Sure everyone take part in the Stop
program

1NYS-199203

Please list the following 3 words in order of importance – Productivity, Quality, Safety

1. _Safety_

2. _Quality_

3. _Productivity_

Explain what you have done personally to improve our safety performance at NYS?

_look out for my co-workers as well as myself when it comes to safety_

In the past 12 months have you received any written disciplinary warnings? _Yes_

If yes, for what reasons? _Some bad material got out and myself and others were held accountable._

Do you have any Grace days left for the remaining year, if so, how many? _2_

Employee Signature _____ Date _6-13-05_

1NYS-199204