**IN THE UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

CORNELIUS BENNETT, ET AL.
                                *
            Plaintiffs           *
VS.                             *
                                *        NO.  3:04CV00291 SWW
NUCOR CORPORATION and     *
NUCOR-YAMATO STEEL        *
COMPANY                     *

            Defendants

## ORDER

      Six plaintiffs--Cornelius Bennett, Clifton Lee, Sr., Sylvester Rogers, Ozzie Green, Larry McBride, and Rodney Washington--bring this employment discrimination case against Nucor Corporation and Nucor-Yamato Steel Company (collectively "Nucor") pursuant to Title VII of the 1964 Civil Rights Act, as amended by the Civil Rights Act of 1991, and 42 U.S.C. § 1981. Previously, the Court denied plaintiffs' motion for class certification (docket entry #123).   Now before the Court is Nucor's motion for summary judgment on plaintiffs' individual claims (docket entries #127, #128, #129, #130), plaintiffs' response (docket entries #144, #145, 146, #147, #148), and Nucor's reply (docket entry #149).  Also before the Court is Nucor's motion to strike plaintiffs' declarations submitted in opposition to summary judgment (docket entries #150, #151) and plaintiffs' response (docket entry #154).  After careful consideration, and for the reasons that follow, Nucor's motion for summary judgment will be granted in part and denied in part, and the motion to strike will be denied.

## I.  Motion to Strike

      Nucor moves to strike from the record declarations submitted by plaintiffs in resistance

to Nucor's motion for summary judgment.  Nucor objects to the declarations on grounds that they contain hearsay statements, contradict prior deposition testimony, and contain testimony not based on the declarant's personal knowledge.   Further, Nucor asserts that plaintiffs' declarations contain new allegations that are not included in the third amended complaint.  Nucor states: "Once the Court strikes the contradictory and inadmissible statements . . . only a shell is left. Defendants therefore ask this Court to strike those declarations in their entirety."  Docket entry #150, at 3.  Alternatively, Nucor requests that the Court strike only the  "numerous inadmissible and contradictory statements" contained in the declarations.   *Id*.

The Court has reviewed Nucor's supporting brief and motion exhibits and finds that most of the challenged declaration testimony has no relevance to any issue that is pivotal to the Court's decision regarding summary judgment.  No purpose would be served by assessing the admissibility of testimony that has no bearing on the dispositive issues before the Court. However, the Court will consider Nucor's arguments in determining whether relevant declaration testimony meets the requirements set forth in Federal Rule of Civil Procedure 56(e) and whether such testimony is consistent with earlier deposition testimony.   With this qualification, Nucor's motion to strike will be denied.

## II.  Motion for Summary Judgment

### A.  Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes

2

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must submit evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

## B. Discussion

Plaintiffs are black, current and former employees of Nucor's steel production plant in Blytheville, Arkansas. Each plaintiff claims that Nucor denied him promotions based on race, and each seeks damages for failure to promote under disparate impact and disparate treatment theories of discrimination. Additionally, each plaintiff claims that Nucor subjected him to a racially hostile work environment and an assortment of adverse employment actions based on race, and separate plaintiffs Rogers, Washington, and Lee claim that Nucor retaliated against them for opposing racial discrimination. Because plaintiffs present similar evidence in support of their disparate impact and hostile environment claims, the Court will consider those claims together.

## Disparate Impact

"Disparate impact claims under Title VII challenge 'employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" *Mems v. City of St. Paul, Dept. of Fire and Safety Services,* 224 F.3d 735, 740 (8th Cir. 2000)(quoting *Hazen Paper Co. v.*

*Biggins*, 507 U.S. 604, 609 (1993)).  To establish a *prima facie* case of discrimination under a disparate impact theory, a plaintiff must show: "(1) an identifiable, facially-neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two."  *Id*. (quoting *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994 (1988)).

In support of their disparate impact claims, plaintiffs charge that Nucor's overall selection process for promotions has a disparate impact on black applicants.  Nucor asserts that plaintiffs cannot meet their *prima facie* burden by attacking Nucor's overall selection process. Normally, a plaintiff must show that each particular challenged employment practice causes a disparate impact, "except that if the complaining party can demonstrate to the court that the elements of [the employer's] decision making process are not capable of separation for analysis, the decision making process may be analyzed as one employment practice."  42 U.S.C. § 2000e-2(k)(1)(B)(I).          Plaintiffs contend that the elements of Nucor's selection process cannot be separated for the purpose of disparate impact analysis.  But the undisputed evidence shows otherwise.  Nucor's production activities at the Blytheville plant are divided among five departments--the melt shop, the roll mill department, quality assurance, maintenance, and shipping--and plaintiffs claim that they applied for promotions in the various departments. Although Nucor maintains written general policies governing hiring decisions, production department managers have developed their own departmental hiring procedures with discrete components.  The manager of the maintenance department has developed departmental procedures for applicant testing and interviews, *see* docket entry #78, Ex. 1, ¶¶  12-15; the shipping department has a two-tiered interview structure between the department manager and

supervisors; and the melt shop has several positions that require specific training and examinations.  *See* docket entry #78, Ex. #1, ¶14; Ex. #25, at 185.  Policies and practices regarding attendance, safety, and discipline (factors that affect hiring decisions in all departments) also vary across production departments.  *See* docket entry #78, Ex.##1-3, 23-24.

      Under these circumstances, plaintiffs must identify the specific employment practices that cause an alleged adverse impact.  *See Watson v. Fort Worth Bank & Trust,* 108 S. Ct. 2777, 2785 (1988)("Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is . . . responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.")

      Nucor asserts that even if plaintiffs were permitted to attack Nucor's overall selection process, they have failed to show causation.  To prove causation in a disparate impact case, "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has cause the exclusion of jobs or promotions because of their membership in a protected group."  *Id.* at 2789.

      Plaintiffs present expert reports by Dr. Edwin L. Bradley, a professional statistician.  Bradley compared the racial composition of the Blytheville plant's workforce with the racial composition of  "employment selections" to determine whether Nucor's overall selection process had  an adverse impact on black applicants, or was otherwise related to race, during the period from December 1, 1999 through October 2005.  *See* docket entry #71, Ex. 12A, at 2.

      Bradley reports that his statistical analysis lead him to conclude that (1) Nucor

underutilized black employees in supervisory positions,[1] indicating that the process for selecting supervisors was related to race and adversely impacts black employees, and (2) Nucor's process for filling non-supervisory positions in production departments is related to race and adversely impacts black employees. *See id*. at 3.

Nucor asserts, and the Court agrees, that Bradley's statistical analysis fails to create a genuine issue for trial with respect to plaintiffs' disparate impact claims. Bradley failed to identify a specific employment practice that has a disparate effect on black employees. Additionally, in performing his analysis, Bradley assumed that the workforce population he considered consisted of individuals possessing minimal qualifications for promotion. Because this is not a case in which it can be assumed that all Nucor employees are equally qualified for promotion to all positions, Dr. Bradley's simplistic percentage comparisons lack real meaning.

Nucor's expert, Dr. Finis Welch, performed a separate analysis for each department, and he included controls for characteristics that affect selection decisions such as applicants' disciplinary history, training, and work experience. Dr. Welch's results showed no statistically significant differences in selection rates between black and white applicants. *See* docket entry #78, Ex. 4, at 11-12.

Plaintiffs argue that the controls considered by Dr. Welch are "racially tainted" and should not be considered.[2] In his rebuttal expert report, Dr. Bradley opines that it is

_____

[1]During the relevant time period, non-supervisory job openings in Nucor's production departments were posted plant-wide, and employees from all departments were eligible to bid on open jobs. However, vacancies for supervisor positions were not posted, but were announced during department meetings.

[2]Plaintiffs claim that Dr. Welch has admitted that Nucor's selection criteria disfavors black employees and has a racially disparate impact. *See* docket entry #71, at 3, docket entry #147 at 139; docket entry # 147, at 13-139. However, as explained in the Court's order denying

inappropriate to adjust for factors such as training and discipline because they have an adverse impact on black employees. *See* docket entry #88, at 3. But like Dr. Bradley's bottom-line percentage comparisons that take in Nucor's overall selection process, his analysis of discipline and training data ignores common non-discriminatory reasons for alleged disparities.

In addition to statistical evidence, plaintiffs present anecdotal evidence in support of their claims. Plaintiffs have worked exclusively in the roll mill department. In separate declarations, each plaintiff states that the roll mill department is segregated by race in that almost all black employees work in the roll shop and finishing areas, and almost all white employees work in the rolling mill or mechanic crew areas. *See* docket entry #71, Exs. 2-7. Plaintiffs claim that the roll shop and finishing jobs performed by black employees are "dirtier" and more laborious than the rolling mill and mechanic crew jobs performed by white employees. *Id*. Plaintiffs also testify that Nucor applies discipline, attendance, and safety polices inconsistently and uses the policies as an excuse to deny promotions to black employees.

Plaintiffs' allegations that Nucor denied them opportunities for career advancement by segregating them from white employees and by subjecting them to disparate treatment in the areas of training and discipline are, definitively, allegations of disparate treatment, which cannot be forced into a disparate impact model. In sum, the Court finds that plaintiffs have failed to come forward with evidence to sustain disparate impact claims.

## Hostile Environment

To establish a *prima facie* case of racial discrimination based on a hostile work environment, a plaintiff must establish that (1) he is a member of a protected group, (2)

plaintiff's motion for class certification, the record does not support this claim. *See* docket entry #123, at 16 n.5.

unwelcome harassment occurred, (3) a causal nexus existed between the harassment and his protected-group status, and (4) the harassment affected a term, condition, or privilege of his employment. *See Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir.1999). Additionally, with regard to claims of coworker harassment, a plaintiff must show that his employer knew or should have known of the harassment and failed to take appropriate remedial action. *See Joens v. John Morrell & Co.* 354 F.3d 938, 940 (8th Cir. 2004). Such proof is not necessary with regard to claims that supervisors committed harassment. An employer may be vicariously for an actionable hostile environment created by a supervisor with immediate, or successively higher, authority over the plaintiff. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65(1998).

Nucor asserts that no plaintiff has established the fourth element of a *prima facie* case-- that he endured harassment so severe or pervasive as to affect a term, condition, or privilege of his employment. "For harassment to affect a condition of employment the conduct must be severe 'as it would be viewed objectively by a reasonable person and as it was actually viewed subjectively by the victim.'" *Elmahdi v. Marriott Hotel Services, Inc.*, 339 F.3d 645, 652 (8th Cir. 2003)(quoting *Howard v. Burns Bros., Inc.,* 149 F.3d 835, 840 (8th Cir.1998)). In determining whether sufficient evidence of a hostile work environment has been presented, the totality of the circumstances must be considered, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance. *See Vajdl v. Mesabi Academy of KidsPeace, Inc.*, 2007 WL 1201867, *3 (8th Cir. April 25, 2007)(citing *Duncan v. General Motors Corp.*, 300 F.3d 928, 884 (8th Cir. 2002)). Whether conditions in the workplace establish an actionable hostile environment is a function of

both the severity and the pervasiveness of racially hostile conduct, "with a high level of severity compensating for a low level of pervasiveness and vice versa." *Jackson v. Flint Ink North American Corp*. 370 F.3d 791, 794 (8th Cir. 2004), *mod. on reh'g on other grounds*, 382 F.2d 869 (8th Cir. 2004).

Plaintiffs' initial declarations include similar testimony that Nucor sold racially offensive merchandise in the company store including "do-rags" and bandanas that featured the confederate flag together with the Nucor company logo. *See* docket entry #71, Ex. #2, ¶18; Ex. #3, ¶13; Ex. #4, ¶19; Ex. #5, ¶16; Ex. #6, ¶12; Ex. #7, ¶9. Additionally, each plaintiff includes the following statement in his second declaration:

> The racial hostility and harassment that I experienced, witnessed and knew about adversely affected the performance of my job by making me self-conscious about my race and how I was perceived, anxious and full of self doubt about my safety and capabilities, nervous about operating machinery, upset at the lack of support I was receiving from co-workers and supervisors, and doubtful of my ability to continue to do my job effectively in such an intimidating environment. I took all of this worry home with me and it adversely affected my relationship with friends and family. This in turn made things even worse at work and adversely [affected] my performance and willingness to continue seeking promotions and training in an environment that made such efforts seem futile.

Docket entry #148, Ex. #40, ¶33; Ex. #41, ¶44; Ex. #42, ¶52; Ex. #43, ¶27; Ex. #44, ¶28; Ex. #45, ¶18.

In addition to the foregoing testimony repeated by each plaintiff, plaintiffs' initial declarations include testimony regarding their separate experiences,[3] summarized below.

---

[3]Each plaintiff, with the exception of McBride, attempts to "adopt" the testimony of other plaintiffs regarding racial harassment by stating as follows: "I have read the description of the racially hostile work environment at Nucor set forth in the [declarations of other plaintiffs]. I have experienced and knew about the same racially hostile incidents and environment they describe. My own experience with such work environment has been very similar to theirs." Docket entry #148, Ex. #40, ¶33; Ex. #42, ¶52; Ex. #43, ¶27; Ex. #44, ¶28; Ex. #45, ¶18. Nucor

Plaintiff Bennett

- He heard the comment "I like my women like I like my coffee: black and strong" broadcast over Nucor's walkie-talkie radio system.

- He heard the word "nigger" and the term  "DAN" (which he states stands for "dumb-ass nigger") broadcast over the plant radio system.

- He saw the words "lazy nigger" written on bathroom walls.

- He saw confederate flag decals displayed on bathroom walls and on lockers and helmets, and he saw a large confederate flag hanging from a crane in the shipping department.

- He overheard a white leadman use the term "nigger-rigged."

- White employees purchased confederate flag items in the company store through payroll deductions and wore them throughout the plant.

- He learned that other black employees had been called "lazy-ass nigger."[4]

- He learned that someone hung a chicken by the neck in a black employee's work area with a note warning him to "be careful."

- He learned that a white employee wearing a white hood came through the roll mill department with burning cross.

Plaintiff Rogers

_____

asserts that plaintiffs cannot "group together every discriminatory allegation from all six plaintiffs in order to meet their *prima facie* case of hostile work environment."  Docket entry #149, at 4.  The Court agrees that plaintiffs cannot show that they were personally aware of each incident of harassment described by every other plaintiff simply by adding a cursory statement to their otherwise detailed and lengthy  declarations.

[4]In support of its motion to strike plaintiffs' declarations, Nucor argues that Bennett's testimony about alleged events that he did not personally witness amounts to inadmissible hearsay.  *See* docket entry #151, at 10. Nucor asserts that Bennett's "second-hand accounts" appear in his second declaration, but the challenged testimony actually appears in Bennett's first declaration.  More important, alleged instances of racial harassment that Bennett learned "through the grape vine" during the time that he allegedly experienced a hostile work environment are admissible and relevant to whether he reasonably perceived a hostile work environment. *See Carter v. Chrysler Corp.,* 173 F.3d 693, 701 (8th Cir.1999) (permitting a hostile environment claimant to introduce evidence of offensive men's room graffiti she learned about through hearsay during her employ, even though she had never been inside the men's room).

- His coworker, James May, told him that he "needed a noose around his neck."

- His supervisor, Durrell Warren, hung a rubber chicken with a noose five feet from his work area.[5]

- His coworker, Allan Thomas, told him over the plant radio that he "could get a hanging."

- He saw a noose hanging from a beam in the finishing department.

- He saw a dummy hung by the neck in the repair bed area.

- He "repeatedly" saw white workers wearing bandanas, hard hats, and tee-shirts with the confederate flag, and he was "repeatedly" exposed to racist graffiti in restrooms, including the letters KKK.

- He reported "many" incidents of harassment to managers and supervisors, but they did little or nothing to stop them from recurring.

Plaintiff Washington

- He saw the confederate flag displayed throughout the plant, and his supervisor, Doug Stacey, wore a "do-rag" decorated with a confederate flag and Nucor's logo.

- He saw racial graffiti on bathroom walls.

- He heard racial slurs, such as "nigger."

- His leadman, Robert Despain, repeatedly referred to him and his co-workers as "lazy-ass niggers" and "working-class niggers."

- Nucor employee Doug Patterson told him that he kept black employees on the cooling bed because they could handle the heat better than white employees.

- He heard, nearly on a daily basis, racially offensive comments and jokes over the plant radio, followed by monkey or gorilla noises.

---

[5]Nucor presents Durrell Warren's deposition testimony regarding Rogers' claim that Warren hung a rubber chicken with a noose in his work area.  *See* docket entry #130, Ex. #68, at 95-99.  Warren testifies that he hung the chicken with string by its foot, away from Rogers' work station.  He states that before he hung the chicken, he explained to Rogers' work crew that he was using the chicken as an incentive, and he planned to give the "chicken award" to the employee who "goofed up" that day.  Warren states that he removed the chicken after Rogers complained that it was satanic.

- A co-worker, Todd Ellis, referred to Martin Luther King as "Martin Luther Coon."

Plaintiff Lee

- He has observed white employees display the confederate flag on hard hats and other equipment. He told his supervisor, Ed Cable, that confederate flag items were being sold in the company store, and Cable took no action.

- His supervisor repeated a racist joke to him and another black employee.

- He witnessed two white co-workers, wearing white hoods, march through the roll shop with a burning cross in February 1992.[6]

- He learned from his brother and co-worker, Danny Lee, that in January 2006, a picture of a gorilla had been left in an employee break area. Additionally, his brother told him that he found a drawing of a license plate with a picture of a monkey and his name in the employee break area.

Plaintiff Green

- He heard white employees refer to black employees as "coon," "big lip," and "DAN (dumb-ass nigger)."

- He saw a chicken hanging from a noose in another black employee's work station.

- He heard racial slurs routinely broadcast over the plant radio.

- He saw "KKK" references and swastikas on bathroom walls, and an offensive poem: "Black is beautiful. Tan is grand. But white is the color of the big boss man."

- He saw confederate flags and items with confederate flag decals widely displayed in the work area.

Plaintiff McBride

- He has observed white employees displaying the confederate flag on hard hats and toolboxes throughout the plant.

- He has observed racial graffiti on bathroom walls, including the letters "KKK."

- He learned that a swastika symbol was displayed on a computer screen in the roll mill

---

[6]Lee provided the date of this occurrence, February 1992, in his deposition. *See* docket entry #80, Ex. #16, 243-244, 382-383.

department.

•      He states that racial slurs are "used without repercussions."

•      He  has observed "that black employees are openly ridiculed over the radio in a way not
done to white employees."

The Court finds that plaintiffs have presented sufficient evidence to withstand summary

judgment on their hostile environment claims.[7]  Each plaintiff testifies that he encountered

racially offensive language, graffiti and the confederate flag in a work area where  black

employees are segregated from white employees.   The Court finds that a reasonable person in

plaintiffs' shoes would find the environment described by each plaintiff sufficiently hostile and

abusive to affect the terms and conditions of employment.  Additionally, each plaintiff testifies

that he subjectively found his work environment hostile and abusive, and the Court credits this

testimony.

Nucor asserts that even if plaintiffs have come forward with sufficient evidence of an

actionable hostile work environment, it is entitled to summary judgment pursuant to the

affirmative defense set forth in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).   Pursuant to the  *Ellerth-Faragher*

defense, when no tangible employment action is taken, a defending employer may avoid liability

by showing (1) that it exercised reasonable care to prevent and correct promptly any harassing

behavior, and (2) that the plaintiff  unreasonably failed to take advantage of any preventative or

---

[7]The Court finds that Rogers has presented ample evidence to support his claim.  Rogers'
testimony that coworkers threatened him with serious bodily harm, if not death, combined with
his testimony regarding racial graffiti, nooses, and hanging dummies clearly establishes a
submissible hostile environment claim.  *See Reedy v. Quebecor Printing Eagle, Inc*., 333 F.3d
906, 909 (8th Cir. 2003)(finding a submissible hostile environment claim based on evidence of
physically threatening graffiti directed specifically at the plaintiff).

corrective opportunities provided by the employer to avoid harm or otherwise.  *Id.*

Many of plaintiffs' allegations involve co-worker harassment, and the *Ellerth-Faragher* affirmative defense applies only to cases of vicarious liability for supervisor harassment.  *See Joens v. John Morrell & Co.* 354 F.3d 938, 940 (8th Cir. 2004)(explaining that the *Ellerth-Faragher* defense applies to harassment committed by supervisors, not coworkers).  Although the defense is potentially applicable to plaintiffs' allegations involving supervisor harassment, Nucor provides no evidence that any plaintiff unreasonably failed to take advantage of corrective opportunities in response to a supervisor's  harassment.

The principle behind the *Ellerth-Faragher* defense--that an employer can avoid liability in situations where it acts promptly to remedy harassment--is inherent in a plaintiff's burden to demonstrate (in cases involving coworker harassment) that the employer  knew or should have known of the harassment and failed to take proper remedial action.  Nucor does not argue that plaintiffs are unable to make this showing.   However, Nucor does assert that it took corrective action in the  "rare instances" where plaintiffs reported discriminatory behavior.   Nucor contends that Plaintiff Rogers admitted in deposition that Nucor managers disciplined employees who wore any article of clothing depicting the rebel flag.  However, Nucor fails to acknowledge Rogers' complete testimony.  Although Rogers acknowledged that Nucor disciplined workers for wearing confederate flag items "since the lawsuit," he testified: "Before the lawsuit, they didn't care nothing about what was going on.  They sold it and everything else." Docket entry #80, Ex. #15, at 239.   According to Nucor, the sale of confederate flag items in the company store was "a one-time incident that was immediately corrected."[8]  However, Washington testifies that

_____

[8]Nucor submits the deposition of Bernice Gray, who has worked as a warehouse clerk at the Blytheville plant since 1995.  *See* docket entry #80, Ex. #36, at 8.  Gray's duties include

14

Nucor sold confederate flag items in the company store from "at least the 1990's" through late 2003."  *See* docket entry #71, ¶18.

In sum, the Court finds that plaintiffs have come forward with evidence of sufficiently severe or pervasive harassment to create liability under Title VII and that Nucor has failed to show that it is free from liability pursuant to the *Ellerth-Faragher* affirmative defense.

## Additional Claims

### *Plaintiff Cornelius Bennett*

Plaintiff Bennett, a current Nucor employee, has worked as a roll guide builder in Nucor's roll mill department since 1993.  Allegations in the third amended complaint  under the heading "Named Plaintiff Cornelius Bennett" state as follows:

> Bennett has been adversely affected by the challenged systemic practices and pattern of racial discrimination by not being able to learn about or compete for employment opportunities in traditionally white job classifications, by being required to work in conditions in which he and other members of his race were demeaned, [and] by being required to work under discriminatory terms and conditions of employment . . . .

Docket entry #18, ¶ 28.   The pleading also states that Nucor transferred Bennett in March 2003 without his consent, which resulted in a $15,000 per year salary reduction, and that similarly situated white employees were not subjected to the same treatment.  *Id.* ¶ 29.

---

buying items for the company store.  *Id*. at 20.  She testifies that in the summer of 2001, a white employee and a black employee "got into it" over a confederate sticker.  *Id*. at 75.  According to Gray, the white employee had a confederate sticker on his hat, and the black employee asked him to take it off because it offended him.  *Id*.  Gray states that she reported the incident to Nucor's general manager, Joe Stratman, and he told her "to take the confederate do-rags out of the store if there was any in there."  *Id*. at 84.  Gray testifies that she had no knowledge that confederate flag "do-rags" were ever sold in the store, but she acknowledges that she pays "no attention to what color they are or anything." *Id*. at 82.   Gray's testimony lends little support to Nucor's position that the sale of confederate items was "a one-time thing."

The foregoing allegations indicate that Bennett brings claims for a hostile working environment (previously addressed), failure to promote, and involuntary transfer.  However, in opposition to summary judgment, Bennett asserts that he also brings a claim for retaliation.  The Court will discuss each claim separately.

**Failure to Promote**

To establish a *prima facie* case of discrimination, Bennett must show that (1) he was a member of a protected group; (2) he was qualified and applied for a promotion to an available position; (3) he was not selected for the position; and (4) a similarly-situated employee who was not a member of a protected group was selected instead. *Allen v. Tobacco Superstore, Inc*. 475 F.3d 931, 937 (8th Cir. 2007)(citing *Shannon v. Ford Motor Co*., 72 F.3d 678, 682 (8th Cir. 1996)).

Nucor asserts that Bennett is unable establish a *prima facie* case because he cannot demonstrate that he applied for a promotion to an available position.[9]  Bennett concedes that he never applied for a promotion, but he argues that  he is exempt from the application requirement because Nucor, he alleges, deters black employees from seeking promotions.

In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324 (1977), a class action, the Supreme Court held that a plaintiff may be excused from the application process where a pattern or practice of discrimination made submitting an application a vain and futile

---

[9]If Bennett fails to establish a sufficient evidentiary basis for any one element of his *prima facie* case, summary judgment is appropriate.  *See Erenberg v. Methodist Hosp.,* 357 F.3d 787, 793 (8th Cir.2004) (finding that  summary judgment was properly granted where plaintiff "did not prove a *prima facie* case of age discrimination, because she failed to show that she was qualified for the position from which she was discharged"); *see also Weber v. American Exp. Co.*, 994 F.2d 513, 516 (8th Cir. 1993)("If the plaintiff fails to establish a factual dispute on each element of the *prima facie* case, summary judgment is appropriate.").

act.  *See Teamsters*, 431 U.S. at 368.  Describing a nonapplicant's burden as a "difficult task," the Court stated: "Resolution of the nonapplicant's claim . . . requires two distinct determinations:   that he would have applied but for discrimination and that he would have been discriminatorily rejected had he applied."[10]  *Teamsters*, 431 U.S. at 368 n.52.

In *Teamsters*, plaintiffs presented overwhelming statistical evidence and over 40 specific instances in which qualified  black and Spanish-surnamed applicants sought promotions and either (1) had their requests ignored; (2) received false or misleading information about requirements, opportunities, and application procedures; or (3) were not considered and hired on the same basis as white applicants.[11]  *Teamsters*, 431 U.S. at 338.  No similar evidence exists in this case.  The Court finds that Bennett has failed to show that submitting a bid for promotion would have been a vain and futile act.

Bennett argues that he is exempt from applying for supervisory positions because prior to 2005, Nucor did not post open supervisory positions.  The Eighth Circuit has held that a formal application for a job opening is not required to establish a *prima facie* case of discrimination if

---

[10]In *Teamsters*, the Supreme Court limited recovery to nonapplicants who demonstrated that they would have applied for a position but for their actual knowledge of unlawful practices. *See  International Broth. of Teamsters v. U.S.,* 431 U.S. 324, 371 (1977).  In his second declaration, Bennett testified that he would have submitted bids for promotions if he "hadn't seen that they were never open to black employees."  Docket entry #148, Ex. #45, ¶8.  However, in an earlier deposition, Bennett testified that he had no knowledge of specific instances where black employees were denied promotions because of racial discrimination.  *See* docket entry #80, Ex. 16, at 21-28.

[11]The anecdotal evidence in *Teamsters* brought the "cold numbers convincingly to life." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324 (1977).  For example, a black employee testified that when he told the manager of his interest in a line driving position, the manager replied that there would be problems on the road with Caucasian people and that the company was not "ready for this right now."  *Id*., at 338 n.19.  A Spanish-surnamed employee testified that when he applied for a line-driver job, he was told: "You're a Chicano, and as far as we know, there isn't a Chicano driver in the system."  *Id*.

the opening was not officially posted or advertised and either (1) the plaintiff had no knowledge of the job from other sources until it was filled or (2) the employer was aware of the plaintiff's interest in the job notwithstanding the plaintiff's failure to make a formal application. *See Gentry v. Georgia-Pacific Corp.,* 250 F.3d 646, 652 (8th Cir.2001). Bennett presents no evidence that either condition is met in this case. The Court finds that Bennett has failed to make out a *prima facie* case of discrimination for failure to promote.

### Involuntary Transfer

Nucor's Batesville plant includes two steel production facilities: NYS1 and NYS2. NYS2 is a newer facility, located approximately 150 yards from NYS1. Bennett claims that he suffered disparate treatment when Nucor reassigned him from NYS2 to NYS1 in March 2003 and did not transfer white employees who were similarly situated to him. *See* docket entry #18, ¶29.

To establish a *prima facie* claim of disparate treatment, Bennett must show that his transfer amounted to adverse employment action under circumstances that give rise to an inference of discrimination. *See Jacob-Mua v. Veneman,* 289 F.3d 517, 521 (8th Cir. 2002). Nucor asserts that Bennett is unable to make this showing because he suffered no adverse employment action, and he has no evidence that his transfer was discriminatory.

 "'[A]n adverse employment action is exhibited by a material employment disadvantage, such as change in salary, benefits, or responsibilities.'" *Id.*(quoting *LaCroix v. Sears, Roebuck & Co.,* 240 F.3d 688, 691 (8th Cir.2001)). It is undisputed that Bennett was classified as a roll guide builder before and after his transfer, and Nucor has come forward with evidence that his earnings actually increased after his transfer. *See* docket entry #130, Ex. 74. However, Bennett

testifies that he had fewer "bonus hours" at NYS1, and the work he performed there was more strenuous than his work at NYS2. *See* docket entry #80, Ex. #76, at 76-77; docket entry #148, Ex. 45, ¶13. Viewing the evidence in a light most favorable to Bennett, the Court finds that a genuine issue of material fact exists as to whether Bennett's transfer amounted to an adverse employment action.

Nucor contends that Bennett cannot show that his transfer occurred under circumstances giving rise to an inference of discrimination because a white employee, Larry Sanders ("Sanders"), was also transferred from NYS2 to NYS1. However, it is undisputed that Sanders requested and was granted a transfer back to NYS2, and Bennett claims that he requested and was denied a similar transfer.[12] The Court finds that Bennett has presented sufficient evidence to create a genuine issue of material fact on the issue of whether his transfer occurred under circumstances giving rise to an inference of discrimination. Accordingly, Bennett's involuntary transfer claim remains.

**Retaliation**

The third amended complaint contains no allegation that Nucor retaliated against Bennett. But Bennett now argues that his second declaration, which he filed in response to Nucor's motion for summary judgment, shows that Nucor retaliated against him for opposing

---

[12]Mike Dugan, the manager of the roll mill department, testified that he transferred Sanders, Bennett, and Clifton Lee from NYS2 to NYS1 in March 2003 in order to provide cross training for NYS1 employees at NYS2. *See* docket entry #80, Ex. #24, at 437. Dugan stated: "We really were concerned about getting some of our [NYS1] employees over to NYS2, and getting them some experience in NYS2." *Id.* Dugan testified that he selected Sanders, Bennett, and Lee for transfer because they "had some experience in [NYS1] and could "step right in and do the job." *Id.* Dugan permitted Sanders to transfer back to NYS2. Dugan explained, "Well, [Sanders] had expressed he wanted to go back to NYS2. [Lee] and [Bennett] had not. Larry was also very good at coming in with different ideas of equipment. And we just felt he would be an employee that would be good to go back to NYS2." *Id*. at 441.

racial discrimination.[13]   Bennett did not mention retaliation in the third amended complaint, and

he  has not requested leave to add a retaliation claim by formal amendment.[14]   Accordingly, no

issues for trial exist with respect to Bennett's unpleaded allegations regarding retaliation.

### *Plaintiff Sylvester Rogers*

Sylvester Rogers began working at the Blytheville plant in 1999 as an inspection bed

inspector in the finishing area of the roll mill department.   Rogers states that from 2000 to 2003,

he applied for several  jobs in various production departments,[15] and Nucor rejected his bids

because of his race.   Rogers also claims that he received disparate treatment in the area of

---

[13]*See* docket entry #147, at 142.   In response to Nucor's motion for summary judgment, each plaintiff  submitted a declaration stating that in early to mid 2002, he "began to participate in meetings and other proceedings with other employees opposing racial discrimination at Nucor's Blytheville . . . and Charleston . . . plants."   Docket entry #148, Ex. #40, ¶11; Ex. #41, ¶30; Ex. #42, ¶32; Ex. #43, ¶4; Ex. #44, ¶3; Ex. #45, ¶4.   Bennett further testifies that when he "began" to oppose the pattern of racial discrimination and harassment at Nucor "in 2002-2003" he was "watched and supervised more closely" and he received a "counseling" on March 13, 2003 for being five minutes late.   Docket entry #148, Ex. #45, ¶ 12.   Additionally, Bennett testifies that his transfer to NYS1 in March 2003 was in retaliation for his opposition to racial discrimination.   *Id*., ¶13.

[14]"Amendments are allowed when the parties have had actual notice of an unpleaded issue and have been given an adequate opportunity to cure any surprise resulting from the change in the pleadings. And, when evidence relating to issues outside the pleadings is introduced and tried without objection, the parties will be deemed to have acquiesced."   *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1063 (8th Cir. 1997)(citing *Nielson v. Armstrong Rubber Co.,* 570 F.2d 272, 275 (8th Cir.1978)).

[15]Rogers claims that he applied and was rejected for the following job openings: shipper/loader, posted February 14, 2000; strandtender, posted February 29, 2000; roll guide builder, posted September 6, 2000; inspection bed tagger, posted September 6, 2000; reheat furnace stoker, posted March 5, 2001; mill/crane operator, posted June 25, 2001; roll mill inspector, posted June 27, 2001; reheat furnace stocker, posted December 28, 2001; piler operator, posted January 17, 2001; inspection bed operator, posted May 31, 2002; repair bed helper, posted January 7, 2003; piler operator, posted January 22, 2003; hot saw operator, posted August 7, 2003, saw operator, posted August 7, 2003; shipping table operator, posted September 25, 2003; and piler operator, posted October 7, 2003.   Docket entry #148, ¶ 6.

training and that Nucor retaliated against him for engaging in activity protected under Title VII. *See* docket entry #18, ¶ 39-42.

### **Failure to Promote**

Nucor asserts that Rogers' failure-to-promote claims must fail for failure to establish the second element of a *prima facie* case: that he possessed the minimum qualifications for promotion.  At the *prima facie* stage, a plaintiff must demonstrate that he met the minimum, objective qualifications for the job at issue.  *Turner v. Honeywell Federal Mfg. & Technologies, LLC*, 336 F.3d 716, 721 (8th Cir. 2003)(citations omitted).

Rogers maintains that his own testimony shows in a "detailed and non-conclusory way" that he was qualified for each position he sought.   In his second declaration, Rogers repeatedly states that his "application and experience . . . made it clear" that he satisfied the qualifications listed on job postings for positions that he sought and that he would not have applied unless he had satisfied the posted job qualifications.  *See* docket entry #148, Ex. 42, ¶¶ 9, 10, 12, 14, 18, 20, 24, 27, 29, 31, 35, 37, 40.  Additionally, Rogers recites qualifications that appeared on job postings, and he states that they are the same or similar to the qualifications required to perform the inspector position he held in the roll mill department.  *Id*.  However, Rogers does not provide a copy of Nucor's job postings, nor does he state that the qualifications listed in his declaration include all qualifications that appeared on actual postings for the positions he sought.  Further, Rogers provides no specific factual evidence showing that the skills required to perform his inspector position were  similar to those required for the positions he sought.

The Court finds Rogers' conclusory testimony--that he possessed the qualifications for positions he sought based on his qualifications for the job he held--insufficient to establish a

*prima facie* case.  *See Rose-Maston v. NME Hospitals, Inc*., 133 F.3d 1104, 1109 (8th

Cir.1998)(conclusory allegations regarding qualifications for position insufficient to establish a

*prima facie* failure-to-promote claim); *see also  Mayer v. Nextel West Corp*., 318 F.3d 803, 809

(8th Cir.2003)("Evidence, not contentions, avoids summary judgment.").

        Nucor argues that even if Rogers could establish a *prima facie* case of discrimination, it

had a legitimate nondiscriminatory reason for rejecting his bids for promotion: a poor

disciplinary record and work history. Nucor presents records from Rogers' personnel file,

documenting nine instances in which Rogers incurred disciplinary action for conduct including

failing to inspect materials, insubordination, leaving work without permission, and threatening

other employees. *See* docket entry #80, Ex. 9. Nucor also presents the affidavits of each

department manager at the Blytheville plant, who testifies that he has the final word on hiring

decisions in his department, and he considers an applicant's  disciplinary and safety records in

making hiring decisions.  *See* docket entry #80, Ex. #1, ¶15; Ex. #2, ¶ 14; Ex. #3, ¶ 26; Ex. #22,

¶ 32; Ex. #23, ¶ 29.

        Rogers argues that Nucor has failed to carry its burden to articulate a nondiscriminatory

reason for rejecting his bids for promotion, and the Court agrees.  To meet its burden of

production, Nucor must "clearly set forth, through the introduction of admissible evidence, the

reason for the plaintiff's rejection."  *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248,

254-55 (1981).  Nucor presents no specific evidence showing that a decisionmaker rejected

Rogers' bids for promotion based on his poor disciplinary record and work history, and the Court

declines to indulge in speculation.  However, for reasons previously stated, the Court finds that

Rogers has failed to make out a *prima facie* case of discrimination based on a failure to promote.

22

**Failure to Train**

Rogers alleges in the third amended complaint that Nucor has denied him training opportunities available to similarly situated white employees.  Although Nucor seeks summary judgment on each claim joined in this case, it makes no mention of Rogers' claim that he received disparate treatment in the area of training.  Accordingly, Nucor has failed to establish its right to summary judgment on this claim, and it remains.  *See Heisler v. Metropolitan Council*, 339 F.3d 622, 631 ("We have repeatedly held that in the Eighth Circuit, a district court commits reversible error when it grants summary judgment on an issue not raised or discussed by the parties.").

**Retaliation**

Rogers alleges that Nucor retaliated against him for filing a discrimination charge against Nucor in 2003.  Nucor does not address Rogers' retaliation claim in its initial brief in support of summary judgment.  However, in its reply brief, Nucor states  that Rogers cannot pursue his retaliation claim in this case because he has filed a separate action against Nucor for retaliation.

On June 28, 2005, Rogers initiated a separate lawsuit, *Rogers v. Nucor*, 4:05CV933 JLH, in which he alleges that Nucor retaliated against him by demoting him for his participation in this case.  *See* 4:05CV933 JLH, docket entry #1.   In this case, however, Rogers claims that Nucor retaliated against him by subjecting him to intense scrutiny and harassment for filing a discrimination charge in 2003.  *See* docket entry #18, ¶41.  Rogers is not precluded from pursuing these distinct claims in separate proceedings.  The Court finds that Nucor has failed to demonstrate the absence of a genuine issue of material fact with respect to Rogers' retaliation claim.  Accordingly, the claim remains for trial.

23

### *Plaintiff Rodney Washington*

Rodney Washington worked at the Blytheville plant from June 1993 until his discharge.[16] Washington brings claims for failure to promote, failure to train, and discriminatory and retaliatory termination.  *See* docket entry #18, ¶¶ 31-34.

### **Failure to Promote**

In July 2002, Washington applied for a promotion to a lubricator position in the maintenance department.   Washington testifies that the job posting stated that applicants' qualifications would be determined by written test scores,  he took the required test, and the test administrator told him that he had the "highest test scores of all the applicants."   Docket entry #148, Ex. #40, ¶ 15.  Washington states that despite his superior test scores, Nucor awarded the job to a white applicant, Michael Smith.

Nucor argues that Washington has failed to show that he was qualified for any position to which he sought promotion.  However, Nucor does not dispute that minimum qualifications for the lubricator position were determined by test scores and that Washington earned a higher score than other applicants.  The Court finds that Washington has offered sufficient evidence to create a genuine issue of fact as to whether he met the minimum, objective qualifications for the lubricator position and whether his qualifications were similar to those of Michael Smith. Accordingly, Washington has established a *prima facie* case of discrimination with respect to Nucor's failure to promote him to the lubricator position posted in July 2002.

Nucor has presented evidence that it rejected Washington for the lubricator position for legitimate, nondiscriminatory reasons.  Rick Ramsdell, the maintenance department manager,

_____

[16]The Court is unable to determine from the record the date of Washington's discharge.

made the final decision to hire Smith.[17]    Ramsdell states that he personally interviewed

Washington for the lubricator position, and during the interview, Washington told him that his

goal was to own his own business in five years and leave Nucor.[18]    Ramsdell testifies:

"[T]hose goals don't align with out departmental goals . . . because there is a lot of time [and]

money invested in training an individual to move into that department . . . ."   Docket entry #80,

Ex. #37, at 201-202.  Ramsdell further testifies that Smith showed a great deal of interest in the

lubricator position and, unlike Washington, made an effort to become familiar with the job

through cross-training.  *Id*. at 198-201.

        Because Nucor, through Ramsdell's testimony, has articulated legitimate,

nondiscriminatory reasons for rejecting Washington's bid, Washington must present evidence

showing that the proffered reasons are pretext for discrimination.  Washington states that he has

testified "that he never said [that his five year goal was to be self-employed], [and] he made clear

in his interview that if he obtained the job . . . he would remain with Nucor permanently . . . ."

Docket entry #146, at 44-45.   The Court has searched the record and is unable to locate such

testimony.   Additionally, Washington testified by deposition that he "may have" stated during

his interview with Ramsdell that his long-term goal was to run his own business.  *See* docket

_____

        [17]Ramsdell testifies that the written test administered to applicants is only the first step in
the hiring process, and that applicants who pass the test are scheduled for an interview with a
panel of maintenance department supervisor.  Docket entry #80, Ex. 2, ¶¶ 13, 14.  After the panel
has completed the interviews, it  submits a summary of test scores and interview evaluations to
Ramsdell.  *Id*., ¶ 14. Ramsdell then interviews the best candidates, and makes the final hiring
decision. *Id*.

        [18]*See* docket entry #80, Ex. #37, at 201. In addition to Ramsdell's deposition testimony,
Nucor has produced Ramsdell's interview notes, dated November 15, 2002, which state in part,
"wants schedule-family-has own business-would like to go to school-5 yr goal have own
business." Docket entry #80, Ex. #21.

entry #80, Ex. #11, at 115.

Washington also presents the testimony of Danny Lee, one of the maintenance supervisors who interviewed applicants for the lubricator position.  Lee states that Washington was the best candidate for the position and that Smith did not perform as well as Washington during supervisor panel interviews.  Docket entry #148, Ex. 46, ¶¶ 2-6.  However, Ramsdell does not contend that Smith out-performed Washington in his initial interview with supervisors.  He only states his determination that Washington's goals were not aligned with Nucor's.  The Court finds that Washington has failed to raise a genuine issue for trial as to whether Ramsdell's stated reasons for rejecting his bid are pretext for racial discrimination.

In addition to the lubricator position opening in July 2002, Washington testifies that he submitted bids and was rejected for promotion to the following non-supervisory jobs: mill operator, posted May 29, 2001; leadman, posted February 3, 2003; rotary straightener, posted March 18, 2003; roll turner, posted September 16, 2003; and leadman, posted September 12, 2003.  Washington states that Nucor selected white applicants to fill these positions.  Additionally, Washington testifies that he was interested in supervisory jobs which were never posted and always awarded to white employees.

Nucor asserts that Washington has failed to present evidence that he was qualified for any position to which he sought promotion.  Washington attempts to establish his qualifications with his own testimony that Nucor's job postings for the jobs he sought and the jobs that he applied for (or would have applied for) required the "same or similar knowledges (sic), skills and abilities as those required for the jobs he performed at Nucor."  *See* docket entry #40, ¶¶ 6, 12, 14, 19, 21.  He states, "I exhibited and satisfied the same [qualifications] in my own existing job

that were posted for the jobs that I applied for, and I wouldn't have applied if I had not met the qualifications." *Id.*, ¶ 14.   The Court finds Washington's conclusory testimony insufficient to show that he possessed the minimum qualifications for the positions he sought.   Accordingly, no issues for trial exist with respect to Washington's failure-to-promote claims.

### Failure to Train

In the third amended complaint, Washington alleges that Nucor failed to provide him "training available to similarly situated white employees."  Docket entry #18, ¶ 31.  Nucor does not address Washington's claim regarding disparate treatment in the area of training. Accordingly, this claim remains.

### Discriminatory Discharge

Washington claims that Nucor terminated his employment because of his race.  He testifies: "[On] September 26, 2003 . . . Doug Stacy began to boss me around and treat me like a boy in the same way Despain had done, telling me that I would have to run the job he had been assigned . . . because it was harder than my regular job, and he would take over my job . . . ." Docket entry #148, Ex. #40, ¶ 29.  Washington testifies that because Stacy was his coworker, not a supervisor, he politely refused to follow his orders.  According to Washington, a supervisor named Glen Ellis ("Ellis") barged into his work cubicle and "started saying that Stacy was in the right."  Washington states:

> When I told Ellis that Stacy had treated me like a boy because I was black, he
> became even more upset and accusatory . . . but he never said I had done anything
> wrong except for not submitting to Stacy when he told me to give him my job.  Ellis'
> attitude and statements were so belittling that I turned away from him and hit the
> window of the door to my cubicle and fell to the floor crying in total frustration.  The
> whole incident seemed orchestrated to bait and entrap me.  It is well known that I
> objected to white co-workers, like Despain and Stacy, presuming authority over me
> that they didn't have over white employees.

*Id*.

Nucor asserts that it discharged Washington based on workplace violence and destruction of company property.  It is undisputed that Washington hit and broke a window when Ellis confronted him.  Washington states that he did not strike Ellis, he only broke a window, and that white employees have not been discharged when they actually hit or struck other employees. According to Washington, two white employees, Joe Wood and Michael Walker, "were just suspended and told to attend anger management classes for grabbing, striking and cursing at one another."  Docket entry #148, Ex. #40, ¶ 31.

Because Nucor has articulated legitimate, nondiscriminatory reasons for its adverse employment decision, Washington bears the burden to show that the proffered reasons are pretextual and that discrimination based on race was the real reason for his termination. Although instances of disparate treatment can support a claim of pretext, to be probative evidence of pretext, the misconduct of a more leniently disciplined employee must be of comparable seriousness.  *See E.E.O.C. v. Kohler Co.* 335 F.3d 766, 775 -776 (8th Cir. 2003)(citations omitted). Here, Washington has failed to come forward with evidence that a white employee committed the same or similar misconduct as he; physical altercations between coworkers is not comparable to breaking company property in response to a supervisor's reprimand.  The Court finds no issues for trial on Washington's wrongful termination claim.

### Retaliatory Discharge

Washington claims that Nucor terminated his employment in retaliation for his opposition to racial discrimination.  *See* docket entry #18, ¶ 33.  Just as  Washington has failed to show that Nucor's articulated reason for his termination is pretext for discrimination, he has

failed to show that the articulated reason is pretext for retaliation.  Accordingly, no issues for trial exist on Washington's retaliatory termination claim. *See Putman v. Unity Health System* 348 F.3d 732, 737 (8th Cir. 2003)(affirming dismissal of retaliatory termination claim when plaintiff failed to show that employer's nondiscriminatory reason for the termination was pretextual).

### *Plaintiff Clifton Lee*

Clifton Lee began working for Nucor in 1991 as a roll guide builder.   He brings disparate treatment claims for failure to promote, failure to train, and involuntary transfer.  Lee also claims that Nucor retaliated against him by transferring him from NYS2 to NYS1.  *See* docket entry #18, ¶¶ 35-37.

#### Exhaustion of Administrative Remedies

Nucor asserts that Lee's claims brought under Title VII are time-barred because he failed to file suit within 90 days of receiving a right-to-sue letter.  In most cases, to exhaust Title VII's administrative remedies, an individual must timely file a charge of discrimination and receive a right-to-sue notice from the Equal Employment Opportunity Commission ("EEOC").  *See* 42 U.S.C. § 2000e-5(b), (c), (e).  Once an employee receives a right-to-sue letter, he has 90 days in which to file suit, and the failure to do so bars a claim based upon acts asserted in the underlying discrimination charge.  *See Spears v. Missouri Dept. of Corrections and Human Resources*, 210 F.3d 850, 852 (8th Cir., 2000).

Nucor provides a copy of a right-to-sue letter issued to Lee, dated July 1, 2003.  Plaintiffs filed this suit on December 8, 2003, and filed an amended complaint on March 22, 2004, adding plaintiffs Lee, Green, and McBride.  Nucor argues that because Lee failed to join this proceeding within 90 days of receiving his right-to-sue letter issued on July 1, 2003, his claims are time-

barred.  Lee responds that he received a separate right-to-sue letter on April 28, 2004 and he timely joined the lawsuit within 90 days.

The Court has no information regarding the content of Lee's administrative charges associated with Lee's July 1, 2003 and April 28, 2004 right-to-sue letters and, therefore, cannot determine whether Lee brought suit within 90 days of receiving a right-to-sue letter related to a discrimination charge that encompasses the claims he pursues in this lawsuit.[19]   Accordingly, issues of fact preclude summary judgment on the basis that Lee's Title VII claims are time-barred.

### Failure to Promote

Lee alleges that he  submitted bids for a rotary straightener position and a cold saw operator position in March 2003, and both jobs were awarded to white employees.  Nucor contends that Lee's failure-to-promote claims must fail for a single reason: Nucor never rejected his bids for a promotion.[20]   Nucor presents the affidavit of Keith Shelton, who worked for Nucor as a lead supervisor in the roll mill department between 2000 and 2005.  Shelton testifies that Lee bid on the cold saw operator position in 2003, but he withdrew his bid before a selection decision was made.  *See* docket entry #130, Ex. #83.

Nucor claims that Lee also withdrew his bid for the rotary straightener position.  By affidavit, roll mill supervisor Glenn Ellis testifies that he interviewed Lee for the rotary

---

[19]"If the EEOC gives the individual a right-to-sue letter following the EEOC investigation, the charge limits the scope of the subsequent civil action because 'the plaintiff may [only] seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge.'" *Cottrill v. MFA, Inc.,* 443 F.3d 629, 634 (8th Cir.2006)(citation omitted).

[20]Nucor *does not* argue that Lee is unable to show that he was qualified for a promotion.

straightener position in 2003, and Lee "declined to complete the written exam required for the position."  Docket entry #84, Ex. #84.  Ellis states, "After Mr. Lee elected not to take the written exam, he verbally withdrew himself from consideration for the position."  *Id*.

In his second declaration, Lee denies that he withdrew his bids for the cold saw operator and rotary straightener positions and states that he "went through the entire selection process." Docket entry #148, ¶¶ 7, 10.  The Court finds that Lee has presented admissible evidence to rebut  testimony that  he withdrew his bids for promotion.  *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-51 (noting that a court is precluded from making credibility determinations and weighing evidence when deciding motions for summary judgment). Accordingly, the Court finds genuine issues for trial with respect to Lee's claims that Nucor rejected his bids for a rotary straighter and cold saw operator.

**Failure to Train**

Lee alleges that Nucor failed to provide him training available to similarly-situated white employees.  Nucor does not address this claim, and it remains for trial.

**Involuntary Transfer to NYS 1**

Lee alleges that in March 2003 Nucor transferred him from a second crew leader position in NYS2 to a roll shop employee position in NYS1.  Docket entry #18, ¶ 37.  Lee alleges that the transfer amounted to a demotion and that less senior white employees were not transferred.  *Id*.

Nucor asserts that Lee cannot show that his transfer amounted to an adverse employment action because he earned more money after his transfer, and he retained the same job duties. However, like Bennett, Lee testifies that he earned fewer bonus hours at NYS1, and his work at NYS1 was more physically demanding than work he performed at NYS2.  He states that the

31

strenuous labor exacerbated a pre-existing medical condition to the point that he was forced take

long-term disability.  The Court finds that genuine issues of fact exist as to whether Lee's

transfer amounted to adverse employment action.

Nucor argues that Lee is unable to show that his transfer occurred under circumstances

that give rise to an inference of discrimination because it also transferred Larry Sanders, a white

employee, from NYS2 to NYS1.  For reasons previously stated in connection with Bennett's

involuntary transfer claim, the Court finds that Lee has come forward with evidence to support a

finding that his transfer occurred under circumstances giving rise to an inference of

discrimination.  Accordingly, Lee's involuntary transfer claim remains.

**Retaliation**

Lee claims that Nucor transferred him to NYS1 in retaliation for participating in activity

protected under Title VII.  Nucor does not address this claim, and it remains for trial.

### *Plaintiff Ozzie Green*

Ozzie Green worked at the Blytheville plant from September 1992 until March 2004.[21]

Green brings disparate treatment claims for failure to promote and failure to train.  *See* docket

entry #18, ¶¶43-44.  Although Green does not allege in the third amended complaint that Nucor

retaliated against him for opposing racial discrimination, he makes such allegations in his second

declaration.  *See* docket entry #148, Ex. 41, ¶¶ 30-32.

**Exhaustion of Administrative Remedies**

Nucor moves for dismissal of Green's and McBride's Title VII claims on the ground that

---

[21]In his second declaration, Green states that he left Nucor in March 2004 when "it
became obvious" that his race and participation in EEOC proceedings left him with no chance of
promotion.  Docket entry #148, Ex. #43, ¶ 16.

these plaintiffs failed to exhaust their administrative remedies.  Title VII requires claimants to

timely file a discrimination charge with the EEOC before bringing suit in federal court, *see*

*Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir.2006), and it is undisputed that neither Green

nor McBride filed a discrimination charge.  However, Green and McBride assert that they "have

the right to rely on the other EEOC charges filed against Nucor by other plaintiffs alleging

similar racial discrimination on behalf of themselves and other black employees like Rogers,

Washington, Bennett, and the original plaintiffs who filed this case from South Carolina."

Docket entry #147, at 139.

Under the single filing rule, "once a single plaintiff has filed an EEOC charge, other non-

filing plaintiffs may join in the action if they allege facts showing that they were similarly

situated and that their claims arose out of similar discriminatory treatment."  *See Winbush v.*

*State of Iowa By Glenwood State Hosp.*, 66 F.3d 1471, 1478 (8th Cir. 1995)(citation omitted).

When these requisite conditions exist, no conciliatory purpose would be served by requiring

separate administrative charges.  *See id*.

Nucor argues that Green and McBride do not have the benefit of the single filing rule

because the Court denied class certification in this case.  However, class certification is not a

prerequisite to application of the single filing rule.   The failure to exhaust administrative

remedies is an affirmative defense that Nucor must prove, *see Miles v. Bellfontaine Habilitation*

*Center*,  481 F.3d 1106, 1107 (8th Cir. 2007), and Nucor has failed to establish that Green and

McBride are not entitled to application of the single filing rule.  Furthermore, in addition to their

claims under Title VII, Green and McBride seek relief under  42 U.S.C. § 1981, which does not

require exhaustion of administrative remedies.

33

### Failure to Promote

Green claims that he applied for and was denied a promotion to two inspection bed operator positions posted on August 22, 2001, a leadman position posted on January 22, 2003, and a roll guide builder position posted on December 11, 2003.   He claims that he was qualified for promotion to these positions and that Nucor rejected his applications in favor of white applicants.  Green also claims that he was interested in and qualified for promotion to supervisory jobs that were not posted and were awarded to white employees.

Nucor asserts that Green's failure-to-promote claims must be dismissed because he has failed to come forward with evidence showing that he possessed the minimum qualifications for any job to which he sought promotion.  Green contends that his second declaration submitted in opposition to summary judgment states his qualifications for the jobs in great detail "based on each discrete knowledge, skill, or ability that Nucor listed on the job postings for such jobs." Docket entry #146, at 56.

The Court has reviewed Green's second declaration and finds that his testimony fails to establish his qualification for any job to which he sought promotion, or any supervisory position that he claims to have had an interest.  In his declaration, Green states his opinion that his "application and experience" made it clear that he satisfied the qualifications listed on Nucor's job postings.  He declares that the jobs he performed at Nucor and elsewhere required the same skills and abilities as those required for the jobs to which he sought promotion, but he provides no specific factual evidence to support this assertion.

### Retaliation

Green makes no allegations regarding retaliation in the third amended complaint.

However, he argues that his second declaration, submitted in response to Nucor's motion for summary judgment, shows that Nucor retaliated against him for opposing racial discrimination. Green failed to plead a retaliation claim, and he has not requested leave to add such a claim by formal amendment.  Accordingly, no issues for trial exist with respect to Green's unpleaded retaliation allegations.

### Failure to Train

Green alleges in the third amended complaint that Nucor discriminated against him by denying him training available to similarly situated white employees.  *See* docket entry #18, ¶ 43.  Nucor does not address this claim, and it remains for trial.

### *Plaintiff Larry McBride*

Larry McBride, a current Nucor employee, brings disparate treatment claims for failure to promote and failure to train.  *See* docket entry #18, ¶¶ 46-48.  Although McBride does not allege in the third amended complaint that Nucor retaliated against him for opposing racial discrimination, he makes such allegations in his second declaration.  *See* docket entry #148, Ex. 41, ¶¶ 30-32.

### Failure to Promote

Nucor moves for summary judgment on McBride's failure-to-promote claims on the ground that he has failed to establish his qualifications for a particular position.[22]  McBride

---

[22]McBride states, correctly, that Nucor's initial brief in support of summary judgment makes specific reference to only one of his bids for promotion–his bid for a cold saw operator position.  However, Nucor provided sufficient notice that it seeks summary judgment on each of McBride's failure-to-promote claims on the ground that he failed to establish his qualifications for promotion to any position.  Nucor argues that McBride "has failed to identify any evidence to support a *prima facie* case of discrimination, [and] the Court should grant summary judgment on all his claims."  Docket entry #129, at 43.  Nucor also argues that conclusory assertions are insufficient to establish McBride's qualifications for a particular position.  *Id.*  Furthermore,

attempts to make this showing in the same manner as his co-plaintiffs, by offering self-serving testimony that he possessed the qualifications for promotion to the positions he sought.  The Court finds that McBride's conclusory testimony fails to show that he possessed the minimum objective qualifications required for the positions to which he sought promotion.

### **Failure to Train**

McBride claims that Nucor has subjected him to disparate treatment in the area of cross-training. Specifically, he alleges that in order to receive cross training for another position, he is required to train on his days off, but he has observed white employees training during normal working hours.  *See* docket entry #18, ¶ 46.  Nucor asserts that McBride has failed to present evidence that he received disparate treatment in the area of cross-training.

Nucor's written policy for compensated training states that an employee's department manager must approve all compensated training in advance, and all compensated training should be scheduled during the employee's own time whenever possible.   Docket entry #71, Ex. 24. The policy for cross training further states:

> Consideration will be given to individuals who have a positive work record, including but not limited to the following items: current job performance, work experience, prior training, and attendance and safety record.  Consideration will also be given to your potential

Docket entry #71, Ex. 24.

In order to prove intentional discrimination based on disparate treatment, McBride must show that white employees who received favorable treatment were similarly situated to him.  *See Philip v. Ford Motor Co.* 413 F.3d 766, 768 (8th Cir. 2005)(concluding that plaintiff failed to establish a *prima facie* case of racial discrimination because he did not prove that employees

---

McBride has addressed his qualifications for each position to which he sought a promotion.

similarly situated to him were treated differently).  Even assuming that Nucor has permitted

white employees to receive cross-training during their regular shifts and denied McBride the

same opportunity, McBride presents no evidence that he and white employees who received

cross training during their regular shifts were similarly situated in terms of work records and

other considerations that affect whether approval for cross training is granted.  Accordingly, the

Court agrees that no genuine issues for trial exist on this claim.

### Retaliation

Like Plaintiffs Bennett and Green, McBride failed to assert a retaliation claim in the

complaint, but he presents a declaration in response to Nucor's summary judgment motion

alleging that Nucor retaliated against him for opposing racial discrimination.   McBride has no

claim for relief based on unpleaded allegations.

### III.  Conclusion

For the reasons stated, Nucor's motion to strike (docket entry #150) is DENIED, and

Nucor's motion for summary judgment (docket entry #127) is GRANTED IN PART AND

DENIED IN PART as stated in this order.  The following claims remain for trial: (1) Plaintiffs'

hostile environment claims, (2) Plaintiff Bennett's involuntary transfer claim, (3) Plaintiff

Rogers' failure-to-train and retaliation claims, (4) Plaintiff Washington's failure-to-train claim,

(5) Plaintiff Lee's failure-to-promote, failure-to-train, involuntary transfer, and retaliation

claims, and (6) Plaintiff Green's failure-to-train claim.   A trial date will be set by separate order.

IT IS SO ORDERED THIS 13TH  DAY OF AUGUST, 2007.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE